EXHIBIT 2

1

2          IN THE UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF INDIANA

4                INDIANAPOLIS DIVISION

5          CAUSE NO. 1:21-cv-03027-RLY-MJD

6    ----------------------------------X

7    RYAN BENNETT,

8          Plaintiff,

9             -v-

10   THUNDERDOME RESTAURANTS, LLC,

11         Defendant.

12   ----------------------------------X

13

14       Deposition of RYAN BENNETT, Volume I

15            via Zoom Videoconferencing

16              Thursday, June 30, 2022

17

18

19

20   Reported by:  Adam D. Miller, RPR

21

22

23

24

25   Job no. 213160

Page 2

```
1
2
3
4
5          June 30, 2022
6          9:40 a.m.
7
8
9
10     The Deposition of RYAN BENNETT,
11  Volume I, held via Zoom
12  Videoconferencing, pursuant to Notice,
13  the proceedings being recorded
14  stenographically by ADAM D. MILLER,
15  Notary Public and Registered
16  Professional Reporter.
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   APPEARANCES:
3   On Behalf of Plaintiff:
4          MARK R. WATERFILL,
5          ATTORNEY AT LAW
6          2230 Stafford Road
7          Plainfield, Indiana 46168
8          BY:  MARK WATERFILL, ESQ.
9
10
11
12
13  On Behalf of Defendant:
14          TAFT STETTINIUS & HOLLISTER
15          425 Walnut Street
16          Cincinnati, Ohio 45202
17          BY:  SARAH LEYSHOCK, ESQ.
18
19
20
21  ALSO PRESENT:
22          KIER MUCHNICKI
23
24
25
```

Page 4

```
                        BENNETT
1
2          RYAN BENNETT, having first been
3      duly sworn according to law, was
4      examined and testified as follows:
5                  - - - - -
6   BY ATTORNEY LEYSHOCK:
7      Q.   Good morning, Mr. Bennett.  My
8   name is Sarah Leshock.  I'm an attorney with
9   Taft Law.  I represent Thunderdome
10  Restaurants, LLC, in the matter that you
11  have brought against them relating to your
12  former employment.
13          When we began, I'm going to give
14  you an opportunity to introduce yourself,
15  identify yourself, and then we'll go
16  over some ground rules.  And then we'll get
17  into asking you some substantive questions.
18          Does that sound okay?
19      A.   That's fine.
20      Q.   And you can hear me all right?
21      A.   Yes.
22      Q.   Okay.  You'll see that there's a
23  court reporter here taking down everything
24  that I say and that you say; so it's
25  important that we speak slowly and clearly
```

Page 5

```
                        BENNETT
1
2   and that we use yes and no rather than
3   nodding our head or body gestures.
4          Do you understand that?
5      A.   Understood.
6      Q.   All right.
7          (Discussion held off the record.)
8   BY ATTORNEY LEYSHOCK:
9      Q.   Mr. Bennett, can you please state
10  and spell your name for the record?
11      A.   Wesley Ryan Bennett, W-E-S-L-E-Y,
12  R-Y-A-N, B-E-N-N-E-T-T.
13      Q.   Have you ever been deposed
14  before?
15      A.   No.
16      Q.   All right.  So let's talk about
17  what we're doing here today.  As I said a
18  moment ago, this is your deposition in a
19  lawsuit that you filed in court against
20  Thunderdome Restaurants, LLC.  You have not
21  had your deposition taken before, so I want
22  to tell you a little bit about this process.
23          In order for the court reporter
24  to record everything that we say, it's
25  important that you respond verbally, as I
```

BENNETT

1
2  said it was.
3      Q.  Okay.  Thank you.
4          ATTORNEY WATERFILL:  I have
5      emailed that to everyone.  Hopefully
6      you have it.
7  BY ATTORNEY LEYSHOCK:
8      Q.  Mr. Bennett, did any of the
9  charges or convictions on the document cause
10  you to be terminated from your employment at
11  any time?
12     A.  No.
13     Q.  Okay.  Have these charges ever
14  stopped you from being hired, that you're
15  aware of?
16     A.  No.
17     Q.  What about any of the
18  convictions; did they prevent you from being
19  hired, that you're aware of?
20     A.  I don't know.
21     Q.  I'm sorry.  What was your answer?
22     A.  I do not know.
23     Q.  Okay.  Just prior to working for
24  Thunderdome, where did you work?
25     A.  Taxman Brewing Company.

BENNETT

1
2      Q.  And did you --
3      A.  Or -- prior to Thunderdome?
4      Q.  Uh-huh.  The -- yeah, the last
5  place of employment before going to
6  Thunderdome, where was that?
7      A.  That was at my barbecue
8  restaurant in Plainfield, Dickey's.
9      Q.  What's the address of the
10  restaurant?
11     A.  I don't remember anymore.  It's
12  been several years.
13     Q.  Is it still operating?
14     A.  It was on West Main Street.
15     Q.  Is it still operating?
16     A.  No.
17     Q.  And you said that was your
18  restaurant.  Did you own it?
19     A.  Yes.
20     Q.  Tell me about your ownership.
21     A.  I was a part-owner.
22     Q.  Who was the other owner?
23     A.  Teresa Ford.  She's passed away.
24     Q.  And what is your relationship
25  with or what was your relationship to

BENNETT

1
2  Ms. Ford?
3      A.  Went to church together.
4      Q.  How long did you know her?
5      A.  For about a year and a half.
6      Q.  And how was it that the two of
7  you decided to go into business together?
8      A.  Her husband knew who I was.  And
9  we went to church together.  She had a
10  restaurant that was available and needed an
11  owner/operator.
12         So I was currently employed with
13  Kilroy's Restaurant Group.  And from there I
14  decided that I would just go with something
15  that was closer to home instead of being in
16  Bloomington.
17     Q.  And was that restaurant organized
18  as a LLC?  Was it a partnership?
19     A.  S Corp. LLC.
20     Q.  And what was your ownership
21  interest, the percentage?
22     A.  20 percent.
23     Q.  And it sounds like you also
24  worked there in addition to owning it?
25     A.  Yeah.  It's part of the sweat

BENNETT

1
2  equity.
3      Q.  Did you work full-time or
4  part-time?
5      A.  Full-time.
6      Q.  And what was your salary?
7      A.  50,000 a year.
8      Q.  If your discovery said that your
9  salary there was 55,000, is that correct or
10  are you correct today?
11     A.  It could be 55,000.  I don't
12  exactly remember how much it was.
13     Q.  Do you have any documents that
14  would help you determine how much your
15  salary was then?
16     A.  Not on me.
17     Q.  Did you look at those documents
18  when you were preparing your responses to
19  discovery?
20     A.  Yes.
21     Q.  Okay.  So is $55,000 correct
22  because that's what's in your discovery, or
23  is 50,000 correct today?
24     A.  55.
25     Q.  Okay.  How long did you work at

Page 30

BENNETT

1
2  Dickey's?
3      A.   We were partnered together for 14
4  months.
5      Q.   And why did you leave that
6  position?
7      A.   I didn't agree with the -- my
8  partner.
9      Q.   On what?
10     A.   On several things.  And we
11 just -- we parted ways.
12     Q.   What was the nature of the issue
13 that caused the disagreement?
14     A.   Her being more of a nursing
15 background.  She didn't really know how to
16 run a restaurant correctly.  And she didn't
17 understand that we needed to pay people a
18 little bit more so that we could get
19 better-quality people versus paying people
20 less to do a job that nobody really wanted
21 to do anyway.
22          So that was just one of the major
23 ones.  I was losing good people to
24 surrounding competitors because the
25 competitors were paying better.  But with

Page 31

BENNETT

1
2  her nursing background, she's used to
3  working with different types of budgets.
4  And she didn't quite understand the
5  difference of restaurant budgets and
6  hospital budgets.  It was more about the
7  equipment than the employee.
8      Q.   Any other disagreement that you
9  had with her?
10     A.   I just gave you one:  It was more
11 about the equipment than the employee.
12     Q.   Are those all the disagreements
13 that led to you leaving the position?
14     A.   I'm sure it's not.
15     Q.   Did you leave voluntarily or
16 involuntarily?
17     A.   Voluntarily.
18     Q.   And did she continue to operate
19 the restaurant after you left?
20     A.   She tried.
21     Q.   For how long?
22     A.   Six months.
23     Q.   And when she was operating the
24 restaurant, were you still an owner?
25     A.   Yes.

Page 32

BENNETT

1
2      Q.   And at the end of that six
3  months, what happened?
4      A.   She closed the restaurant, said
5  there was nothing for me to get out of it.
6      Q.   Okay.  Did you dissolve the LLC?
7      A.   Didn't get a chance to.  She
8  passed away unexpectedly.
9      Q.   Okay.
10     A.   Car crashed -- or Jeep crashed
11 out on Florida Keys.
12     Q.   What did you do after you stopped
13 working with Ms. Ford at Dickey's Barbecue
14 Pit?
15     A.   I was immediately employed by
16 Thunderdome.  I had secured the job before I
17 left.
18     Q.   Why did you apply at Thunderdome?
19     A.   The reputation at the time.
20     Q.   What was the reputation?
21     A.   That it was great food.
22     Q.   And did you apply for a specific
23 job?
24     A.   Kitchen manager.  Kitchen manager
25 for their new restaurant that they were

Page 33

BENNETT

1
2  going to be starting, Krueger's, what I had
3  initially applied for.
4      Q.   And is that the job that you were
5  hired into?
6      A.   No.
7      Q.   What was the job you were hired
8  into?
9      A.   Assistant KM at Bakersfield on
10 Mass Ave.
11     Q.   And assistant KM, you mean that's
12 assistant kitchen manager?
13     A.   Correct.
14     Q.   Okay.  Before working for
15 Thunderdome, had you ever been fired from a
16 place of employment?
17     A.   I'm sorry?  What did you say?
18     Q.   Before working at Thunderdome or
19 working for Thunderdome, had you ever been
20 fired from a place of employment?
21     A.   Yeah.
22     Q.   How many times?
23     A.   I was 15, one time.  Ritter's
24 Frozen Custard.  I think it was like 2002;
25 20 years ago.

Page 34

BENNETT

1
2      Q.    And did you say you were age
3  15 --
4      A.    Yes.
5      Q.    -- or it was 2015?
6      A.    I was age 15.
7      Q.    And what was the name of the
8  employer?
9      A.    It was my first job, Ritter's
10  Frozen Custard.
11      Q.    And where was that located?
12      A.    I'm sorry.  You're cutting...
13      Q.    Where was that place of
14  employment?
15      A.    Plainfield, Indiana.
16      Q.    And what was the reason for the
17  termination?
18          Mr. Bennett, what was the reason
19  for the termination?
20      A.    Oh, I don't remember.  It was 20
21  years ago.
22      Q.    Okay.  Were you terminated from
23  any other positions?
24      A.    No.
25      Q.    Okay.  Prior to being employed

Page 35

BENNETT

1
2  for Thunderdome, did you ever experience a
3  workplace injury?
4      A.    Sure.  I've gotten cuts on my
5  finger, burns.  I've got all kinds of
6  injuries at work.
7      Q.    Were any of those injuries the
8  subject of a workers' compensation claim?
9      A.    No.
10      Q.    At the time that you went to work
11  for Thunderdome, were you experiencing any
12  health issues arising from a previous
13  workplace injury?
14      A.    Not that I can remember.
15      Q.    Did you have any preexisting
16  health issues that impeded your ability to
17  do your job at Thunderdome at the time that
18  you started?
19      A.    Diabetes.
20      Q.    And how did that affect your
21  ability to do your job there?
22      A.    Well, I had my, my pills stolen
23  out of the office one time, so I started
24  keeping them in my car.  So I'd have to
25  routinely go out to my car to take my

Page 36

BENNETT

1
2  medicine for my diabetes.  And that seemed
3  to be a source of ill-content with some of
4  the management because they didn't feel like
5  I should be keeping it out there.
6          But, you know, when it's a
7  life-or-death thing and somebody steals your
8  pills, it's not a very good thing for you.
9  So...
10      Q.    How often do you take your
11  diabetes pills?
12      A.    Daily.
13      Q.    Do you take them once a day?
14  twice a day?
15      A.    Twice.  And then it depends on
16  what my blood sugar is throughout the day if
17  I need to take another.
18      Q.    What time do you normally take
19  those pills?
20      A.    Morning and night.
21      Q.    Is that like 6:00 a.m./6:00 p.m.?
22      A.    No.  It's usually about 7:00 and
23  7:00.
24      Q.    Okay.  And is that when you took
25  your pills when you were working for

Page 37

BENNETT

1
2  Thunderdome?
3      A.    Yes.
4      Q.    And you take them on a routine
5  basis every day?
6      A.    Every day.
7      Q.    Do you ever take them at
8  different times, or is it a strict
9  time-sensitive administration?
10      A.    It's usually around that general
11  time.  But I'm sure the times have changed a
12  few times.  But usually around that general
13  time.
14      Q.    So sometime around 7:00 p.m. is
15  when you take your pills?
16      A.    Yeah.
17      Q.    Okay.  What would happen if you
18  took it, you know, 30 minutes earlier or 30
19  minutes later?
20      A.    I don't know.
21      Q.    Okay.
22      A.    I'm sure probably the same thing.
23      Q.    Okay.  So it would be just as
24  effective?
25      A.    I'm sure it would be.  But

BENNETT

1  usually you want to keep about a twelve-hour
2  difference.  That's what it says on the
3  bottle, at least.  And as long as I don't
4  need it throughout the day.  Hopefully, I'm
5  maintaining my diet and not drinking a
6  sugary drink.  But if I did, then I might
7  need to take one.
8       Q.    So are these pills prescribed to
9  be taken as needed or as an established
10 regimen, every time same time?
11      A.    Established regimen.
12      Q.    And do you take the first pill in
13 the morning every time at the same time each
14 day?
15      A.    Yeah.
16      Q.    And do you take it when you wake
17 up or when you eat breakfast?  What's the
18 impetus for taking your first pill?
19      A.    I take my girlfriend's mother to
20 work.  She's without a car.  So I just take
21 her to work at 6:30.  And I get back; I take
22 my medicine with a cup of coffee and start
23 my day.
24      Q.    Okay.
25

BENNETT

1       A.    But I get home about 7:00
2  o'clock.
3       Q.    What is the name of this
4  prescription?
5       A.    I'm sorry?
6       Q.    What's the name of the medication
7  that you take twice a day, 7:00 a.m. and
8  7:00 p.m.?
9             Can you hear me?
10            Mr. Bennett, can you hear me?
11            ATTORNEY WATERFILL:  Ryan, can
12      you hear Sarah?
13            THE WITNESS:  No, I cannot.
14 BY ATTORNEY LEYSHOCK:
15      Q.    Can you see me moving?
16      A.    No, I don't see you moving.
17            ATTORNEY WATERFILL:  Looks like
18      the court reporter's frozen.
19            No.  No, he's not.
20 BY ATTORNEY LEYSHOCK:
21      Q.    Mr. Bennett, what's name of the
22 medication that you take twice a day?
23            ATTORNEY WATERFILL:  Ryan, did
24      you hear that question?
25

BENNETT

1       THE WITNESS:  No.  She keeps
2       going in and out for me.  I'm sorry.
3            ATTORNEY WATERFILL:  I'd say try
4       it again, Sarah.
5  BY ATTORNEY LEYSHOCK:
6       Q.    What's the name of the medication
7  that you take twice a day?
8       A.    My med is metformin.
9       Q.    Can you spell that?
10      A.    M-E-T-F-O-R-M-E-N [sic].
11      Q.    And who prescribes that to you?
12      A.    Dr. Rogers.
13      Q.    Do you know his first name or
14 her first name?
15      A.    Charles.
16      Q.    And where is Dr. Rogers' office
17 located?
18      A.    Avon, Indiana.
19      Q.    How long have you been on that
20 medication?
21      A.    Four years, five years.
22      Q.    All right.  Before you went to
23 work for Thunderdome, did you ever receive
24 any disciplinary action from an employer?
25

BENNETT

1       A.    I'm sorry.  The internet's not --
2  I'm not hearing things correctly, I don't
3  think.  All I heard was "employer."
4       Q.    Before you went to work for
5  Thunderdome, have you received any
6  disciplinary action from an employer?
7       A.    No.
8       Q.    So never any feedback? coaching?
9  written warnings?
10      A.    Coaching and feedback aren't
11 disciplinary actions, are they?
12      Q.    They can be.
13      A.    They're learning opportunities;
14 sure.  But I don't think that they're
15 disciplinary.
16      Q.    Okay.  So you've been given
17 feedback on ways to improve your work
18 performance; is that right?
19      A.    Yeah.  Yeah.  We have quarterly
20 meetings; we have budget meetings with
21 things -- we go over several different
22 things in those type of situations.
23      Q.    And, Mr. Bennett, when you say
24 "we," who are you talking about?
25

Page 42

BENNETT

2     A.   I was usually more of an upper
3 management position in my last few
4 positions, so...
5     Q.   And were you giving feedback in
6 those positions or giving feedback?
7     A.   Mostly giving feedback.
8     Q.   So you don't recall receiving any
9 feedback about areas of improvement with
10 respect to your own performance; is that
11 what you're saying?
12     A.   Correct.
13     Q.   Okay. When you started working
14 for Thunderdome, was it July 2018 that you
15 were assigned your first position for the
16 company, and that was a kitchen manager at
17 Krueger's -- I'm sorry, assistant kitchen
18 manager at Krueger's?
19     A.   No.
20     Q.   When was that?
21     A.   I don't know.
22     Q.   Okay. What was your first
23 position at -- for Thunderdome?
24     A.   Assistant kitchen manager for
25 Bakersfield on Mass Ave.

Page 43

BENNETT

2     Q.   Okay. I see. I thought you told
3 me a moment ago that you --
4     A.   I applied for a different
5 position, but I received another position.
6     Q.   Okay. You applied for the
7 position at Krueger's?
8     A.   I applied for the K -- kitchen
9 manager position at Krueger's. That's what
10 I was told I was interviewing for by my
11 recruiter, Kathy Radoll [phonetic], who
12 works with Thunderdome. And as far as I was
13 told, that's what I was coming in for. But
14 that did not happen.
15     Q.   Were you given an explanation as
16 to why that didn't happen?
17     A.   There was a misunderstanding, is
18 what I was told.
19     Q.   And what was the
20 misunderstanding?
21     A.   You'd have to ask Ricky Tindell.
22     Q.   Okay. Who was misunderstood?
23     A.   Ricky Tindell.
24     Q.   Okay. And do you think he
25 misunderstood which position you were

Page 44

BENNETT

1 interested in?
2     A.   I think so. And then -- but then
3 I was told I was hired for that position but
4 apparently I needed to wait at Bakersfield
5 and help them out while they were finished
6 the building of Krueger's next door.
7     Q.   And was it July 2018 when you
8 start at Bakersfield?
9     A.   That's correct.
10     Q.   Do you know who was involved in
11 the decision to hire you?
12     A.   Yes.
13     Q.   Who?
14     A.   The current kitchen manager at
15 that time Ryan Sunderhill -- or Sunderland.
16 The former GM of the location. I don't
17 remember his name. He was let go by the
18 company. Kier could probably tell you why.
19 And then Ricky Tindell. And then Kathy
20 Radoll, my recruiter, who's also a recruiter
21 for Thunderdome.
22     Q.   Who's Ricky Tindell?
23     A.   He likes to change his titles.
24 So I don't know if he's the general manager

Page 45

BENNETT

1 or which store it is. But then he also
2 likes to go under the title of regional
3 manager and regional operating partner. I
4 don't know. He has several different titles
5 that he gives himself.
6     Q.   What about Ryan Sunderland; what
7 was his title?
8     A.   Kitchen manager at Bakersfield on
9 Mass Ave.
10     Q.   Okay. Do you know who made the
11 ultimate decision to hire you?
12     A.   I do not.
13     Q.   What were your job duties there
14 as assistant kitchen manager of Bakersfield?
15     A.   Maintain the wine; maintain the
16 quality of food; maintain the employees;
17 maintain standards of the restaurant, set
18 forth.
19     Q.   Did you supervise staff?
20     A.   Absolutely.
21     Q.   Did you sometimes have to work
22 shoulder to shoulder with staff on the floor
23 to assist them with their duties --
24     A.   Every shift.

