## EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RYAN BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO. 1:21-cv-03027-RLY-MJD |
| THUNDERDOME RESTAURANTS, LLC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEPOSITION OF KIER MUCHNICKI

DATE: AUGUST 10, 2022

PAGES 1 - 96

Recording Agent:  Christy Brooks
Phoenix Transcription Services, LLC
christy@phoenixtranscription.org
317-937-2396

APPEARANCES

ON BEHALF OF THE PLAINTIFF RYAN BENNETT:

MARK WATERFILL
ATTORNEY AT LAW
2230 STAFFORD ROAD, SUITE 115
PLAINFILD, INDIANA
317-501-6060
Mark@waterfilllaw.com


ON BEHALF OF THE DEFENDANT THUNDERDOME RESTAURANTS, LLC:

SARAH CLAY LEYSHOCK
TAFT LAW FIRM
425 WALNUT STREET SUITE 1800
CINCINNATI, OH 45202
513-357-8731
Sleyshock@taftlaw.com

# Contents

AUGUST 10, 2022 ................................................................................. 6

KIER MUCHNICKI, .............................................................................. 7

DIRECT EXAMINATION OF KIER MUCHNICKI ...................................... 7

  BY MR. WATERFILL, COUNSEL FOR PLAINTIFF: ............................... 7

    (Exhibits 1 - 23 received) ................................................. 9

    (Exhibit 24 received) ...................................................... 22

    (Exhibit 25 received) ...................................................... 24

    (Exhibit 4 received) ....................................................... 30

    (Exhibit 2 received) ....................................................... 37

DIRECT EXAMINATION CONTINUES ................................................. 40

    (Exhibit 7 received) ....................................................... 40

    (Exhibit 9 received) ....................................................... 47

    (Exhibit 10 received) ...................................................... 48

    (Exhibit 11 received) ...................................................... 53

    (Exhibit 13 received) ...................................................... 57

    (Exhibit 14 received) ...................................................... 58

    (Exhibit 15 received) ...................................................... 58

    (Exhibit 26 received) ...................................................... 68

    (Exhibit 27 received) ...................................................... 69

    (Exhibit 28 received) ...................................................... 70

(Exhibit 31 received) ....................................................................... 74

(Exhibit 32 received) ....................................................................... 81

CROSS-EXAMINATION OF WITNESS KIER MUCHNICKI ...................... 89

    BY MS. LEYSHOCK, COUNSEL FOR DEFENDANT:.......................... 89

REDIRECT EXAMINATION OF WITNESS KIER MUCHNICKI................. 91

    BY MR. WATERFILL, COUNSEL FOR PLAINTIFF:............................ 91

CERTIFICATE OF OATH ...................................................................... 95

CERTIFICATE OF REPORTER............................................................. 96

APPEARANCES

ON BEHALF OF THE PLAINTIFF RYAN BENNETT:

MARK WATERFILL
ATTORNEY AT LAW
2230 STAFFORD ROAD, SUITE 115
PLAINFILD, INDIANA
317-501-6060
Mark@waterfilllaw.com


ON BEHALF OF THE DEFENDANT THUNDERDOME RESTAURANTS, LLC:

SARAH CLAY LEYSHOCK
TAFT LAW FIRM
425 WALNUT STREET SUITE 1800
CINCINNATI, OH 45202
513-357-8731
Sleyshock@taftlaw.com

<u>AUGUST 10, 2022</u>

1

2          (Called to order at 10:04 a.m.)

3                    RECORDING AGENT:  All right.  And let me just swear the witness

4     in.  And Kier --

5                    MS. LEYSHOCK:  I'm sorry. Before we start, can we just confirm

6     that this is Ryan, maybe verbally?  Just to make sure for security purposes

7     there's not someone else attending this deposition.

8                    RECORDING AGENT:  Yes.

9                    MR. BENNETT:  No, this is Ryan.

10                   MS. LEYSHOCK:  Okay.  Okay.

11                   RECORDING AGENT:  All right.

12                   MS. LEYSHOCK:  Just wanted to make sure.  Thanks guys.

13                   MR. WATERFILL:  Yeah.

14                   MS. LEYSHOCK:  Thank you.

15                   RECORDING AGENT:  All right.

16                   And then Kier, am I saying your name correctly?

17                   MS. MUCHNICKI:  Yes, it's Kier.

18                   RECORDING AGENT:  Kier.

19                   RECORDING AGENT: Okay.

20                   MS. MUCHNICKI:  Yes.

21                   RECORDING AGENT:  And how do you pronounce your last name?

22                   MS. MUCHNICKI: It's Muchnicki.

23                   RECORDING AGENT:  Muchnicki.  Okay.

24                   All right.  If you would please raise your right hand.

25

1          RECORDING AGENT:  Okay.  Thank you.

2    BY MR. WATERFILL:

3    Q      When did you say that you began working for Thunderdome?

4    A      It was January of 2016, I believe.

5    Q      And who hired you?

6    A      The ownership group, so Joe Lanni, John Lanni, and Alex Blust.

7    Q      Are those three still engaged at Thunderdome?

8    A      Yes.

9    Q      And what position were you initially hired into?

10   A      My initial position was a combination of director of training for Currito

11   and director of HR.

12   Q      What's Currito?

13   A      Currito is one of the quick-service restaurant brands that we have.

14   Q      So the director of HR was for the entire company?

15   A      That's correct.

16   Q      Where did you work prior to Thunderdome?

17   A      Prior to Thunderdome I worked for Winegardner and Hammons hotel

18   management group.

19   Q      Where?

20   A      The location I was working at when I left Winegardner, and Hammons

21   was Marriott Union Centre.

22   Q      In Cincinnati?

23   A      Yeah, in West Chester, which is a suburb outside of Cincinnati.

24   Q      What was your job title?

25   A      Director of HR.

1    Q        During what period of time did you work there?

2    A        So I worked for Winegardner and Hammons for ten years at various

3    locations.  So at the last location I worked at, which is Marriott Union Centre, I

4    was there for approximately four years.

5    Q        And when did you begin working there?

6    A        At the Marriott -- I'll have to kind of think through this a minute.

7    Probably 2000-and -- let's see -- 2011, likely.

8    Q        To whom did you report?

9    A        At the time of leaving I was reporting to Jennifer Porter, the general

10   manager of the hotel.

11   Q        What hotel?

12   A        Marriott Union Centre.

13   Q        Why did you leave?

14   A        I left for a better opportunity.

15   Q        More pay?

16   A        It was a little bit more pay, yes.

17   Q        Where did you work prior to Marriott Union Centre?

18   A        Prior to Marriott Union Centre I was at DoubleTree in Blue Ash.

19   Q        Doing what?

20   A        I was the director of HR.

21   Q        During what period?

22   A        Let's see -- let me do a little -- I was there 2011 -- I was most likely there

23   from 2000-and -- probably 2008 to 2011.

24   Q        To whom did you report?

25   A        At the time of leaving the DoubleTree I reported to David Sundermann.

1    Q       Why did you leave?

2    A       I received a promotion to a larger hotel within the same company,

3    Winegardner and Hammons.

4    Q       What did you do before working at the DoubleTree?

5    A       Before working at the DoubleTree I worked at Holiday Inn in Fairborn,

6    Ohio.

7    Q       What was your job?

8    A       Director of HR.

9    Q       To whom did you report?

10   A       At the time of leaving there I reported to Mike Cunie (phonetic), I believe.

11   Q       Why did you leave?

12   A       For a promotion to a larger hotel.

13   Q       During what period of time did you work there?

14   A       Let's see.  I worked there probably 2006 to 2008.

15   Q       What did you do prior to that job?

16   A       I worked at the Marriott Union Centre.

17   Q       Doing what?

18   A       I was the restaurant manager.

19   Q       To whom did you report?

20   A       I reported to Brian Perkins, the general manager.

21   Q       During what period of time?

22   A       That would have been 2005 to 2006.

23   Q       Why did you leave?

24   A       For a promotion to an HR director position at another hotel within the

25   same company.

| 1 | Q | And prior to the restaurant manager job, what did you do? |
| 2 | A | I worked for Cincinnati Financial. |
| 3 | Q | Doing what? |
| 4 | A | As a commercial lines insurance underwriter. |
| 5 | Q | During what period of time? |
| 6 | A | So that would have been about 2003 to 2005. |
| 7 | Q | To whom did you report? |
| 8 | A | I believe I reported to Steve Smith (phonetic). |
| 9 | Q | Why did you leave? |
| 10 | A | I left because I did not feel that I wanted to stay in the insurance |

industry.  It was my first job out of college, and I had always worked in the

hospitality industry and was interested in HR and hospitality.

| 13 | Q | Where did you go to college? |
| 14 | A | I went to Ohio University. |
| 15 | Q | Did you obtain a degree? |
| 16 | A | Yes. |
| 17 | Q | In what? |
| 18 | A | A bachelor's of communication. |
| 19 | Q | What year? |
| 20 | A | I graduated in 2003. |
| 21 | Q | How old are you? |
| 22 | A | I am 41. |
| 23 | Q | Have you obtained any other higher education degrees? |
| 24 | A | I have a certification, not a degree, but a certification. |
| 25 | Q | In what? |

1    A     In human resources, the SHRM-SCP.

2    Q     Anything else?

3    A     No.

4    Q     When did you obtain that?

5    A     In 2017.

6    Q     What did you do to obtain that?

7    A     I took a course at Miami University, West Chester campus, so that was a

8    -- sort of a prep course to sit for the exam.