BENNETT

2    Q.    -- in order to maintain the
3  quality?
4    A.    Every shift.  90 percent of my
5  shift was that.
6    Q.    Do you have any -- did you have
7  any performance issues while you were
8  working at Bakersfield, to your knowledge?
9    A.    No.
10    Q.    Do you remember if management
11  ever spoke to you about your performance?
12    A.    Nope.  I had to consistently
13  remind them that I needed to be reviewed,
14  actually.  They didn't review properly or on
15  time or at the schedule that they would tell
16  us they were supposed to be doing it.  And,
17  no, I did not receive very good coaching.
18    Q.    Do you recall management talking
19  to you about your relationships with your
20  team being not healthy or weak?
21    A.    No.  I actually hung out with
22  several of my employees after work.
23    Q.    Okay.  So you don't recall having
24  any strained relationships with your
25  co-workers or difficulty working with them?

BENNETT

2    A.    I think -- I wouldn't -- yeah,
3  some of my employees would -- I'm sure had
4  issues with being managed correctly.  But I
5  don't -- you know, that's on them.  I'm sure
6  that -- there's disgruntled employees
7  everywhere you go.  Not everybody's going to
8  like you.
9    Q.    So you don't recall receiving any
10  feedback about the way you managed or the
11  way you talked with your co-workers?
12    A.    No.  We actually had a pretty
13  good relationship about it.
14    Q.    Okay.  I'm going to pull up
15  another document here.
16    A.    Sounds good.
17        ATTORNEY LEYSHOCK:  Mark, if you
18      received my email -- and Adam -- this
19      is called tab 15.  But I will put it
20      on the screen and identify it by Bates
21      stamp.
22  BY ATTORNEY LEYSHOCK:
23    Q.    Can you see this document,
24  Mr. Bennett?  Looks like an email at the top
25  that says from Ricky Tindell?

BENNETT

2    A.    Yeah.  It says from Ricky
3  Tindell, February 23rd, 2022.
4        ATTORNEY LEYSHOCK:  So for the
5      record, I'm having Mr. Bennett look at
6      a document that is Bates stamped
7      Thunderdome000019.  And I'm going to
8      try to change the view so you can see
9      it all at the same time.
10        ATTORNEY WATERFILL:  Is this
11      Exhibit 2?
12        ATTORNEY LEYSHOCK:  It will be.
13        ATTORNEY WATERFILL:  And have you
14      emailed it to us?
15        ATTORNEY LEYSHOCK:  Yes, I
16      emailed this this morning.  And I also
17      sent this to you in discovery.
18        ATTORNEY WATERFILL:  Well, we're
19      not getting your emails.
20        And have you gotten my email with
21      Exhibit 1?
22        ATTORNEY LEYSHOCK:  Yes.
23        Do you want me to email these one
24      at a time?  It's going to slow us
25      down, but I'm happy to do it.

BENNETT

2        ATTORNEY WATERFILL:  I think it's
3  a good idea to email them as you
4  present them; yes.
5        ATTORNEY LEYSHOCK:  Okay.  I can
6  do that.
7        THE WITNESS:  I'll be right back
8  while she's doing that.
9        ATTORNEY LEYSHOCK:  All right.
10  Mark, I just tried to send you the
11  documents five at a time; and they're
12  being rejected, saying it's too large.
13        ATTORNEY WATERFILL:  I received
14  your email of 10:49.  I've just
15  received your email of 10:51.
16  Maybe -- if you're only sending them
17  to me, I've got them.
18        ATTORNEY LEYSHOCK:  Did you get
19  tabs 1 through 29?
20        ATTORNEY WATERFILL:  I have tab 1
21  through 5.  And I have tab 21 through
22  25.
23        ATTORNEY LEYSHOCK:  Well, I sent
24  them all five at a time, so I think
25  they'll be coming in.  All I need

Page 50

```
 1              BENNETT
 2       right now is -- well, what am I
 3       working on now -- tab 15.
 4              ATTORNEY WATERFILL:  Yeah; in the
 5       last couple minutes --
 6              ATTORNEY LEYSHOCK:  So let's get
 7       Mr. Bennett back.  And if we need to,
 8       I'll send them to you one at a time.
 9              ATTORNEY WATERFILL:  No, I've
10       gotten one, two, three, four, five --
11       six emails from you --
12              ATTORNEY LEYSHOCK:  Okay.
13              ATTORNEY WATERFILL:  -- since
14       10:48.
15              ATTORNEY LEYSHOCK:  Well, that
16       must have worked, breaking them down
17       into smaller groups.
18              ATTORNEY WATERFILL:  Probably.
19  BY ATTORNEY LEYSHOCK:
20       Q.   All right.  I'd like to try to
21  stay on the record with the screen on,
22  Mr. Bennett.  All right.  And if you need a
23  break, let me know.  I'd like to try to get
24  as much done as we can.  We have a long way
25  to go still, and we're just now getting
```

Page 51

```
 1              BENNETT
 2  started.
 3         I think we have the procedure for
 4  showing exhibits worked out.  So I'd like
 5  you to take a look at what's on the screen,
 6  Bates stamped Thunderdome000019.
 7         Have you ever seen this document
 8  before?
 9       A.   Nope.
10       Q.   Does it look like a text message
11  from or with someone named Siobhan?
12       A.   Yes.
13       Q.   Do you know someone name Siobhan
14  who used to work at Thunderdome?
15       A.   Siobhan?  Yes.
16       Q.   What was Siobhan's last name?
17       A.   I don't remember.
18       Q.   Okay.  Was it Siobhan Stephenson?
19       A.   Yeah, Stephenson.
20       Q.   And what's Siobhan Stephenson's
21  position?
22       A.   She was general manager for
23  Bakersfield on Mass Ave.
24       Q.   All right.  I'm going to read
25  this, and you tell me if I read this
```

Page 52

```
 1              BENNETT
 2  correctly.  The text message says -- one
 3  person writes:  Can you send me Tori's
 4  number.
 5         And then it looks like a contact
 6  card was sent for Tori.  Does that look
 7  right?
 8       A.   Yep.
 9       Q.   And then it says:  Thanks.  I've
10  had two BOH employees walk out of their
11  shifts tonight because of Ryan Bennett.  I'm
12  just letting you know.  I've already spoken
13  to him, but it may be a good idea if he
14  receives a call from you as well.
15         The other person responds:
16  Jesus.  Heard.  I'm not going to call him
17  tonight but will call tomorrow.
18         Then the first person says:
19  Thanks.  Let me know how it goes.
20         Did I read that correctly?
21       A.   Yeah.
22       Q.   Okay.  So now that you've seen
23  this text message from Siobhan that I
24  represent to you is the general manager or
25  was the general manager at Bakersfield at
```

Page 53

```
 1              BENNETT
 2  the time that you worked there, do you
 3  recall having any conversations with
 4  management regarding your interactions with
 5  colleagues?
 6       A.   No.
 7       Q.   And you don't recall any feedback
 8  regarding your performance when you worked
 9  at Bakersfield?
10       A.   Well, usually it was standard
11  practice to write the document up.  I would
12  think that there would be some type of
13  written document about it.
14       Q.   Do you remember receiving
15  feedback?
16       A.   No.
17       Q.   Okay.
18       A.   And if I would have, there should
19  have been documentation, per their
20  standards.
21       Q.   Do you recall --
22       A.   That would be the --
23       Q.   -- what this situation involved?
24  Do you recall two employees walking off
25  their shifts because of some interaction
```

Page 54

```
                    BENNETT
 1  they had with you?
 2      A.   No.
 3      Q.   Do you think that this statement,
 4  this text message exchange is accurate?
 5      A.   I don't know.
 6      Q.   Do you have any reason to believe
 7  this person made this up about you?
 8      A.   Yeah.
 9      Q.   Okay.  What's your reason for
10  thinking that?
11      A.   Well, I knew things about her
12  that she didn't really want to come to light
13  to the company and I had seen things that
14  she probably wouldn't have appreciated me
15  letting Ricky know or any of the owners.
16  And I also heard things from other
17  employees.  And she knew that I knew that.
18      Q.   Okay.  So other employees knew
19  this as well or knew that same information
20  that they provided to you?
21      A.   Oh, yeah.
22      Q.   But Siobhan here in this
23  conversation, she's not talking about other
24  employees having --
```

Page 55

```
                    BENNETT
 1      A.   You asked me about her.
 2      Q.   She's only talking about your
 3  performance; is that correct?
 4      A.   She's not talking about my
 5  performance at all; no.
 6      Q.   Okay.  So when you read "I had
 7  two BOH" -- what does BOH stand for?
 8      A.   Back of the house.
 9      Q.   Okay.  So:  I had two
10  back-of-the-house employees walk out of
11  their shifts tonight because of Ryan
12  Bennett.
13           You don't think that's a
14  criticism of you?
15      A.   No; because I don't know why the
16  employees left.  That could be a criticism
17  on them.  Maybe they're at fault.  I don't
18  know the situation.  There should be written
19  documents about it.
20      Q.   Okay.  I says:  I've spoken to
21  him, but it may be a good idea if he
22  received a call from you as well.
23           You don't think you're the one
24  that they're talking about giving
```

Page 56

```
                    BENNETT
 1  performance feedback to here?
 2      A.   I think I am the one that they're
 3  talking about.  But I don't remember this
 4  incident.
 5      Q.   Okay.  So after seeing this, you
 6  would still tell me that your relationships
 7  with your colleagues at Bakersfield was
 8  healthy?
 9      A.   Yeah.  I had a lot of healthy
10  relationships --
11      Q.   Strong?
12      A.   I still have friends that I talk
13  to today still from there.
14      Q.   Did you have any that weren't
15  healthy or strong?
16      A.   Not that I can remember.  Not
17  that I really cared about.
18      Q.   Okay.  Do you smoke cigarettes,
19  Mr. Bennett?
20      A.   I do.
21      Q.   Did you smoke cigarettes while
22  working at Bakersfield?
23      A.   Yes.
24      Q.   When did you start smoking?
```

Page 57

```
                    BENNETT
 1      A.   When I was 16.
 2      Q.   And have you smoked ever since
 3  then?
 4      A.   Yeah.
 5           ATTORNEY LEYSHOCK:  All right.  I
 6      would like to mark tab 15 as our next
 7      exhibit.
 8           Remind me, is that 2 or 3?
 9           THE COURT REPORTER:  That would
10      be 2.
11           (Exhibit 2, Text Messages,
12      Thunderdome000018 to '20, was marked
13      for identification.)
14           ATTORNEY WATERFILL:  Tab 15 was
15      Exhibit 2 that we looked at; right?
16           ATTORNEY LEYSHOCK:  Correct.
17           ATTORNEY WATERFILL:  Yeah.  Okay.
18      So that's Exhibit 2?
19           ATTORNEY LEYSHOCK:  Yep.
20           ATTORNEY WATERFILL:  Okay.
21           Ryan, are you able to look at
22      attachments to emails if I send them
23      to you just with the exhibits?
24           THE WITNESS:  Yes.  I'm looking
```

Page 58

```
                    BENNETT
1
2        at her screen right now.  She's got
3        her screen pulled up on mine.
4             ATTORNEY WATERFILL:  But then I
5        can also email you the exhibits?
6             THE WITNESS:  Yes.
7             ATTORNEY WATERFILL:  So if you
8        want to scroll through them, you can
9        do so.
10            THE WITNESS:  Yeah.
11            ATTORNEY WATERFILL:  Okay.
12   BY ATTORNEY LEYSHOCK:
13       Q.    Mr. Bennett, what was
14   Thunderdome's smoking policy for employees
15   during work hours?
16       A.    I don't remember the exact
17   verbiage of it.
18       Q.    Do you remember generally what it
19   allowed and prohibited?
20       A.    I know there was a smoke time
21   listed and there's smoke times not listed.
22       Q.    So meaning during certain hours
23   you were allowed to smoke or take smoke
24   breaks and during certain hours of the day
25   you were not allowed to smoke or take smoke
```

Page 59

```
                    BENNETT
1
2    breaks; is that correct?
3        A.    Yeah.
4        Q.    And was there any sort of pattern
5    to that time?  When were you --
6        A.    I believe there was.
7        Q.    When you were you allowed to
8    smoke versus not allowed to smoke?
9        A.    I don't remember the exact times,
10   ma'am.  I just said that.
11       Q.    Was it during prime business
12   hours when smoke breaks were prohibited?
13       A.    Prime business hours could be a
14   whole busy period; doesn't meant what time
15   it was.  And Bakersfield on Mass Ave, The
16   Eagle on Mass Ave, and Krueger's were very
17   busy restaurants.  So it didn't matter what
18   time of day it was.  It was busy.
19       Q.    So are you saying there's no
20   connection between the smoking policy and
21   the busy period?
22       A.    I'm saying there was a policy,
23   but I don't remember what it said.
24       Q.    Okay.  Did management ever talk
25   to you about taking too many smoke breaks?
```

Page 60

```
                    BENNETT
1
2        A.    Not too many; no.
3        Q.    Did they ever tell you that you
4    took a smoke break at a time when you
5    weren't permitted to take a smoke break?
6        A.    Yes.
7        Q.    And did you, in fact, take a
8    smoke break at that time?
9        A.    When they told me to; yes.
10   That's why they told me not to do that.
11       Q.    When they were talking to you
12   about having violated the smoking policy,
13   did you take a smoke break at a time when
14   smoke breaks were not permitted?
15       A.    No.  I smoked whenever I was sent
16   on break.  And if I was sent on break,
17   that's when I smoked.
18       Q.    So you're saying you never smoked
19   at a time when you weren't permitted to take
20   a smoke break?
21       A.    I went and smoked when I was sent
22   on break, ma'am.
23       Q.    And who sent you on break,
24   Mr. Bennett?
25       A.    Another manager would send me on
```

Page 61

```
                    BENNETT
1
2    break, another on-duty manager.
3        Q.    So you're telling me you never
4    took a break without permission?
5        A.    Correct.
6        Q.    You always obtained permission
7    before you took a break?
8        A.    Ma'am, you're not listening to
9    me.  I'm telling you, yes.
10       Q.    So if Thunderdome management
11   testifies that they counseled you on taking
12   smoke breaks when you were not permitted,
13   are they going to be telling a lie?
14       A.    No.
15       Q.    Okay.
16       A.    I would hope not.
17       Q.    Do you recall an incident where
18   Thunderdome management spoke to you because
19   you left the restaurant in the middle of
20   your shift --
21       A.    Yes.
22       Q.    -- at Bakersfield?
23       A.    No.
24       Q.    Okay.  Where were you when that
25   happened?
```

BENNETT

1
2    A.    I wasn't with Bakersfield.  I
3  don't remember exactly.
4    Q.    Do you remember leaving in the
5  middle of your shift while you were working
6  on the expo line and you took a ticket from
7  the window?
8    A.    No.
9    Q.    What's the expo line?
10    A.    That's three countertops put
11  together -- well, it depends what
12  restaurant.
13    Q.    Okay.  Well, still talking about
14  Bakersfield.
15    A.    Well, Bakersfield there's not
16  really an expo line.  It's just the entire
17  kitchen line.  At The Eagle it's different.
18  It's also different at Krueger's.
19    Q.    Did they use tickets with the
20  expo?
21    A.    Absolutely, we did.
22    Q.    Okay.  Explain what the tickets
23  are for.
24    A.    Tickets are the orders that come
25  in.  They're so you know what to make and to

BENNETT

1
2  put on the plate.
3    Q.    So an expo reads a ticket, makes
4  sure that all the food for a particular
5  order is on the plate or collected on the
6  tray and can be delivered to the customer's
7  table; is that right?
8    A.    Correct.
9    Q.    And do you recall taking a ticket
10  and leaving the restaurant in the middle of
11  your shift when you were working at
12  Bakersfield?
13    A.    No.
14    Q.    Do you remember doing that when
15  you worked at a different restaurant?
16    A.    No.  I wouldn't take it off the
17  line.
18    Q.    If Thunderdome management
19  testified that that happened --
20          [Crosstalk.]
21  I'm sorry?
22    A.    I said that wouldn't make sense
23  to do that.
24    Q.    Tell me why.
25    A.    Because if I was going on break

BENNETT

1
2  and leaving, why would I need the ticket?
3    Q.    What's the consequence of you
4  taking the ticket, if it happened?
5    A.    Nothing.  They remake the order.
6  Or they make the order.  Actually, they have
7  a -- if I've got the ticket, then all that
8  happens is -- there's another ticket with
9  the people on the line.  So they would just
10  get that ticket and send that order out to
11  the customer.  So there's no effect that
12  would have at all.  And they wouldn't have
13  any waste either, because they'd only have
14  to make the order once.
15    Q.    Do you recall leaving --
16    A.    It doesn't make sense to me to
17  take a ticket.
18    Q.    Do you recall leaving your shift
19  earlier when you were at Bakersfield without
20  Thunderdome's management approval?
21    A.    I'm sorry.  You're breaking up.
22  I can't understand you, ma'am.  I can't
23  understand you.  You're breaking up, ma'am.
24  It says your internet connection's unstable.
25    Q.    Do you recall leaving your shift

BENNETT

1
2  early from Bakersfield without management's
3  approval?
4    A.    No.
5    Q.    You never did that?
6    A.    No.  And I think there would be a
7  written document.
8    Q.    If Thunderdome management
9  testifies that did happen, would they be
10  lying?
11    A.    Yes.
12    Q.    And what evidence do you have to
13  suggest that they are lying?
14    A.    Because they would have had a
15  different standard or a different practice
16  in place at that time.  They would -- if I
17  left my shift, they would write me up for
18  that.
19    Q.    So you're saying that's not
20  acceptable behavior?
21    A.    No, I said that if they wrote --
22  if I had done that, then I would have been
23  written up for it.
24    Q.    And that's because leaving work
25  in the middle of a shift subjects you to

BENNETT

1
2  discipline; is that right?
3       A.   It's in their handbook.
4       Q.   Because it's disruptive to
5  workplace operations?
6       A.   No, I don't think that would be
7  what it would be categorized under.  I'd
8  probably put it under workplace abandonment.
9       Q.   Okay.
10      A.   That's grounds for discipline, I
11 would think.  But that's just how I perceive
12 it.
13      Q.   Were you transferred to another
14 restaurant after working at Bakersfield?
15      A.   I was asked if I would like to.
16 I wasn't transferred.
17      Q.   Okay.  Who asked you if you would
18 like to be reassigned to another restaurant?
19      A.   Don't remember who exactly
20 brought it up.  But they just asked if I
21 would be interested in going over there
22 because they were shorthanded.  They had to
23 relieve their general manager, Collin
24 Martin, because he was misplacing money --
25 or at least that's the rumor that was going

BENNETT

1
2  around.
3       Q.   But no one from management told
4  you that?
5       A.   They didn't actually terminate
6  him.  They just demoted him and sent him
7  over to Bakersfield.
8       Q.   Were you reassigned, Mr. Bennett?
9       A.   No, I was not.
10      Q.   How did you get to Krueger's
11 Restaurant?
12      A.   I was asked if I would like to go
13 over there --
14      Q.   And how did you respond?
15      A.   -- because they needed help.
16      I told them I needed to think
17 about it for a little bit.
18      Q.   And did you ultimately decide to
19 go?
20      A.   I did.
21      Q.   How long did you take to think
22 about it?
23      A.   Two or three days.
24      Q.   And what did you think about?
25      A.   What the pros and cons of going

BENNETT

1
2  over there would be.
3       Q.   What were the pros of going over
4  to Krueger's?
5       A.   One, not having to deal with
6  Siobhan Stephenson.
7       Q.   Why did you not want to deal with
8  Siobhan?
9            Is it "Siobhan" or "Siobhan"?
10      A.   "Siobhan."
11      Q.   What did you not want to deal
12 with related to Siobhan?
13      A.   Her attitude and the way she
14 treated other employees.  She's usually
15 strung out on cocaine, so she didn't usually
16 come off very well to some of the other
17 employees.
18      Q.   What was another reason that you
19 wanted to work at Krueger's?
20      A.   The equipment.  I was tired of
21 working in a small kitchen like Bakersfield.
22 It's very, very, very small.  I'm a bigger
23 person, so I like a little bit more space.
24 And so for me, it was more comfortability.
25 And the nicer equipment that was in there;

BENNETT

1
2  it was all brand-new equipment.  That was --
3  as a chef, who doesn't want to work with
4  that frier that talks to you.
5       Q.   Any other reason?
6       A.   Some of the employees over there
7  as well.  They told me it would be a great
8  opportunity.  They wanted me to come over
9  there and work with them.  Things like that.
10      Q.   Were there any downsides to
11 moving over there?
12      A.   Yes.
13      Q.   What was that?
14      A.   Leaving the employees I was with
15 at Bakersfield was my biggest one.  Like I
16 said, I was very friendly with several of
17 them, in and outside of work.
18      Q.   And when did you change
19 restaurants from Bakersfield to Krueger's?
20      A.   I don't remember the exact dates.
21      Q.   Does July 15, 2019 sound correct?
22      A.   No.
23      Q.   Do you think it was before or
24 after that?
25      A.   I would say it was before.