9    Q     Any other training after college?

10   A     Other than on-the-job training and then continuing education that I'm

11   required to keep up with for my certification, no other formal training.

12   Q     What do you mean to keep up you job --

13   A     To keep up my -- oh, I'm sorry.

14   Q     Go ahead and explain.

15   A     So part of my SHRM-SCP certification with the Society for Human

16   Resource Management is that you complete I think it's 60 credits of continued

17   education for each three-year period, so that entails basically training courses

18   of a variety related to the HR field.

19   Q     Have you taken training courses regarding the Family Medical Leave Act?

20   A     Yes.

21   Q     When?

22   A     I would have to go back and look at records to recall.

23   Q     Well, can you estimate the month and year?

24   A     I don't know if I could estimate the month.  I received my certification in

25   2017.  I can recall taking some of my credit hours that, you know, may have

1    reviewed some of the FMLA regulations, you know, throughout the course of

2    that.  I don't know that I could get any further specific on the exact month or,

3    you know, formal training.  We complete 60, which equals 60 hours, basically,

4    in a three-year period, so that, you know, would be difficult to recall.

5    Q       That was completed in 2017?

6    A       My certification.  I sat for the exam in 2017, so that's when I received the

7    certification, and after you receive the certification then you have three-year

8    increments of time that you have to complete the 60 hours of continuing

9    education.  So it would have been somewhere in between 2017 and 2020, to

10   my recollection.

11   Q       Have you attended any seminars specifically on the FMLA?

12   A       I don't believe so, no.

13   Q       Have you attended any seminars specifically on workers' comp?

14   A       I have attended seminars promoted by the Bureau of Workers'

15   Compensation in Ohio.  I have attended seminars that have included

16   information on workers' compensation.

17   Q       Where?

18   A       Well, the Ohio BWC virtual seminars.

19   Q       When?

20   A       I'd have to go back and look at exact records.  You know, I would -- I

21   know since I've been with Thunderdome I have attended various virtual or in-

22   person seminars that provide, you know, current event topics on, you know,

23   various HR functions, policies, regulations, and many of those have included

24   some of these topics.  So I don't have any exact dates on hand.

25   Q       Who is Thunderdome's FMLA coordinator?

1     A     Oh, that's myself.

2     Q     Who designated you in that position?

3     A     Joe Lanni.

4     Q     How long have you held that position?

5     A     Since I was hired into the company.

6     Q     Does Thunderdome use Form 380?

7     A     If you're referring to a form number in regards to the FMLA forms, quite

8     possibly.  We use all of the FMLA-regulated forms.  I don't know the form

9     numbers offhand.

10    Q     Does Thunderdome use its own forms or those provided by the

11    Department of Labor?

12    A     We use the Department of Labor forms.

13    Q     Have you ever taught an FMLA seminar to Thunderdome employees?

14    A     No, I have not.

15    Q     Has anyone?

16    A     No one has taught an individual only-for-FMLA course.  FMLA is covered

17    through our orientation for team members, line-level employees, and managers

18    during the orientation process.

19    Q     Was Ryan Bennett a manager?

20    A     Ryan Bennett was a manager, yes.

21    Q     If he were to testify that he was never instructed about the FMLA, would

22    you believe that to be true?

23    A     I don't have any knowledge on his exact, you know, day-to-day

24    employment, so I could not indicate that.  I can say that every employee in the

25    company is required to go through an orientation and is given a handbook, and

1    through that handbook that is reviewed at orientation and in the handbook

2    that they are given a copy it does include instructions for -- it does include the

3    FMLA process, and it includes instructions on what to do if you need to request

4    a leave of absence.

5    Q      Who provides this instruction?

6    A      Who provides the instruction on which part?

7    Q      On what you just testified to, who provides that instruction?

8    A      The orientation is provided by the general manager of the restaurant,

9    and they review the handbook through the orientation.

10   Q      So regarding Ryan Bennett, who would have provided that instruction to

11   him?

12   A      Let's see.  I believe -- well, his general manager at the location he was

13   hired for.  I don't recall right now who the GM of Bakersfield was when he was

14   hired, so I can't recall the exact general manager.

15   Q      You have possession of Ryan Bennett's personnel file, correct?

16   A      I do.  It's not right in front of me, but I -- you know, it's -- somewhere I

17   do have information.

18   Q      There's no indication in his personnel file that Ryan Bennett received

19   instruction on the FMLA, is there?

20   A      I don't have that in front of me, so I can't testify to that.  If there's

21   nothing in the file, it doesn't mean that it didn't happen.

22   Q      Well, does the company use forms that -- like a checklist to say that this

23   employee was instructed on these various human resources issues?

24   A      There is a signoff to the handbook.

25   Q      Okay.  To the handbook, but how about -- you talked about this

1   orientation.  Is there any checkoff about the issues presented in orientation?

2   A       There's no check -- there's not a checkoff that is submitted to the file in

3   the way that you're referring.

4   Q       So is it your testimony that the orientation is done by the manager where

5   the employee is assigned?

6   A       That's correct.

7   Q       Okay.  Who trains those managers?

8   A       The managers are trained by their superior, and they are coached and,

9   you know, have constant, you know, monthly manager calls, reviews and

10  updates, you know, on various topics.

11  Q       So there's not like a video that Thunderdome uses to ensure that all new

12  employees are trained the same way, correct?

13  A       There is not a video for this, no.

14  Q       And if Ryan Bennett were to testify that he was never trained on the

15  FMLA, would you have personal knowledge of any facts that would rebut that?

16  A       I would not be able to comment on that.  I, you know, as a standard

17  practice and highly -- our managers are highly compliant with orientation

18  occurring on their first day, and the basis of the entire orientation is to review

19  the handbook.  The FMLA and leave of absence policies in the handbook are

20  about five pages of the handbook.  In addition, there are postings of FMLA in

21  the restaurant on the labor law posters, so there would be various

22  opportunities for there to be acknowledgement or notification of leave of

23  absence and FMLA policies.

24  Q       I hear what you're saying, but do you have any documents that reflect

25  that these orientations happened?

1    A    We have the sign-off of the handbook, which is one item.  We have the

2    orientation that's attended and the time and attendance records for that.

3    Q    Okay.  I can tell you that we've received Ryan Bennett's personnel file,

4    and there's no sign-off on the handbook.

5    A    Okay.  That still doesn't mean, to my knowledge, that it didn't happen.

6    Q    Oh, that what didn't happen?  He didn't sign off on receiving a handbook.

7    A    That he did not attend the orientation and have an opportunity to have --

8    to view the handbook or to have a copy of the handbook or to see the labor law

9    posters in the restaurant or to have access to receive any of this information.

10   Q    If Ryan Bennett were to testify that he had never received a

11   Thunderdome handbook, do you have personal knowledge of any facts to rebut

12   that?

13   A    I don't have any personal knowledge because I don't work physically at

14   that location and there are 1,300 employees, so I cannot attest to the exact

15   events of that day outside of our practices.

16   Q    Let's look at Exhibit 24.  Sarah, you should have that.  Perhaps the

17   witness can view that on her computer or your computer.

18              MS. LEYSHOCK:  (Inaudible).

19              MS. MUCHNICKI:  Okay.

20        (Exhibit 24 received)

21   BY MR. WATERFILL:

22   Q    Okay.  Exhibit 24 is a document produced by Thunderdome.  Do you

23   understand that?

24   A    Yes.

25   Q    During what period of time was this handbook in effect at Thunderdome?

1    A    It's been in effect since I started with -- since prior to me starting with

2    the company.  I don't know exactly what year they put it into effect.

3    Q    So you've made no revisions to the handbook?

4    A    I have made revisions to the handbook since I've been with the company.

5    Q    Okay.  Let's look at page 37.

6                RECORDING AGENT:  I'm sorry.  Can I interrupt for just a

7    moment?  Since I do not have my screen on the computer with the exhibit on

8    it, can we all agree that everybody's looking at the same exhibit just for now

9    and --

10               MR. WATERFILL:  Yes.

11               MS. LEYSHOCK:  Yeah.

12               MS. MUCHNICKI:  Yes.

13               MR. WATERFILL:  Yeah.

14               MS. MUCHNICKI:  Yes.

15               RECORDING AGENT:  Okay.

16               MR. WATERFILL:  All right.

17               RECORDING AGENT:  Okay.  All right.  Thank you.

18   BY MR. WATERFILL:

19   Q    Looking at Exhibit 24, page 37, do you see that?

20   A    Yes.

21   Q    Okay.  There's no team member signature or witness signature date or

22   name, is there?

23   A    You mean there's no signature on those lines, is that what you --

24   Q    Yes.

25   A    -- meant?  Yes.

1    Q    Okay.  Now, let's look at 25.

2                   MS. LEYSHOCK:  Mark, is that page 25?

3                   MR. WATERFILL:  No, Exhibit 25.

4                   MS. LEYSHOCK:  Exhibit 25.

5                   MR. WATERFILL:  Do you see Exhibit 25?

6                   MS. LEYSHOCK:  I believe so.  Can you tell us what you're looking

7    at so we can make sure it's the same thing?