Page 70

BENNETT

```
 1                    BENNETT
 2        Q.    Okay.  What month?
 3        A.    That July time is, I think, when
 4   I ended working with Krueger's and started
 5   with The Eagle.
 6        Q.    Okay.  Do you think you worked at
 7   Krueger's from July 15th to August 11th?
 8        A.    I don't remember.
 9        Q.    So it could be?
10        A.    It could be.
11        Q.    Okay.  And who did you report to
12   at Krueger's?
13        A.    There were a couple people there.
14   Randy, I believe his name was.  I don't
15   remember his last name.  I think he was
16   the -- he was an assistant KM at the time.
17        Q.    Is that Randy Hull, H-U-L-L?
18        A.    Don't know.
19        Q.    Who else?
20        A.    There was a GM there, but I don't
21   remember her name either.  She was brought
22   in from the outside.
23        Q.    Courtney Arseneau?
24        A.    Yes, Courtney.
25        Q.    Okay.  That's A-R-S-E-N-E-A-U.
```

Page 71

BENNETT

```
 1                    BENNETT
 2   Does that sound right?
 3        A.    Sure.
 4        Q.    Did you report to anyone else?
 5        A.    Ricky Tindell.
 6        Q.    Okay.  Anyone else?
 7        A.    Not that I know of.
 8        Q.    And when you were working at
 9   Krueger's, did you receive any feedback or
10   disciplinary action about your performance?
11        A.    Not that I can remember.
12        Q.    You don't recall any feedback
13   about taking smoking breaks when you weren't
14   allowed to?
15        A.    No.  I usually smoked with
16   Courtney, actually, so...
17        Q.    Do you recall leaving work early
18   without management approval while you were
19   at Krueger's?
20        A.    No.
21        Q.    Do you recall having more issues
22   with communication and relationships with
23   your peers when you were at Krueger's?
24        A.    No.  We all saw each other pretty
25   regularly, communicated in person pretty
```

Page 72

BENNETT

```
 1                    BENNETT
 2   well.
 3        Q.    If Thunderdome management
 4   testified that you did have performance
 5   issues like those I just described, would
 6   they be lying?
 7        A.    They could be.
 8        Q.    And what --
 9        A.    If I was coached on something,
10   they would have documented it, ma'am.
11        Q.    Okay.  So you don't -- I'm not
12   asking what they documented.  I have their
13   documents, Mr. Bennett.  I'm asking what you
14   remember.
15        A.    I'm telling you I don't remember
16   that.
17        Q.    Okay.
18        A.    But no, you didn't.  You asked me
19   what they would say if they testified.
20        Q.    Did you ultimately transfer to
21   The Eagle Restaurant?
22        A.    Yes.
23        Q.    And do you believe that occurred
24   on August 12th, 2019?
25        A.    Sure.
```

Page 73

BENNETT

```
 1                    BENNETT
 2        Q.    Why did that occur?
 3        A.    David Downs had just lost his
 4   kitchen manager, who quit and went to Upland
 5   Brewing Company.  And so they were
 6   shorthanded.  And they had only promoted a
 7   bartender to help run the kitchen, so
 8   they're short-staffed in the kitchen and
 9   it's the busiest restaurant volume-wise in
10   the city.  So they needed an extra pair of
11   hands.
12        Krueger's had had down sales over
13   the last few quarters.  And so there wasn't
14   a lot of room, labor-wise.  So we were
15   having to cut people's hours.  So it made
16   more sense for me to go over to The Eagle to
17   help them out.
18        Q.    Who did you report to at The
19   Eagle?
20        A.    David Downs.
21        Q.    What was his title?
22        A.    General manager.
23        Q.    Anyone else?
24        A.    Ricky Tindell.
25        Q.    Anyone else?
```

Page 74

BENNETT

1
2    A.   Collin Martin.
3    Q.   What was Collin Martin's title?
4    A.   I'm not quite sure.  He was the
5  acting kitchen manager at the time.  He's
6  been moved around so many times.  He'd been
7  demoted from the general manager position
8  because of some money issues that was going
9  on with Krueger's.  But he was the general
10 manager there.
11       Then he got moved over to The
12 Eagle, more so that Ricky could keep a
13 better eye on him.  But he technically a
14 senior manager, so I would report to him as
15 well.
16    Q.   And how did you learn about the
17 the reason for Collin Martin's alleged
18 demotion?
19    A.   Oh, Siobhan and some of the other
20 managers were talking about it.
21    Q.   Did you report to anyone else
22 while you worked at The Eagle?
23    A.   No.
24    Q.   How about Dayton Neely,
25 N-E-E-L-Y?

Page 75

BENNETT

1
2    A.   I did not report to him.  I
3  hardly -- he was the assistant general
4  manager there, but I didn't report to him.
5    Q.   Okay.  And did you work with him?
6    A.   I did.
7    Q.   Okay.  What were your job duties
8  when you were worked at The Eagle?
9    A.   Same as Bakersfield.
10   Q.   Okay.  Did your position include
11 placing orders for food in the kitchen?
12   A.   Yes.
13   Q.   Tell me about that
14 responsibility.
15   A.   Well, they're --
16       [Technical difficulties.]
17       They had shown me how to do it
18 for a couple weeks before I had gotten
19 there.  But, yeah, you just -- there's a
20 piece of paper.  And write down the order,
21 write down how much you need.  And then you
22 can either call it in or type it in on the
23 computer.
24   Q.   I apologize if I ask you a
25 question that's repetitious.  You were

Page 76

BENNETT

1
2  frozen for the first, say, ten seconds of
3  your answer there.
4       How often did you place orders
5  for food?
6    A.   Regularly.
7    Q.   Is that weekly? monthly?
8  as-needed?
9    A.   It was part of the daily job.
10   Q.   So you placed a food order every
11 day?
12   A.   Almost, yeah.
13   Q.   And were there any guidelines as
14 to the amount or frequency of the orders?
15   A.   Yeah, absolutely.  That's what
16 they call a "par sheet."
17   Q.   Tell me about the par sheet.
18   A.   Well, that's what I told you.
19 You have to fill it out.  It has all the
20 things that need to be ordered.  So you fill
21 it out.  You walk around.  You go through
22 the walk-in.  You count everything and you
23 write it down.  And then it has a par level
24 that you match that to, so you have to order
25 up to that amount.

Page 77

BENNETT

1
2    Q.   So before you place an order, you
3  need to do an inventory, find out what needs
4  to be ordered; and then you place an order
5  for an amount to bring it up to par; is that
6  correct?
7    A.   Correct.
8    Q.   And again, do you do that daily?
9  Do you do that as directed?
10   A.   As directed.
11   Q.   Okay.
12   A.   It was usually -- I was usually
13 directed to do it every day by the kitchen
14 manager.  But yeah.  Sometimes another
15 kitchen manager would do it.  But, you know,
16 it just depends on who was available.
17   Q.   And did you use Piazza?  Is that
18 a program or a -- the par sheet that you
19 used to place the order?
20   A.   No.
21   Q.   What is Piazza?
22   A.   I don't know what Piazza is.
23   Q.   Okay.  What happens if an order
24 is not properly placed or if an inventory is
25 not conducted?

BENNETT

1
2      A.    I'm sorry?  You broke up for the
3  first few seconds.
4      Q.    What happens if an order is not
5  properly completed?
6      A.    Well, if it's not properly
7  completed, you don't get your order.  You
8  have to hit "order" for it to go through.
9      Q.    What happens if inventory isn't
10  checked before an order is placed?
11      A.    Well, you wouldn't do that.  You
12  can't make your sheet if you don't count it
13  correctly.
14      Q.    Could it result in ordering
15  things that the restaurant doesn't need?
16      A.    No.  There's an order guide
17  already established on the website.  So you
18  don't have to manually type something in or
19  find a product; it's already there for you
20  as the product that they want you to use
21  that's standardized for that restaurant or
22  that concept.  There's different types of
23  things that they would order for different
24  concepts.
25              Like I couldn't order the chili

BENNETT

1
2  peppers that Bakersfield gets, like the
3  dried anchos or something like that.  I
4  couldn't get that for The Eagle because it
5  wasn't on my order guide.
6      Q.    But if you don't conduct an
7  inventory, you may order too much or too
8  little of an item based on what's in stock
9  in the restaurant; is that correct?
10      A.    I'm sorry?  Say that again.
11      Q.    If you don't check the inventory,
12  if you don't conduct an inventory and you
13  place an order, you might end up ordering
14  too much or too little of a particular item;
15  is that correct?
16      A.    Yeah.  But you have to count it.
17  You can't just make a guess.  Then you're
18  going to be shorthanded for the next day.
19      Q.    Okay.
20      A.    I counted every time I made an
21  order.
22      Q.    Was completing a prep list part
23  of your duties?
24      A.    I'm sorry?  You broke up.
25      Q.    Is completing a prep list part of

BENNETT

1
2  your duties?
3      A.    It was whoever -- yeah.  If
4  there's multiple kitchen managers on duty,
5  sure.
6      Q.    What is a prep list?
7      A.    It's what you need, the prep
8  cooks in the morning need to manage for the,
9  for the food.
10      Q.    What happens if a prep list isn't
11  completed on a day?
12      A.    Nothing.  Somebody can come in
13  and just write the prep list in.
14      Q.    Somebody else can do it?
15      A.    Yeah, absolutely.  Every
16  manager's trained on that.
17      Q.    What other duties did you do in
18  your position at The Eagle?
19      A.    Oh, we're on to The Eagle now?
20      Q.    (Nodded.)
21              Are you there?
22      A.    Yeah, I'm here.
23      Q.    Okay.  Yeah.  What were your
24  other duties at The Eagle?
25      A.    Maintaining the expo station.

BENNETT

1
2      Q.    Okay.  What did you do to
3  maintain the expo station?
4      A.    I ran expo.
5      Q.    Can you elaborate?
6      A.    I would call out the orders, let
7  the cooks know what I needed.  The ticket
8  would come through.  I'd place the plates
9  onto trays.  Then servers would take those
10  trays up to the tables.
11      Q.    Did you have to lift any items?
12      A.    Absolutely.
13      Q.    What types of items would you
14  lift?
15      A.    Beer kegs, cases of beer, cases
16  of food, heavy pots and pans, heavy trays,
17  baskets and baskets of chicken.  You name
18  it.  Lexan pans of just brined chicken
19  breasts.  Those were 50 gallons.
20      Q.    How often would you lift items
21  weighing more than 10 pounds?
22      A.    Every day.
23      Q.    How many times a shift?
24      A.    Multiple.
25      Q.    Like ten?

Page 82

BENNETT

1
2    A.    Multiple -- I don't know more
3    than that.
4        Q.    You think 20?
5    A.    Sure.
6        Q.    More than 20?
7    A.    Depends on how busy we are.  I
8    mean, yeah, when I had to lift out ten cases
9    of avocados to make guacamole at
10   Bakersfield, yeah.  That's just ten cases of
11   avocados.  And that's just one thing.  So,
12   yeah.  That weighed 30 pounds.
13       Q.    How often did you lift kegs?
14   A.    Whenever they asked me to.
15       Q.    How often was that, in terms of
16   frequency?
17   A.    I'd usually help out with the
18   liquor order probably once a month.  One of
19   the managers, Brett or Siobhan or -- I
20   forget what the blond girl's name was.  She
21   was a AGM there.
22           But they would ask me to help
23   move some of the stuff over for them and
24   help rearrange the keg cooler so we could do
25   a better inventory.  And then mop the floor

Page 83

BENNETT

1    in there, because that was part of my AORs,
2    was the cooler and making sure they stayed
3    cleaned.  So you'd have to rearrange things,
4    take things in, do first-in/first-out or
5    what we call FIFO.
6        Q.    What does "AOR" stand for?
7    A.    You're breaking up again.
8        Q.    What does "AOR" stand for?
9    A.    Areas of responsibility.
10       Q.    All right.  How frequently were
11   you standing during your shift?
12   A.    90 percent, 95 percent of the
13   shift.
14       Q.    And how long is your shift,
15   normally?
16   A.    10 hours.
17       Q.    What time would you start and
18   what time would you finish?
19   A.    It would usually depend on
20   whether I was working the morning or whether
21   I was working the evening shift.
22       Q.    What time would you start if you
23   were working the morning shift?
24   A.    I'd usually get there at 9:00 --

Page 84

BENNETT

1    well, sometimes I had to start opening for
2    Siobhan, so I'd get there actually around
3    8:00 o'clock or so.
4        Q.    Let focus on The Eagle.  What
5    time did you start work when you had a
6    morning shift at The Eagle?
7    A.    I believe it was 9:00 a.m.
8        Q.    And what time would you finish?
9    A.    Well, I would finish around --
10   that's what time it was.  But other managers
11   would leave earlier that than.
12       Q.    I didn't hear the beginning of
13   your answer.  What time would you finish?
14   A.    I would usually finish around
15   6:00 or 7:00.
16       Q.    So 9:00 a.m. to 6:00 or 7:00
17   p.m.?
18   A.    Yeah; whenever I was relieved.
19       Q.    And when you worked an evening
20   shift, what time would you start and finish?
21   A.    Started at 4:00 o'clock; finish
22   whenever it's done.
23       Q.    And in your experience, what time
24   was that?

Page 85

BENNETT

1
2    A.    Ma'am, you got to understand.
3    These are high-volume restaurants.  They can
4    vary from day to day.  And these are very,
5    very high-volume restaurants.  So it could
6    be midnight to 5:30, 6:00 a.m.  There are
7    people that wouldn't leave till 7:00,
8    8:00 o'clock in the morning sometimes
9    because they're having to count everything
10   down.
11           I mean, it just depends on what's
12   going on and how many people are there
13   still, how busy we were, and what they had
14   to do to clean up.
15       Q.    So your typical day would be 4:00
16   p.m. until what time?
17   A.    Well, we would close the
18   restaurant at 2:00 o'clock, 2:00 a.m.
19       Q.    And you would leave right at 2:00
20   o'clock, 2:00 a.m.?
21   A.    Can you hear me?
22       Q.    Yeah.  I didn't hear an answer.
23   What time would you leave after the
24   restaurant closed?
25   A.    About an hour and a half after

BENNETT

1  the restaurant closed -- two hours, usually.
2      Q.   Okay.  So you're telling me you
3  would work -- your average day would be 4:00
4  p.m. to 4:00 a.m.?
5      A.   Or 3:00; yeah.
6      Q.   All right.
7      A.   It all depended if I needed to
8  wait for the female manager or if we didn't
9  have a female manager.  So, I mean, the men
10  usually walked the female managers to their
11  car if they were the female manager that was
12  closing in the front of the house.  So
13  sometimes I would have to stay later that
14  way, because that person didn't have anyone
15  to walk them to their car at night.
16
17      Q.   So you walked female managers to
18  their car, but you did not walk male
19  managers to their cars; is that correct?
20      A.   Yes.  I was told by Ricky that
21  was a responsibility, that we walk female
22  managers to their car and wait for them to
23  leave.  We cannot just leave a manager like
24  that alone in a restaurant; because I
25  believe we had an incident in one of our

BENNETT

1  other locations across the nation who was
2  robbed at gunpoint or something of that
3  nature.  There should be a memo on it in the
4  memo book.  I remember signing it.
5      Q.   Did you have to bend or twist
6  your trunk when you were --
7      A.   Yes.
8      Q.   -- performing your duties?
9          I'm sorry.  I did not hear your
10  answer.
11      A.   Yes.
12      Q.   Did you have to bend or twist
13  your trunk when you were performing your
14  duties at The Eagle?
15      A.   Yes.
16      Q.   And how often were you bending
17  and twisting?
18      A.   Daily.
19      Q.   How many days a week did you work
20  on average, Mr. Bennett, at The Eagle?
21      A.   Five.
22      Q.   Were they fixed days or some
23  weekdays, some weekends?  Which five days of
24  the week?
25

BENNETT

1      A.   It was never a fixed schedule.
2      Q.   So it varied?
3      A.   It varied to whatever Collin's
4  schedule was, so that he could have time
5  off.
6      Q.   Did you get along with Collin
7  Martin?
8      A.   I got along with him in the work
9  environment, but I had my own personal
10  opinions about him.
11      Q.   How many hours a week did you
12  work on average at The Eagle?
13      A.   50.
14      Q.   When you were at The Eagle, did
15  you suffer a workplace injury?
16      A.   I did.
17      Q.   Okay.  More than one?
18      A.   Yes.
19      Q.   Okay.  What was the first one?
20      A.   A hernia.
21      Q.   Okay.  How did that happen?
22      A.   Helping put away the liquor
23  order -- the beer order.
24      Q.   Were you carrying something?
25

BENNETT

1  lifting something?
2          Sorry.  Were you carrying or
3  lifting something?
4      A.   I didn't hear the question.
5          Can you not hear what I'm saying
6  at all?
7      Q.   Mr. Bennett, were you carrying or
8  lifting something when you had an injury at
9  work?
10      A.   Yes, I said -- are you not
11  hearing my answers, ma'am?
12      Q.   I think we're both experiencing
13  some glitches.  I think that's to be
14  expected with Zoom.  If it's frustrating to
15  you, we can pause this and get together in
16  person.  My understanding was that you
17  wanted to do this by Zoom.  And I'm happy to
18  be accommodating.  But we're going to have
19  to be patient and understand that we're
20  going to have to repeat questions a little
21  bit because of the technology.
22      A.   I understand that.  That's why I
23  was asking if you were hearing my answers
24  because I can't tell if you were or not.
25

BENNETT

1
2      Q.    Okay.  What were you lifting --
3      A.    I haven't had a problem with the
4  Zoom call.
5      Q.    -- when you had the workplace
6  injury?
7      A.    I was helping put away the beer
8  order.
9      Q.    And what did you have in your
10 hand?
11     A.    A keg.
12     Q.    And who was around when that
13 happened?
14     A.    Several employees.
15     Q.    Can you identify them by name?
16     A.    I cannot.
17     Q.    Why not?
18     A.    I cannot.
19     Q.    Okay.
20     A.    They should have a record of who
21 was working that day, and then that would
22 probably refresh my memory.
23     Q.    Okay.  Can you tell me what you
24 were doing at the moment that the injury
25 occurred.

BENNETT

1
2      A.    Putting away the beer order.
3      Q.    Which room were you in?
4      A.    The basement.
5      Q.    Okay.  And what did you feel when
6  you realized an injury had occurred?
7      A.    Sudden sharp pains in my lower
8  groin.
9      Q.    And what did you do when you felt
10 the pain?
11     A.    Went to the restroom.
12     Q.    What did you do next?
13     A.    Urinated, partially on myself.  I
14 was bleeding.
15     Q.    You were bleeding?
16     A.    Yes.
17     Q.    Okay.  And where was the blood
18 coming from?
19     A.    My urethra.
20     Q.    And what did you do next?
21     A.    I went to the manager on duty --
22 I believe was it Dayton Neely -- and let him
23 know that I had just placed a -- I'd just
24 been -- I just had a workplace injury; I
25 needed to go get it taken care of.