8                   MR. WATERFILL:  Well, first off, I've got to get answers from the

9    witness, but Exhibit 25, Kier -- may I call you Kier; is that okay?

10                   MS. MUCHNICKI:  Yes, of course.  Yes.

11                   MR. WATERFILL:  All right.  It begins at Thunderdome000154.

12   You may have heard in Ryan's deposition we have Bates numbers in the

13   bottom right.

14                   MS. MUCHNICKI:  Uh-huh.

15         (Exhibit 25 received)

16   BY MR. WATERFILL:

17   Q    Okay.  So 25 begins at 154.  24 begins at 115.  Okay?  Does that appear

18   accurate?

19   A    Yes.

20   Q    Okay.  And they're both 38 pages in length, correct?

21   A    I believe so, yes.  Uh-huh.

22   Q    Why were two handbooks produced?

23   A    I don't recall precisely.  It is possible that the handbook that I submitted

24   was a different version from -- just as you referenced earlier, from an update in

25   an additional year.  So I'm not -- that would be my assumption.

1    Q      Looking at page 37 of Exhibit 25, there are no signatures or names, or

2    dates inserted, correct?

3    A      No, I do not see any signatures -- physical signatures on the page.

4    Q      Have you ever seen a handbook with Ryan Bennett's name or signature

5    on it?

6    A      I don't recall seeing one, no.

7    Q      Okay.  Now, have you issued any specific instructions regarding

8    orientation?

9    A      The instructions that have been given to managers are that orientation --

10   and some of this has changed.  So to my knowledge, around the timeframe that

11   Ryan worked, orientations took place on Mondays for any new employees, and

12   the orientation lasts around two hours, and they are to cover the handbook.

13   They're not reading every single word, but they're providing the handbook to

14   the employees to retain a copy if they would like, and they review, you know,

15   the highlights.  They do turn every page and make reference to large policies.

16   They would go into more detail on certain items that require it, and they would

17   discuss any store-level policies, clock-in and clock-out, those types of

18   instructions, a pretty typical orientation.

19   Q      How have those alleged instructions been communicated?

20   A      Those are communicated in manager training, so through the manager

21   training program.  Any manager that is permitted to hold an orientation has to

22   attend a certain number of orientations with their manager to be trained on the

23   topics, the orientation process, before they can hold an orientation.

24   Q      Who conducts manager training?

25   A      The store-level manager, so it would be a combination of, you know,

1    senior-level management, general managers, regional managers, experienced --

2    Q    Now, wait --

3    A    -- managers.

4    Q    Do you conduct manager training?

5    A    I cannot conduct manager training for all managers.

6    Q    Did you conduct manager training for The Eagle restaurant in

7    Indianapolis?

8    A    Did I conduct -- I just want to make sure I could hear you -- did I

9    conduct manager training for The Eagle in Indianapolis?

10   Q    Yes.

11   A    No, I did not.

12   Q    Who did?

13   A    Can you be more specific with your question?  In a certain time period, a

14   certain level of management?

15   Q    During the time that Ryan worked there, who conducted manager

16   training at The Eagle in Indianapolis?

17   A    Ryan, as an assistant kitchen manager, would have attended orientation

18   just like any other employee would attend, and then his training would have

19   taken place by his direct manager, which is the kitchen manager, and various

20   parts I, you know, imagine by the general manager.

21   Q    Okay.  Ryan states that his manager was a person named Dalton.  Okay?

22   A    Okay.

23   Q    D-A-L-T-O-N.  Do you know that person?

24   A    No, I do not know Balton.  B-A-L-T-O-N?

25   Q    No, D as in dog --

1    A       Oh, D.

2            MS. LEYSHOCK:  Hold on.  Hold on.

3    BY MR. WATERFILL:

4    Q       D-A-L-T-O-N.  Who trained Dalton?

5    A       I'm sorry, I don't know who Dalton is.

6    Q       Okay.  But generally, in your organization, who trains the managers at

7    each restaurant?

8    A       The general manager and the regional manager.

9    Q       Who was the regional manager?

10   A       The regional manager was Ricky Tindell.

11   Q       Do you know him?

12   A       I do know him.

13   Q       Have you trained him on the FMLA?

14   A       Ricky was hired in the company prior to me arriving, so I did not initially

15   train him.  Ricky, as a regional manager, is in very frequent communication

16   with myself on any HR practices and policies, so we have had constant

17   communication, I would say, on leave of absence, FMLA, really any employee

18   relation issue.

19   Q       Have you held a specific training session at which Ricky Tindell attended

20   on the FMLA?

21   A       I have not held a formal training session on FMLA for Ricky Tindell, not

22   in a formal setting.

23   Q       You have not held a formal FMLA training for any of the managers at

24   Thunderdome, have you?

25   A       We have certainly --

1    Q    No, you.

2    A    -- had --

3    Q    You.  You.

4    A    I'm sorry?

5    Q    You, personally.  You have not held an FMLA training session for any of

6    the regional, district, or general managers at Thunderdome, have you?

7    A    Yes.  We have covered leave of absence and FMLA policies in our

8    conferences with senior-level management.  This is a comprehensive seminar,

9    training, annual conference that we review high-level HR practices, and --

10   Q    When did you present FMLA to Ricky Tindell?

11   A    I have presented FMLA to Ricky Tindell probably -- I don't know -- 20-

12   plus times over the course of us working together through various

13   conversations with employees that have reported to him in his region.

14   Q    What have you told him regarding an employee who is injured on the job

15   and cannot work?

16   A    I have told Ricky a lot regarding injured workers on the job.

17   Q    Did Ricky Tindell ever report to you that Ryan Bennett was injured on

18   the job?

19   A    Yes, he did.

20   Q    Did you instruct Ricky to provide a Form 380 to Ryan Bennett?

21   A    I did not because there was no instruction or request --

22   Q    Wait.

23   A    -- for any --

24   Q    Wait.

25   A    -- time off.

1  Q      Could we answer my question?  Okay?  Did you --

2             MS. LEYSHOCK:  Hey, Mark, let's just slow down for a second

3  because she was still finishing her answer.  So I don't think it's fair for you to

4  say she didn't answer your question.  You didn't listen to her entire answer.  So

5  I just want to take a break here and let everybody reset and then let the -- let

6  Mark finish his question --

7             MS. MUCHNICKI:  Uh-huh.

8             MS. LEYSHOCK:  -- and let Kier finish her answers.

9  BY MR. WATERFILL:

10  Q      Did you provide Ricky Tindell with a Form 380 for Ryan Bennett?

11  A      No.

12  Q      Did you tell Ricky Tindell, you need to provide Ryan Bennett with a Form

13  380?

14  A      No.

15  Q      Have you ever provided a Form 380 to Ricky Tindell for any

16  Thunderdome employees?

17  A      Yes.

18  Q      When.

19  A      I can't recall dates offhand.  Ricky and I have worked together for six and

20  a half years, so he's had, you know, 5 to 12 employees go out on FMLA in the

21  course of a year throughout his region.

22  Q      Did Ricky Tindell ever talk to you about Ryan Bennett?

23  A      Yes.

24  Q      When?

25  A      I recall having a few conversations with Ricky regarding Ryan.  Most of

1    my recollection is around a couple of months before the -- his reported

2    workplace injury and then a little bit more conversation surrounding that

3    workplace injury.

4    Q       Okay.  Let's look at Exhibit 4.

5               MS. LEYSHOCK:  And I'm going to step aside --

6               MS. MUCHNICKI:  Yeah.

7               MS. LEYSHOCK:  -- just so you have space again.

8               MS. MUCHNICKI:  Okay.

9           (Pause)

10              MR. WATERFILL:  Do you have that?

11              MS. MUCHNICKI:  I do.

12          (Pause)

13              MR. WATERFILL:  I can get it.  Hang on just a second.

14              MS. MUCHNICKI:  Sure.

15          (Exhibit 4 received)

16    BY MR. WATERFILL:

17    Q       This exhibit is not broken up.  Okay.  Is the first page

18    Thunderdome000008?

19    A       Yes, it is.

20    Q       Okay.  Have you seen this first page before?

21    A       I have, yes.

22    Q       Did you see it at or near the time it was created?

23    A       I did, yes.

24    Q       Who sent it to you?

25    A       I don't remember exactly who sent it to me, but a member of the

1    management team at The Eagle, Indy emailed it to me.

2    Q    Where's that email?

3    A    In my email.  It would have been basically the instructions, and from

4    what I remember in pulling this up is that they fill out this form, they attach it

5    to an email, and they send it per the instructions at the top of this page.

6    Q    Was the email that sent page 1 of Exhibit 4 produced?

7    A    Page 1 of Exhibit 4?

8         MS. LEYSHOCK:  Did you look in there?

9    BY MR. WATERFILL:

10    A    Oh.  I don't recall.  When I remember pulling this document up to give to

11    Sarah, I recall the email with the attachment and no information on the email,

12    to my recollection.  So to my recollection, it would have been an email that

13    probably just showed the sender and then the recipient, you know, and the

14    typical email stamp information.