BENNETT

1
2      Q.    Were you able to walk?
3      A.    Barely.
4      Q.    What other symptoms did you have
5  at that time?
6      A.    I don't remember any other
7  symptoms that I had.  It was just a lot of
8  pain.
9      Q.    And when you reported this to
10 Dayton Neely, how did he respond?
11     A.    He seemed a little agitated at
12 the time because we were pretty busy.  We
13 were leading into the dinner rush and it was
14 getting pretty busy.  So he seemed to be a
15 little annoyed by it.
16          But he asked me some questions,
17 filled out a piece of paper, and then told
18 me I need to go to Concentra over by the
19 airport and to go there.
20     Q.    And is Concentra a medical
21 provider?
22     A.    Yes.  It's an urgent care for
23 employers.
24     Q.    It's for employees who've been
25 injured, to seek medical treatment?

BENNETT

1
2      A.    Workplace injuries.
3      Q.    Uh-huh.
4      A.    Correct.
5      Q.    And did you go there?
6      A.    Yes.
7      Q.    And what happened when you were
8  there?
9      A.    They discovered that I had a
10 hernia.
11     Q.    Okay.
12     A.    I had a left groinal strain and a
13 hernia.  They could not verify it, due to
14 the insurance.  They didn't have the proper
15 equipment also to sonogram it.  But he could
16 feel a left groinal hernia.
17     Q.    What was the date of your injury,
18 Mr. Bennett?
19     A.    Don't remember the date.  I
20 believe it was in August.
21     Q.    Does August 23rd, 2019 sound
22 correct?
23     A.    Absolutely.
24          ATTORNEY LEYSHOCK:  Okay.  I'm
25          going to look at what I sent out today

Page 94

BENNETT

1      as tab 9.  And I'd like to mark that
2      as Exhibit 3.
3              (Exhibit 3, Bennett Concentra
4      Medical Records, Thunderdome000349 to
5      '418, was marked for identification.)
6              THE WITNESS:  While you're doing
7      this, Sarah, I need to take a quick
8      break.
9              ATTORNEY WATERFILL:  Yeah, why
10     don't we take at least a ten-minute
11     break.
12             ATTORNEY LEYSHOCK:  Okay.  It's
13     11:38.  We'll come back at 11:50.
14             (Recess.)
15  BY ATTORNEY LEYSHOCK:
16     Q.   We were talking about whether you
17  experienced any workplace injury while you
18  were working at The Eagle.  And you had
19  indicated that there two injuries, the first
20  of which occurred on August 23rd, 2019.
21             What was the date of the second
22  one?
23     A.   It happened the same day.  I just
24  didn't realize it yet until the surgeon

Page 95

BENNETT

1      found it.
2      Q.   Okay.  So two injuries resulting
3  from the same actions at work?
4      A.   Correct.
5      Q.   The same incident?
6      A.   Correct.
7      Q.   Okay.  Thank you.  I would like
8  for you to take a look at my screen-share
9  here.  I would like to mark this Exhibit 3.
10             Let me identify this for the
11  record.  This is a 70-page document.  It
12  begins on Thunderdome000349.  And the last
13  Bates stamp to Thunderdome000418.
14             I'll represent to you these are
15  the medical records that we collected, with
16  your authorization, from Concentra.  And I'd
17  like to direct your attention to page 68 of
18  those records.
19             Have you seen these before,
20  Mr. Bennett?
21     A.   Yes.
22     Q.   And the first record I want to
23  look at has the date of August 23rd, 2019 as
24  the date of visit in the top left-hand

Page 96

BENNETT

1      corner; is that correct?
2      A.   Correct.
3      Q.   All right.  And is this the first
4  medical appointment that you had related to
5  your work-related injury while you were at
6  The Eagle?
7      A.   Yeah.
8      Q.   Let's look at page 69.  And I'm
9  referring to the page number in writing on
10  the bottom of the page, referring to the
11  medical records, not the PDF.
12     A.   Okay.
13     Q.   Okay.  Do you see the reason for
14  the visit and chief complaint?
15     A.   Yup.
16     Q.   Okay.  Can you read that for me?
17     A.   Patient presents today with -- PT
18  was lifting and suddenly the PT felt a sharp
19  in in the lower abdomen and groin area.
20     Q.   Can you keep reading.
21     A.   Sharp pain when urinating.
22     Q.   And one more line.
23     A.   Workers' compensation.  Patient's
24  occupation, worker.

Page 97

BENNETT

1      Q.   Okay.  So with respect to what
2  you were doing at the time the injury
3  occurred, is this accurate?  Is it
4  consistent with what you were doing?
5      A.   I sure it is.  But I don't know
6  what "PT" means, and they have bad grammar.
7      Q.   Yeah.  I agree with that.  Assume
8  that "PT" means "patient."  Were you lifting
9  and felt a sharp pain in you lower abdomen
10  and groin area?
11     A.   Yes.
12     Q.   Okay.  And do you recall this
13  appointment with the Concentra provider on
14  August 23rd?
15     A.   Yeah.
16     Q.   Okay.  And did he -- was it a man
17  or a woman?
18     A.   The nurse was a woman, and then
19  the doctor that I spoke with -- but the
20  nurse took all my vitals and everything.  I
21  spoke with her first.  And then the doctor,
22  he was a male.
23     Q.   Okay.  And during that office
24  visit did an evaluation get performed?

BENNETT

1
2      A.   Yes.
3      Q.   Okay.  And the doctor and the
4  nurse talked to you about your experience?
5      A.   Yes.
6      Q.   Okay.  And did they provide you
7  with proper care?
8      A.   No; he could not.
9      Q.   You said he could not provide you
10 with proper care?
11          I'm sorry.  Did he provide you
12 with proper care?
13     A.   No; he could not provide me with
14 proper care.
15     Q.   Okay.  And tell me why his care
16 was not proper.
17     A.   I believe he said he didn't have
18 the proper equipment to for sure know if it
19 was a hernia.  And that would have been an
20 ultrasound machine that he needed to use.
21 They didn't have that there at that
22 location.
23          He also recommended that I see a
24 general surgeon right away.  I believe
25 that's on there as well, as part of the

BENNETT

1
2  overall review.  He consulted that I see a
3  general surgeon.  And he could not fix the
4  pain for me.  He could only mildly reduce
5  it.
6      Q.   So I think that's contained in
7  the section under the heading Plan --
8      A.   Yes.
9      Q.   -- number 2, general surgery
10 referral.  Is that correct?
11     A.   Yeah.  That would be to see the
12 general surgeon.
13     Q.   Okay.  And then underneath that,
14 do you see the Activity Status and
15 Restriction section, Mr. Bennett?
16     A.   I do.
17     Q.   Okay.  And I'm going to read --
18     A.   Do you have the next one?
19     Q.   I'm sorry?
20     A.   Do you have the next one from the
21 following -- from the next week.
22     Q.   I have all of your records, and
23 we'll go through them.  Just be patient, and
24 we'll going to through them.
25     A.   Yeah.  I was just asking.  Thank

BENNETT

1
2  you.
3      Q.   I'm going to read the activity
4  status from August 23rd, 2019.  You tell me
5  if I read that correctly; all right?
6      A.   Uh-huh.
7      Q.   So treatment status, it says:
8  Returning for follow-up on 8/26/2019.
9  Activity status:  Return to modified work
10 activity today.  Work duration, it says:
11 patient may work their entire shift.
12          Is that correct?
13          I'm sorry.  I read that.  Were
14 you able to hear me read that?
15     A.   No, I couldn't hear you.  You cut
16 off until the very end.
17     Q.   Okay.  So under the treatment
18 status it say:  Return for follow-up on
19 August 26th.
20          Is that correct?
21     A.   Yes.
22     Q.   And then under activity status it
23 says:  Return to modified work activity
24 today.
25          Did I read that correctly?

BENNETT

1
2      A.   Correct.
3      Q.   Under work duration, it says:
4  Patient may work their entire shift.
5          Did I read that correctly?
6      A.   Yes.
7      Q.   All right.  And then there's sort
8  of a key.  It says Restrictions, and then
9  the word "key"; and it defines "frequently"
10 as up to 6 hours a day.
11          Do you see that?
12     A.   Yes.
13     Q.   Okay.  And then below that key,
14 the activity status says:  May lift up to
15 10 pounds frequently, may bend occasionally,
16 may stand frequently, may walk frequently,
17 may engage in activities requiring trunk
18 rotation frequently, may perform
19 sweeping/mopping occasionally.
20          Did I read that correctly?
21     A.   You're frozen towards the middle
22 and end of it.
23     Q.   Okay.  Well, why don't you read
24 that and tell me if this is consistent with
25 your recollection of the visit, that your

Page 102

BENNETT

1
2  doctor left you with those restrictions.
3      A.   Yes.  I believe I signed the
4  paperwork that day.
5      Q.   All right.  Did your treatment
6  plan require you to take time off at that
7  time?
8      A.   He advised me to, but I said that
9  I couldn't afford to.
10     Q.   Okay.  So he didn't put that in
11 the medical records, that you needed to take
12 time off?
13     A.   I don't know if he did or not
14 anywhere else.
15     Q.   Okay.  Well, I'll represent to
16 you it's not in these medical records that
17 you're advised to take time off.
18          Did you return to work the next
19 day?
20     A.   I returned to work that night
21 with the paperwork.  I was told to.
22     Q.   And that was consistent with
23 these records from your physician?
24     A.   Yeah.  I brought in the paperwork
25 from the physician to work, back into work

Page 103

BENNETT

1
2  after I was finished there.
3      Q.   Did you provide a list of the
4  restrictions from your physician when you
5  returned to work that day?
6      A.   I gave them every document the
7  doctor gave me.
8      Q.   And what was the response?
9      A.   I believe that they needed to
10 talk to Ricky and David and they would get
11 back to me.
12     Q.   And who was it that you provided
13 the documents to?
14     A.   Dayton Neely was who I provided
15 it to.  And he was sitting there with
16 another manager.  I don't remember his name.
17 Younger, blond-haired kid.
18     Q.   And when you returned to work,
19 did you follow these restrictions?
20     A.   Yes.
21     Q.   Outside of work, were you
22 following these restrictions?
23     A.   Absolutely.
24     Q.   Did you go back to Concentra for
25 additional medical treatment?

Page 104

BENNETT

1
2      A.   Absolutely.
3      Q.   Do you remember when?
4      A.   Two more times.
5      Q.   Do you remember when the next
6  visit was?
7      A.   The 26th.
8      Q.   All right.  I'm showing you
9  page 44 of Exhibit 3, which is Bates stamped
10 Thunderdome000391.  Can you see this page?
11          I'll stop scrolling.
12          Can you still see this document,
13 Mr. Bennett?
14     A.   It's still trying to catch up to
15 you, ma'am.
16          It's on page 44 right now.
17     Q.   Do you see at the top left-hand
18 corner the date of visit is August 26th,
19 2019?
20     A.   Yes.
21     Q.   Okay.  On the second page of the
22 records from that visit, do you see the
23 activity status and restrictions that we
24 talked about, similar to the ones from the
25 23rd?

Page 105

BENNETT

1
2          Do you see the activity status
3  and restrictions?
4      A.   Yes.
5      Q.   Are those the same restrictions
6  that you were given on August 23rd?
7      A.   Yes.
8      Q.   Okay.  Then let's go back up to
9  page 44.  I'd like for you to look at the
10 history of present illness.  I'm going to
11 read it.  You tell me if I've read this
12 correctly.
13          Follow-up right inguinal hernia.
14 Pain not bad at rest but increased with
15 light-duty work after an hour or two.
16 Better if he sits down for a while.
17 Discussed changing restrictions but states
18 he needs to keep working, so we'll keep the
19 restrictions the same at present.  Has not
20 been contacted yet to schedule general
21 surgeon referral.
22          Did I read that correctly?
23     A.   Yes, you did.
24     Q.   So did you tell this physician
25 that you were working light-duty?

Page 106

BENNETT

1
2     A.   Yes, I did.  He recommended that
3  I take time off of work.  And that's where
4  he then sat and discussed about changing the
5  restrictions there, as he stated.  And --
6  but I told him that I needed --
7         [Technical difficulties.]
8         -- and so he just said then we'll
9  just keep the work restrictions the way
10  there are.
11     Q.   Okay.
12     A.   But I did express that -- you do
13  see there that I expressed the current work
14  conditions were exasperating how much pain,
15  the pain level I was at.
16     Q.   Uh-huh.  But you declined to
17  allow your physician to modify your
18  restrictions; is that correct?
19     A.   No.  I just didn't know that
20  there was other options available to me.
21     Q.   So when your doctor discussed
22  changing your restrictions, you didn't know
23  there were other options available to you?
24     A.   No.
25     Q.   Okay.  Did Thunderdome provide

Page 107

BENNETT

1  you with time off to go to this medical
2  visit?
3     A.   No; I was paid for it.
4     Q.   Did you provide an update to
5  Thunderdome management when you came back
6  from this medical appointment?
7     A.   Yes.  I told you earlier that I
8  came back in right after and I presented all
9  the papers to Dayton Neely and that
10  blond-headed manager.
11     Q.   I thought that was August 23rd.
12  This was August 26th.
13     A.   I thought you were still talking
14  about that as well.
15     Q.   No.  After this medical
16  appointment.
17     A.   The second medical appointment,
18  yes, I brought it back in immediately.
19     Q.   And did Thunderdome -- did you
20  continue to follow those restrictions when
21  you worked after this appointment on the
22  26th?
23     A.   To the best of my ability.
24     Q.   And outside of work, were you

Page 108

BENNETT

1
2  following those restrictions?
3     A.   Absolutely.
4     Q.   Do you know when your -- let's
5  see.  Do you know when -- sorry.  Do you
6  know when Thunderdome filed the workers'
7  compensation claim on your behalf?
8     A.   No.
9     Q.   Okay.  Did you talk to them about
10  the claim?
11     A.   Yes.
12     Q.   When did you talk to management
13  about filing a claim?
14     A.   I talked to Ricky Tindell the
15  next day.
16     Q.   You mean the day after your
17  injury or the day after the appointment on
18  the 26th?
19     A.   Day after the injury.
20     Q.   Okay.  So on the 24th?
21     A.   Yeah.
22     Q.   Okay.  And when you went to
23  Concentra, did you have to pay anything out
24  of pocket?  Or did you understand that was
25  covered by workers' comp insurance?

Page 109

BENNETT

1
2     A.   I understood it was covered under
3  workers' comp.  That's why it says it on the
4  top of the document that you have.
5         ATTORNEY LEYSHOCK:  Okay.  I'm
6     going to open up a new document.  We
7     can mark this as Exhibit 4.
8         (Exhibit 4, Safety
9     Investigation - Employee Injury
10     Report, Thunderdome000008 to '15, was
11     marked for identification.)
12  BY ATTORNEY LEYSHOCK:
13     Q.   Mr. Bennett, I'm showing you a
14  document we've just marked as Exhibit 4 to
15  your deposition.  It is eight pages long.
16  It starts with Bates stamp
17  Thunderdome000008, and it runs through
18  Thunderdome000015.
19         ATTORNEY WATERFILL:  Which tab is
20     this?
21         ATTORNEY LEYSHOCK:  I'm sorry.
22     This is tab 8.
23  BY ATTORNEY LEYSHOCK:
24     Q.   Do you have it up?
25     A.   Yeah, I see it.

Page 110

BENNETT

2    Q.    Have you seen this first page of
3 the document before?
4    A.    I haven't seen that exact
5 document.  But I have seen that document
6 before when it's not written in.
7    Q.    So you've seen the form before,
8 but you haven't seen this particularly
9 completed version of the form; is that
10 right?
11    A.    Correct.
12    Q.    Okay.
13    A.    And I don't recognize that
14 signature at all.
15    Q.    Okay.  Do you see that the
16 document has been filled out at Store Name
17 and Location to say Eagle Indy; and then
18 number 1, Employee Name, Ryan Bennett?
19          Did I read that correctly?
20    A.    Yes.
21    Q.    And on number 7 it identifies the
22 date of incident as August 23rd.  Do you see
23 that?
24    A.    Yes.
25    Q.    And then on number 10 it asks for

Page 111

BENNETT

2 the incident to be described.  And it's
3 written in:  Ryan approached Ricky and
4 informed him that he had suffered a hernia
5 from bending over to pick up a tray and
6 needed medical attention.
7          Is that an accurate summary of
8 what happened on the date of your injury?
9    A.    No.
10    Q.    Okay.  Why is this incorrect?
11    A.    Because I wasn't on expo station
12 and I wasn't expo'ing when the incident
13 occurred.
14    Q.    Does it say something about --
15    A.    Yeah.  It says:  Location of
16 incident area, expo; location -- job being
17 performed when incident occurred, expo.
18          That's on the complete opposite
19 end of the basement.
20    Q.    Uh-huh.  And did you inform Ricky
21 Tindell of your injury, or did you inform
22 Dayton Neely?
23    A.    I did not.  I informed Dayton
24 Neely.
25    Q.    Okay.  And when you talked to --

Page 112

BENNETT

2    A.    He called Ricky.  Ricky was at
3 his apartment, a block away.
4    Q.    Okay.  So your testimony is that
5 you were not picking up a tray; you were
6 picking up a keg of beer?
7    A.    Correct.
8    Q.    Okay.
9    A.    Pretty sure you can pull up their
10 liquor order for that day too.
11    Q.    All right.  Let's look at page 3
12 of that document.  It's Thunderdome000010.
13          Can you read the top of that page
14 for me?
15    A.    Cincinnati Insurance Companies.
16    Q.    And what's the next line?
17    A.    Claims Center Data Capture.
18    Q.    Do you know who Cincinnati
19 Insurance Companies is?
20    A.    The insurance company that deals
21 with Thunderdome or Kier.
22    Q.    So workers' compensation
23 insurance provider; is that right?
24    A.    I'm sure that's one of the things
25 that they do; yes.

Page 113

BENNETT

2    Q.    All right.
3    A.    It looks like it was filed four
4 days after the incident.
5    Q.    Okay.  Would you agree that this
6 is a workers' compensation claim filed on
7 your behalf in connection to your workplace
8 injury on August 23rd, 2019?
9    A.    Sure.
10    Q.    You can take time to look at it
11 if you need to.
12    A.    Yes, I believe that that's
13 correct.  But it's inaccurate.
14    Q.    But it does document that a claim
15 was filed; would you agree with me?
16    A.    As long as you agree that it's
17 inaccurate.
18    Q.    Well, I don't have an opinion as
19 to the accuracy, Mr. Bennett.  I wasn't
20 there, so I'm not qualified to say.
21          I just want to know if you agree
22 that this is a workers' compensation claim
23 filed by the company on your behalf as a
24 result of your reported injury on
25 August 23rd?

BENNETT

1
2    visit in six days.
3         Is that right?
4    A.   Correct.
5    Q.   Off for the rest of shift and
6    then modified duty starting on August 29th.
7         Is that correct?
8    A.   Correct.
9    Q.   Patient may work only 6 hours a
10   day.
11        Is that correct?
12   A.   That's correct.
13   Q.   And that's shorter than your
14   normal shift of 10, 12 hours; is that right?
15   A.   That's correct.  But then I was
16   told by Ricky that it wasn't enough.
17   Q.   Did you work up to 6 hours a day
18   following --
19   A.   Some days.
20   Q.   -- this time?
21        So you believe you worked more
22   than 6 hours?
23   A.   Some days.
24   Q.   If I showed you your time records
25   that show you didn't work more than 6, maybe

BENNETT

1
2    6 and a half hours on a shift --
3    A.   That's more than 6, ma'am.
4    Q.   If I showed you your time records
5    that showed you work 6 to 6 and a half hours
6    on every shift after this, would you believe
7    those time records are correct?
8    A.   I believe that those time hours
9    would show that I worked more than what was
10   recommended.
11   Q.   Okay.  And that was, at most, 6
12   and a half hours?
13   A.   Sure.
14   Q.   Okay.  The restrictions after the
15   key, it says:  May lift up to 5 pounds
16   occasionally.  Should be sitting 75 percent
17   of the time.
18        Did I read that correctly?
19   A.   Yes.
20   Q.   Now, if you sat 75 percent of the
21   time for your job, what duties would you be
22   doing while you were sitting?
23   A.   Well, there's not a lot of duties
24   that you can do, realistically, that are
25   positive for the environment.