15    Q    Who was the sender?

16    A    I think I answered earlier, I don't recall exactly who the sender was, but

17    I'd have to go back and look, but it would have been a member of the

18    management team of The Eagle.

19    Q    Is that still in your email?

20    A    Most likely it is.  I believe that's how I retrieved this incident report.

21    Q    Why did you not produce the email?

22    A    I don't recall if I did or if I did not, and I am happy to, you know, get that

23    information.  Again, there is no additional information in that, to my

24    recollection, other than the email timestamp and whatnot.

25    Q    Whose handwriting is on page 1 of Exhibit 4.

1    A    I don't recognize the handwriting, but I believe from pulling this back up

2    through this process and reviewing it, I believe that it's Dayton Neely's

3    handwriting.

4    Q    Who is Dayton Neely?

5    A    At the time he was the assistant general manager of The Eagle Indy.

6    Q    Is he still there?

7    A    He is not.

8    Q    Why did he leave?

9    A    I don't recall.

10    Q    Yeah.  At item 10 it says, "Ryan approached Ricky and informed him that

11    he had suffered a hernia from bending over to pick up a tray and needed

12    medical attention."  Do you see that?

13    A    I do, yes.

14    Q    Do you believe that statement is true?

15    A    I have no reason to believe otherwise.

16    Q    Did you ask Ryan Bennett if that statement was true?

17    A    I did not.

18    Q    Do you understand that Ryan is adamant that statement is not true?

19    A    I do not understand that, no.

20    Q    Ryan knows that he became injured by picking up kegs of beer.

21        MS. LEYSHOCK:  Objection.

22    BY MR. WATERFILL:

23    Q    Have you ever heard that?

24    A    I recall when going back through these statements that -- or some of the

25    information that we gathered for discovery, I remember seeing that on another

1  document.  I don't remember off the top of my head.  So I remember seeing

2  that, and I remember seeing a third explanation, as well, which I believe was

3  the tray.  So I -- that is the -- you know, that's the extent, to my knowledge, of

4  the reason for the industry, that there have been essentially three different

5  reasons for -- proposed -- presented in some way for the injury.

6  Q     Okay.  Did you ever pick up the phone and ask Ryan Bennett, how were

7  you hurt?

8  A     I did not.  This information, to my recollection, is only brought to my -- I

9  don't recall knowing that at the time, nor was that in question because we were

10  not questioning the industry (sic), and we submitted the claim either way.

11  That was not a relevant piece of information at the time.

12  Q     Are you meaning to say the word industry or injury?

13         MS. LEYSHOCK:  You did say industry.

14         MS. MUCHNICKI:  I did say industry.

15         MS. LEYSHOCK:  Yeah, actually.

16         MS. MUCHNICKI:  I'm sorry.  Injury.

17  BY MR. WATERFILL:

18  Q     Okay.  So whose signature is on page 1 of Exhibit 4?

19  A     I believe the signature is Dayton.  It's very difficult to read, but I believe

20  it's Dayton Neely.

21  Q     And I mean, this is kind of making it seem that Ryan did something

22  wrong picking up a tray, right?

23  A     Pick up a tray -- no, I would never -- I would not think that, no.  That is

24  not how I perceive this.

25  Q     What does 18 say?

1    A    What does 18 say?

2    Q    Uh-huh.

3    A    Follow proper bending and lifting guidelines.

4    Q    Okay.  What are those?

5    A    Well, general lifting guidelines would be to squat to lift rather than to

6    bend over.  I assume that might be what they're referring to.

7    Q    What is this Safety Investigation Employee Incident Report's purpose?

8    A    To gather more information in regards to an injury.

9    Q    Is it used for discipline?

10    A    It is very rare that it's used for discipline.  The most common time that

11    it's used for discipline is when someone does not use a -- you know, some type

12    of PPE, for example.  Really the only instance that we've used it is if someone

13    did not wear a cut glove and they cut their finger.

14    Q    What was the basis of Dayton Neely saying that the employee could

15    return on light duty?

16         MS. LEYSHOCK:  Objection.

17    BY MR. WATERFILL:

18    A    Did he -- is the employee --

19    Q    Item 15.

20    A    So -- sure, yes, I just wanted just to make sure --

21         MS. LEYSHOCK:  (Indiscernible)

22    BY MR. WATERFILL:

23    A    -- that's where they were referring to.  Well, I can answer it generally that

24    that question is referring to if the employee sought medical attention and if we

25    had the information back from the medical provider on returning to work, then

1    Q    Did you ever talk to Siobhan about this?

2    A    Not about this communication on this text message.  I didn't know about

3    this.

4    Q    Did you ever talk to Ricky Tindell about this?

5    A    No.

6    Q    Did you ever talk to Ryan Bennett about this?

7    A    No.

8    Q    Who were the two back of house employees?

9    A    I don't know who they were.

10    Q    Has anyone ever said to you that Siobhan used illegal drugs while she

11    was at work?

12    A    I heard Ryan say that in his --

13             MS. LEYSHOCK:  Objection.  Sorry.  Go ahead.

14             MS. MUCHNICKI:  That's okay.

15    BY MR. WATERFILL:

16    A    I heard Ryan say that in his deposition, I believe.

17    Q    Okay.  Anyone else?

18    A    I do not believe so.  I have -- not to my recollection, no.

19    Q    Do you know Siobhan?

20    A    I do know Siobhan, yes.

21    Q    Does she still work for Thunderdome?

22    A    She does, yes.

23    Q    Where?

24    A    She is the regional manager of the Charlotte market, Charlotte, North

25    Carolina.  She works in -- specifically works out of The Eagle in Charlotte,

1    North Carolina.

2    Q       Is Siobhan a first name?

3    A       Siobhan is her first name, yes.

4    Q       What's the last name?

5    A       It's Stephenson, with a P-H.

6    Q       Okay.  Let's take a 10-minute break.  Does that sound good.

7    A       Okay.  That sounds great.  Thank you.

8    Q       Thanks.

9           RECORDING AGENT:  Okay.  We are off the record.  Thank you.

10    (Off the record at 11:01 a.m.)

11    (On the record at 11:09 p.m.)

12           RECORDING AGENT:  Okay.  All right.  We're back on the record.

13    Thank you.

14                  DIRECT EXAMINATION CONTINUES

15    BY MR. WATERFILL:

16    Q       Okay.  Kier --

17    A       Yes.

18    Q       Please look at Exhibit 7.

19    (Exhibit 7 received)

20    A       Okay.

21    Q       That's at Thunderdome000251.

22    A       Okay.

23    Q       The medical records I think start at Thunderdome000258.

24    A       Okay.

25    Q       Did you review these at the time that Ryan Bennett was employed at

1    Thunderdome?

2    A    I don't -- let me look at this a little bit more.  (indiscernible) Primary

3    Care.  I don't believe that I received this report that we're looking at right now,

4    to my recollection.  Through a work comp injury, I don't receive every medical

5    note or documentation.  It's only certain items, obviously, due to HIPAA and

6    whatnot.

7    Q    Please look at what is Bates stamped, yeah, 400.

8    A    Okay.

9    Q    Thunderdome000400.

10   A    Is that still under Exhibit 7?  I think it only goes up to 348.

11           MS. LEYSHOCK:  That's correct.

12           MS. MUCHNICKI:  Okay.

13           MS. LEYSHOCK:  Mark, the last page of that Exhibit is 348.

14           MS. MUCHNICKI:  348.

15           MR. WATERFILL:  What is the exhibit that Thunderdome000400 is

16   under?

17           MS. MUCHNICKI:  I see the 400s, but it's like Exhibit Number --

18           MS. LEYSHOCK:  Uh-huh.

19   BY MR. WATERFILL:

20   Q    Well, let me ask it to you this way.

21   A    Sure.

22   Q    What medical records did you receive regarding Ryan Bennett before he

23   was fired?

24   A    To my recollection, the only medical records I received prior to his

25   separation of employment was the Concentra medical forms that explained his

1  return to work and restrictions.

2  Q      Okay.

3  A      That's it.

4  Q      And so you knew that he had been injured at work?

5  A      I did.

6  Q      And that he had gone to Concentra to see a doctor?

7  A      Correct, yes.

8  Q      Okay.  After receiving that information, did you contact Ryan Bennett?

9  A      I did not contact Ryan Bennett, no.  I spoke with his management team

10  and verified that he was permitted to return to work the same day or

11  immediately with restrictions, and we discussed how -- they explained to me

12  how they would accommodate the restrictions.

13  Q      When you say management team, who are you speaking of?

14  A      Ricky -- to my recollection, the individuals I spoke with were Ricky and

15  David Downs.

16  Q      Okay.  And have you already testified to everything that Ricky told you?

17  A      Have I?

18          MS. LEYSHOCK:  Objection.

19  BY MR. WATERFILL:

20  A      Can you be more specific?  I just want to make sure I answer your

21  question appropriately.