BENNETT

1
2    Q.   Okay.
3    A.   I'm more in the way and a
4    hindrance to people in my position sitting
5    behind the expo line, just sitting there.
6    There's not much you can do when you're just
7    sitting there.
8    Q.   Okay.  Did you return to work
9    after August 29th and follow these
10   restrictions?
11   A.   I -- to the best of my ability.
12   Q.   Did you follow these restrictions
13   on your own time, when you were not working?
14   A.   Absolutely.
15   Q.   Okay.  To what extent were you
16   not able to follow these restrictions while
17   you were working?
18   A.   During busy peak times.
19   Q.   And what would you do?
20   A.   Then they wouldn't have a manager
21   down there to relieve me so I could get off
22   of the expo line.  And I'd end up having to
23   work the expo line so that the food orders
24   wouldn't get backed up.
25   Q.   Did you --

BENNETT

1
2    A.   Otherwise, they would have been
3    way behind and there was not extra managers.
4    And Ricky was already at home for the day,
5    and so was David and Collin.
6    Q.   Did you tell anyone that you were
7    doing that work that was inconsistent with
8    your restrictions?
9    A.   Yeah; they all knew it.
10   Q.   And did you remind them of your
11   restrictions?
12   A.   Daily.
13   Q.   Okay.  And who did you tell?
14   A.   Managers on duty, leads.  Yeah.
15   Q.   Did you -- do you recall a
16   particular day where you told someone?
17   A.   No.
18   Q.   So you just remember generally
19   that you told everybody?
20   A.   Every day there was somebody that
21   I told about my incident.
22   Q.   Uh-huh.  Uh-huh.  And did anyone
23   tell you that you weren't supposed to be
24   working outside of your restrictions?
25   A.   The doctor.

Page 126

BENNETT

1
2    Q.    But you chose to work anyway?
3    A.    Ricky Tindell.
4    Q.    Tell me about your conversation
5    with Mr. Tindell.
6    A.    He made it seem that my job was
7    in jeopardy because of the fact that I was
8    having so many restrictions.
9    Q.    Did he say that?
10    A.    No.  He tried to say it in a
11    roundabout way.
12    Q.    So you were concerned about your
13    job because of your work restrictions?
14    A.    Yeah; because of my performance
15    because of the work restrictions that were
16    given to me and because of the injury.  I
17    was in a serious amount of pain.  And I
18    couldn't get a surgeon on the phone because
19    the insurance companies took over 15 weeks.
20    You're just on the first five days.  What
21    about the other 14 and half weeks that it
22    took to get to a surgeon?
23    Q.    But you understood that you
24    couldn't perform your job well while --
25    A.    No, I understand that I was in a

Page 127

BENNETT

1
2    lot of pain.
3    Q.    -- you were on these
4    restrictions?
5    A.    I understood that I was in a lot
6    of pain and I was going through a lot
7    because of this injury.  And they weren't
8    doing anything.  And I hadn't seen the
9    surgeon in five days after being injured.
10    Q.    I'm sorry.  You're talking about
11    the medical care you were receiving was not
12    sufficient?
13    A.    Didn't hear any of the last part
14    you just said.
15    Q.    Okay.  You said they weren't
16    doing anything.  And I'm asking you:  Who
17    wasn't doing anything?
18    A.    Well, the person sitting next to
19    you, Ricky Tindell, David Downs, Cincinnati
20    Insurance Company.
21    Q.    Uh-huh.
22    A.    I hadn't -- I had not been able
23    to see the surgeon yet because they hadn't
24    gotten the paperwork.
25    Q.    So did you attempt to schedule an

Page 128

BENNETT

1
2    appointment with the surgeon and you were
3    denied for --
4    A.    Correct.
5    Q.    -- some reason outside of --
6    and --
7    A.    Correct.
8    Q.    -- and this is as of August 26th;
9    is that right?
10    A.    It was as of August 28th.  But
11    yes.
12    Q.    Okay.  All right.  Let me take a
13    second here and ask you if you had asked for
14    any time off of work as of August 28th.
15    A.    Yes.
16    Q.    Who did you ask for time off?
17    A.    I told Ricky and David.  I was
18    like: I don't know if I can do this job in
19    the way you guys want me to do it because
20    I'm in so much pain.  And this is -- it's
21    excruciating.  I said: I'm pissing blood
22    every time I go to the bathroom.  It hurts a
23    lot.
24        Nobody told me about any --
25    Q.    And did you ask for time off,

Page 129

BENNETT

1
2    Mr. Bennett?  Or were you telling them about
3    the injury?
4    A.    No.  I just made that general
5    statement that I told to you.
6    Q.    Okay.
7    A.    And my response back was:  If
8    you're in pain, just go to the doctor, then.
9    Q.    Okay.  And did you stay home from
10    work as a result of your injury?
11    A.    On the 28th.
12    Q.    Only on the 28.  Did you ask for
13    any additional time off that you were
14    denied?
15    A.    After I made the statement,
16    nobody made any other changes to my
17    schedule.
18    Q.    Okay.  So you did not ask for any
19    time off?
20    A.    No.  I told them that I don't
21    know that I could perform the job duty, the
22    duties of the job because of my injury.
23    That's what I told them.
24        And then there was no other
25    changes to my schedule except for the fact

BENNETT

1
2  that it was shortened down to 6 hours.
3          [Crosstalk.]
4      Q.   Mr. Bennett, did you ask for any
5  changes to your schedule?
6          ATTORNEY WATERFILL:  Hold on.  I
7      have to object here, Sarah.  You've
8      got to let him finish.  You guys are
9      talking over one another.
10         ATTORNEY LEYSHOCK:  Okay.
11     Thanks, Mark.
12 BY ATTORNEY LEYSHOCK:
13     Q.   Go ahead, Mr. Bennett.
14     A.   I said yes, I did.  I told them
15 that I couldn't perform the job and that I
16 needed to have time off for this.
17         There was no other discussions
18 about it after that.  There was no other
19 shortening of my schedule except for the
20 fact they shortened it down to 6 hours.  And
21 even then I was still working more than 6
22 hours because there was no manager to
23 relieve me to do my job.
24         And then I would get in trouble
25 for leaving a regular hourly employee there

BENNETT

1
2  expo'ing, versus a manager.
3      Q.   What's the process for asking for
4  time off, Mr. Bennett?
5      A.   There's a form that you can fill
6  out.  But I don't know what -- but that was
7  to ask for a regular day off and spend a
8  vacation day.  I didn't -- I shouldn't
9  have -- I wasn't requesting off because I
10 was medically injured.  I leave that up to
11 the doctors and the good sense of the people
12 running the company.
13     Q.   So if you can't work for your own
14 health reasons, it's not up to you to decide
15 that; is that what you're saying?
16     A.   It's up to the doctor.
17     Q.   Okay.
18     A.   It's also up to the employer, I
19 would think, if I can't perform the duties
20 they're asking me to do.
21     Q.   Do you think it's up to you?
22     A.   I can only tell them what's wrong
23 with me.
24     Q.   No.  You can ask for time off,
25 right, because there's a form.  Isn't that

BENNETT

1
2  what you told me a moment ago?
3      A.   Yeah.  If you need time off for
4  vacation, absolutely, there's a form to
5  request for time off.
6      Q.   And you don't think --
7      A.   But that's something --
8      Q.   -- it's your responsibility --
9      A.   You have to ask that time off --
10         [Crosstalk.]
11         You have to ask that time off two
12 weeks in advance.
13     Q.   Okay.  And you don't think it's
14 your responsibility to ask for time off when
15 you're injured?
16     A.   I didn't have the vacation days.
17 So I wasn't told I could take the day off.
18 My managers never tell me anything that I
19 was allowed to.  They didn't even tell me
20 that was an option, minus the FMLA.
21     Q.   Did you ever ask for FMLA
22 leave --
23     A.   No, I didn't know --
24     Q.   -- or paperwork?
25     A.   I didn't know it was offered,

BENNETT

1
2  didn't know what it was, didn't -- was never
3  trained on it, nothing.
4      Q.   When you started at Thunderdome,
5  did you receive an employee handbook?
6      A.   No, I did not, actually.
7      Q.   Did you know that Thunderdome has
8  an employee handbook?
9      A.   Yes, I do.
10     Q.   Did you know that handbook was in
11 place during your employment?
12     A.   Yes, I do.
13     Q.   Do you know that the FMLA policy
14 is located in the employee handbook?
15     A.   No, I did not.
16     Q.   Okay.
17     A.   It wasn't a part of my training
18 on my orientation day.
19         ATTORNEY WATERFILL:  Ryan, I
20     suggest your pull your hands down from
21     in front of your face.
22         And I'll object to the last
23     question as it assumes facts not in
24     evidence.
25 BY ATTORNEY LEYSHOCK:

BENNETT

2    Q.    Let's take our attention back to
3 page 31 of Exhibit 3, Bates stamp ending in
4 378.
5    A.    Okay.
6    Q.    One page above that is part of
7 the same medical record from that visit of
8 August 28th.  And under the plan it says
9 you're having intolerable pain with current
10 work restrictions.
11         Is that right?
12   A.    Yes.
13   Q.    And despite that intolerable
14 pain, your doctor released you to return to
15 work?
16   A.    Under new restrictions; yes.
17   Q.    Uh-huh.  And you said the
18 restriction includes sitting 75 percent of
19 the time?
20   A.    Yeah.  He increased that.
21   Q.    Uh-huh.
22   A.    It's hard to do your job when
23 you're sitting.
24   Q.    Uh-huh.  But you can't ask for
25 time off of work or you didn't want to miss

BENNETT

2 work following this doctor's appointment; is
3 that correct?
4    A.    It's not I didn't want to work.
5 But I didn't know that -- you know, I
6 expected to still be able do something for
7 the company for 10 hours a shift, not, not
8 just 6 to 6 and a half, based on the work
9 restriction I was given.
10         But they couldn't find another
11 position for me to do, sitting, other than
12 just expo'ing.  There was one day, actually,
13 when I shredded paper for them.
14   Q.    Okay.
15   A.    But that was it.
16   Q.    Okay.  But you were working up to
17 6 and, on one occasion, 6 and half hours a
18 day?
19   A.    Yeah.  But they didn't tell me
20 that I could have been on FMLA and it would
21 have paid out a larger sum and wouldn't have
22 lost out on so much money because of my
23 hourly time.  They didn't tell me any of
24 that kind of stuff.  They didn't tell me
25 what options were available to me.

BENNETT

2         They just told me to go to the
3 doctor and get another note.  Any time I
4 brought it up, they said:  Well, you can
5 just go back to Concentra and get another
6 note.
7         That's why I returned three days
8 after the injury instead of a week later,
9 when it was said to.
10   Q.    Mr. Bennett, is it your
11 understanding that the FMLA provides paid
12 leave for medical injuries?
13   A.    I do not.  I didn't know anything
14 about FMLA.
15   Q.    Okay.  Well, as you sit here
16 right now, do you believe that FMLA provides
17 paid leave for a medical injury?
18   A.    No.  I actually don't understand
19 what FMLA is, to be honest with you.
20   Q.    Would it surprise you if I told
21 you that FMLA leave does not provide any
22 income replacement or compensation while off
23 work?
24   A.    No.
25         ATTORNEY LEYSHOCK:  Okay.  Let's

BENNETT

2 look at what I've distributed as tab 6
3 and mark it as Exhibit 5.
4         (Exhibit 5, Bennett Time Records,
5         Thunderdome000016, was marked for
6         identification.)
7 BY ATTORNEY LEYSHOCK:
8    Q.    Mr. Bennett, I'm showing you a
9 document that we just marked as Exhibit 5 to
10 your deposition.  It's Bates stamped
11 Thunderdome000016.  I'll represent to you
12 that this is a record of your time worked on
13 the dates listed.
14         Have you ever seen this document
15 before?
16   A.    I have not.
17   Q.    And would you agree that the
18 document appears to reflect entries from
19 August 13th through -- the latest date is
20 September 20th?
21   A.    Yeah.  27th I worked 11 hours.
22 What?  Or 7 hours.  9, 10 hours.  9, 8.
23         I would say that I regularly
24 worked over 6 and a half hours.
25   Q.    Let me make sure I have the right

Page 174

BENNETT

1    BENNETT
2        A.   Just wanted to make sure.
3        Q.   Let me pull up in my document
4    list, and I'm going to introduce a new
5    exhibit.
6             All right.  Can you see a
7    document in the shared window or the shared
8    screen window, 53 pages?  It's labeled as
9    tab 17.
10       A.   Yes.
11       Q.   Okay.  I'd like to mark that as
12   Exhibit 8 to your deposition.
13       A.   Okay.
14            ATTORNEY LEYSHOCK:  Mark, do you
15       have that document?
16            ATTORNEY WATERFILL:  Yes.
17            (Exhibit 8, Bennett Indiana
18       University Health Methodist Hospital
19       Medical Records, Thunderdome000198 to
20       '250, was marked for identification.)
21   BY ATTORNEY LEYSHOCK:
22       Q.   All right.  Mr. Bennett, I'll
23   represent to you that these are your medical
24   records provided with your authorization
25   from IU Health Methodist Hospital.

Page 175

BENNETT

1    BENNETT
2        Have you seen these before?
3        A.   Yes.
4        Q.   Okay.  I'd like to direct your
5    attention to page -- let me see...
6             ATTORNEY WATERFILL:  This is
7        Exhibit 8?
8             ATTORNEY LEYSHOCK:  This is
9        Exhibit 8.
10            ATTORNEY WATERFILL:  It's 53
11       pages?
12            ATTORNEY LEYSHOCK:  Correct.
13            ATTORNEY WATERFILL:  Okay.
14   BY ATTORNEY LEYSHOCK:
15       Q.   I just want to make sure I have
16   the right page.  Yeah.
17            Okay.  This is page 47 of the
18   PDF.  It's Bates stamped ending in 244.
19            Take a second to look at that.
20            Do you agree this is the medical
21   record for your ultrasound that was
22   conducted on October 8th, 2019?
23       A.   Yes.
24       Q.   And there's an admit and
25   discharge date at the top, indicating both

Page 176

BENNETT

1    BENNETT
2    occurred on October 8th, 2019?
3        A.   What do you mean "both"?  There
4    was only one thing.
5        Q.   That's right.  When you came into
6    the facility and when you left the facility
7    was the same day?
8        A.   Yes.
9        Q.   Okay.  And the physician that you
10   saw was Larry Stevens?
11       A.   Correct.
12       Q.   All right.  I'd like to scroll
13   down into this record a little bit deeper
14   and look at the document Bates stamped '249,
15   ending in 249.
16            Do you see the section in the
17   middle of the page with the heading
18   Insurance Information?
19       A.   Yes.
20       Q.   And who's listed as your primary
21   insurance company underneath that section?
22       A.   Says workers' comp.
23       Q.   Did you provide that information
24   to the --
25       A.   Yes, I did.

Page 177

BENNETT

1    BENNETT
2        Q.   -- hospital?
3        A.   Yes, I did.
4        Q.   Okay.
5        A.   They couldn't get it right with
6    the insurance company because the insurance
7    company didn't have the right information,
8    apparently.  That's why it's just listed
9    under workers' comp and it doesn't have any
10   other explanation under it.
11       Q.   So the hospital understood that
12   your treatment was being covered under the
13   workers' compensation system; is that right?
14            ATTORNEY WATERFILL:  Objection;
15       calls for speculation.
16            THE WITNESS:  No, I can answer
17       it.
18            It wasn't until I informed them
19       that it was workers' comp that they
20       realized it was workers' comp.
21   BY ATTORNEY LEYSHOCK:
22       Q.   Okay.  Do you recognize the
23   address listed for the primary insurance
24   company?  It says 6200 South Gilmore Road.
25       A.   I don't recognize that address,

Page 178

BENNETT

1
2  no.
3       Q.   Okay.  In Fairfield, Ohio?
4       A.   No.  Never been there.
5       Q.   Okay.  Do you know if that
6  address is affiliated with Thunderdome?
7       A.   No, I do not.  The only one that
8  I know of was in downtown Columbus.
9       Q.   Okay.
10      A.   Or Cincinnati.  Cincinnati, I'm
11  sorry.
12      Q.   Does it make sense that this
13  would be the address for the workers' comp
14  company, Cincinnati Insurance?
15      A.   I don't know, ma'am.
16      Q.   Okay.  Where did they get this
17  address?
18      A.   I don't know, ma'am.
19      Q.   Did you provide this to them?
20      A.   No, I did not.
21      Q.   Okay.  Where did they get the
22  information that this matter was covered by
23  workers' comp as the primary insurance
24  company?
25      A.   I just said that five minutes

Page 179

BENNETT

1  ago, that I was the one that told them it
2  was a workers' comp injury.  They actually
3  send me a note that you have in evidence
4  that said to bring a $75 deposit for it.
5  They didn't realize it was under workers'
6  comp at all.
7       Q.   Did you schedule this appointment
8  yourself?
9       A.   No.  It was scheduled for me.
10      Q.   By whom?
11      A.   The doctor, Larry Stevens.
12      Q.   Okay.  And that was with
13  Concentra?
14      A.   Well, through Concentra.
15      Q.   Okay.
16      A.   He correlated it with the doctor
17  there, I believe.  I saw a couple different
18  physicians while I was at Concentra.
19      Q.   And from your last doctor's
20  appointment on September 10th until this
21  appointment -- till this ultrasound
22  appointment on October 8th, were you
23  following your up-to-date medical
24  restrictions?
25

Page 180

BENNETT

1
2       A.   Yes.
3       Q.   Both at work and at home?
4       A.   No.
5       Q.   Okay.  Tell me why you were not
6  following your medical restrictions.
7       A.   I wasn't at work because they
8  were having me work sometimes past 6 hours.
9       Q.   So you believed at that time you
10  had a 6-hour-limit restriction per your
11  physician?
12      A.   Yes.
13      Q.   And that was through October 8th
14  you believe that restriction was in place?
15      A.   Yeah.
16      Q.   Okay.
17      A.   From September 3rd up until the
18  time of my ultrasound on the 30th,
19  absolutely.  It shows it on the time stamp
20  that you provided earlier.
21      Q.   Okay.  The document that I
22  provided earlier showed that you were able
23  to return to your full shift.  But you say,
24  despite that language, you still believe you
25  were restricted from working more than

Page 181

BENNETT

1  6 hours?
2
3       A.   Yes.  I don't believe that that
4  was correctly interpreted.
5       Q.   Okay.  Any other restriction by
6  the physician that you weren't following as
7  of October 8th?
8       A.   Well, even before October 8th I
9  wasn't following the instructions because I
10  was still working more than 6 hours in a
11  shift.
12      Q.   Okay.  Other than --
13      A.   From the time of my injury.
14  Because at the time of my injury, he placed
15  me on those restrictions immediately.
16      Q.   Any other restrictions you were
17  unable to follow?
18      A.   A lot of the bending they had me
19  do.  I'd have to move heavy trays from one
20  table over to the other, lifting up other
21  crates that were more than 5 or 10 pounds at
22  times.
23      Q.   Did you tell your doctor that you
24  were working light-duty during this time?
25      A.   Yes, I did.

Page 182

BENNETT

1

2     Q.   Okay.

3     A.   I told them I was doing -- it's
4  different than what I was normally doing
5  before.  I told them I was sitting when I
6  could.  I explained everything pretty
7  thoroughly to them.

8     Q.   All right.  Let's look at another
9  document.  This is from October 9th, 2019.
10  This is the day after your ultrasound.  And
11  it's tab 18.  Let's mark this as Exhibit 9.

12          (Exhibit 9, Team Member Warning
13          Form, Thunderdome000029, was marked
14          for identification.)