22  Q      Okay.  What did Ricky tell you?

23  A      About -- right following the injury, is that what you're regarding?

24  Q      Yes.

25  A      Okay.  To my recollection, my conversation with Ricky went something

1   like, you know, the incident report has been submitted to myself, you know,

2   we're submitting the claim to our insurance company, you know, we reviewed

3   or discussed the Concentra medical notes.  Which this entire process is very

4   typical and in accordance with every work comp injury that has medical

5   attached to it with light-duty instructions.  We discussed how his job -- what

6   he could do within his job that met the restrictions and how they would do it

7   and that he was discussing with David and Collin, I believe -- because Collin

8   was the kitchen manager -- basically their plan to accommodate that on Ryan's

9   shifts.

10  Q      When did you speak -- I'm sorry, who was the other person in the

11  management team that you said you spoke to about this?

12  A      Yeah, sure.  So Collin Martin was the kitchen manager.

13  Q      And what did you talk to him about?

14  A      I don't recall speaking with him.  I recall just speaking with Ricky as the

15  regional manager who David Downs, the general manager, reported to, and

16  then Collin Martin, the kitchen manager, reported to David.

17  Q      Okay.  Please look at Thunderdome000013.

18              MS. MUCHNICKI:  Is this Bates marked 13?

19              MS. LEYSHOCK:  Do you mean Exhibit 13?

20              MR. WATERFILL:  No, it's Bates marked Thunderdome000013.

21              MS. LEYSHOCK:  Okay.  Which Exhibit number is that?

22              MR. WATERFILL:  Well, I'm trying to find.  The exhibits were not

23  sent separately, they were -- it's Exhibit 4.

24  BY MR. WATERFILL:

25  A      Okay.  Thirteen.  Okay.

1    Q      Okay.  Okay.  Under Additional History -- do you see that at the bottom

2    of Thunderdome000013?

3    A      Thunderdome000013, Additional History.  Okay, yes, I do see that.

4    Q      It says, "Patient is a chef at The Eagle restaurant downtown who was

5    lifting a heavy box from floor level."

6    A      Yes, I see --

7    Q      Do you see that?

8    A      Yes, I do.  Uh-huh.

9    Q      Did you read that at the time?

10   A      I imagine that I did, yes.

11   Q      Okay.  It says, the pain is a sharp, electric pain that radiates around his

12   abdomen and right flank, correct?

13   A      Yes, I see that.

14   Q      And did you talk to Ricky Tindell about that?

15   A      I don't recall speaking with Ricky specifically regarding his pain.  No, I

16   don't recall that.

17   Q      Okay.  And then the page just previous to that is a health insurance

18   claim form, correct?

19   A      Yeah.  Yes.  This is the insurance claim form that -- to my recollection --

20   because every state this looks a little bit different, or location, but this is what

21   is provided by the -- that Concentra completes.

22   Q      Okay.  And was Ryan Bennett provided insurance through

23   Thunderdome?

24   A      What type of -- are you referring to workers' comp insurance or medical

25   insurance?

1    Q    Health insurance.

2    A    He was provided the opportunity to enroll in health insurance.  I believe

3    he did enroll.  I don't have an exact memory, but I believe he did enroll in

4    medical insurance.

5    Q    Is that what Thunderdome000012 relates to?

6    A    No.  This is -- I believe what this is, is that when an employee goes to

7    Concentra for a workers' compensation injury, and if they -- most -- we work

8    primarily with Concentra in all of our markets, and so they have insurance --

9    our insurance -- our workers' compensation, to be specific, insurance on file,

10   and so when they have information on the claim, then they submit this to the

11   insurance company, and that's why Cincinnati Insurance is listed at the top.

12   Q    Okay.  So Thunderdome000012 and 13 of -- I'm sorry, 11.

13   Thunderdome000011 and 12 of Exhibit 4 are documents which were used to

14   make a workers' compensation claim.  Is that accurate?

15   A    Eleven?  So there's kind of a few things going on here.  I don't know if

16   they're relevant, but the first -- and you just stop me if this isn't the answer

17   that you're asking for -- but Thunderdome000010 and 11 are from the

18   insurance company, Cincinnati Insurance.  Ten and eleven are the documents

19   that I receive after I submit the claim to Cincinnati Insurance, and then once

20   they file it in their system then they send this back to me, which is basically

21   my receipt of the claim and then the claim number I believe is on here

22   somewhere.

23   Q    Okay.

24   A    So 10 and 11 is that, and then 12 and 13 are different.  I believe those

25   are from Concentra.  So if I -- when I submit a claim, if I have some of the

1  medical information already, then I submit it with the claim, so this may have

2  been submitted at the time of claim submission.

3  Q      Okay.  So as of what date was the workers' compensation claim

4  submitted?

5  A      It usually shows on that form here, so let me look on

6  Thunderdome000010.  It says at the top, "reported date 8/27, 6:17 p.m.,

7  reported to A. Palmer."

8  Q      8/27/2019, correct?

9  A      Correct.  Yes.  I apologize.

10 Q      Okay.  Did you speak to Ryan Bennett about his workers' compensation

11 claim?

12 A      I did not speak to Ryan Bennett until what I mentioned earlier in a

13 previous question you had.  I had no contact directly with Ryan Bennett, to my

14 knowledge -- to my recollection until after he had ended employment with us,

15 and that would be typical in our process.  In my position, I work with the

16 management team to make sure that, you know, if they have any questions

17 regarding the work comp injury and that -- we just kind of provide guidance as

18 needed.

19 Q      Did you instruct Ricky Tindell to speak to Ryan Bennett regarding his

20 workers' compensation claim?

21 A      I instructed Ricky Tindell to work with the management team and Ryan,

22 if required, to accommodate restrictions and make work available to Ryan per

23 the instructions of the doctor, the doctor's notes here.

24 Q      Did you speak to any of your three subordinates, Kacie Schultz, Yuko

25 Driscoll, or Erica Corcoran, regarding Ryan Bennett?

1    A       No.

2    Q       Okay.

3    A       They were not all in -- they did not all work for me at the time of this

4    injury.

5    Q       Who did?

6    A       Sarah Trenz.

7    Q       Oh, okay.  Not -- did any of those three work for you in August of 2019?

8    A       They didn't.  Yuko and Erica did not work for the company.  Kacie did,

9    but she was not reporting to me at the time.

10   Q       Okay.  Sarah Trenz.  How do you spell --

11   A       Uh-huh.  Yep.  Sarah with an H, and then T as in Tom, R-E-N-Z.

12   Q       Did you speak to her about Ryan Bennett?

13   A       I don't recall speaking to her.  She did not process work comp claims for

14   me or really have that under her job description, so I don't recall speaking with

15   her.

16   Q       Okay.  Okay.  Please look at Exhibit 9.

17           (Exhibit 9 received)

18   A       Okay.

19   Q       That is -- it's at Page 242 of the PDF.

20               MS. LEYSHOCK:  Thank you.

21   BY MR. WATERFILL:

22   Q       The PDF has 305 pages.

23   A       Okay.

24   Q       Okay?

25   A       Okay.

1    Q    Okay.  So we're looking at Page Thunderdome000029.

2    A    Yes.

3    Q    Page 242 of the PDF.

4    A    Okay.

5    Q    Okay.  When did you first see this document?

6    A    I first saw this document when I responded to an unemployment claim

7    for Ryan Bennett.

8    Q    After he had been terminated?

9    A    Correct.

10   Q    Okay.  Did Collin Martin talk to you about this item on or about October

11   9, 2019?

12   A    No.

13   Q    Did you talk to Collin Martin about providing accommodations to Ryan

14   Bennett?

15   A    I don't recall speaking to Collin directly.  I do recall speaking to Ricky

16   and very possibly David regarding accommodating restrictions.

17   Q    Okay.  And have you already testified about that?

18   A    Have I already testified about that?

19   Q    Yeah, what you told Ricky and David?

20   A    Yeah.  When I spoke with Ricky after receiving the medical notes from

21   the claim.

22   Q    Okay.  Thunderdome000030 is Deposition Exhibit 10.  When did you

23   first see that?

24        (Exhibit 10 received)

25   A    Okay.  Let me get there.  Hold on just a minute.  I think my binder's a

Phoenix Transcription Services, LLC
(317)-937-2396

1    little different than yours, so give me just a minute.  Thirty.

2                 MS. LEYSHOCK:  It should be the next page.

3                 MS. MUCHNICKI:  Oh, I don't -- it didn't seem like there was

4    anything there.

5                 MS. LEYSHOCK:  There's nothing there?

6                 MS. MUCHNICKI:  Huh-uh.

7                 MS. LEYSHOCK:  (Inaudible).

8                 MS. MUCHNICKI:  Okay.  I'm going to look on Sarah's screen here.

9    Hold on.  Okay.  Let me review -- I have it pulled up.  Let me review it really

10   quick.  Just a moment.

11   BY MR. WATERFILL:

12   A     Okay.  And then, I'm sorry, did you have a question about that?  I don't

13   recall.

14   Q     When did you first see Exhibit 10?

15   A     To my recollection, I believe first reviewing Exhibit 10 or seeing it when I

16   submitted his unemployment claim -- response to his unemployment claim.

17   Q     Did Collin Martin speak to you about this criticism at or near October

18   10, 2019?