15  BY ATTORNEY LEYSHOCK:

16     Q.   I'm showing you a one-page PDF
17  Bates stamped Thunderdome000029.

18          Have you ever seen this document
19  before, Mr. Bennett?

20     A.   Yes, I've seen that form.

21     Q.   Okay.  What is this?

22     A.   It's a standard write-up,
23  disciplinary action, first warning.

24     Q.   Okay.  And who's the team
25  member's name identified at the top?

Page 183

BENNETT

1

2     A.   Collin Martin.

3     Q.   That's the manager's name.  Who's
4  the team member's name?

5     A.   Oh, that's my name, Ryan Bennett.

6     Q.   And is there something listed as
7  the date of this infraction?

8     A.   Previous disciplinary meeting was
9  held on:  No date.

10          So I guess I didn't have any
11  other disciplinary meetings, it shows.

12     Q.   Okay.  What was the date of this
13  infraction as noted on the form?

14     A.   10/9/19.

15     Q.   Okay.

16     A.   I had explained to Collin that I
17  was having trouble getting dressed and ready
18  for work because of the amount of pain I was
19  in and it took me a little bit extra longer
20  to get ready for work that day.

21          Again, this was like two and a
22  half months after I'd been injured, so it's
23  been a while since I had been treated for
24  anything.  And I'm not on painkillers.  So,
25  you know, urinating blood every day.

Page 184

BENNETT

1

2          So after a while, that kind of
3  takes a toll on your body.  And I, you know,
4  I couldn't get to work on time.  I couldn't
5  get out of bed, you know.

6     Q.   So you were late for work on
7  October 9th because you had trouble getting
8  dressed?

9     A.   Getting out of bed, getting
10  dressed, going to the bathroom.  I urinated
11  blood everywhere.

12          Yeah.  I had general issues with
13  everything I was doing that day.

14     Q.   Okay.  Did you report these
15  issues to your physician?

16     A.   Absolutely, I did.

17     Q.   Had you already reported these
18  issues to your physician before this date?

19     A.   Yes, I had, several times.

20     Q.   Okay.  And despite this
21  situation, your doctor did not indicate that
22  you would need flexibility with scheduling
23  or that you needed to be off of work; is
24  that correct?

25     A.   Yeah, he did.  He limited my

Page 185

BENNETT

1

2  hours.  He needed me to reduce the amount of
3  hours I was working from 10 hours to at
4  least half that.  That's why he reduced it
5  down to 6.  And they still weren't following
6  that.

7          So he tried to reduce it even
8  more.  Ricky made it clear that he wasn't
9  very happy with that decision.  So did
10  David.

11     Q.   Tell me how what Ricky and David
12  did that you interpreted as them not being
13  happy about your work restrictions.

14     A.   I was told that they were having
15  other private conversations between each
16  other by other team members and managers
17  that overheard their conversations.

18     Q.   Okay.  So they were having a
19  conversation that you were not a party to,
20  but you heard about those through secondhand
21  information; is that correct?

22     A.   That's correct.

23     Q.   And what was the nature of the
24  conversation, as far as you understand it
25  through that secondhand report?

BENNETT

1
2      A.   Figuring a way to let me go.
3      Q.   Okay.  Who told you that?  Who
4  was the team member that told you they heard
5  the conversation?
6      A.   He was an African American
7  gentleman.  I don't remember what his name
8  was.  He was on the work-release program.
9  But he and another guy named Briscoe
10 approached me about it.
11     Q.   Okay.  What is Briscoe's last
12 name?
13     A.   Briscoe.  I don't remember what
14 his first name was.  But his last name was
15 Briscoe.
16     Q.   Oh, I see.
17     A.   We called him "Briscoe," though.
18 That's what he was known by.
19     Q.   And what was his position?
20     A.   He was a team lead -- no, I'm
21 sorry.  He was not.  I think he was just --
22 he was one of the cooks.  But he was more of
23 a higher-up cook.  He'd been there for a
24 while.
25     Q.   Okay.  And the other man, whose

BENNETT

1
2  name you don't recall, who you believe was
3  on a work-release program, African American
4  gentleman, what was his position?
5      A.   He was usually on the chicken
6  sandwich station.  He was a cook as well.
7      Q.   Okay.  So based on that
8  information, you believe that Ricky or David
9  had a conversation about how to let you go?
10     A.   Yes.
11     Q.   And did --
12     A.   I was told to watch my back and
13 make sure I dot my I's and cross my T's.
14     Q.   Who said that?
15     A.   That's what Briscoe and the other
16 gentleman said.
17     Q.   Was that their advice to you?
18     A.   That was their advice to me
19 because of what was said that they had
20 overheard.
21     Q.   Okay.  And did they overhear
22 David and Ricky explaining why you might be
23 let go?
24     A.   I believe the words that were
25 used was that I was worthless.

BENNETT

1
2      Q.   Okay.  Anything else?
3      A.   Not at that time.
4           ATTORNEY LEYSHOCK:  Okay.  Let's
5      see.  Let's pull up tab 19 and mark
6      that as Exhibit 10.
7           (Exhibit 10, Team Member Warning
8      Form, Thunderdome000030, was marked
9      for identification.)
10 BY ATTORNEY LEYSHOCK:
11     Q.   Mr. Bennett, I'm showing you a
12 document that we just marked as Exhibit 10
13 to your deposition.  It is Bates stamped
14 Thunderdome000030.
15          Do you recognize this document?
16     A.   Yes, I do.
17     Q.   What is it?
18     A.   It's another written warning.
19     Q.   And who is it issued to?
20     A.   It is issued to Ryan Bennett.
21     Q.   Does it explain the date of
22 the -- I'm sorry.  Does it list the date of
23 the infraction?
24     A.   Apparently the same day that I
25 was late.

BENNETT

1
2      Q.   Okay.
3      A.   Doesn't really make sense.  It
4  feels like it was altered in some way.
5      Q.   Hmm.  So is the date of the
6  infraction listed as September 9th?
7      A.   Yeah.
8      Q.   And then --
9      A.   [Crosstalk.]
10     Q.   -- it says the previous
11 disciplinary meeting was held on 10/9?
12     A.   Yeah, that's what it says.
13     Q.   Yeah.  So that would be a month
14 later?
15     A.   Yeah.  That doesn't make sense,
16 does it?
17     Q.   So do you think this incident
18 occurred on September 9th and there was a
19 disciplinary meeting or conversation held on
20 10/9?
21     A.   No.
22     Q.   Okay.  Tell me -- I'm going to
23 read to you the explanation of the
24 infraction, and I want you to tell me if you
25 remember this incident.

Page 190

BENNETT

2 On September 9, 2019, Ryan failed
3 to fully complete the Piazza order guide.
4 This is after three previous coaching about
5 how to use Piazza order guide. This gross
6 negligence when it comes to order accuracy,
7 resulting in an order for 21 cases of grape
8 tomatoes.
9 Does this summary or this
10 explanation here sound familiar to you?
11 A. It does.
12 Q. Okay. Did you fail to complete
13 the order guide?
14 A. No.
15 Q. Okay. Do you recall receiving
16 coaching about how to properly use the order
17 guide?
18 A. Well, if I had been coached on
19 it, there would have been one of these
20 papers, ma'am.
21 Q. Well, I'm asking you if you
22 remember. I'm not asking you if there's a
23 paper showing.
24 I'm asking: Do you recall a
25 member of management coaching you on the

Page 191

BENNETT

1 order guide?
2
3 A. No; because it didn't happen.
4 Otherwise there would have been
5 documentation on it, because we document
6 every time we coach somebody.
7 Q. Okay. And on this occasion you
8 don't recall failing to properly complete
9 it?
10 A. Correct.
11 Q. Okay. Why do you think there's a
12 write-up here stating that you did?
13 A. Because I think it was entered
14 incorrectly. But I don't think that I
15 failed to complete the order.
16 Q. Is it your job duty to enter it
17 correctly?
18 A. It is.
19 Q. So is it fair to say that you
20 incorrectly completed the order guide?
21 A. No. I think accidents happen,
22 ma'am.
23 Q. So you had an accident when you
24 were completing the order guide?
25 A. Yeah. I mean, I've been in pain

Page 192

BENNETT

1 for a month at this point. I mean,
2 probably -- it's at the end of my shift when
3 we have to do this. It's late at night.
4 So, yeah, after being there all
5 day, I was probably in a lot of pain and
6 there might be an accident typing it in;
7 sure.
8 But the other thing is that it
9 wouldn't be gross negligence when they could
10 just send it back, no charge.
11 Q. Do you recall anyone speaking to
12 you about that incident?
13 A. Yeah; the next day.
14 Q. And who talked to you about it?
15 A. Collin Martin.
16 Q. And what did he say?
17 A. Said we had a mess-up on the
18 order from the produce delivery.
19 Q. Anything else?
20 A. No, not that I recall.
21 Q. Did you tell him anything?
22 A. I told him that I didn't agree
23 with this.
24 Q. Do you recall being presented

Page 193

BENNETT

1 with an opportunity to sign this document?
2 A. Yes. And that's why it's signed.
3 Q. That's your signature on the
4 bottom of this page?
5 A. Yes, it is.
6 Q. Okay. Thank you.
7 A. But as it also says, it doesn't
8 mean that I agree with what was said by
9 signing my signature there.
10 Can you scroll back down to that?
11 Q. (Complies.)
12 A. Just want to make sure I read it
13 right.
14 Yeah, it doesn't mean that you
15 agree that the infraction occurred.
16 Q. That's right. It says Note:
17 Your signature on this form means that we
18 have discussed the situation. It doesn't
19 mean you agree that the infraction occurred.
20 Did I read that correctly?
21 A. You did.
22 Q. Okay.
23 A. Thank you.
24 Q. All right. Let's go back to

BENNETT

1
2  Exhibit 7.  It's marked tab 13.
3          These are the notes from your
4  meeting with your surgeon.
5      A.  Yep.
6      Q.  Let's focus on the document Bates
7  stamped Thunderdome -- ending in 332.
8          Do you see this document says the
9  note was performed by or the evaluation was
10 performed by Dr. Larry Stevens on
11 October 14, 2019?
12     A.  Yes.
13     Q.  And is this the consultation
14 notes from your appointment with him on that
15 day?
16     A.  Yes, it is.
17     Q.  Do you recall if Thunderdome gave
18 you time off from work to attend this
19 appointment?
20     A.  I do not.
21     Q.  Do you recall if you were
22 scheduled to work that day?
23     A.  I do not.
24     Q.  Did you receive any disciplinary
25 action for going to the doctor that day?

BENNETT

1
2      A.  I don't remember.
3      Q.  Let's look at the section with
4  the heading Assessment/Plan.
5          I'm going to read this -- it's
6  sort of a long section.  I'm going to read
7  this, and you tell me if I read out
8  correctly.
9          The patient and his father was
10 advised that we would recommend laparoscopic
11 repair of the left inguinal hernia plus
12 laparoscopic exploration of the right groin.
13 If a right inguinal hernia is found at the
14 time of the laparoscopic exploration, we
15 would plan to undertake repair at the same
16 anesthetic.  The patient and his father were
17 informed that we would use -- and it goes on
18 to describe the process, talk about some
19 possible risks --
20     A.  Uh-huh.
21     Q.  -- and some potential outcomes.
22          Did I read that correctly, and
23 summarize that correctly?
24     A.  Yes.
25     Q.  Okay.  So based on this visit

BENNETT

1
2  with Dr. Stevens, did you understand that
3  you were being recommended for surgical
4  treatment?
5      A.  I had been recommended from my
6  first time that I saw a Concentra doctor.
7      Q.  Okay.  And did you schedule your
8  surgery at this appointment?
9      A.  Yes.
10     Q.  And after you left this
11 appointment, did you believe the same
12 restrictions were in place from the
13 physician at Concentra who had been seeing
14 you?
15     A.  Yes.
16     Q.  So there were no changes to your
17 restrictions as a result of the appointment
18 with Dr. Stevens?
19     A.  He thought I shouldn't have been
20 working.  But that that was, that was his
21 opinion.
22     Q.  Do you see in his note that he's
23 advised you to take time off of work?
24     A.  I don't see exactly where it is,
25 no.

BENNETT

1
2      Q.  Okay.  But it's your testimony
3  that he told you that verbally without
4  putting it in the report?
5      A.  Yeah.  For how long it had been,
6  he couldn't believe it had been that long.
7      Q.  Okay.  But I want to get
8  specifically into any restrictions.  Did
9  Dr. Stevens give you any restrictions about
10 your ability to work with or without
11 modification?
12     A.  I told you, he -- I followed the
13 Concentra doctor's orders.
14     Q.  Okay.  So Dr. Stevens didn't
15 change anything that Concentra had ordered
16 in terms of your ability to work?
17         ATTORNEY WATERFILL:  Objection.
18         Ryan, are you able to see the
19 exhibit?
20         THE WITNESS:  Yes.
21         ATTORNEY WATERFILL:  Okay.  I
22 just want to make sure that you can
23 see what she's asking you about.
24         THE WITNESS:  I see what she's
25 asking me about.  It just doesn't make

Page 198

BENNETT

1  sense to me.
2          ATTORNEY WATERFILL:  You're able
3  to read it?
4          THE WITNESS:  Yes, I am.
5          ATTORNEY WATERFILL:  Okay.
6  BY ATTORNEY LEYSHOCK:
7      Q.   All right.  So Dr. Stevens did
8  not change your restrictions from what
9  Concentra had in place at the time of this
10  appointment; is that correct, Mr. Bennett?
11      A.   Yes.
12      Q.   All right.  And following this
13  appointment, you continued to comply with
14  the Concentra restrictions?
15      A.   Yes.
16      Q.   Both at work and on your own
17  time?
18      A.   Absolutely.
19      Q.   And do you know how your surgery
20  was scheduled that day?  Did you walk up to
21  a desk and schedule that personally, or did
22  that go through someone else?
23      A.   I went up to a desk, I believe.
24  And they gave me the date and a time

Page 199

BENNETT

1  available for the next surgery that he was
2  available.
3      Q.   Okay.  And do you know what date
4  that was?
5      A.   I don't remember the date.
6      Q.   Was it the date that you ended up
7  having the surgery?
8      A.   Yes.
9      Q.   Okay.  If I told you that was on
10  November 4th, would that sound correct?
11      A.   Yes.
12      Q.   2019.
13      A.   We had tried to have it a date
14  before that, actually, I believe.  I don't
15  remember, I don't remember if something had
16  happened where we couldn't do it.
17      Q.   When you say we couldn't do it,
18  do you mean --
19      A.   The surgeon couldn't do it that
20  day.
21      Q.   Okay.  So it got rescheduled by
22  the surgeon's option?
23      A.   Correct.
24      Q.   Okay.

Page 200

BENNETT

1      A.   They were missing paperwork.
2      Q.   Okay.  What paperwork was
3  missing?
4      A.   Something from the insurance
5  companies.
6      Q.   Okay.  And they called to let you
7  know that they didn't have authorization for
8  workers' comp to cover this --
9      A.   Yep.
10      Q.   -- surgery?
11      A.   Yes.  And I even -- I -- after
12  they told me that, I went and immediately
13  told Ricky and David Downs.
14      Q.   Okay.  And then what did Ricky
15  and David Downs say?
16      A.   Told me that they would talk to
17  Kier about it.
18      Q.   And what day was this when you
19  had the conversation with Ricky and David?
20      A.   I don't remember.  It was
21  whatever day that they called and
22  rescheduled it.
23      Q.   Did you have that conversation
24  with Ricky and David in person?

Page 201

BENNETT

1      A.   I didn't -- with David in person.
2  I think Ricky was on the phone.
3      Q.   And did you ever talk to Kier
4  Muchnicki in human resources about approving
5  or why the charge had not been approved?
6      A.   Yes.
7      Q.   And was that specific to this
8  surgery?
9      A.   Yes.
10      Q.   And on what date did that
11  conversation happen?
12      A.   I don't remember.
13      Q.   Okay.  What was said during that
14  conversation?
15      A.   I think she just asked me a
16  couple questions and then gave me the name
17  of the adjustor -- I think his name was Bob;
18  I could be wrong -- but gave me his phone
19  number as well.
20      Q.   And just to be clear, that's the
21  name of the workers' compensation insurance
22  adjustor?
23      A.   I believe that's what his name
24  was; yes.

Page 202

BENNETT

1    Q.    And did you reach out to him?
2    A.    Yes.
3    Q.    When did you reach out to him?
4    A.    Right after I received those
5    calls and told Ricky and David and talked to
6    Kier.  I don't remember the dates.
7    Q.    Did you talk to Bob?
8    A.    Yes.
9    Q.    What was said?
10   A.    Bob said that I needed to get
11   back ahold of my HR department because
12   they're missing paperwork from them.
13   Q.    Okay.  Did he identify what
14   paperwork was missing?
15   A.    He did not.
16   Q.    Okay.  And what did you do next?
17   A.    I don't, I don't know.
18   Q.    What did you do next with respect
19   to following up on workers' comp coverage so
20   you could have this surgery?
21   A.    I just kept attending my
22   appointments.  I let David and Ricky know if
23   they need updates.  I called Bob a few more
24   times.  I let Ricky know.  And I also let

Page 203

BENNETT

1    Ricky know that, you know, the surgery
2    hadn't taken place and that if it didn't
3    happen soon, I was going to have to take a
4    legal action.
5    Q.    Okay.  What day did you say that
6    to Ricky?
7    A.    The day before I was let go.
8    Q.    And who was present when you made
9    this statement?
10   A.    I made the statement to David
11   Downs, not actually to Ricky.  He relayed it
12   to Ricky.
13   Q.    I see.  And why did you tell
14   David Downs that you were considering taking
15   legal action?
16   A.    Because it had taken over two and
17   a half months and I'd been in pain for so
18   long.  It was the -- your guy's,
19   Thunderdome's insurance company that they
20   hired that -- and, and Thunderdome's HR that
21   that was supposed to be handling this.  They
22   weren't handling it in a very timely manner.
23   There was -- I was just in a lot of pain,
24   and I shouldn't have had to deal with that

Page 204

BENNETT

1    for so long.  And it seemed like the only
2    way I could get anywhere to get them to
3    schedule it and file the paperwork properly
4    was to threaten legal action.
5    Q.    Okay.
6    A.    I had conversations with both
7    Ricky and David about how long this was
8    taking, this process was taking.
9    Q.    All right.  So I thought you said
10   you told David Downs that you were
11   considering taking legal action because of
12   the duration of the process; is that right?
13   A.    I did.
14   Q.    Did you tell him that you felt
15   that Thunderdome had failed to properly
16   process your claim?
17   A.    Yes, I did.
18   Q.    Okay.  And did you tell Ricky
19   that same day that you were considering
20   taking legal action?
21   A.    I did.
22   Q.    You told him to his face?
23   A.    No.
24   Q.    Okay.  Which is it?

Page 205

BENNETT

1    A.    We had a conversation on the
2    phone.
3    Q.    Okay.  And you said that you were
4    contemplating taking legal action?
5    A.    Yes; and also report him to the
6    Triple B.
7    Q.    And why is that?
8    A.    Because I don't think they're
9    doing their job correctly.
10   Q.    And by "Triple B," do you mean
11   Better Business Bureau?
12   A.    That's correct.
13   Q.    And when you say they weren't
14   doing their job correctly, what are you
15   referring to?
16   A.    And also the workers' comp board.
17   We also told them they would let the
18   worker's comer board know as well.
19   Q.    And who is "we"?
20   A.    My father and I.
21   Q.    Was your father on the phone when
22   you were talking with Ricky?
23   A.    No.
24   Q.    Okay.  When did your father have

Page 206

BENNETT

1  BENNETT
2  a conversation with Ricky?
3      A.   He never had a conversation with
4  Ricky.  I never said he did.
5      Q.   Well, you said "we told him."
6      A.   Oh.  I apologize, then.  Maybe I
7  misspoke.
8          I told him that we, me and my
9  father, would be reporting them to the
10  Better Business Bureau, take legal action,
11  and then also file a complaint with the
12  workers' comp board.
13         But I also told him that I didn't
14  want to do any of that stuff.  I would
15  really just like to get this handled and
16  fixed right way so I could return to work
17  and be able to perform at a hundred percent.
18     Q.   And how did Ricky respond?
19     A.   He didn't really.  He just said
20  "Okay."  And then the next day I was let go.
21  He was slightly intoxicated.  Apparently, he
22  had been drinking over at Bakersfield.
23     Q.   Did you see him drinking?
24     A.   I'm sorry?
25     Q.   Did you see him drinking at

Page 207

BENNETT

1  BENNETT
2  Bakersfield?
3      A.   No.  He runs a regular tab there
4  every day.
5      Q.   But on that day did you see him
6  there?
7      A.   I saw him walk outside from his
8  apartment to the -- to one of the other
9  restaurants on Mass Ave.  Yeah, I saw him
10  working that day.
11     Q.   Did you see him with a drink in
12  his hand?
13     A.   Well, seeing somebody with a
14  drink in their hand is not unusual.
15     Q.   That's not responsive.  Did you
16  see Ricky with a drink in his hand around
17  the time that you had a phone call with him?
18     A.   I was told he had a tab over at
19  Bakersfield; that's why.
20     Q.   What about David?  When you had a
21  conversation with David about your status of
22  your workers' comp claim, how did David
23  respond?
24     A.   He didn't seem too concerned.  He
25  kind of blew it off a little bit.  He -- I

Page 208

BENNETT

1  BENNETT
2  guess I would say he referred to Ricky.
3      Q.   What does that -- I'm not sure I
4  understand.
5      A.   He didn't really, he didn't
6  really do anything.  He didn't really show
7  any type of concern, emotion about it.
8  After I told him, I think he was just more
9  going to go with whatever Ricky said.  I
10  think he just understood that he was going
11  to pass a message along.
12     Q.   Okay.  And you're saying this is
13  the day before you were terminated --
14     A.   Yes.
15     Q.   -- from Thunderdome?
16         And you were terminated on the
17  26th; is that correct?
18     A.   Yes.
19     Q.   So these conversation allegedly
20  occurred on the 25th.  Okay.
21         And at that time you had already
22  received, let's see, two disciplinary forms
23  that you and I have already gone through;
24  isn't that correct?
25     A.   Yes, I received those.