19   A     I do not recall speaking with Collin Martin about this.

20   Q     It states the date of the infraction is 9/9/2019; do you see that?

21   A     I do see that, yes.

22   Q     It says that the previous disciplinary meeting was held on 10/9/2019; do

23   you see that?

24   A     I see that, yes.

25   Q     Isn't that an inappropriate way to fill out this form?  Wouldn't the

1    previous disciplinary meeting be before the date of the infraction?

2               MS. LEYSHOCK:  Objection.

3    BY MR. WATERFILL:

4    A      I don't know if I can answer that.  If I was viewing this myself, you know,

5    at the time of this happening, I would, you know, think that there was -- you

6    know, I would just ask if that was correct, you know, and verify.  I can't speak

7    to that.  I think the importance of this overall is that there's a conversation

8    that's documented about a -- you know, on a coaching item.

9    Q      Well, this is a form that your company uses, right?

10   A      Correct.

11   Q      This is a form that's used by your department, the human resources

12   department of Thunderdome, correct?

13   A      Every department in the company uses these forms, yes.

14   Q      But the form's created by your department, right?

15   A      Yes.

16   Q      Okay.  So you want people to put in the date of the infraction, right?

17   A      Correct.

18   Q      And you then want them to put in the previous disciplinary meeting.

19   Doesn't that mean a date prior to the date of the infraction?

20   A      It could, or it may not.  Every situation could be different.

21   Q      Do you understand the definition of previous?  That means before in

22   time, correct?

23   A      Correct.

24   Q      Do you instruct managers on how to fill out this form?

25   A      There is explanation given.  We write the forms with the hopes that

1    Q      Okay.  Had you seen this before?

2    A      No.

3    Q      Okay.  When you received this, did you ask Ricky Tindell, Collin Martin,

4    David Downs whether Ryan Bennett was at work and in pain?

5    A      No, we were collecting documents for discovery, not investigating.

6    Q      Okay.  Did you ever ask, back before Ryan was fired -- did Ryan express

7    to you he was in pain?

8    A      Ryan never told me he was in pain.

9    Q      Did you ask Ricky Tindell, did Ryan ever say to you he's in pain?

10   A      I never asked Ricky Tindell that.

11   Q      Do you expect employees to work who are in pain?

12   A      I expect employees to communicate what they need -- what their medical

13   needs are and, you know, provide proper medical documentation so that we

14   can understand from them and their physician if they're able to work.

15   Q      And according to this email, he did ask the manager on duty to leave,

16   correct?

17   A      That's what it states here.  That doesn't --

18   Q      And that was October 23, 2019, right?

19   A      Yes.

20   Q      And then Thunderdome fired him a few days later.

21   A      The separation date was October 26th, yes.

22   Q      Okay.

23   A      It does note here that --

24   Q      Please, please, there's no question --

25           MS. LEYSHOCK:  Mark, she wants to clarify --

1          MS. MUCHNICKI:  Okay.  I don't (indiscernible) --

2          MS. LEYSHOCK:  -- her answer.  I think that's appropriate.

3          MR. WATERFILL:  That -- no, no.

4          MS. LEYSHOCK:  Okay.  So we're going to go ahead and put on the

5    record here that Kier has additional information to provide responsive to your

6    last question and you're declining to allow her to do so.

7          MR. WATERFILL:  That's fine.  You can put on the record whatever

8    you like, but --

9          MS. LEYSHOCK:  Okay.

10          MR. WATERFILL:  -- we're responding to questioning.

11          MS. LEYSHOCK:  The record is clear that Kier's answer is

12    incomplete.

13    BY MR. WATERFILL:

14    Q     You heard our -- you have heard the allegation by Ryan Bennett that

15    Ricky Tindell told a person at another restaurant that he had to fire his fat ass

16    in relation to Ryan Bennett, correct?

17    A     I heard Ryan say that in his deposition, yes.

18    Q     Have you talked to Ricky Tindell about that?

19    A     I asked Ricky Tindell if he had recollection of that, and he said he did not

20    recall.  That was the extent of our conversation.

21    Q     When did you ask?

22    A     I asked him prior to Ryan's deposition but after receiving -- I don't know

23    the technical term but responses, you know, that you provided Sarah, when we

24    were first informed of that allegation.

25    Q     So his statement was he could not recall?

1    A       His statement was, yes, he didn't recall saying that.

2    Q       Okay.  Did you inquire further?

3    A       No, that was all Sarah, you know, asked me to do.  There wasn't --

4                   MS. LEYSHOCK:  Objection.  And don't repeat anything --

5                   MS. MUCHNICKI:  Okay.

6                   MS. LEYSHOCK:  -- that I asked you to do to Mark --

7                   MS. MUCHNICKI:  Okay.

8                   MS. LEYSHOCK:  -- anything that I said to you.

9                   MS. MUCHNICKI:  Uh-huh.

10   BY MR. WATERFILL:

11   Q       Let's look at page 11 of the interrogatory responses, item 17.

12                  MS. LEYSHOCK:  (Indiscernible)

13   BY MR. WATERFILL:

14   Q       And you know, this is where we ask for the pay and benefits provided to

15   the Plaintiff, and we get this non-answer.  What benefits did Ryan receive at

16   work?

17   A       Okay.  Okay.  Let me -- I haven't looked at this in quite a while, so I'm

18   going to read it really quick.  Okay.  I'm sorry.  Was there a question?

19   Q       What benefits did Ryan receive at work?

20   A       Benefits is a pretty broad category, so I'll just provide, you know, all that

21   I know.  Ryan, as a junior hourly manager received the manager benefit

22   package, essentially, for insurance benefits, medical, dental, vision, short-term

23   disability.  There's some voluntary options for life insurance, supplemental life

24   insurance.  There's a basic life insurance at $50,000.  At the time I believe that

25   there were some manager benefits for dining privileges.  I believe that there was

1    -- I'm trying to recall.

2    Q    Vacation?

3    A    Yes.  Thank you.  He received two weeks of PTO for each PTO benefit

4    year, which starts May 1st for us, so he -- when he was hired most likely he

5    received two weeks, or ten days, and then he received -- in the first year of May

6    1st to August 30th, and then the second following time period another two

7    weeks.  The time period does not roll over, and that -- it's a flexible PTO policy,

8    so it includes sick and vacation time.

9    Q    What's the value of the manager's benefit package?

10   A    I don't have that number at hand.

11   Q    How much does Thunderdome contribute to medical, dental, and health

12   insurance?

13   A    For managers it's about 50 percent.

14   Q    What's the total cost?

15   A    I'm more up to date with the current rates.  It's hard to remember exactly

16   at that time period.  For an individual, the total monthly -- I'm just going to get

17   -- do my calculator really quick -- the total monthly -- monthly it was probably

18   about $375 total premium for a medical individual plan.

19   Q    What's the premium on the life insurance?

20   A    The premium on the basic life insurance at the time was probably --

21   more of a rough guess, but possibly $10 a month.

22   Q    What are the dining privileges?

23   A    That is a policy that has been changed since then, so I cannot speak very

24   clear on it, but managers had the ability for comp benefits, meaning that if

25   Ryan came in for dinner that night then he may receive a comp benefit,

1    meaning that he would have received that for free.

2    Q    Do you see there at 17 that we asked for this information?

3    A    I see that there is -- yes, there's a question, all pay and benefits.

4    Q    Okay.  And it says to see the document production.  I see no documents

5    that were produced, that answers this question.  Do you know of any

6    documents that were produced that answered this question?

7    A    I don't recall.

8    Q    Okay.  Then on 18, identify and describe all communications between

9    you and Plaintiff regarding his workplace injury and request for FMLA leave,

10   and again it says see documents production for responsive documents.  Were

11   any, any documents produced responsive to that question?

12   A    "Identify and describe all communication between you and Plaintiff

13   regarding his workplace injury and request for FMLA leave."  There were

14   various -- we provided all of the documents we had on the workplace injury,

15   which included all medical notes that Ryan brought to management from his

16   visits, and then we have no request for FMLA, so there was -- there's nothing to

17   produce, either verbal or written.

18   Q    Please look at number 20.  Do you see that question?

19   A    "Identify and describe all training provided to the employees and

20   managers at The Eagle restaurant through January 16th regarding FMLA

21   discrimination (indiscernible)."

22   Q    We received no documents identifying training.

23   A    It looks like -- yes, and you asked specifically on Ricky.  I don't know if

24   that question was in regards to Ryan or Ricky, but yes, I believe we covered

25   that our employee handbook has all of those items in it, and it's available to

1    anyone at any time and reviewed at orientation.

2    Q      Okay.  So that's the document that you would identify?

3    A      Yes.

4    Q      Okay.  Let's take a look at --

5           (Pause)

6           Please look at Exhibit 32, the response to request for admissions.

7           (Exhibit 32 received)

8    A      Okay.  We have it pulled up.

9    Q      Let's look at Number 5.  Now, you testified that you're the FMLA

10   coordinator, right?

11          MS. LEYSHOCK:  Hold on one second, please, Mark.  I think we

12   were looking at the wrong Number 5.

13          MS. MUCHNICKI:  Oh, okay.

14          MS. LEYSHOCK:  You want her to look at request Number 5 and

15   the response there, too?