Page 209

BENNETT

1  BENNETT
2      Q.   And isn't it true that there was
3  a third disciplinary meeting that happened
4  on December [sic] 24th, which is two days
5  before you were let go and one day before
6  you allegedly made this statement about
7  pursuing legal action?
8      A.   No.  I don't think that's how it
9  occurred at all, actually.
10         ATTORNEY LEYSHOCK:  All right.
11         Let's open up tab 23 and mark that as
12         Exhibit 11.
13         (Exhibit 11, Team Member Warning
14         Form, Thunderdome000025, was marked
15         for identification.)
16  BY ATTORNEY LEYSHOCK:
17     Q.   I am showing you a document Bates
18  stamped Thunderdome000025 that we just
19  marked as Exhibit 11 to your deposition.
20         Can you see that okay?
21     A.   Yeah, I can.
22     Q.   Okay.  And what -- have you seen
23  this document before?
24     A.   No, I have not.  That's why it's
25  not signed by me.

BENNETT

2    Q.    Okay.  So you've never seen this?
3    A.    No.  This is created --
4          [Crosstalk.]
5          -- let go.
6    Q.    I'm sorry?
7    A.    It was created after I was sent
8    home and let go.
9    Q.    Oh.  How do you know that?
10   A.    Because I was sent home that
11   night, as it states on there, at 7:19, when
12   I came back from my break.
13   Q.    Okay.  So this document is a team
14   member warning form --
15         [Crosstalk.]
16         And it says Team Member Name:
17   Ryan Bennett.  So it was issued to you or
18   about you?
19   A.    Yes.
20   Q.    By Collin Martin; is that
21   correct?
22   A.    That is correct.
23   Q.    And it's dated October 24th,
24   2019?
25   A.    Yep.

BENNETT

2    Q.    And it's marked as a final
3    warning?
4    A.    Yep.
5    Q.    And it lists October 23rd, 2019
6    as the date of the infraction.
7          Did I read that correctly?
8    A.    It does.
9    Q.    And it says previous disciplinary
10   meeting was held on October 10, 2019.
11         Did I read that correctly?
12   A.    You read it correct.
13   Q.    And then the explanation of the
14   infraction here is:  Ryan was caught smoking
15   at 7:19 p.m. during no smoking/no break
16   time.  Ryan has been counseled on this
17   multiple times in the past.
18         Do you recall if you were smoking
19   at 7:19 p.m. on the day?
20   A.    I do.
21   Q.    Were you?
22   A.    Yes, I was.
23   Q.    Okay.  And was that no smoking/no
24   break time?
25   A.    No.  I was sent on my break,

BENNETT

2    actually.
3    Q.    Okay.  Who sent you on your break
4    at that time?
5    A.    Dayton Neely.
6    Q.    Okay.
7    A.    There should be video evidence of
8    it.  I mean, it's all recorded on the expo
9    line.
10   Q.    So you're saying although you
11   were smoking at 7:19 on this evening, you
12   were authorized to do so?
13   A.    Yes.  I was sent on break by
14   Dayton Neely.
15   Q.    Okay.  Do you see the bottom of
16   this form?
17   A.    I do.
18   Q.    And it says Manager Name Printed,
19   Collin Martin.
20         Did I read that correctly?
21   A.    It does.
22   Q.    And then below that it says:
23   Witness Name Printed and Witness Signature.
24         Would you agree that's Dayton
25   Neely's signature on this?

BENNETT

2    A.    Yeah, I do.
3    Q.    Okay.  So you're saying that
4    Dayton signed this document even though it
5    contains false information?
6    A.    Yeah.  He did whatever they --
7    yeah, I do.
8    Q.    Okay.  So you're saying that this
9    document is false and that you were actually
10   authorized to be smoking --
11   A.    Yes.
12   Q.    -- and Collin and Dayton are
13   lying by filling out this form?
14   A.    Yes.
15   Q.    Okay.  Do you have any evidence
16   to support your position that this is false?
17   A.    Well, it should have been
18   recorded on the cameras there.
19   Q.    Well, I'm asking if you have any
20   evidence.
21   A.    I personally don't have any
22   evidence except for what I was told to go
23   do; because you don't leave the expo line
24   without another manager being there present
25   to work the expo line so the tickets can go

Page 214

```
                    BENNETT
 1
 2   out to the servers.  That's a manager's
 3   position.
 4           Dayton was the only other manager
 5   on duty that night besides me.  So it would
 6   have had to have been him that would have
 7   covered the expo line for me to even walk
 8   away from it.
 9           And I just don't go on break to
10   go on break.  I don't -- I have to ask
11   permission to go on break.  So I asked
12   permission to go on break, and I was told I
13   could at 7:19 -- even though that's a
14   no-smoking time, that's when I was sent on
15   break.  So that's when I decided to smoke,
16   because that's when I was sent on break.
17       Q.   Is it possible that you could
18   have left the expo line without any coverage
19   and just gone outside and smoked?
20       A.   Absolutely not.
21       Q.   That's not possible?
22       A.   No.
23       Q.   It's possible; right?  I mean,
24   like, feasible?  Like you could actually
25   walk away from the line and no one would be
```

Page 215

```
                    BENNETT
 1
 2   there.  That's possible, Mr. Bennett?
 3       A.   That's possible, yeah.
 4       Q.   Okay.  Do you recall receiving a
 5   copy of this document or anyone talking to
 6   you about this situation?
 7       A.   No.  That's why I don't have it
 8   signed.
 9           Or, no, I'm sorry.  I answered
10   that incorrectly.
11           I do remember having a
12   conversation about it.  That's why I didn't
13   sign it.  And Dayton Neely signed that he
14   witnessed me not signing.  That's why I
15   believe Dayton signed it.
16       Q.   All right.  So to be clear, you
17   did receive a copy of this document.  You
18   just declined to sign it?
19       A.   That's correct.  I was told I
20   could go home after that.  Then I was
21   written up again for leaving my shift early,
22   even though I was told to go home after this
23   after not signing it.
24       Q.   All right.  Let's look at tab
25   number 21.
```

Page 216

```
                    BENNETT
 1
 2       A.   And I was told to go home over
 3   the phone by David Downs via Collin Martin.
 4           ATTORNEY LEYSHOCK:  Let's mark
 5       tab number 21 as Exhibit 12.  This is
 6       a one-page document Bates stamped
 7       Thunderdome000026.
 8           (Exhibit 12, Team Member Warning
 9       Form, Thunderdome000026, was marked
10       for identification.)
11           THE WITNESS:  Yeah, I don't
12       recognize this.
13   BY ATTORNEY LEYSHOCK:
14       Q.   This is a team member warning
15   form issued to Ryan Bennett by Collin Martin
16   dated October 24, 2019.
17           Did I read that correctly?
18       A.   Yes.
19       Q.   I mean, doesn't it seem weird
20   that I'm getting all these, these things
21   where it says I'm going to -- I'm being
22   disciplined?  Doesn't that look like it
23   some -- they're trying to get somebody out
24   of there?
25       Q.   Does this document say it's a
```

Page 217

```
                    BENNETT
 1
 2   final warning?
 3       A.   It does say that's a final
 4   warning.  But so did that last one, so I'm
 5   confused.
 6       Q.   And what's the date of this
 7   infraction?
 8       A.   The same date as the last one.
 9       Q.   And when was the previous
10   disciplinary meeting held?
11       A.   Previous disciplinary meeting was
12   held on 10/10.  But I believe it was 9/10
13   because it was put on there wrong.
14       Q.   Okay.  But there was a warning --
15   a previous disciplinary meeting.  There was
16   a previous disciplinary meeting?
17       A.   There you go.
18       Q.   And let's go down to the
19   explanation of the infraction.  I'll read
20   it, and you tell me if I've read it
21   correctly.
22           Ryan failed to properly order
23   produce on his shift two weeks ago on
24   October 10, 2019.  Ryan was counseled about
25   the importance of properly used the Piazza
```

Page 254

```
1              BENNETT
2  versa.  He said he had email
3  communication.
4       ATTORNEY WATERFILL:  Okay.
5  And --
6       ATTORNEY LEYSHOCK:  And he said
7  he did not check --
8       ATTORNEY WATERFILL:  So your
9  client --
10      ATTORNEY LEYSHOCK:  -- for
11 anything responsive to our discovery.
12      ATTORNEY WATERFILL:  [Inaudible.]
13 Did your client produce them?
14      ATTORNEY LEYSHOCK:  We don't have
15 anything.  But that doesn't mean that
16 Mr. Bennett doesn't have an obligation
17 to check.  We checked.
18      ATTORNEY WATERFILL:  Well, okay.
19 If you checked and you don't have any
20 emails --
21      ATTORNEY LEYSHOCK:  I don't think
22 it works that way.  I don't think
23 that's the way --
24      ATTORNEY WATERFILL:  You know,
25 Sarah, you can interrupt --
```

Page 255

```
1              BENNETT
2       ATTORNEY LEYSHOCK:  Let's talk
3  about this separate, Mark.  Let's talk
4  about it afterwards.  We only have a
5  little bit of time left.
6       ATTORNEY WATERFILL:  You just
7  interrupt all the time.  People are
8  trying to make a point.  And the point
9  is that you're asking for emails from
10 Thunderdome to Mr. Bennett.  If you
11 don't have them, then he doesn't have
12 them.
13      ATTORNEY LEYSHOCK:  That's not
14 true.  That is not a statement I can
15 stand behind, Mark.
16      ATTORNEY WATERFILL:  You're
17 kidding me.  A business doesn't keep
18 their emails?
19      ATTORNEY LEYSHOCK:  Can we agree
20 to talk about this at a different
21 time, Mark?  We have limited time
22 today.
23      ATTORNEY WATERFILL:  Sure.
24      ATTORNEY LEYSHOCK:  Okay.
25 Thanks.
```

Page 256

```
1              BENNETT
2  BY ATTORNEY LEYSHOCK:
3       Q.   All right.  Mr. Bennett, can you
4  turn your screen back on?
5       A.   Yeah.
6       Q.   Okay.  Thanks.
7            So when you came in and had a
8  conversation with Ricky, Collin, and Dayton
9  at 9:00 a.m. on the 25th, what did they tell
10 you?
11      A.   They told me they were letting me
12 go, and they handed me those papers that
13 they had drawn up.
14      Q.   Okay.  What were those papers
15 that they had drawn up?
16      A.   The four final warnings that you
17 have in evidence that you showed earlier,
18 ma'am.
19      Q.   All right.  And did you say
20 anything when they handed those to you?
21      A.   I told them I disagreed with
22 them.  And I told them I thought this was in
23 retaliation to me telling them I was going
24 to seek legal action and that I didn't agree
25 with it.
```

Page 257

```
1              BENNETT
2       Q.   And did they respond to you?
3       A.   They just asked me to leave.  So
4  I literally turned around, walked out the
5  back door right there, left.
6       Q.   Do you recall if they told you,
7  no, in fact, this was not in retaliation for
8  your comment?
9       A.   No.  They did not reply to that.
10      Q.   Okay.  But based on the
11 documentation that they gave you, it was
12 clear that your termination was for
13 performance; is that correct?
14      A.   No, it wasn't clear because I
15 think they're false documents and I think
16 they're just trying to cover up their tracks
17 to make sure they've got all the I's dotted
18 and T's crossed.
19           Normally, none of that stuff was
20 ever handwritten.  If you were asked to
21 produce ten out of ten warnings, they'll
22 never be handwritten.  Those are
23 professionally typed out and everything.  I
24 mean, that's never happened that way, so --
25 and the dates aren't even correct on them.
```

Page 258

```
                    BENNETT
1
2       Q.   Did they tell you who was
3  involved in the decision to terminate your
4  employment?
5       A.   Yeah; Ricky.
6       Q.   Is that what they told you?
7       A.   Ricky said "You're fired."
8       Q.   Okay.  That's a little bit of a
9  different question than what I'm asking.
10            Did they tell you who was
11 consulted in making the decision to
12 terminate your employment?
13      A.   Yes.  He said "You're fired."
14 And this isn't -- and he also made a point
15 to say "And this doesn't include -- this
16 doesn't -- this is not because of your
17 workers' comp.  Don't worry.  I've talked to
18 Kier and that's all settled, so..."
19      Q.   Okay.  So he did deny that this
20 was in retaliation for your workers'
21 compensation issue?
22      A.   Absolutely, he did.
23      Q.   Okay.  But he didn't tell you who
24 was involved in the decision, other than
25 that he had already consulted human
```

Page 259

```
                    BENNETT
1
2  resources?
3       A.   Yes.
4       Q.   But presumably Collin Martin and
5  Dayton Neely were at least aware, because
6  they were in that meeting with you; is that
7  correct?
8       A.   No.  Dayton Neely was not in that
9  meeting.  Dayton Neely just signed the
10 document that Collin wrote the day before.
11      Q.   Okay.  Who did you meet with on
12 the morning of the 25th?
13      A.   Collin, David Downs, and Ricky
14 Tindell.
15      Q.   I'm sorry.  I must have written
16 down the wrong name.  I must have written
17 down Dayton instead of David Downs.  I see
18 what you're saying.
19            All right.  So was David
20 consulted, then, with regard to the
21 termination decision?
22      A.   I would assume so, since its his
23 store and he's the general manager of it.
24      Q.   But Dayton Neely was not a part
25 of the conversation?
```

Page 260

```
                    BENNETT
1
2       A.   No, he was not.  I never actually
3  talked to Dayton Neely about the situation.
4            Can you scroll up just a tiny bit
5  for me.
6       Q.   (Complies.)
7       A.   The other thing is that this is
8  incorrect in the fact that it says I was
9  severed within the first 90 days of
10 employment.
11      Q.   And you think that's incorrect
12 because you had actually been with
13 Thunderdome for longer?
14      A.   That's correct.
15      Q.   But had -- is it more accurate to
16 say that you were terminated within the 90
17 days of your placement at The Eagle?
18      A.   No.
19      Q.   You were outside of the 90 days?
20      A.   September, October -- yeah.
21      Q.   Okay.  Do you know if Ricky
22 Tindell has ever sustained a workplace
23 injury?
24      A.   No.
25      Q.   Do you know if Collin or David or
```

Page 261

```
                    BENNETT
1
2  Dayton have?
3       A.   No.
4       Q.   Do you know if Kier Muchnicki has
5  ever sustained a workplace injury?
6       A.   No.
7       Q.   Do you know if they have ever
8  taken FMLA leave?
9       A.   No.
10      Q.   All right.  Did you end up having
11 surgery for your hernia?
12      A.   Yes.
13      Q.   And when did that surgery take
14 place?
15      A.   I want to say November.
16      Q.   Was it November 4th, 2019?
17      A.   That sounds about right.
18            ATTORNEY LEYSHOCK:  All right.  I
19       would like to open up tab 17 and have
20       this marked as Exhibit 16.
21 BY ATTORNEY LEYSHOCK:
22      Q.   Mr. Bennett, I'm showing you a
23 53-page PDF.
24      A.   I'm sorry.  Isn't this the same
25 one as before?
```

Page 262

BENNETT

2  Q.  I apologize.  This is Exhibit 8.
3  A.  That's what I thought.
4       ATTORNEY LEYSHOCK:  This is
5  Exhibit 8, friends.  Okay.  No need to
6  re-mark.
7  BY ATTORNEY LEYSHOCK:
8  Q.  So I'm showing you the 53-page
9  PDF that we previously marked as Exhibit 8
10  to your deposition.
11      I'd like to direct your attention
12  to the document Bates stamped
13  Thunderdome000205.  Will you take a look at
14  this document and tell me if it refreshes
15  your recollection with regard to whether
16  November 4th, 2019 is your surgery date.
17  A.  Yes, it does.
18  Q.  Okay.  And after this surgery
19  date, have you seen a physician for your
20  work-related injury?
21  A.  Yes.
22  Q.  Who have you seen?
23  A.  Dr. Charles Rogers, my primary
24  care physician.
25  Q.  And what type of treatment have

Page 263

BENNETT

2  you received?
3  A.  I've been given some low-dose
4  painkiller; some swelling medicine as well,
5  to -- well, yeah.  I have an enlarged left
6  testicle now because of the surgery.  So I
7  have to go get a swelling medicine for that.
8  Q.  And do you incur medical charges
9  when you see your physician?
10  A.  Absolutely.
11  Q.  And do you pay for those out of
12  your pocket?
13  A.  Yep.
14  Q.  Have you tried submitting those
15  to the workers' compensation claim?
16  A.  Yep.
17  Q.  You did?
18  A.  Yes.
19  Q.  Okay.  And what happened?
20  A.  I was sent the bill and had to
21  pay it.
22  Q.  Okay.  Did you receive any sort
23  of notice that the claim was being rejected?
24  A.  Yes.
25  Q.  And who was that notice from?

Page 264

BENNETT

2  A.  IU Health Network.
3  Q.  They're not the workers'
4  compensation insurance company, are they?
5  A.  No.  But that's who my doctor's
6  affiliated with.  It's the health network
7  that my doctor's affiliated with.
8  Q.  Did you contact the workers'
9  compensation administrator, Bob --
10  A.  Yes, I did.
11  Q.  -- about covering these items?
12  A.  Yes, I did.
13  Q.  And what did he say?
14  A.  He said that he would look into
15  it.
16  Q.  Okay.  And on what date did you
17  talk to him?
18  A.  This was months later.  I don't
19  remember.
20  Q.  Months later as in --
21  A.  Well, this was after post
22  surgery.  I had complications post surgery.
23  And I saw Dr. Charles Rogers because of
24  those complications, because he's my general
25  care physician.

Page 265

BENNETT

2       And he made -- he says that I
3  have an enlarged left testicle due to the
4  surgery.  He gave me -- he prescribed me
5  swelling medicine and pain-relief medicine.
6  Also some infection medicine so that
7  there's -- if there's any possible
8  infection.
9       I also had to do a blood test to
10  make sure it wasn't a STD, even though I
11  knew it wasn't a STD.
12      I had to do a urine test as well
13  to see if it wasn't a UTI that caused it.
14  It wasn't.  It was just an accident that
15  happens sometimes during hernia surgeries
16  because they go through your groin and go
17  through that area.
18      [Crosstalk.]
19  Q.  I'm sorry.  I didn't mean to cut
20  you off.
21  A.  That's fine.
22  Q.  So it's your testimony that you
23  contacted the insurance company
24  representative, Bob, months after you had
25  surgery --

BENNETT

2    A.    I actually contacted him a couple
3  of times.
4    Q.    -- in an attempt to get them to
5  pay your medical bills?
6    A.    I actually --
7         [Crosstalk.]
8    Q.    Did you hear my question?
9    A.    Yes, I did.
10   Q.    Okay.  Go ahead.
11   A.    I said "yes, I did."  But I also
12  contacted him several times.
13   Q.    All months after the surgery?
14   A.    Yes.  I even contacted -- I
15  contacted Siobhan as well, because I didn't
16  have Ricky's phone number to let him know.
17  And I think he sent me -- he got back to me
18  and sent me Kier's email address.
19   Q.    And did you reach out to Kier?
20   A.    Yes.  We spoke on the phone about
21  it.
22   Q.    Months after the surgery?
23   A.    Yes.
24   Q.    Do you remember how long that
25  phone call was?