16          MR. WATERFILL:  Yeah.

17          MS. LEYSHOCK:  Okay.  We're there now.

18   BY MR. WATERFILL:

19   A      Okay.  Yes, I have admitted that I am the FMLA coordinator for the

20   company.

21   Q      Is there any document that identifies you as the FMLA coordinator?

22   A      I believe in the handbook under the request for leave -- or under the

23   leave of absence policy section with the FMLA that it indicates to contact

24   human resources, therefore myself.

25   Q      Okay.  But you're not individually identified in the handbook?

1    A    I don't believe at that time that I was, no.

2    Q    And is there any document at Thunderdome that identifies you as the

3    FMLA coordinator?

4    A    There are labor law posters in the -- outside of the manager's office; it's

5    in different locations in sort of an information area which has all the labor law

6    posters for the state and federal and then it also has a metal sign with my

7    name and phone number on it.  It states something like if there's any

8    questions, concerns.  It's sort of a sign that captures all of the issues.  It's

9    promoted for our open-door policy so that there is a point of contact outside of

10   the restaurant.

11   Q    Are you saying that this sign identifies you as the FMLA coordinator?

12   A    I'm saying that this sign identifies me as all HR pieces' contact.

13   Q    Is there any other document that identifies you as the FMLA coordinator

14   for Thunderdome?

15   A    There's no other additional documents that I can recall.

16   Q    The response says, "At all relevant times, defendant's human resources

17   department and managers coordinated FMLA requests." Do you see that?

18   A    "At all relevant times, Defendant's human resource department and

19   managers coordinated --"  Yes.

20   Q    Okay.  So that's the entire department, right?

21   A    So this response is referring to my department, which would, you know,

22   be anyone that assists me at the HQ level and then the managers of the

23   restaurant to work together and coordinate the request for leave and any

24   required documents to respond to that.

25   Q    When we look back at -- think back about those health records that we

1    looked at --

2    A    Uh-huh.

3    Q    -- from Concentra and from IU Health, are those kept in Ryan's

4    personnel file?

5    A    They're not kept in Ryan's personnel file.  Many of the ones we looked at

6    were not -- didn't even arrive at the store, but, no --

7    Q    Well --

8    A    -- medical records are not kept in the personnel file.

9    Q    Where are they kept?

10    A    They're kept in a separate medical file.

11    Q    Please look at Item 10, Request for Admission 10, Page 5, Exhibit 32.

12    A    Okay.  (indiscernible) Okay.

13    Q    Why do you deny that Ryan Bennett's injury was a serious health

14    condition?

15            MS. LEYSHOCK:  Objection.  You can answer.

16    BY MR. WATERFILL:

17    A    It says admit that Plaintiff's injury in June 2019 was a serious health

18    condition pursuant to FMLA.  I don't know of an injury in June 2019 that was

19    a serious health condition.  I don't know.

20    Q    Was his injury reported August 27, 2019, a serious health condition?

21    A    The injury dated August -- it's in these files -- August 23rd, 2019, was a

22    work comp injury that did require medical attention, yes.

23    Q    Was it a serious health condition pursuant to the FMLA?

24    A    Pursuant to the FMLA, I would say that the FMLA process, you receive a

25    medical certification, and the physician writes you out of work or incapable of

1  working, and so therefore that would indicate the need for leave.  There were

2  no medical documents that we received that took Ryan out of work.  He was

3  instructed to return to work with light duty.  So if we are discussing that what

4  a serious health condition is refers to not being able to work, then no.

5  Q    You did not ask Ryan to fill out any FMLA forms, did you?

6  A    I didn't need to ask Ryan to fill out any FMLA forms.

7  Q    You did not ask Ryan to fill out any FMLA forms, did you?

8  A    I did not.

9  Q    You knew that he had this injury, and you knew that he was in pain,

10  correct?

11  A    I, personally -- I knew he had this injury, as it was reported.  I personally

12  did not know about him being in pain from him.  I did review his medical

13  records which indicated that he was to return to work on light duty.

14  Q    Does Thunderdome have an FMLA tracking system?

15  A    We don't have a formal electronic tracking system, if that's what you're

16  referring to.  We have -- we distribute the forms and collect them and keep

17  them in the file in my cabinet at corporate.

18  Q    What method of calculating the leave year does Thunderdome use?

19  A    We use the rolling 12-month period.

20  Q    Rolling forward or backward?

21  A    Rolling backward.

22  Q    Is it your testimony that the labor law posters have your name on them?

23  A    No, they do not.  There's a metal sign in that area that has my name and

24  phone number on it.

25  Q    In what area?

1    A    So in every restaurant -- which he worked at three, so I -- and I'm not

2    there every day, so I can't state very specifically, but there's a general area of

3    each restaurant that is in the back of house, many times it's near the

4    manager's desk, where there would be, you know, sort of like a bulletin board

5    type area for employees to view any current or relevant information.

6    Q    Does that exist at The Eagle?

7    A    It exists, yes, at The Eagle.

8    Q    Have you seen it?

9    A    I have seen it.  I haven't been to The Eagle in some years, but yes, I have

10    seen it there.

11    Q    Please look at 15 on Page 6.

12    A    Okay.

13    Q    Do you see that?

14    A    I do.

15    Q    Ryan states that Ricky Tindell said this to an employee named Erica

16    Sommers, S-O-M-M-E-R-S.

17    A    Okay.

18    Q    Do you know her?

19    A    I don't know her personally.  I do know that she did work for us, yes.

20    Q    Have you asked her about this?

21    A    I have not spoken with her, no.

22    Q    Does Ricky Tindell still work for your company?

23    A    Yes, he does.

24    Q    Has he ever been disciplined?

25    A    I have not pulled his file.  I have not been involved in any written

1    disciplinary actions with him.

2    Q    Has he ever been promoted?

3    A    He has not been promoted since the time period that we're referring to,

4    but he was promoted from general manager of The Eagle to regional manager of

5    the Indianapolis market.

6    Q    If Ryan's statement in this regard is accurate, would that be appropriate

7    for someone in Ricky Tindell's position to say?

8    A    I don't have any knowledge that this comment took place.  Obviously,

9    you know, it's not a comment that, you know, I prefer, but I don't have any

10   information on this.

11   Q    Right.  I understand that, but if it had happened, is that appropriate?

12   A    I don't think it's -- personally I don't think it's appropriate for anyone to

13   say.

14   Q    Now, what is the current status of Ryan's workers' comp claims?

15   A    As of today?

16   Q    Yeah.

17   A    His worker comp claim exists with the insurance company.  It's very

18   standard that once a work comp claim has been submitted to the insurance

19   company that an adjuster is an assigned to the claim and if there is -- if they

20   are in need of any information from the employer then they reach out to me,

21   but I don't have -- I'm not required, nor do I have like day-to-day information

22   on the claim.  So I --

23   Q    You understand that Ryan has been frustrated that payments have not

24   been made for medical bills.

25   A    I understand that through his deposition.  That's when I learned about

1    this most recently, and that is very unfortunate.  I wish that we would have

2    spoken sooner, you know, to help direct him to the insurance company to

3    review those appropriately if he had not done that, but I only understand that

4    from his deposition.  I'm sorry.

5    Q    Have you contacted the insurance company lately?

6    A    I contact -- when we were doing discovery, then I contacted the

7    insurance company to provide information on how much was paid on the

8    claim.

9    Q    And what did you learn?

10   A    I learned that it was -- I think they gave us $27,000, I believe.  I don't

11   have it in front of me, but that's what I recall.

12   Q    And what was distributed to Ryan?

13   A    Well, those were medical bills that were paid is my knowledge, so they

14   are paid directly to the medical provider.

15   Q    And are there still outstanding medical bills?

16   A    I don't have that information.

17   Q    How would you find out?

18   A    Well, there would be various ways that I could find out, but most

19   appropriately would probably be that Ryan provide those to the insurance

20   company or to myself.  I don't know what has taken place in the last couple of

21   years as far as if he's done that.  No one from Cincinnati insurance has

22   reached out to me to discuss bills that were paid or not paid.  I imagine that

23   the review process of medical bills for an insurance claim would be to

24   determine if they naturally are related to the claim, to the injury, at play, so I

25   don't -- but that is not part of -- I am not involved in that process at all.  It's a

1    separate entity as the insurance company.

2    Q      Have you had similar delays with Cincinnati insurance?

3    A      Well, first I don't have any real -- I don't have any evidence or medical

4    bills that have been presented to me that are unpaid.  With Cincinnati

5    Insurance, from time to time -- well, we have Cincinnati insurance outside of

6    Ohio, and in Ohio it's through the BWC, so we use Sedgwick as our managed

7    care organization, so there's various answers, but both with Sedgwick and with

8    Cincinnati Insurance it is relatively common in the medical industry from time

9    to time that the office manager or medical coder sends the bill to the wrong

10   person, it could be the place of employment, it could be the employee, it could

11   be the wrong insurance company.  There's, you know, various errors that

12   occur, and as a very typical process if those are sent to me then I look up the

13   claim number and forward it on to that adjuster.