BENNETT

2    A.    It wasn't very long.
3    Q.    And do you recall what was said
4  on that phone call?
5    A.    She said just to send her the
6  documents and she would look at it.
7    Q.    Meaning the medical bills?
8    A.    Yes.
9    Q.    And did you do that?
10   A.    Yes, we did.
11   Q.    Okay.  What records do you have
12  showing that you sent the medical bills to
13  Kier?
14   A.    I don't.  I just know what I did.
15   Q.    And how did you send them to her?
16   A.    I don't remember if we faxed it
17  or scanned it and emailed it.  Something of
18  that nature.
19   Q.    And do you remember approximately
20  what date you submitted these medical bills?
21   A.    No.  They were months and months
22  later.
23         I also know things are kind of
24  hard to deal with at that point because of
25  COVID.  So I know things got lost in the

BENNETT

2  shuffle, just because of lack of people
3  being available and open and working, things
4  like that.
5         I know it was a hard transition
6  period for a lot of businesses during that
7  time.  So -- I mean, I don't necessarily
8  blame people.  I just wanted to get it
9  fixed.  So I just tried to keep
10  communicating it.
11         And I communicated it to Bob
12  several times.  I reached out to Ricky --
13  well, Siobhan first, who reached out to
14  Ricky for me -- and then reached out to
15  Kier.
16         I mean, I feel like I did my due
17  diligence on it.
18   Q.    So how many times total would you
19  say after you had surgery you reached out to
20  someone verbally to try to have your
21  expenses covered by the workers'
22  compensation insurance?
23   A.    Four or five, six times.  I would
24  say five times.
25   Q.    Okay.  And how many times did you

BENNETT

2  reach out in writing?
3    A.    I think it was just the one text
4  message to Siobhan.
5    Q.    And how many times did you submit
6  the bill to someone associated with
7  Thunderdome, whether it's the insurance
8  company or whether it was --
9    A.    It's to Bob one time.  I sent it
10  to Bob one time.  And then I sent it to Kier
11  the one time.  And that's -- I think that
12  was the only two times I sent it.
13   Q.    And do you recall whether you
14  sent that by email --
15   A.    No.
16   Q.    -- mail, fax --
17   A.    No.  I told you I don't recall.
18   Q.    Okay.  So neither with respect to
19  documents you -- the bills you submitted to
20  Kier or the bills you say you submitted to
21  Bob, you don't recall how you submitted
22  those?
23   A.    No.
24   Q.    You didn't request a delivery
25  receipt or anything like that?

Page 270

BENNETT

1
2     A.    No, I did not.  You know, it's
3 not something I'm used to be dealing with,
4 to be honest with you.  No.  I should have
5 done something like that, though, looking
6 back.
7     Q.    And after you submitted the
8 medical records to Kier, did you hear from
9 her?
10    A.    No.  But I did follow up a couple
11 weeks later, and I left a message.  I never
12 got a call back after that, though.
13    Q.    And what about Bob?  When you
14 submitted copies of the bills to Bob, did
15 you get a response?
16    A.    He would answer sometimes.  But,
17 no, it was hard to get ahold of him.
18    Q.    Well, you said you submitted the
19 records one time?
20    A.    Yes.
21          One time to Bob, one time to
22 Kier.
23    Q.    Okay.  And did you have multiple
24 communications with Bob other than the time
25 when you submitted your bills?

Page 271

BENNETT

1
2     A.    Yes.  I tried to follow up
3 several more times; like three, four, five
4 times I said, to see what was going on.
5     Q.    And on those times that you
6 attempted to follow up, did you talk to Bob?
7     A.    Not all of them, no.  That's what
8 I just said.  Sometimes he would answer;
9 sometimes he wouldn't.
10    Q.    How many times did you talk to
11 Bob?
12    A.    Twice.
13    Q.    And what did he say in the first
14 one, the first -- I assume it's a phone
15 call?
16    A.    Yes.
17    Q.    And what did he say in the first
18 phone call?
19    A.    Told me to get him that
20 paperwork; he would take a look at it; he
21 would reach out; he would reach back to me
22 when he got an answer.
23    Q.    And when you say "got an answer,"
24 what's the question?
25    A.    The question is -- the first

Page 272

BENNETT

1
2 question was:  Were they actually liable for
3 those doctor bills?  He wasn't sure of that.
4 He needed to find out if they were
5 technically liable.
6     Q.    Okay.  Anything else that was
7 said in that phone call?
8     A.    Not that I can recall.
9     Q.    And what about on the second
10 occasion in which you spoke with Bob?
11    A.    He said that he didn't have an
12 update yet.
13    Q.    Do you remember how much time
14 passed between the first and the second
15 conversation?
16    A.    I would say a month and a half.
17    Q.    Did he say anything else?
18    A.    No.
19    Q.    So he didn't say that he was
20 waiting on someone else or he had not looked
21 at the documents; he just simply said he's
22 waiting on an update?
23    A.    He said he didn't have an update
24 for me.
25    Q.    Okay.  He didn't have an update

Page 273

BENNETT

1
2 for you.  And did you say anything to him?
3     A.    I said that was very
4 disappointing.  You know, this is hurting my
5 credit because it's basically turned into
6 corrections.  I told him it was a little
7 ridiculous that I'm even dealing with this.
8          I was a little heated; yeah.
9     Q.    How long did that conversation
10 last?
11    A.    It lasted for about two and a
12 half minutes for my side.  I think he
13 understood my point.
14    Q.    And what did you understand would
15 happen after your phone call?
16    A.    After the phone call is when I
17 decided to call my father and see what we
18 needed to do to take this to a higher level
19 because it wasn't getting dealt with in a
20 very timely manner; and at that point it was
21 starting to affect my credit, like I said.
22    Q.    And what happened after you
23 talked to your father?
24    A.    We decided to seek counsel.
25    Q.    And who did you seek first?

BENNETT

2      A.   There was several attorneys that
3  my father's familiar with that he, he threw
4  the name out.  And then we came across
5  Mark's name.  And I had known his son.  So
6  decided to keep it within the family, so to
7  say, I guess.
8      Q.   Yeah.  Don't tell me anything
9  that you and Mark have talked about.  And
10  I've not asked for any of that.  But I just
11  want to put up a guardrail, just to make all
12  of us more comfortable.
13      A.   Yeah, no, I understand.  I'm not
14  telling you what we talked about.  I'm just
15  letting you --
16      Q.   Did you consult with any other
17  attorneys, on the phone or in person, before
18  hiring Mark?
19      A.   Yes.  My father did, and I did as
20  well.
21      Q.   Okay.
22      A.   I believe the Attorney General's
23  office, a gentleman by the name of Reed
24  Rickey [phonetic] as well.
25      Q.   Anyone else?

BENNETT

2      A.   And then Mark.
3      Q.   Did any -- do you know what the
4  Family & Medical Leave Act is?
5      A.   No, I do not.
6      Q.   Okay.  Did you file a lawsuit
7  that involved a claim arising under the
8  Family & Medical Leave Act?
9      A.   Yes.
10      Q.   And that lawsuit was filed
11  against Thunderdome; is that correct?
12      A.   Yeah.  That's why we're here.
13      Q.   So you must have a general
14  understanding since you're accusing them of
15  doing something wrong with respect to that
16  law.
17      A.   I do not --
18      Q.   You must have some understanding
19  of what that law involves; is that fair to
20  say?
21      A.   Sure.
22      Q.   Tell me in your own words what
23  you think the FMLA provides to employees.
24      A.   I think they provide another
25  option for employees.  Didn't know what the

BENNETT

2  option -- that that option was even
3  available, and I didn't even understand it.
4      But it's just another -- it's an
5  option for -- it's another option for
6  employees that are injured, that have major
7  things happen in their lives that --
8  uncontrollable circumstances happen and take
9  over and they need time off.
10      I believe that that is what is
11  there to help protect those employees and
12  the rights to do that.
13      Q.   Okay.  Any -- is it for any
14  personal reason or only certain reasons?
15      A.   I don't know --
16      ATTORNEY WATERFILL:  I'm going to
17      show a running objection to this as
18      calling for a legal conclusion.
19      ATTORNEY LEYSHOCK:  Okay.
20      ATTORNEY WATERFILL:  You can
21      answer.
22  BY ATTORNEY LEYSHOCK:
23      Q.   You can answer.
24      A.   Yeah, I don't know.
25      Q.   Okay.  So you don't know when --

BENNETT

2  or you don't have an understanding of when
3  employees may be entitled to FMLA and when
4  they may not be?
5      A.   No.
6      Q.   Do you have an understanding of
7  how much leave is available under the FMLA?
8      A.   No.  Again, Thunderdome never
9  trained or showed me any of that stuff.
10      Q.   Do you recall seeing a poster
11  with "Your FMLA Rights" or "Your Rights
12  Under the FMLA" in the restaurant?
13      A.   Which one?
14      Q.   All three restaurants.  Do you
15  recall?
16      A.   I don't.
17      Q.   Okay.  Do you recall if the leave
18  that's available under the FMLA is paid or
19  unpaid?
20      A.   No, I don't.  I don't know, I
21  don't know about the FMLA.
22      ATTORNEY LEYSHOCK:  Okay.  Let's
23      open up tab 27 and mark that as...
24      THE COURT REPORTER:  Actual 16.
25      ATTORNEY LEYSHOCK:  That's right.

Page 278

BENNETT

1     Exhibit 16 for real this time.
2          (Exhibit 16, Complaint, was
3     marked for identification.)
4  BY ATTORNEY LEYSHOCK:
5          Q.   Mr. Bennett, I'm showing you a
6  document that is not Bates stamped, but it
7  is a four-page PDF.  We've just marked it as
8  Exhibit 16 to your deposition.
9          Do you recognize this document?
10         A.   Yes.
11         Q.   What is it?
12         A.   I believe that's the -- it's what
13 we filed to -- it's our lawsuit that we
14 filed.
15         Q.   Okay.  This is the complaint that
16 you filed through your attorney against
17 Thunderdome Restaurant Group; is that
18 correct?
19         A.   Yeah.
20         Q.   And Thunderdome was your former
21 employer, the same Thunderdome that we were
22 talking about throughout this entire
23 deposition today?
24         A.   That's correct.

Page 279

BENNETT

1          Q.   All right.  Do you understand
2  that when I use the acronym "FMLA" that I'm
3  referring to the Family & Medical Leave Act?
4          A.   Yes, I do.
5          Q.   Okay.  Can you adjust your
6  screen.  I can't see you, and I need to be
7  able to see you when I talk.
8          A.   (Complies.)
9          Q.   Perfect.
10         Let's look at paragraph 10 of
11 your complaint.  In the first claim you
12 allege that you were entitled to medical
13 leave under the FMLA but Thunderdome "never
14 properly accounted for plaintiff's FMLA
15 leave."
16         Did I read that correctly?
17         A.   I think you did.
18         Q.   Okay.  Have you ever taken FMLA
19 leave from any employer?
20         A.   No.
21         Q.   Did you ever request FMLA leave
22 from Thunderdome?
23         A.   No.
24         Q.   Did you ever request FMLA leave

Page 280

BENNETT

1  from any employer?
2          A.   I was never told it was available
3  to me at Thunderdome.
4          Q.   Okay.  What about at any other
5  employer?
6          A.   Yeah.  They had, they had -- they
7  offered things like that.  I know people
8  that have used it before.
9          Q.   Okay.  So you're aware that
10 people used it.  But no one offered you FMLA
11 leave in the past?
12         A.   No.  I didn't need to.
13         Q.   Are you alleging -- where'd you
14 go, Mr. Bennett?
15         A.   I'm right here.
16         Q.   Okay.  Are you alleging in your
17 lawsuit that you've suffered damages because
18 you weren't provided FMLA leave?
19         A.   Yes.
20         Q.   Okay.  And were you ever denied
21 an opportunity to go to a doctor's
22 appointment by Thunderdome?
23         A.   No.
24         Q.   And did you ever -- were you

Page 281

BENNETT

1  aware of any other Thunderdome employee
2  taking FMLA leave during your tenure with
3  Thunderdome?
4          A.   No.
5          Q.   Do you believe that Thunderdome
6  terminated you because you requested FMLA
7  leave?
8          A.   I think that they terminated me
9  because of me threatening to take a legal
10 action.
11         Q.   Okay.  So the answer is no?
12         A.   No.
13         Q.   Do you think it's possible that
14 Thunderdome terminated you for reasons
15 unrelated to your injury?
16         A.   No.
17         Q.   Okay.  What evidence do you have
18 to support that?
19         A.   Oh, I have evidence of those two
20 guys telling me that Ricky and David are
21 trying to have me fired.
22         Q.   Anything else?
23         A.   The evidence of Ricky Tindell
24 going over to Erica Sommers and saying "I

BENNETT

1  BENNETT
2  finally fired his fat ass."
3          "Finally," in the way that
4  statement reads and sounds, it sounds like
5  he was trying to do it for a while.
6      Q.    That's your interpretation?
7      A.    It wasn't just my interpretation,
8  but...
9      Q.    Is that your interpretation?
10     A.    That was my interpretation, yes.
11     Q.    Was that Erica's interpretation?
12     A.    Yes.
13     Q.    Is it possible that that wasn't
14  Ricky's terms?
15     A.    No.
16     Q.    That's not possible?
17     A.    Why would he word it like that?
18     Q.    Perhaps --
19          [Crosstalk.]
20          Could he have been referring to a
21  long pattern of behavioral issues -- I'm
22  sorry; let me repeat that -- a long pattern
23  of performance issues?
24     A.    No; because why would he talk to
25  a line lead at another restaurant about my

BENNETT

1  BENNETT
2  performance issues when she's an hourly
3  employee and I'm a salaried manager?  That
4  would be a little unprofessional, I would
5  think.
6      Q.    Well, I don't think that's the
7  issue that we're talking about.  We're just
8  simply saying --
9      A.    No --
10     Q.    -- are there --
11          [Crosstalk.]
12          -- more than one way to interpret
13  that statement?
14     A.    No.
15          ATTORNEY WATERFILL:  Hold on.
16     Hold on here.  We've got to answer
17     questions.  There's not a question
18     pending.
19          What's the question?
20          ATTORNEY LEYSHOCK:  Well, the
21     question was -- Mr. Bennett, I can't
22     see your face.
23  BY ATTORNEY LEYSHOCK:
24     Q.    The question is:  Is it possible
25  that Ricky Tindell meant something different

BENNETT

1  BENNETT
2  than the way you've interpreted his
3  statement to Erica Sommers?
4      A.    No.
5      Q.    All right.  Okay.  Mr. Bennett,
6  is it your position that you were terminated
7  because of your workers' compensation claim?
8      A.    Yeah.
9      Q.    Okay.  What evidence do you have
10  to connect the reason for your termination
11  to your workers' compensation claim?
12     A.    Well, my workers' compensation --
13  I filed workers' compensation.  And after I
14  had, there was, there was a pattern that
15  looks like people were trying to get me
16  fired for it.
17     Q.    Okay.  But, Mr. Bennett, didn't
18  you acknowledge performing some of the
19  violations that we discussed earlier that
20  are documented as first, second, and final
21  warning?
22     A.    I don't recall.  Which one did I
23  agree with that?  I believe there --
24     Q.    You did.
25     A.    I don't think I agreed with those

BENNETT

1  BENNETT
2  documents.
3      Q.    But you admitted you engaged in
4  the conduct that constituted the violation
5  as written up in those documents.
6      A.    No.  That's why I didn't sign
7  them and I don't agree with them.  I also
8  say that I thought they were false.
9      Q.    So what evidence do you have that
10  the workers' compensation claim is the
11  reason for your termination?
12     A.    I just stated those.  There's
13  been evidence of current employees hearing
14  Ricky and David talking about ways of
15  getting me fired.  And it was only after I
16  had filed the workers' compensation claim
17  that they were doing that.
18     Q.    Okay.  So it's the conversation
19  that you heard and it's your disagreement
20  with what's in the performance write-ups in
21  September and October; is that correct?
22     A.    Correct.
23     Q.    Anything else?
24     A.    I think they were trying to get
25  me to quit.

Page 286

BENNETT

2    Q.   What did they do to try to get
3    you to quit?
4    A.   They didn't make it a very
5    hospitable work environment; that's for
6    sure.  I had to deal with people saying to
7    me -- just like the blond manager said --
8    "Do you ever fucking do your job?"
9         Like, I'm sorry I'm hurt.  I'm
10   sorry that I've been injured and I can't
11   physically do it.
12        So, yeah, there was workplace --
13   they didn't make the workplace very
14   hospitable for me, even though I was
15   injured, because I was trying to help out
16   his front-of-the-house employees, the
17   bartenders and the bar backs, by helping
18   them with the order that came in, because I
19   was told to by Dayton Neely.
20   Q.   Do you believe the reason you
21   were terminated is because you filed a
22   workers' compensation claim?  Or do you
23   believe it's because you said to David
24   Downs -- I can't see your face.
25   A.   I'm right here.

Page 287

BENNETT

2    Q.   Okay.  Do you believe the reason
3    you were terminated is because you filed a
4    workers' compensation claim or because you
5    said you were going to retain legal counsel?
6    A.   I think both tie into each other.
7    You can't have one without the other.
8    Q.   Okay.  So you think it's both?
9    A.   Yeah.
10   Q.   Have you had any other
11   conversations with a Thunderdome employee
12   about your termination?
13   A.   Yeah; with a couple of them,
14   actually.
15   Q.   Who have you spoken with?
16   A.   Oh, it wasn't necessarily about
17   my termination.  It was more about just
18   what's-going-on, how's-it-going type of
19   thing.
20   Q.   Okay.  Let me ask the question
21   again, then.
22        Have you talked to any
23   Thunderdome employees about your
24   termination?
25   A.   Yes.  Well, I don't know.  He

Page 288

BENNETT

2    doesn't work for them anymore.  But he
3    worked for them at the time; yeah.
4    Q.   Who was that?
5    A.   Matt Sutter.  He's a really good
6    friend of mine.
7    Q.   And what -- which restaurant did
8    he work for?
9    A.   I think he was first hired on at
10   Thunderdome with Bakersfield.
11   Q.   Did he work at other restaurants?
12   A.   Yes, he did.
13   Q.   Which ones did he work at?
14   A.   I believe he worked for The Eagle
15   in Louisville.  I don't know.  I had
16   referred him to Thunderdome to come work
17   there and then told him he could put me as a
18   reference.  And then he was -- ended up
19   being hired in Louisville for one of their
20   concepts.  I think it was The Eagle.
21        And then he wanted to move back
22   closer to his friends.  We originally had
23   been co-workers before at Kilroy's and had
24   become friends over the last four years or
25   so.

Page 289

BENNETT

2        And he would tell me what was
3    going on and how things were going and
4    things like that.  And we talked about
5    our -- I mean, our other friends that we
6    have in common.  We have a bunch of friends
7    in Bloomington together because we went to
8    school down there and we worked down there
9    together, spent three years together, so --
10   working side by side.
11        So I don't know.  He's just been
12   a really good friend over the years.  And I
13   recommended him to his current job that he's
14   at now, along with our other good friend,
15   who's the regional manager, Ross Freeman.
16   But yeah.
17   Q.   Did he start working for
18   Thunderdome after you left?
19   A.   He was working for Thunderdome
20   before I left.
21   Q.   When did he start?
22   A.   I don't recall.
23   Q.   Okay.
24   A.   You'd have to ask him.  Or Kier
25   could pull up his hire date.