14   Q      Have you had problems with other employees with Cincinnati Insurance?

15   A      Not in the way that Ryan is describing.

16   Q      In what way?

17   A      I've had other employees contact their manager or contact myself to say

18   that they received a medical invoice or a bill relating to their injury, and I asked

19   them to send it to me -- I asked them to do one of two things or both, to send it

20   to me so that I can send it on to the insurance company or to contact the

21   adjuster that reached out to them and was assigned to them to represent them

22   in their claim to get that information to them.  That is the only way that the

23   adjuster and the insurance company can have knowledge of bills that are not

24   paid -- or that are going to the wrong place, I should say.

25           MR. WATERFILL:  Okay.  I pass the witness.  Sarah, do you have

1    any questions?

2                    CROSS-EXAMINATION OF WITNESS KIER MUCHNICKI

3    BY MS. LEYSHOCK, COUNSEL FOR DEFENDANT:

4    Q       Yeah, Kier, I just wanted to give you a chance to follow up when we were

5    talking about an exhibit, and I think you started to speak and didn't get an

6    opportunity to complete your answer.

7    A       Okay.  I think it was --

8    Q       Yeah, I'm trying to think of what --

9    A       I think it was right here.  I think I remember.

10   Q       Just one second.  This is Exhibit 31.  We're looking at the email that's

11   Bates stamped Thunderdome000022, and Kier, do you want to discuss or

12   further respond to the timing between the incident that's being described in

13   this email on October 23rd, 2019, and Ryan's complaining of being in pain, do

14   you want to provide any --

15   A       Yeah.

16   Q       -- additional information about your understanding of what happened

17   next?

18   A       So my understanding in reading this email and then also in the very

19   typical and consistent instruction that I provide is that, in work comp claims

20   more specifically, is that if an employee is complaining of any kind of pain or

21   inability to do their job in relation to the accommodations that have been

22   provided for light duty that we are not medical doctors, and so if we are

23   working within the restrictions of light duty, then we should assume that

24   maybe something else is going on or, you know, if it's not doable then the

25   physician needs to weigh in as we want to make sure that we're providing --

1   we're making work available so that there is no lost time and we have work

2   available for the employee.  In this note it says, "Ryan complained of being in

3   pain and asked the MOD to leave.  Ryan has specific instructions from myself,

4   David, and Ricky, that he is not allowed to leave a shift without approval and

5   that he was leaving for a shift being in pain that he must go to Concentra." And

6   it states, "Ryan did not go to Concentra, nor did he notify myself or David that

7   he was leaving early." So there was a lot surrounding that indication of Ryan

8   being in pain at that time it appears in this email.

9   Q      And Kier, is there any other information that you want to provide that we

10  didn't give you a chance to do so today?

11  A      Huh-uh.  I don't think.  I think it's very -- well, I think it's very important

12  to just kind of reiterate the last question that I gave Mark, which is that

13  Thunderdome in no way, shape, or form has denied the work comp injury, nor

14  have we resisted any type of medical payments, and that we have been -- we

15  would like to have that information to assist or point Ryan in the right

16  direction, and I believe that has happened, and if there's still pending

17  information out there, then I think we need to make sure that that moves

18  forward with Cincinnati Insurance.

19  Q      And Kier, can you provide with a little more information about how the

20  time-off process works if an employee wants to take a day off of work for either

21  medical or non-medical reasons?

22  A      Sure.  So if an employee needs to take time -- would like to take time off

23  work in the future for a future date, that they are asked to submit a time-off

24  request form, which could be paid or unpaid.  If they have PTO available, then

25  they are permitted to use that.  They submit the request to their direct

1  manager; it's approved or denied.  In most cases it's approved, and then PTO is

2  paid on payroll if available, and then additionally, if time off is requested in the

3  day for the day or with not much advance notice, then that they are to either

4  call off for their shift by calling the manager on duty or to talk to their manager

5  about not being able to work their next shift or whatever it may be.  This is

6  noted in the handbook.  Additionally, there is multiple ways to communicate

7  this through forms or on the scheduling platform.

8  Q    And does Thunderdome have a cultural perspective about the use of time

9  off?

10  A    Thunderdome, in all cases that I've been involved in, any request for time

11  off or any request for a leave of absence -- we have two policies that pertain to

12  leave of absence.  We have, obviously, the FMLA as we are a covered employer,

13  and then we also have the Thunderdome unpaid leave of absence, and most all

14  of the time -- actually, in every case that I've ever been involved with, we have

15  always approved the Thunderdome unpaid leave of absence even when

16  employees did not qualify for FMLA.  So there is a very flexible environment

17  towards employees needing to take time off, knowing that we have a very

18  diverse culture with lots of different personal needs, whether it be medical

19  needs they need to attend to or personal needs, we are constantly, you know,

20  and obviously in the hospitality industry hiring, so we believe that we always

21  have something available for employees and that we can -- we're fortunate to be

22  able to approve most all leave requests.

23         MS. LEYSHOCK:  Okay.  I don't have any more questions.

24         REDIRECT EXAMINATION OF WITNESS KIER MUCHNICKI

25  BY MR. WATERFILL, COUNSEL FOR PLAINTIFF:

1    Q    Okay.  So looking at this exhibit, is it -- I think 31, which is the email

2    from Collin Martin to David Downs, is that right?

3    A    It looks like it's from Collin to David, yes.

4    Q    And it says and that if he was leaving the shift for being in pain that he

5    must go to Concentra, do you see that?

6    A    I see that, yes.

7    Q    Is that a policy that appears in your handbook?

8    A    We do not have anything in the handbook that specifically states that.

9    My direction to managers is that should be the response when we're trying to

10   work through the environment of an employee being on light duty and possibly

11   having medical concerns come up through the course of their light-duty

12   employment.

13   Q    Well, Concentra is not located at all the different locations that

14   Thunderdome has restaurants, right?

15   A    Yeah, we actually do have a Concentra in every market that we are in.

16   Q    Okay.  So is it written anywhere among the Concentra policies that if an

17   employee is in pain they must go to Concentra?

18   A    No, it's not written that way, and that would only be our instruction if

19   there's a work comp injury.  If they have personal pain, then obviously it's, you

20   know --

21   Q    Okay.

22   A    -- more their choice.

23   Q    In your experience, has an employee at Thunderdome ever been fired

24   because they left a shift because they were in pain, but they did not go to

25   Concentra?

1        MS. LEYSHOCK:  Objection.

2    BY MR. WATERFILL:

3    A    I --

4    Q    Go ahead.

5    A    Sorry.  I do not recall any specific termination based on that.

6    Q    Okay.  Then you talked about leave of absence and unpaid leave of

7    absence.  Did you talk to Ryan about taking an unpaid leave of absence before

8    he was fired?

9    A    I did not have any -- I did not talk to him.  I didn't have any reason to

10   talk to him about a leave of absence.  There's nothing that indicated that he

11   needed a leave of absence.

12   Q    Did you talk to Ricky Tindell, Collin Martin, or David Downs about Ryan

13   Bennett, who was in pain, receiving an unpaid leave of absence?

14   A    I did not talk -- I don't recall talking to them about the topic of any type

15   of leave of absence because all medical notes we were reviewing throughout his

16   follow-up visits were instructing him to return to work.  I believe there was

17   even one note where it -- just the physician described a conversation between

18   him and Ryan, and Ryan said he needed to go -- needed and wanted to go back

19   to work.

20   Q    Okay.  If an employee is in pain such that they cannot work, should they

21   stay at work?

22   A    If an employee is in pain and they believe they shouldn't be working, I

23   would hope that they go to the doctor if they can't work.  This is the basis of,

24   you know --

25   Q    Well, let's answer my question.  Should they stay at work?

1    A    They shouldn't stay at work if they believe that they cannot work due to

2    the pain.

3                   MR. WATERFILL:  That's all I have.  Thank you.

4                   You want to talk to them about signature?

5                   RECORDING AGENT:  Yes, I was just going to ask that.  Would you

6    like signature?

7                   MS. LEYSHOCK:  Yes, please.

8                   MR. WATERFILL:  Yeah.

9                   RECORDING AGENT:  Okay.

10                  All right.  It is 1:40 and that will conclude the deposition.

11                  Thank you.

12              (Deposition concludes at 1:40 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OATH

STATE OF INDIANA

COUNTY OF MARION

  I, **Christy Brooks**, Notary Public in and for the State of Indiana, do hereby certify that the witness named herein, **Kier Muchnicki**, appeared before me via zoom on August 10, 2022, and was duly sworn.

  WITNESS my hand and official seal this 15th day of September, 2022.

       */s/ Christy Brooks*
       Christy Brooks
       NOTARY PUBLIC - STATE OF INDIANA
       MY COMMISSION NO.: 0703343
       EXPIRES:  JULY 28, 2025

CERTIFICATE OF REPORTER

STATE OF INDIANA

COUNTY OF MARION

     I, Christy Brooks, digital recorder, do hereby certify that I was authorized to and did electronically report the examination of the witness named herein, **Kier Muchnicki**; that a review of the transcript was requested; and that the foregoing transcript is a true record my electronic recording.

     I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel for any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of this action.

     DATED THIS 15thday of September 2022.

*/s/ Christy Brooks*
Christy Brooks