EXHIBIT 4

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RYAN BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO. 1:21-cv-03027-RLY-MJD |
| THUNDERDOME RESTAURANTS, LLC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEPOSITION OF RICKY TINDELL

DATE: AUGUST 12, 2022

PAGES 1 - 84

Recording Agent:  Christy Brooks
Phoenix Transcription Services, LLC
christy@phoenixtranscription.org
317-937-2396

APPEARANCES


ON BEHALF OF THE PLAINTIFF RYAN BENNETT:

MARK WATERFILL
ATTORNEY AT LAW
2230 STAFFORD ROAD, SUITE 115
PLAINFILD, INDIANA
317-501-6060
Mark@waterfilllaw.com



ON BEHALF OF THE DEFENDANT THUNDERDOME RESTAURANTS, LLC:

SARAH CLAY LEYSHOCK
TAFT LAW FIRM
425 WALNUT STREET SUITE 1800
CINCINNATI, OH 45202
513-357-8731
Sleyshock@taftlaw.com

# Contents

AUGUST 12, 2022 ...................................................................................... 4

DIRECT EXAMINATION OF RICKY TINDELL ........................................... 4

BY MR. WATERFILL, COUNSEL FOR PLAINTIFF: ............................... 4

(Exhibits 1 - 20 received) ......................................................................... 6

(Exhibit 14 received) ................................................................................ 6

(Exhibit 2 received) ................................................................................ 23

(Exhibit 3 received) ................................................................................ 28

(Exhibit 4 received) ................................................................................ 29

(Exhibit 3 received) ................................................................................ 35

(Exhibit 8 received) ................................................................................ 41

(Exhibit 9 received) ................................................................................ 45

(Exhibit 10 received) .............................................................................. 46

(Exhibit 11 received) .............................................................................. 50

(Exhibit 12 received) .............................................................................. 53

(Exhibit 13 received) .............................................................................. 54

(Exhibit 15 received) .............................................................................. 57

(Exhibit 26 received) .............................................................................. 67

CERTIFICATE OF OATH ......................................................................... 82

CERTIFICATE OF REPORTER ................................................................ 83

1        <u>AUGUST 12, 2022</u>

2        (Called to order at 10:00 a.m.)

3        RECORDING AGENT:  Okay.  It is August the 12th at 10:00 a.m.

4    We're here in the case of Ryan Bennett versus Thunderdome Restaurant, cause

5    number 1:21-CV-03027-RLY-MJD in the United States District Court,

6    Southern District of Indiana, Indianapolis Division.  We have Mark Waterfill on

7    behalf of Ryan Bennett, and we have Sarah Leyshock on behalf of Defendant,

8    and the deponent is Ricky Tindell.

9        And if you could raise your right hand, sir?

10        RICKY TINDELL,

11        Called as a witness, having been first duly sworn to tell the truth,

12        the whole truth and nothing but the truth, was examined and testified as

13        follows:

14        <u>DIRECT EXAMINATION OF RICKY TINDELL</u>

15    BY MR. WATERFILL, COUNSEL FOR PLAINTIFF:

16    Q    Good morning.

17    A    Good morning.

18    Q    Mr. Tindell, my name is Mark Waterfill.  I'm the attorney representing

19    Ryan Bennett.  Have you had your deposition taken before?

20    A    I have not.

21    Q    So I'll ask you a series of questions.  I'll ask you to be verbal in your

22    responses; does that sound fair?

23    A    Yes, sir.

24    Q    Since this is a Zoom deposition, we need to be careful that we do not

25    speak over one another's words; is that fair?

1    A    Yes.

2    Q    So we need to try not to interrupt one another; is that okay?

3    A    Absolutely.

4    Q    Are you in the same room as Ms. Leyshock?

5    A    I am not.  I'm in Indianapolis in a conference center.

6    Q    Okay.  Do you have access to email?

7    A    I do.

8    Q    So we will email you the deposition exhibits.  Do you think you'll be able

9    to view those?

10    A    Yeah, that shouldn't be a problem.

11    Q    Okay.  What email should we send that to?

12    A    You can send it to Ricky, R-I-C-K-Y, dot, Tindell,  T-I-N-D-E-L-L, at

13    tdome.com.

14            MR. WATERFILL:  Okay.  Christy, could you go ahead and send

15    him the exhibits to his email address?

16            RECORDING AGENT:  Yes, do you want -- which exhibits do you

17    want emailed to him?

18            MR. WATERFILL:  Well, we've got Exhibit 1 through 20 which is on

19    one PDF.

20            RECORDING AGENT:  Yes.

21            MR. WATERFILL:  And then I think we've got; I believe it was

22    through 32.

23            RECORDING AGENT:  Okay.

24            MR. WATERFILL:  Can you send all those to him while we're doing

25    some introductory testimony?

1          RECORDING AGENT:  Okay.

2          MR. WATERFILL:  All right.

3    BY MR. WATERFILL:

4    Q       Mr. Tindell, where do you work?

5          MS. LEYSHOCK:  Mark, I'm sorry to interrupt.  Don't forget about

6    Exhibit 14 that was sent separate from the 1 through 20.

7          RECORDING AGENT:  Yes, I have that one.

8          MS. LEYSHOCK:  Okay.  Thank you.

9          RECORDING AGENT:  Uh-huh.

10         (Exhibits 1 - 20 received)

11         (Exhibit 14 received)

12   BY MR. WATERFILL:

13   Q       Where do you work?

14   A       I work in Indianapolis for Thunderdome Restaurant Group.

15   Q       What's your job?

16   A       I am the regional managing partner.

17   Q       How long have you held that job?

18   A       I believe I was hired November 2nd of 2015 as general manager, and then

19   I've been the regional manager, I believe for five years.

20   Q       How old are you?

21   A       I'm 42.

22   Q       What did you do to prepare for this deposition?

23   A       I had a conversation with our lawyers.

24   Q       Other than your lawyer, did you speak to anyone else?

25   A       I have not.

| | | |
|---|---|---|
| 1 | Q | Did you speak with Kier to prepare for this deposition? |
| 2 | A | Kier was present on the conversation with the lawyer in the meeting. |
| 3 | Q | Okay.  And when was that conversation? |
| 4 | A | I believe that was Wednesday. |
| 5 | Q | Okay.  Was that after Kier's deposition? |
| 6 | A | No, that was before Kier's deposition, I believe. |
| 7 | Q | Okay.  Have you talked to anyone else in preparation for your |
| 8 | | deposition? |
| 9 | A | I have not. |
| 10 | Q | What documents have you looked at in preparation for your deposition? |
| 11 | A | I've just seen the documents that I submitted. |
| 12 | Q | Okay.  What did you submit? |
| 13 | A | Just, I was part of the -- just any of the discovery for myself and Collin. |
| 14 | | I've seen all those documents. |
| 15 | Q | Do you maintain a Ryan Bennett file? |
| 16 | A | I'm sorry, what was that? |
| 17 | Q | Do you have a Ryan Bennett file? |
| 18 | A | I -- no, I'm not really sure what that means. |
| 19 | Q | Well, do you have a file folder related to Ryan Bennett? |
| 20 | A | Like a hard copy? |
| 21 | Q | Yes. |
| 22 | A | We have employee folders, but I don't believe that we were able to find |
| 23 | | his employee folder. |
| 24 | Q | Where are the employee folders kept? |
| 25 | A | They're typically kept in a filing cabinet in the restaurant. |

1    Q      Okay.  And so, you looked for Ryan Bennett's folder and did not find

2    one?

3    A      That is correct.

4    Q      Why not?

5    A      Because back at that time when employees were terminated, we would

6    mail the folder to the corporate office, or it was then -- were there then kept

7    and we were just unable to find his folder.

8    Q      Okay.  So, did you produce any documents regarding Ryan Bennett in

9    this case?

10   A      Yes.

11   Q      What?

12   A      I just looked through emails and anything that I had on -- anything that

13   I could find with his name or any information pertaining to the case that was

14   requested through discovery.

15   Q      Where did you look besides emails?

16   A      I searched on desktops as well as in hard files.

17   Q      Did you find any documents on desktops or hard files?

18   A      Everything that I had found has been submitted.

19   Q      Okay.  So, you did find some things?

20   A      Everything that I found has been submitted.

21   Q      Okay.  But -- and you did submit some things, I guess is what I'm

22   asking.

23   A      Yes, so I'm saying some of the things that you have in evidence are

24   things that I have submitted, yes.

25   Q      Okay.  All right.  So, are the personnel files typically -- for the

1  Indianapolis employees, typically kept in your office in Indianapolis?

2  A    They are kept in whichever respective restaurant the employee is

3  working.

4  Q    Okay.  And where is the office located where you were looking for his

5  personnel file?

6  A    Well in Bakersfield in his -- in the basement.  I mean, our offices aren't

7  really offices.  It's like a desk in the back corner of a basement and then you

8  have filing cabinets with the employee files in them.

9  Q    So it's --

10  A    It was held in Bakersfield because he was employed at multiple

11  restaurants.  In Bakersfield, it is in a basement.  At The Eagle, it is in a

12  basement as well.

13  Q    Okay.  And did you look at both Bakersfield and The Eagle?

14  A    Yes, we did -- would absolutely everything that was requested of us in

15  discovery.

16  Q    And did you find a Ryan Bennett file in either location?

17  A    Did I find a file that specifically had Ryan Bennett's name on it?  No, I

18  did not.

19  Q    Okay.  So, in the locations at Bakersfield and The Eagle where you

20  looked, there are files with other employees' names?

21  A    Yes.

22  Q    Okay.  Did you have any -- did you arrive at any explanation as to why

23  you could not find a Ryan Bennett personnel file?

24  A    Well, I mean, there would be multiple reasons for that.  One, like I stated

25  before, at that time, I believe that was when the -- our practice was to take

1    terminated employees and mail that file to the corporate office.  At The Eagle, I

2    can say that we have experienced flooding in the past as well and did lose some

3    files due to that.

4    Q    After Ryan was terminated, did you send his personnel file to human

5    resources at -- of Thunderdome?

6    A    I don't recall if that specifically happened.

7    Q    And through your communications, have you been told whether human

8    resources at Thunderdome possessed Ryan Bennett's personnel file?

9              MS. LEYSHOCK:  Objection.  You can answer.

10             THE WITNESS:  Okay.  We did definitely look for his file and I was

11   told that we were unable to find it in the corporate office.

12   BY MR. WATERFILL:

13   Q    Okay.  All right.  Because you said a couple of times after somebody's

14   fired, we usually send it to -- to Bakersfield.

15   A    So I'm speaking to -- I'm sorry, if I can clarify.  I'm speaking to at that

16   time, that was the practice--

17   Q    Yeah.

18   A    -- at the time of Ryan's termination.  So, our practices have changed

19   throughout.  Things have gone more electronic currently.  So, I'm just saying at

20   that time.

21   Q    Okay.  I'm just trying to close the loop and --

22   A    Of course.

23   Q    -- find out if you're telling me that we sent it to HR and we have it now,

24   but it doesn't sound like that's what you're saying.

25   A    I was speaking to files in general of all employees during that time, that

1    was our best practice, but I cannot speak to whether or not -- I cannot speak to

2    what happened specifically to Ryan Bennett's file.

3    Q       Okay.  So, when you did an email search, you performed this on your

4    email inbox?

5    A       Yes.

6    Q       And what kind of email system is used?

7    A       I have Gmail.

8    Q       And so what email address did you search?

9    A       I searched everything that was requested on the discovery, all of the

10   words and everything that was requested, Ryan Bennett, anything that I

11   possibly could have related to the case.

12   Q       Okay.  Did you search Ricky.Tindell@Tdome.com?

13   A       Yes, as well as TindellRicky@Gmail.com.

14   Q       Okay.

15   A       That is my email address that I've had with the company since before the

16   company went to -- and those email accounts are combined.

17   Q       Okay.  And did you find anything?

18   A       What I found, I submitted.

19   Q       Okay.  So, you did find something?

20   A       Yes, I found some emails, yes.

21   Q       Okay.  We'll go through that as we go through the exhibits.

22   A       Okay.

23   Q       Okay.  So as the Thunderdome regional managing partner to whom do

24   you report?

25   A       I would report to the owners of the company.

1    Q    Which are who?

2    A    Joe Lanni, John Lanni, and Alex Blust.

3    Q    Have you talked to Joe Lanni about this lawsuit?

4    A    Joe Lanni was present in the meeting on Wednesday.

5    Q    Okay.  Other than at that meeting, have you spoke to him about this

6    lawsuit?

7    A    I have not.

8    Q    How many people report to you?

9    A    Currently or?

10    Q    Yeah, currently.

11    A    Currently, I mean, I have -- I am responsible and oversee both

12    restaurants.  I believe Bakersfield currently has around 60 to 70, I'd say closer

13    to 60 employees.  Eagle has probably around 90.

14    Q    And are those two restaurants your sole responsibility?

15    A    Yes.

16    Q    You said you started on November 2, 2015, correct?

17    A    I believe so.  It could have been the third or fourth, but I know it was

18    early November.

19    Q    Right, right.  What was your job when you started?

20    A    General manager of The Eagle Indianapolis.

21    Q    When did your title change to regional manager?

22    A    I don't know the exact date.  I would say about a year and a half to two

23    years --

24    Q    Okay.

25    A    -- after.

1    Q    Okay.  What did you do before working for Thunderdome?

2    A    I've been in the restaurant industry since 1996.

3    Q    Okay.  What did you do before working at Thunderdome?

4    A    I worked for Jeff Ruby Culinary Entertainment.

5    Q    Jeff Ruby?

6    A    Jeff Ruby's Culinary Entertainment, yes.

7    Q    Where?

8    A    Cincinnati, Ohio.

9    Q    When?

10   A    That would have been, I believe, 2010 is when I started there, 2009,

11   2010, somewhere around that time.

12   Q    What was your job?

13   A    I was hired on as the assistant general manager at Walnut Street Grill.

14   That restaurant closed, and then I was the assistant general manager at Jeff

15   Ruby's Steak House Downtown.  I was then the assistant general manager at

16   Jeff Ruby's Precinct.  I was then the general manager at Jeff Ruby's Carlo and

17   Johnny, and then I was then assistant general manager at Jeff Ruby's Precinct.

18   Q    To whom did you report?

19   A    To -- when I was an assistant general manager to the general manager,

20   and when I was the general manager, it would have been to what there -- was

21   like a regional type individual.  His name was Bawe Shinholster .

22   Q    Can you spell that?

23   A    B-A-W-E.  Last name, S-H-I-N-H-O-L-S-T-E-R.  That may or may not be

24   correct on the last name.

25   Q    Do you remember any other person to whom you reported at Jeff Ruby's?

1    A     I mean, I could go into the very specific names of the general managers

2    for each restaurant.

3    Q     Okay.

4    A     Neal Collinsworth would have been Jeff Ruby's downtown.  Brandon

5    Ruby  would have been at the Precinct.  But at all of those locations it would

6    have been Bawe Shinholster.

7    Q     Why did you leave Jeff Ruby's?

8    A     I was offered a position to move with very minimal compensation and at

9    the same time I had a friend who worked for Thunderdome Restaurant Group,

10   and she said I should talk to -- talk to one of the people that worked for

11   Thunderdome, Lauren Altman.  We ended up meeting for lunch and then I

12   ended up interviewing with Alex Blust.

13   Q     So you thought it was a better opportunity?

14   A     Yes.

15   Q     Okay.  So where did you work prior to Jeff Ruby's?

16   A     I worked at Jag's Steak and Seafood in West Chester, Ohio?

17   Q     During what period of time?

18   A     I would say that was 2003 up until '9 or '10.

19   Q     What did you do?

20   A     I was a server, and then the last couple of years I was a server and bar

21   manager.

22   Q     To whom did you report?

23   A     Um --

24   Q     At the end?

25   A     Michael, and his last name is failing me right now.

1   Q   Why did you leave?

2   A   I had an opportunity to get into management with Jeff Ruby's.

3   Q   Okay.  What did you do -- where did you work before Jag's?

4   A   Oh geez, in -- I started there shortly after college.  In college I delivered

5   pizza for Papa John's.

6   Q   Where did you go to college?

7   A   Florida State University.

8   Q   Did you graduate?

9   A   I did.

10  Q   In what?

11  A   I have a Bachelor's of Science in Food and Nutrition Dietetics.

12  Q   What year?

13  A   2003.

14  Q   What education do you have beyond your B.A.?

15  A   It's a bachelor's of science, but --

16  Q   I'm sorry, B.S.

17  A   No other formal, I don't have a master's or anything like that.

18  Q   Have you taken any seminars?

19  A   Have I taken any seminars?  No.

20  Q   Attended any seminars?

21  A   I have not.

22  Q   Okay.  Do you know my son, Nick Waterfill?

23  A   I don't believe so.

24  Q   Okay.  He was a manager at Bazbeaux's.

25  A   Okay.  The name sounds familiar.

1    Q     All right.  Okay.  Have you attended any human resources seminars put

2    on by an entity other than your employer?

3    A     No, there was a, like, organizational leadership-type conference that Jeff

4    Ruby had where they brought like a motivational speaker in, but other than

5    that, that's the only thing that can come to mind.

6    Q     Have you attended any seminars regarding the Family Medical Leave

7    Act?

8    A     I have not.

9    Q     Have you attended any seminars regarding worker's compensation?

10   A     I have not.

11   Q     Would you consider yourself an expert in the Family Medical Leave Act?

12   A     I consider myself knowledgeable, based off of my experience in the

13   restaurant industry.

14   Q     And is it solely based on your experience that you consider yourself

15   knowledgeable?

16   A     I would say that I've had information provided to me as well.

17   Q     By who?

18   A     By former employers as well as Thunderdome Restaurant Group.

19   Q     Who at Thunderdome has provided you information regarding the FMLA?

20   A     It's actually part of a packet for all individuals as they're onboarded.  It's

21   our Now What packet.

22   Q     Now What packet.  Are you referring to the handbook?

23   A     I'm sorry, yes.

24   Q     Okay.  All right.  Other than being given the Thunderdome handbook,

25   have you been given any other materials regarding the FMLA?

1   A       No.

2   Q       Okay.  Does Thunderdome provide management training?

3   A       Yes.

4   Q       At that management training, who presented?

5   A       So all managers are required to attend orientation where we go over the

6   Now What handbook in which FMLA is covered within that.  So currently I do

7   all orientations as a regional manager.

8   Q       Okay.  Did you ever attend management training at Thunderdome for

9   yourself?

10  A       Yeah.  So, we have a new manager orientation.

11  Q       And when did you attend that?

12  A       I did my training in Cincinnati, so I want to say I did that probably my

13  first week or second week of employment.

14  Q       So that was back in November of 2015?

15  A       I would say, yes.

16  Q       Who presented it?

17  A       Alex Blust typically leads those.

18  Q       How do you spell his last name?

19  A       B-L-U-S-T.

20  Q       Who is he?

21  A       Sorry, he's one of the owners that I mentioned.

22  Q       Okay.  And did he discuss the Family Medical Leave Act?

23  A       I don't recall.

24  Q       All right.  After that session, you have not received any other in-person

25  training regarding the FMLA; have you?

1     A     No.

2     Q     After that training, you have not received any other in-person training

3     regarding worker's comp; have you?

4     A     No.

5     Q     Okay.  After that training, you have not received any other in-person

6     training regarding the Americans with Disabilities Act, correct?

7     A     Correct.

8     Q     Okay.  Currently, do you provide in-person training to new employees?

9     A     Yes, as I stated, I perform the orientation and we read over the Now What

10    handbook which covers all the things.

11    Q     And you do that currently?

12    A     Yes.

13    Q     But you did not do that with Ryan Bennett, correct?

14    A     Ryan Bennett would have absolutely attended a orientation.

15    Q     Right, but it was not presented --

16    A     We go over that information.

17    Q     Right, but it was not presented by you?

18    A     At that time it would have been myself or David Downs or Siobhan

19    Stevenson [ph].  So, it's typically either myself or one of the general managers.

20    Q     Okay.  If Ryan were to testify that you did not provide his orientation, do

21    you have personal knowledge of facts to rebut that?

22    A     I don't know that it was me specifically.  It would have been one, myself,

23    or the two other individuals that --

24    Q     Okay.  And all -- really what I'm saying is, as you're sitting there right

25    now, do you remember, oh, I gave Ryan his orientation?

1    A    I do remember sitting with him at a table at Bakersfield and going over

2    his -- going over the paperwork with him when he was hired.

3    Q    Okay.  All right.  So, when you went over the paperwork with him, does

4    that include the Now What packet?

5    A    Yes.

6    Q    Now when you go over paperwork, do you include form 380 which is an

7    FMLA form from the US Department of Labor?

8    A    I am not familiar with that, so --

9    Q    Have you ever used form 380?

10    A    I have had employees that have gotten FMLA, so that's not really

11    something that I'm a part of.  So, anything that involves FMLA or moving

12    towards compliance with FMLA, I would call Kier.

13    Q    Okay.  And have you done that in the past?

14    A    Absolutely.

15    Q    I'm sorry?

16    A    Absolutely.

17    Q    Okay.  Did you do that for Ryan Bennett?

18    A    I did not.

19    Q    Okay.  How many times in the past have you called Kier regarding

20    FMLA?

21    A    FMLA specifically, a handful of times.

22    Q    Okay.  Now you understand that Ryan Bennett was injured lifting beer

23    kegs; is that correct?

24    A    That is not what he initially claimed.

25    Q    What did he initially claim?

1    A    He initially claimed that he was bending over on expo and lifting to grab

2    a tray.

3    Q    Okay.  And to whom did he state that?

4    A    He stated that to, I believe Dayton Neely was who filled out the incident

5    report that day.

6    Q    And did you hear Ryan say that to Dayton Neely?

7    A    Did I hear Ryan say that to him? No. That was filled out on an incident

8    report which is per protocol.

9    Q    And so you don't have personal knowledge that Ryan Bennett said that

10   to Dayton Neely?

11   A    I do not.

12   Q    That is what Dayton Neely said to you?

13   A    That is what Dayton Neely filled out on our incident report immediately

14   after the incident occurred?

15   Q    Okay.  Did Ryan ever say to you that he was injured lifting beer kegs?

16   A    No.

17   Q    Did you ever ask Ryan, how did you hurt yourself?

18   A    I don't recall that.

19   Q    And Ryan is someone who you would see on a daily basis, right?

20   A    I wouldn't say necessarily daily.  I had three restaurants at that time.

21   So, his interactions were more so with Collin Martin, Dayton Neely and David

22   Downs at the time.

23   Q    Okay.  Let's back up for a minute.  When did you first meet Ryan

24   Bennett?

25   A    I actually hired Ryan as the assistant kitchen manager at Bakersfield.

1    Q    When?

2    A    I'm not sure of the exact date.

3    Q    Did you interview him?

4    A    I did interview him.

5    Q    And what did you discuss?

6    A    Just previous employment, expectations of the job, those types of things.

7    Q    And do you recall that interview?

8    A    Vaguely.

9    Q    Do you recall why you hired Ryan?

10    A    Yes, because he seemed to have the experience required for the job.

11    Q    Did he interview with anyone else?

12    A    Not that I recall.

13    Q    What was his first job?

14    A    His first job was the assistant kitchen manager at Bakersfield.

15    Q    Did you observe his performance in that job?

16    A    I did.

17    Q    How did he do?

18    A    I would say it was lackluster at best.

19    Q    Why?

20    A    Ryan was not open to coaching.  Whenever he was coached on a manner

21    whether it be how to speak to an employee or not walking off the line during

22    peak times and going to smoke cigarettes or going to his car for 30 to 45

23    minutes to get medication, the conversations just seemed to be pretty circular

24    and there wasn't a lot of, you know, he wasn't very receptive to feedback.

25    Q    Is Ryan diabetic?

1   A       I have heard that Ryan is diabetic.  I don't recall him ever telling me that

2   he was diabetic.

3   Q       Did you ever ask him if he was diabetic?

4   A       I did not.

5   Q       Did you criticize him for going to his car to get medicine?

6   A       I spoke to Ryan about the amount of time that he was taking to go to his

7   car to get his medicine.  I did not ask him what the medicine was or what it

8   was for.  I did discuss with him in length about the fact, and we did come to an

9   agreement that it did not require him 30 to 45 minutes to go to his car to get

10  the medication.

11  Q       Do you fill out annual evaluations on employees?

12  A       That is something we've done in the past, yes.

13  Q       Well, I've looked through a lot of documents.  I see no performance

14  evaluations for Ryan Bennett.  Are there any?

15  A       I'm sorry.

16  Q       Are there any?

17  A       Everything that I have found on Ryan you all have.

18  Q       Well, did you ever fill out a performance evaluation for Ryan?

19  A       I most likely did and that would probably be in the folder, in his folder.

20  Q       The folder you didn't find?

21  A       Correct.

22  Q       Okay.  So, when did you first fill out a performance evaluation for Ryan

23  Bennett?

24  A       Well, I mean we have 30, 60, and 90-day reviews that we were doing

25  back at that time.  So that would have been that, but there's a lot of verbal

1    conversations as well with individuals.

2    Q      All right.  Well, let's focus on when did you first fill out a performance

3    evaluation on Ryan Bennett?

4    A      I do not recall.

5    Q      Did you ever?

6    A      I absolutely know that I did at some point, yes.

7    Q      But you've not found them?

8    A      Correct.

9    Q      Okay.  Did anyone else fill out a performance evaluation on Ryan

10   Bennett?

11   A      I don't recall.

12   Q      Okay.  This coaching that you've testified to, have you found a single

13   document that supports your contention that you provided this coaching to

14   Ryan Bennett?

15   A      I -- you all have all the documents that I have found concerning Ryan

16   Bennett.

17   Q      Okay.  Well, when you provided them to me, did you find anything that

18   documented your coaching to Ryan Bennett?

19   A      I don't recall all of the documents that have been submitted.

20   Q      All right.  Let's look at Exhibit 2.

21          (Exhibit 2 received)

22   A      Okay.  Give me a second.  I'm not sure how to exit here.  Hold on.

23   Q      Yeah, it's Exhibit 2.

24   A      Okay.

25          MS. LEYSHOCK:  Mark, could you show your screen so we can

1   make sure we're all looking at the same document at the same time?

2               MR. WATERFILL:  I think we did fine the other day, and no, I can't,

3   because I'm using my phone, and -- but you have given us the exhibits and we

4   all have them in front of us, and that also allows the witness to look through

5   the entire exhibit as he would like.

6               THE WITNESS:  Okay.  So, I have it pulled up.  I can't see you all's,

7   but I have to go in between the screens.  Which one?

8               MR. WATERFILL:  Okay.  So it -- it's page 8.  This is a 305-page

9   PDF.  It's got Siobhan's name at the top.

10              MS. LEYSHOCK:  Mark, can you identify for the record which --

11  which deposition exhibit we're talking about?

12              MR. WATERFILL:  Yeah, I said 2.

13              MS. LEYSHOCK:  Okay.

14              THE WITNESS:  Okay.  You said it's page 8?

15              MR. WATERFILL:  Yeah, page 8 of 205 (sic)

16              THE WITNESS:  Okay.

17  BY MR. WATERFILL:

18  Q       At the bottom right, it says Thunderdome 19.

19  A       Okay.  I got it.

20  Q       Yeah, and are these -- is this -- are these text messages between you and

21  Siobhan?

22  A       Between me and who?

23  Q       Siobhan.

24  A       I'm not sure.

25  Q       I'm not sure if I'm pronouncing her name correctly, but --

1   A      All right.

2   Q      S-I-O-B-H-

3   A      Oh, I'm so sorry.  I did not see that.  It's Siobhan is how you pronounce

4   that.

5   Q      Yeah, are these text messages between you and Siobhan?

6   A      It looks like it, yes.

7   Q      Okay.  Do you recognize your responses that I think are shaded?

8   A      Yes.

9   Q      Okay.  So, what was Siobhan's position at that time?

10  A      She was the general manager of Bakersfield.

11  Q      Okay.  Where was Ryan working?

12  A      I'm sorry, what was that?

13  Q      Where was Ryan working?

14  A      At that time Ryan was at Bakersfield.

15  Q      Okay.  Has anyone reported to you that Siobhan used illegal drugs such

16  as cocaine during work?

17  A      No, I am not aware of that.

18  Q      Okay.  She states on May 16, 2019, "I've had two BOH employees", what

19  does BOH mean?

20  A      Back of house.

21  Q      Who is she referring to?

22  A      I couldn't speak to that.

23  Q      Okay.  Did you ever ask her?

24  A      I'm sure there was a verbal follow-up to that if that's what I stated that I

25  was going to call.

1    Q      Okay.  And she says, "walk out of their shifts tonight because of Ryan

2    Bennett", do you see that statement?

3    A      I do.

4    Q      Okay.  Did you call Ryan about this?

5    A      I do not recall.  I would imagine that if I said I was going to call him that I

6    did.

7    Q      Okay.  But you can't remember?

8    A      No.

9    Q      Okay.  Did you ever hear any more information about this allegation?

10   A      I honestly do not recall this instance.

11   Q      Okay.  We've not received any written warnings or documents related to

12   this, have you -- did you write Ryan up for this?

13   A      I don't recall.

14   Q      Did you talk to Siobhan about this any further?

15   A      Like I said, if I said I was going to call and follow up then I would have,

16   but I don't recall any specifics.

17   Q      Okay.  Did you obtain Exhibit 2?

18   A      What -- what is Exhibit 2?

19   Q      What we were looking at, text messages.

20   A      Okay.  I didn't know.  I apologize.  I didn't know that was Exhibit 2.

21   Q      Yeah.

22   A      You're asking if I obtained it?

23   Q      Yes.  You testified that you basically did a document search essentially?

24   A      Yes, yes.  You're asking if I submitted this?  I believe I was the one that

25   submitted this.

1    Q    Yeah, okay.

2    A    Yes.

3    Q    Okay.  How did you obtain it?

4    A    I just searched my phone, my text messages.

5    Q    Okay.  And then did you -- how did you print it?

6    A    I believe I would have screenshotted it, sent it to my email, and then

7    printed it off with the computer.

8    Q    Okay.  Sure, so did you find any other text messages regarding Ryan

9    Bennett?

10    A    Again, you all have everything that I would have submitted.

11    Q    Okay.  But as you sit here right now, do you remember having more than

12    just this one?

13    A    I believe so.  I -- I still have my text messages from Ryan and I that I

14    believe I've submitted.

15    Q    You think you have submitted all of your text messages between you and

16    Ryan Bennett?

17    A    Yes, sir.

18    Q    Okay.  Do you think that you have submitted all text messages that you

19    possess regarding Ryan Bennett?

20    A    I believe so.

21    Q    Okay.  All right.  Let's look at page 30 of 205 (sic) -- of 305 of this

22    document.

23    A    You said 230?

24    Q    No, 30.

25    A    Thirty, sorry.

1  Q      Yeah.  That is Exhibit 3.

2         (Exhibit 3 received)

3  A      Okay.

4  Q      Page 30, and this is within several pages of medical health records

5  regarding Ryan, correct?

6  A      I -- I'm just looking at it.  It says recheck entry flow sheet?

7              MS. LEYSHOCK:  Ricky, you can take some time to look at this

8  because it's a pretty long document and honestly, I'm not sure if this is

9  something that you've seen before.

10             THE WITNESS:  Yeah, I was going to say this is not something I

11 would have seen.

12 BY MR. WATERFILL:

13 Q      All right.  I'll let you guys do the deposition.  Have you seen this before?

14 A      I have not.

15 Q      Okay.  All right. Did you see any health records regarding Ryan Bennett's

16 injury?

17 A      I have not.

18 Q      When you were gathering records, did you find any Ryan Bennett health

19 records?

20 A      I -- that's not something I would have had access to.  When an employee

21 has a work-related injury, they go to Concentra.  Concentra provides us with

22 what their restrictions are.  That is something that I see.  Anything after that

23 would go to Kier.

24 Q      Okay.  So, let's take it from the typical scenario that you just testified

25 and narrow it down to this particular situation.

1    A     Okay.

2    Q     In this particular situation, did you obtain any Ryan Bennett health

3    records?

4    A     I did not.

5    Q     Okay.  So, for example, if we look at page 68 of 305 --

6    A     Okay.

7    Q     -- those are some Concentra health records.

8    A     Okay.

9    Q     You never had those?

10   A     Sixty-eight with the outline of the body?

11   Q     Yeah.

12   A     I have not seen that, correct.

13   Q     Okay.  All right.  Let's move to Exhibit 4.

14   A     I'm not seeing which -- when you're saying Exhibit 2, 3, 4, I'm not seeing

15   that.  So -- the page number is helpful for me.

16   Q     I know, I know, but Thunderdome has sent us one PDF with 20 exhibits

17   on it, but please direct your attention to page 80.

18   A     Okay.

19   Q     Of 305, and you will see a blue exhibit sticker that says Exhibit 4.

20   A     Yes.

21         (Exhibit 4 received)

22   Q     Okay.  And have you seen page 80 before?

23   A     Yes.

24   Q     Is that the document that you referred to earlier?

25   A     It is.  The one where he informed me, he picked up a tray, correct.

1    Q      And this was created by who?

2    A      It's definitely not my handwriting.  Supervisor's signature, it looks like

3    that could be David Downs, or actually that's probably Dayton -- no, that was

4    Dayton Neely it looks like.

5    Q      Okay.  Who is Dayton Neely?

6    A      Dayton Neely was the AGM at the time, assistant general manager.

7    Q      For which?

8    A      I'm sorry?

9    Q      For which restaurant?

10   A      For The Eagle.

11   Q      Okay.  And how long have you worked with Dayton Neely?

12   A      At that -- well, Dayton is no longer with the company.  I want to say, let's

13   see, that was in 2019, so I probably worked with Dayton, Dayton started off as

14   a bartender at Bakersfield, so at that time it was probably a total of four years.

15   Three to four years.

16   Q      Why did Dayton leave?

17   A      Dayton was terminated.

18   Q      Why?

19   A      I honestly don't recall.

20   Q      Did you fire him?

21   A      Alex Blust fired him.

22   Q      Did Alex ever tell you why?

23   A      I believe, I mean, I'm trying to think back.  I believe that was actually

24   performance-based as well.

25   Q      When did that happen?

1    A    I -- I couldn't recall.  I mean, if I looked up records, I could potentially

2    find out, but I don't recall.

3    Q    Can you estimate the year?

4    A    I mean, this was 2019.  I would say, no, I really don't know.  I know that

5    Krueger's Tavern was still open, so if I looked at the dates of Krueger's Tavern I

6    could potentially, but in front of me right now, no, I'm not sure what year that

7    would be.

8    Q    Can you estimate how much longer -- wait a minute, let me restate this.

9    Was Dayton Neely fired soon after the date of Exhibit 4?

10    A    I don't recall.

11    Q    Okay.  And Exhibit 4 is 8-23-19, right?

12    A    Uh-huh.

13    Q    Exhibit 4 is dated at line 21, 8-23-19?

14    A    Yes.

15    Q    Okay.  And at item 2, it shows Ryan Bennett's hire date as 7-27-18,

16    correct?

17    A    Yes.

18    Q    Does that sound correct to you?

19    A    So that -- I mean, yes.

20    Q    Okay.  And item 10 --

21    A    If I could clarify just on that piece, the hire date could potentially have

22    been because he was transferred for that specific restaurant.  I don't know if

23    that matters.  I'm just saying, it could have been when you're transferred you

24    have a hire -- even though we are the same company, you could potentially

25    have a hire date that was for that restaurant.  So, I'm not sure if that was for

1   The Eagle or if that was his original hire date at Bakersfield.

2   Q       At item 10, it says Ryan suffered a hernia, right?

3   A       "Ryan approached Ricky and informed him that he had suffered a hernia

4   from bending over to pick up a tray and needed medical attention."  Yes.

5   Q       Okay.  When did you receive Exhibit 4?

6   A       It was prob-- I would say it was within 24 hours.  Our policy is that all

7   employee incidents are to be filled out within 24 hours.

8   Q       Okay.  All right.

9   A       Of the incident.

10  Q       Okay.  Did you then speak to Ryan about it?

11  A       I believe so, yes.

12  Q       What did you say?

13  A       He would have gone to Concentra and then we would have discussed

14  what his work restrictions were.

15  Q       Well, what did you say?

16  A       I don't recall the exact conversation after that.

17  Q       What did he say?

18  A       I don't recall the exact conversation.

19  Q       Okay.  Did you ask him, are you still in pain?

20  A       I don't recall that exact conversation.

21  Q       Okay.

22  A       I do know that I would have gone off of whatever the restrictions were

23  that he came back with from Concentra, and I do know that we did abide by all

24  work restrictions that were submitted to us from his worker's comp claim.

25  Q       Did you see written restrictions from Concentra?

1    A    I believe so, yes.

2    Q    Okay.  So that puts us back up to the documents we were just looking

3    at.  You did see some health records?

4    A    Well, you were asking if I had seen those specific pages.  I had not seen

5    those specific pages.  The employee typically comes back with a hand -- like in

6    their hand, an actual piece of paper from Concentra, and I believe that's what

7    he came back with, and he had work restrictions that required him to sit at

8    times, and we did make those accommodations.  He would actually sit at expo

9    on a stool.

10    Q    Let's look at the next page of Exhibit 4 which is Thunderdome 9.

11    A    Nine, okay.

12    Q    That is a document that is "factors contributing to cause of incident,

13    review and check all applicable considerations", do you see that?

14    A    Yes.

15    Q    Is that a disciplinary form?

16    A    It is not.

17    Q    Check marked is "instructions disregarded, improper lifting", do you see

18    that?

19    A    I do.

20    Q    Did you see that within 24 hours of 8-23-19?

21    A    That is the second page of the employee incident report, so I would say,

22    yes.

23    Q    And did you talk to Ryan about that item?

24    A    Yes, that is part of the follow-up.

25    Q    What did you say?

1    A      I said that you should make sure that you're lifting properly and take

2    precaution.

3    Q      What did he say?

4    A      I don't recall.

5    Q      Prior to 8-23-19, did you direct Ryan Bennett to lift beer kegs in the

6    basement?

7    A      I have never directed Ryan Bennett to lift beer kegs.

8    Q      Did you know he was doing that?

9    A      I had no knowledge of Ryan Bennett ever lifting a beer keg.

10   Q      Are beer kegs delivered at the restaurants?

11   A      Yes, they are delivered downstairs by the people that deliver them and

12   they are placed either in the beer cooler or directly outside of the beer cooler.

13   There is no reason for an assistant kitchen manager to ever interact with a keg.

14   Q      And how do the kegs get in the beer cooler?

15   A      Typically bar backs or server assistants or bartenders do that.

16   Q      Let me go back to your orientation.  Wasn't Ryan's orientation two weeks

17   after his start?

18   A      I don't recall that timeline.

19   Q      Is it possible that that is the case?

20   A      I mean, I would say that there's times where employees are hired for

21   employment and have previous obligations so there may be a lapse there from

22   their actual hire date where they're onboarded into the computer system and

23   then from the date that they actually start work there could be a difference

24   there.

25   Q      Isn't it a fact that Ryan Bennett was given no training regarding the

1  FMLA?

2  A     Ryan Bennett was provided the Now What Handbook and orientated just

3  as any other employee which has FMLA in it.  We also have all of our

4  Department of Labor signage posted appropriately within the restaurants.

5  Q     If Ryan Bennett were to testify, he was never given the Now What

6  Handbook, do you have personal knowledge of any facts to rebut that?

7  A     I would say that that would be highly unlikely.

8  Q     Have you ever seen a handbook with Ryan Bennett's signature

9  expressing that he received it?

10  A     I have not seen that.

11  Q     Okay.  Let's look at, I think Christy should have sent you exhibits --

12         MR. WATERFILL:  Oh, Christy, go ahead and send the other

13  exhibits as well, 14, and then 21 through 32.

14         RECORDING AGENT:  Yes, I believe those were sent with the

15  originals.

16         THE WITNESS:  No, I have those.  I have those.

17         MR. WATERFILL:  Okay, good, good.  All right.  Okay.  Let's look at

18  29.

19         THE WITNESS:  Okay.

20      (Exhibit 3 received)

21  BY MR. WATERFILL:

22  Q     That's the Now What Handbook that you've been talking about, right?

23  A     Correct.

24  Q     And down at the bottom, page 37 of this 38-page PDF --

25  A     Uh-huh.

1  Q    -- it's not signed, is it?

2  A    No, it is not.

3  Q    Okay.  Have you ever seen a handbook which was signed by Ryan?

4  A    I mean, I don't recall that.

5  Q    Okay.

6  A    That would have been protocol at the time.

7  Q    Okay.  And if Ryan were to testify that Dayton Neely gave him his

8  orientation, do you have anything to rebut that?

9  A    I -- no, I don't recall.

10  Q    Please look at 25.  This is another handbook, right?

11  A    Okay.

12  Q    And it's not signed either, correct?

13  A    Correct.

14  Q    And if Ryan Bennett were to testify that he received zero performance

15  evaluations while working at Thunderdome, do you have personal knowledge of

16  any facts to rebut that?

17  A    Do I have a hard copy of them?  No.

18  Q    Okay.

19  A    Do I know that he received them?  Yes.

20  Q    Based upon what?

21  A    Based upon that I saw them.

22  Q    When?

23  A    And I know that I personally had sat down and had conversations with

24  Ryan concerning his performance.

25  Q    We're talking about written performance evaluations.

1    A     Okay.  No, I do -- you're correct.  I do not have any of those.

2    Q     Okay.  Is it your testimony that you filled them out?

3    A     No.

4    Q     Is that your job?

5    A     Not necessarily.  There were people in between Ryan and I.  I over --

6    Ryan had direct supervisors that would have been responsible for that.

7    Q     Who?

8    A     Siobhan Stevenson at Bakersfield.  Courtney Arseno [ph], I'm not sure

9    who was the -- so it would have been the GM or kitchen manager at all three of

10   the respective restaurants would have likely been responsible for that, not

11   would have likely.  They would have been responsible for his performance

12   evaluations (inaudible).

13   Q     I'm sorry.  What time of year are performance evaluations done?

14   A     What's that?

15   Q     What time of year are performance evaluations done?

16   A     We typically do 30, 60, 90-day reviews, and then again, I mean, the

17   company has evolved, so there -- I believe at that time were annual as well for

18   managers.

19   Q     Okay.  So --

20   A     (Inaudible) came back to the time -- again, the company has evolved so

21   I'm just thinking back to at that time what it was most likely.

22   Q     Okay.  So, if Ryan's hire date was July 27, 2018, it's your testimony that

23   he should have had a 30-day written performance evaluation?

24   A     Yes.

25   Q     And a 60-day written performance evaluation?

1    A      Yes.

2    Q      And a 90-day written performance evaluation?

3    A      Yes.

4    Q      And you've not seen any of those?

5    A      I have not.  As I mentioned, we were unable to find his file that would

6    have had all that in it.

7    Q      And did you ever ask anyone, did you do a 30, 60, or 90-day

8    performance evaluation on Ryan?

9    A      I don't recall.

10   Q      And in any event, Ryan continued in his employment past the first 90

11   days, correct?

12   A      Correct.

13   Q      And so as we know from Exhibit 4, he was employed at Thunderdome

14   more than a year after his hire date because it shows 7-27-18 as the hire date

15   and 8-23-19 as the incident, right?

16   A      Correct.

17   Q      Okay.  So once an employee is past their 90 days, is it your testimony

18   that there's a -- you know, like some companies give annual evaluations like in

19   January maybe, or maybe December or other companies do it like on each

20   employee's anniversary date.

21   A      Uh-huh.

22   Q      Does Thunderdome have a practice in that regard?

23   A      I don't recall what it would have been at that time.  I just -- like I said, I

24   can think back to that time that they were considered annual.

25   Q      Well what does it -- how is it done now?

1   A    Now it's typically -- it falls on like the same time.  So, it's not based off of

2   the hire date.

3   Q    Okay.  And what is that time?

4   A    Currently I believe it's in March.

5   Q    And does Thunderdome have an annual performance form?

6   A    So we have transitioned into this -- we're -- and again, we're evolving as a

7   company, so we currently are on the EOS system, and we have what are called

8   GWCs, and those are performed quarterly.  We're currently in quarter three,

9   and those are due this month, and that is for all managers.  So that is our

10  current manager evaluation policy.

11  Q    None of that was done --

12  A    That is not the system we had in place when Ryan was employed,

13  correct.

14  Q    Okay.  We got to make (inaudible).  We got to make sure we don't speak

15  over one another.

16  A    Sorry.

17  Q    Sometimes my questions may seem stilted, or they may seem awkward,

18  but that's just because I need to finish the question.  So, let's do that.  Is it

19  your testimony that you never saw Ryan lifting a beer keg at the beer cooler?

20  A    Absolutely.

21  Q    Isn't the beer cooler downstairs?

22  A    It is.

23  Q    And that's where the kitchen is also?

24  A    At which restaurant?

25  Q    Well, which restaurant was he working in on 8-20; he was working at

1    The Eagle, right?

2    A    Yes, so the beer cooler is in the basement at The Eagle, correct.

3    Q    Is that also where your office is?

4    A    Yes.

5    Q    Okay.  So how are beer kegs transported into the beer cooler?

6    A    Well, the delivery person will put kegs into the beer cooler.  That is what

7    they are supposed to do.  If there is overflow, there may be a couple of kegs

8    outside of the beer cooler, and then those are placed in the beer cooler by

9    bartenders, server assistants, or server assistants and bar backs.

10   Q    Okay.  Are managers prohibited from doing that?

11   A    Are managers prohibited from it?  No.

12   Q    Okay.  And then are the beer kegs transported up to the bar?

13   A    They are not.

14   Q    They're kept in the beer cooler?

15   A    They are, and then they're hooked up to a line and that line goes up to

16   the bar in the tap.

17   Q    Okay.  All right.

18   A    It's like through the floor and the infrastructure.

19   Q    Okay.  Okay.  Let's take a ten-minute break, come back at 11:15, okay?

20   A    Okay.

21   Q    Thanks.

22        (Off the record at 11:05 a.m.)

23                              (On the record at 11:15 a.m.)

24             MR. WATERFILL:  Okay.  We're ready?

25             RECORDING AGENT:  Yes, I believe everyone is here.  It is 11:16,

1    we're back on the record.

2    BY MR. WATERFILL:

3    Q    Okay.  Looking at Exhibit 4, Mr. Tindell, oh, let me ask you something,

4    what is your home address?

5    A    141 East Pleasant Run Parkway South Drive, Indianapolis, 46225.

6    Q    Okay.  After receiving Exhibit 4, did you provide that to Kier?

7    A    I'm sorry.  Can you refer to the page number?

8    Q    Page 80 of 305 and it's Thunderdome 8.

9         (Exhibit 8 received)

10   A    Okay.  Hold on one second, sorry.  You said 80 of 305?

11   Q    Yes.

12   A    Okay.

13   Q    Did you provide that to Kier?

14   A    Yes, that would have been emailed to myself and Kier would have been

15   copied on the email.

16   Q    And I've seen no email reflecting that; have you?

17   A    I don't recall, no.

18   Q    Is it your testimony that this page was emailed to you by Dayton Neely?

19   A    It would have been, yes.

20   Q    Well, was it?

21   A    I'm sorry?

22   Q    Was it?

23   A    I don't -- if it's not in the -- if it's not in the discovery then we were

24   unable to find that.

25   Q    Did you talk to Kier about this immediately afterwards?

1   A      Yes, I would have called Kier.

2   Q      You did call Kier?

3   A      Yes, I called Kier.

4   Q      And what did you say?

5   A      I don't recall the specifics of the conversation.

6   Q      What did she say?

7   A      I don't recall the specifics of the conversation.  This is a very --

8   Q      That's okay.  You've answered.  Item 10 says --

9           MS. LEYSHOCK:  I think you cut him off.  If he lets you finish your

10  question, then I think you should let him finish his answer.

11          MR. WATERFILL:  Item 10.

12          MS. LEYSHOCK:  He wasn't finished, Mark.

13  BY MR. WATERFILL:

14  Q      Item 10 says Ryan suffered a hernia, right?

15  A      Yes.

16  Q      Okay.  Did you talk to Kier about that?

17  A      This is a typical employee incident report, but the process that we go

18  through is that I would have received this, I would have called Kier, and I

19  would have discussed this with Kier.  Concentra would come back with

20  restrictions, and we would follow up.

21  Q      Wait a minute.  Did you talk to Kier about the fact that Ryan suffered a

22  hernia?

23  A      I'm sure I spoke to Kier about this.

24  Q      Okay.  And did she ask you whether it was a chronic condition?

25  A      I do not recall.

1    Q    Did you and Kier discuss whether a hernia is a chronic condition under

2    the FMLA?

3    A    I don't recall.

4    Q    Did you and Kier discuss the FMLA at all?

5    A    We wouldn't have discussed FMLA because Ryan did not request any

6    additional time off.  We abided by all restrictions that were sent from

7    Concentra.

8    Q    And it's your opinion, I guess, that an employee must ask for FMLA

9    leave?

10    A    No, Ryan was provided the handbook which notifies him that we are

11    compliant with FMLA as well as the documents that are on the wall from the

12    Department of Labor.  Ryan has been provided appropriate information

13    knowing that we are compliant with that.

14    Q    Well, you understand Ryan disputes that adamantly, that he was never

15    provided the handbook?

16    A    I --

17    Q    You understand that?

18    A    I understand that, yes.

19    Q    And you also understand that you've testified you have no personal

20    knowledge that he was provided the handbook?

21    A    I'm testifying that all employees are provided the handbook.

22    Q    Okay.  And you do that personally with every employee?

23    A    Do I do that personally with every employee?  No.

24    Q    Okay.  So, getting back to your conversation with Kier.  What day was

25    that conversation?

1    A      I don't recall.

2    Q      Okay.  Was there more than one conversation between you and Kier

3    regarding Exhibit 4?

4    A      I would say, yes.  I know that we discussed this at length multiple times.

5    Q      Okay.  On what dates?

6    A      I don't know what dates those would be.  It would have been most likely

7    the day after the incident.

8    Q      And so you had more than one phone call about Exhibit 4?

9    A      Yes.

10   Q      And did you keep notes of those phone calls?

11   A      No, I did not.

12   Q      At any of those several phone calls, did you and Kier discuss Ryan's

13   worker's compensation claim?

14   A      Yes.

15   Q      What did you discuss in that regard?

16   A      We discussed the restrictions that came back from Concentra and that

17   we were to always make work available, and that work was made available for

18   him, and that we were complying with his Concentra restrictions and allowing

19   him to sit on a stool while working on expo.

20   Q      What does that mean, "working on expo"?

21   A      Expo is short for expediting.  That's where the food comes out of the

22   kitchen.

23   Q      Okay.  So, prior to August 23, 2019, the date of Exhibit 4 --

24   A      Uh-huh.

25   Q      -- I've not seen any written warnings to Ryan Bennett; have you?

1    A    I have not.

2    Q    After August 23, 2019, Ryan Bennett either received or had written about

3    him several written warnings, correct?

4    A    Correct.

5    Q    So if we go to page 242, Exhibit 9, we have a written warning dated 10-9-

6    19, right?

7    A    Yes, I see that.

8        (Exhibit 9 received)

9    Q    And who prepared that?

10   A    Collin Martin.

11   Q    Okay.  Does Collin still work at Thunderdome?

12   A    He does.  He's the general manager at Bakersfield, currently.

13   Q    And that is Exhibit 9 signed by Ryan Bennett and Sarah Straub, correct?

14   A    Correct.

15   Q    Why is this not signed by Collin Martin?

16   A    I'm not sure.

17   Q    Okay.  Did you see this at or about the time?

18   A    Yes.

19   Q    Is it unusual for a manager to be late?

20   A    Is it unusual for a manager to be late?  Yes.

21   Q    How late was Ryan?

22   A    I couldn't speak to that.

23   Q    Did you ask Collin?

24   A    I don't recall.

25   Q    Looking at the next Exhibit 10, that is a warning, it says second warning

1    dated 10-10-2019, correct?

2         (Exhibit 10 received)

3    A    Okay. Yes, dated 10-10, yes.

4    Q    The same date as Exhibit 9, correct?

5    A    Correct.

6    Q    Who prepared Exhibit 10?

7         MS. LEYSHOCK:  Hang on a second.  I want to make sure I'm

8    looking at the right document.  You said Exhibit 9 and Exhibit 10 have the

9    same dates on them?

10        MR. WATERFILL:  Yes, that's the testimony.

11   BY MR. WATERFILL:

12   Q    Who prepared Exhibit 10?

13        MS. LEYSHOCK:  Ricky, do you want to take a look at that again?

14   Because either I'm looking at the wrong document --

15        THE WITNESS:  Yeah, 9 has a date of 10-9-19, date of infraction

16   10-9-19.

17   BY MR. WATERFILL:

18   Q    Okay.  Gotcha.  You're right.  Okay.

19   A    And the date on -- the date on 10 is -- the date is 10-10-2019.  Date of

20   previous infraction was 10-9.

21   Q    Okay.  I gotcha.  You're right.

22        MS. LEYSHOCK:  Okay.  And we're talking about Thunderdome 29

23   and 30?

24        MR. WATERFILL:  No, we're talking about Exhibits 9 and 10.

25        MS. LEYSHOCK:  Okay.

1          THE WITNESS:  29 and 30 is at the bottom right, yes, you're

2  correct, Sarah.

3  BY MR. WATERFILL:

4  Q      Who -- oh, I see what you mean.  You're right, yes.  Who prepared

5  Exhibit 10?

6  A      It looks like Collin Martin.

7  Q      So did you talk to him about either Exhibit 9 or 10?

8  A      Yes.

9  Q      What did you say?

10  A      I asked him what occurred and actually, actually I take that -- I did not

11  ask him what occurred.  Collin had sent an email concerning all of these

12  infractions.

13  Q      Did you talk --

14  A      I followed-up with him on those.

15  Q      I'm sorry.  Repeat your answer when you said --

16  A      Collin had sent an email concerning these infractions.  So, because there

17  were so many egregious things that occurred at the same time, I followed up

18  with him and his frustrations with Ryan's performance.

19  Q      Okay.  So, on Exhibit 10, the event that Ryan Bennett is being written up

20  for on 10-10-2019 actually happened on 9-9-2019, correct?

21  A      So I would have to look back in the email from Collin.  Collin is -- Collin

22  is dyslexic and mixes numbers up sometimes, but there is an email that

23  corresponds with these that would align the correct date.  So that may have

24  been a typo on that date.  I don't know for a fact, but I know that an email has

25  been submitted with Collin speaking to these specific infractions.  So that's

1    why I'm saying there could be a discrepancy on this date.

2    Q      Did you ask him about that?

3    A      I don't recall.  I'm just speaking to that now.

4    Q      On the face of Exhibit 10, it appears that the write-up is regarding an

5    event that happened a month before, right?

6    A      I am stating that the date on there, yes, is showing a month before, but

7    I'm stating that there is an email that corresponds with this that might show a

8    different date, so I'm not sure what the actuality is on the incidents on when

9    they occurred.

10   Q      Should warnings be accurate?

11   A      I'm sorry?

12   Q      Should written warnings be accurate?

13   A      That -- that's -- would be an ideal situation, yes.

14   Q      Okay.

15   A      I think that managers are humans, and they make mistakes.

16   Q      Did you ask Collin about these dates when you looked at this document?

17   A      I don't recall.  That's something that I'm just noticing now, and I was just

18   trying to seek the correct information.

19   Q      Well, let's just answer my question.  Did you ask Collin about these dates

20   when you looked at this document?

21   A      I do not recall.

22   Q      Did you look at this document on or soon after 10-10-2019?

23   A      Yes.

24   Q      Did you talk to Ryan Bennett about it?

25   A      These documents were part of the conversation that led to Ryan's

1    termination.

2    Q        Did you talk to Ryan Bennett about this document on or soon after

3    10-10-2019?

4    A        Yes.

5    Q        What did you say?

6    A        Well, the conversation was I followed up with David and Collin, again,

7    referring to the email that I was speaking to about the multiple infractions.

8    Q        Mr. Tindell, did you talk to Ryan Bennett about Exhibit 10?

9    A        Yes.

10   Q        What did you say to Ryan Bennett?

11   A        I explained to him that this was unsatisfactory performance from a

12   manager.

13   Q        Okay.  What was the date of that conversation?

14   A        That would have been the date of his termination.

15   Q        Okay.  So, you did not talk to him on or soon after October 10?

16   A        I believe the date of his termination was the 23rd.

17   Q        Okay.  So, it would have been thirteen days later, right?

18   A        Correct.

19   Q        Okay.  Did you view the Piazza order that Ryan completed?

20   A        Yes.

21   Q        What was wrong with it?

22   A        The order was inaccurate.

23   Q        In what way?

24   A        In that he ordered product that we didn't need and didn't order product

25   that we did need.

1    Q    What product?

2    A    Well, on the incident it says grape tomatoes, but in the email that I'm

3    referring to there's other specifics.

4    Q    Okay.  Were you able to return the grape tomatoes?

5    A    I don't recall.

6    Q    If Ryan were to testify that you were able to return the grape tomatoes

7    and receive full credit, do you have personal facts that would rebut that?

8    A    I do not.

9    Q    Okay.  Did you ask Collin Martin, were we able to return the grape

10    tomatoes?

11    A    I don't recall.

12    Q    Has any other manager made a mistake in ordering?

13    A    I'm sure other managers have made mistakes in ordering.

14    Q    Are they written up every time?

15    A    I don't recall.

16    Q    Have you ever made a mistake in ordering?

17    A    Not to my recollection.

18    Q    Do you order?

19    A    I am responsible for ordering at times when we don't have the managers

20    set.

21    Q    Please look at Exhibit 11.  That is a written warning dated 10-24-2019,

22    right?

23    A    Yes.

24        (Exhibit 11 received)

25    Q    And the date of the infraction is 10-23-2019, correct?

1    A     Yes, that's what it reads.

2    Q     Okay.  It says Ryan was caught smoking at 7:19 p.m. during no

3    smoking, no-breaks time, correct?

4    A     Correct.

5    Q     Are employees allowed to smoke on their breaks?

6    A     It's a no-break time.

7    Q     Are employees allowed to smoke on their breaks?

8    A     They are.

9    Q     If Ryan was given permission to take a break at 7:19 p.m., did he do

10   anything wrong?

11   A     Ryan would not have been given permission.  We have posted signs that

12   all employees are aware of and as well as management that this is a no-break

13   time.

14   Q     Ryan was on light duty at the time, correct?

15   A     I couldn't speak to that based off of what's in front of me.

16   Q     Did you receive this on or soon after 10-24-2019?

17   A     I don't recall.

18   Q     Did you talk to Collin Martin about it?

19   A     So all of the exhibits that you're showing me, I did speak to Collin Martin

20   and David Downs about at some point.

21   Q     Did you ask Ryan Bennett whether he had been given permission to go

22   on break?

23   A     Yes.

24   Q     What did he say?

25   A     No.

1  Q    When had Ryan been counseled on this in the past?

2  A    I personally, as well as all of his other supervisors -- this all started, the

3  conversation of not smoking during appropriate times was a conversation not

4  only at Bakersfield where he started but at Krueger's Tavern and as well as at

5  The Eagle.  This was a consistent issue with Ryan.

6  Q    Did you start to say you have talked to Ryan about this before?

7  A    I personally have spoken to Ryan about this in the past in his tenure

8  with us, yes.

9  Q    How many occasions?

10  A    I would say, I mean, a handful, multiple.

11  Q    And prior to 8-23-19, you never wrote Ryan Bennett up for it; did you?

12  A    I can't speak to that as we do not have the file where all of these previous

13  documentations would have been.

14  Q    Well, you don't have any documents reflecting that you wrote up Ryan

15  Bennett for taking smoke breaks prior to 8-23-19; do you?

16  A    I do not, but I also want to be very clear that we have verbal

17  conversations.  We don't document every single time we speak to an employee

18  about corrective action, about correcting their behavior.  It would -- I mean, if I

19  had --

20  Q    Let's go to the next Exhibit 12.  Understand your --

21       MS. LEYSHOCK:  Was there more to your answer there that you

22  want to complete?

23       THE WITNESS:  Yes, I just want to make it very clear that I feel like

24  this is -- I'm sorry, I don't feel like -- I don't -- it would be a detriment to a

25  business to have to write a physical document every time you have a corrective

1    action, like a correction, or a behavioral conversation with an employee.  So, I -

2    - it's -- there's multiple conversations that are had and conversations that are

3    had over the tenure of somebody's employment that are not going to be

4    documented.

5    BY MR. WATERFILL:

6    Q      All right.  Mr. Tindall, my client is paying for this deposition.  Your

7    lawyer gets a chance to ask you questions after it's over.  You have to respond

8    to questions from me, okay?

9    A      Okay.

10   Q      Now let's look at Exhibit 12 and this is another write-up dated 10-24-

11   2019, correct?

12   A      Correct.

13          (Exhibit 12 received)

14   Q      And this is another write-up about ordering produce, right?

15   A      That's what it looks like, yes.

16   Q      And is this the same mistake regarding ordering produce as the previous

17   one?

18   A      I cannot tell.

19   Q      Did you ask Collin Martin, is this the same mistake ordering produce as

20   the previous written warning?

21   A      I do not recall.

22   Q      Did you tell Collin Martin, you need to start writing Ryan Bennett up?

23   A      I do not recall.

24   Q      Did you talk to Ryan Bennett about this write-up?

25   A      I did.

1  Q    What did you tell him?

2  A    I told him that this was unacceptable performance for a kitchen

3  manager.

4  Q    Was that the same conversation where you fired Ryan?

5  A    I believe so.

6  Q    Okay.  Now let's look at Exhibit 13.  That is another write-up dated

7  10-24-2019, right?

8  A    It's what it looks like, yes.

9       (Exhibit 13 received)

10  Q    Did you tell Collin Martin to create this write-up?

11  A    I do not recall.

12  Q    It says, "Ryan failed to properly complete the prep list on his shift", do

13  you see that?

14  A    I do.

15  Q    What does that mean?

16  A    The prep list is what we write the night before in order to know what

17  product needs to be prepared for the people that are working on prep for the

18  next day.  So, the indication is that that's written so that we know what we

19  need to prepare the next day and that was one of his responsibilities.

20  Q    Did you see the prep list he prepared?

21  A    I don't recall.

22  Q    Did Collin Martin describe the prep list that Ryan prepared?

23  A    I don't recall.

24  Q    Did you talk to Ryan Bennett about this before you fired him?

25  A    Yes.

1    Q    Was it at the same meeting where you fired him?

2    A    I believe so.

3    Q    What did you say?

4    A    I informed him that this was unsatisfactory performance.

5    Q    What product did Ryan not order?

6    A    So this one isn't about ordering.  This is a prep list.  This is about items

7    that need to be prepared for the next day.

8    Q    Well it says, "did not order the correct produce to complete the list".

9    A    So this is kind of two-fold.  You have to write the prep list.  So, I can

10   provide an example.  Can I do that?

11   Q    Yes.

12   A    So if we believe that we're going to sell 200 orders of collard greens, then

13   you would say, write on the prep list, that would be a four times for collards,

14   and then when you go to do your order, you would look at what a four times of

15   collards would be, and then that would result in ordering say four cases of

16   collards.  So, it goes hand in hand.  You write the prep list to know what you're

17   expecting for the next day, and then you take your produce order and then you

18   place the produce order based off of what is written on the prep list.  So, the

19   prep list guides the order.

20   Q    What items did he fail to order?

21   A    I don't recall.

22   Q    It says items in the walk-in were not counted.  What does that mean?

23   A    So when you're placing, when you're looking at the prep -- again, this is

24   kind of a multilayered, when you're looking at the prep list, you write the prep

25   list.  So again, in my example, if you did a four times of collards, you'd go into

1    the item -- you'd go into the walk-in, and you would say, we have two cases of

2    collards on hand.  Well, if I need four cases of collards to complete the prep list

3    and I have two on hand, that would mean I need to order two additional.  And

4    on the prep list -- I'm sorry.  To clarify, and on the prep list, there is a column

5    that states, on-hand.  So, the correct procedure is to fill that out so that you

6    know how many -- I'm sorry.  On the produce order -- I misspoke.  On the

7    produce order, it states how many you have on hand.  So, your job is to

8    basically inventory what you have before you finalize the order.

9    Q      Isn't it a fact that you told Collin Martin to create several write-ups of

10   Ryan Bennett?

11   A      Absolutely not.

12   Q      Isn't it a fact that you did that in order to justify your termination of

13   Ryan Bennett?

14   A      Absolutely not.

15   Q      Isn't it a fact that all of these write-ups were after Ryan Bennett was

16   injured at work?

17   A      I don't recall the dates in front of me.

18   Q      Okay.  Well, we've got 9 through 14 and they all happened after Ryan

19   Bennett was injured at work, correct?

20   A      (Inaudible).

21            MS. LEYSHOCK:  Objection.  Go ahead.

22            THE WITNESS:  If that's what the dates are.  I don't have

23   everything directly in front of me.  I'm look-- I can only see one document at a

24   time, and at this point, I actually don't know what his termination date was.

25   BY MR. WATERFILL:

1    Q    Let's look at 15.  That's a document created by you, correct?

2         (Exhibit 15 received)

3    A    Yes.  That is my name, my signature, yes.

4    Q    A Thunderdome form, right?

5    A    Uh-huh.

6    Q    Yes?

7    A    Yes, sorry.

8    Q    Okay.  Ryan Bennett had been working at Thunderdome since July 27,

9    2018, correct?

10   A    I believe so, yes.

11   Q    He was not within his 90-day orientation period; was he?

12   A    So the 90 day would have been from his time at The Eagle as I mentioned

13   earlier that the date on the documents could potentially change when they are

14   transferred to a different restaurant.  At that time, that was considered -- it is

15   still considered a separate entity, so they would have a start and an end date.

16   Q    Did you ever (inaudible) --

17   A    So if it was within 90 days of him being transferred to The Eagle, it would

18   have been a 90-day separation.

19   Q    Did you ever say to Ryan Bennett when he was transferred, "you are now

20   within your orientation period again"?

21   A    I don't recall.

22   Q    And he was not within his first 90 days of working for Thunderdome; was

23   he?

24   A    That's correct.

25   Q    And Thunderdome has central human resources for both The Eagle and

1  Bakersfield, correct?

2  A      Correct.

3  Q      And you're the regional manager over both restaurants, correct?

4  A      Correct.

5  Q      You have the authority to hire and fire people at both restaurants?

6  A      Correct.  We had three restaurants at that time.

7  Q      Okay.  And so, you used the wrong form; didn't you?

8  A      I can't -- I believe that that would have been the right form because your

9  start date starts when you are transferred to --

10 Q      Have you seen a single document --

11 A      -- another restaurant.  These are LLCs.

12 Q      Have you seen a single document --

13 A      A separate restaurant.

14 Q      Have you seen a single document that reflects that Ryan Bennett's start

15 date was anything other than 7-27-2018?

16 A      I have not.

17 Q      Okay.  Is it still your testimony that this Exhibit 15 was the correct form

18 to use?

19 A      I believe so, yes.

20 Q      Did you talk to Kier about which form to use before you filled out 15?

21 A      I do not recall.

22 Q      Did you talk to Kier about firing Ryan Bennett?

23 A      About firing Ryan Bennett?  No.

24 Q      Yes.  No?

25 A      No.

1    Q      When you fired Ryan Bennett, did you say to him, I've spoken to Kier,

2    and she told me it's okay to fire you even though you're on worker's comp?

3    A      I did not say that.

4    Q      If Ryan were to testify to that, would he be lying?

5    A      Yes.

6    Q      Did you say anything about his worker's comp during your termination

7    meeting?

8    A      Absolutely not.

9    Q      Was anyone else in the meeting?

10   A      David Downs and Collin Martin.

11   Q      Where was the meeting located?

12   A      That was in, we call it the 20s.  It's the backroom at The Eagle.

13   Q      On Exhibit 15, you did not check mark or circle any of the bullet points;

14   did you?

15   A      It doesn't look like it.

16   Q      So there's not a reason stated on this document; is there?

17   A      It can be any of the reasons that are stated, listed on that document.

18   Q      All right.  Well, let's answer my question.  There is no indication on this

19   document of the reason?

20   A      Correct.

21   Q      Okay.  Isn't it a fact that you never gave this document to Ryan Bennett?

22   A      I don't recall.

23   Q      There's no team member signature; is there?

24   A      There's plenty of times where team members decide not to sign

25   documents, so I can't recall whether or not I actually showed this to him.

1   Q       Okay.  But let's answer my question.  There's no team member signature

2   on Exhibit 15; is there?

3   A       That is correct.

4   Q       Nor does it say, "refuse to sign", correct?

5   A       Correct.

6   Q       As we go back up through these documents, there's no team member

7   signature on Exhibit 14; is there?

8   A       That's not necessarily a requirement of writing someone up.

9   Q       Okay.  You know, I don't know who you're talking to, but let's answer my

10  question.  Is there a team member signature on 14?

11  A       There is not.

12  Q       Does it say, "refuse to sign"?

13  A       It does not.

14  Q       Isn't it a fact this was never given to Ryan Bennett?

15  A       I can't speak to that.  I don't recall that.

16  Q       On 13, there's no team member signature; is there?

17  A       There is not.

18  Q       Does it say, "refuse to sign"?

19  A       There is an email that corresponds to these --

20  Q       (Inaudible).

21  A       -- that he refused to sign.

22          MS. LEYSHOCK:  Mark, if he's going to answer, he's going to

23  answer, right?  If you pose a question, you have to wait for the answer.  That's

24  the way this works.  I'm totally giving you as much flexibility as possible and

25  patience, but if there's a question, he gets to answer even if you don't like what

1    he's saying.

2          THE WITNESS:  There is an email that corresponds to all of these

3    documents stating that he refused to sign.

4          MR. WATERFILL: (Inaudible) questions on his own and answers

5    somebody else's question or something else.

6          MS. LEYSHOCK:  That's not it.  You just don't like it.

7          MR. WATERFILL:  No, he's not answering the question.

8    BY MR. WATERFILL:

9    Q    Does Exhibit 13 state, "refuse to sign"?

10   A    It does not.

11   Q    Okay.  Isn't it a fact this document was never given to Ryan Bennett?

12   A    I can't state whether that is a fact or not.

13   Q    Looking at 12, did the team member sign 12?

14   A    No.

15   Q    Does it state, "refuse to sign", under team member signature?

16   A    It does not.

17   Q    Isn't it a fact Ryan Bennett was never given Exhibit 12?

18   A    I can't speak to that.

19   Q    On 11, there's no team member signature; is there?

20   A    There is an email referring to all of these documents stating that Ryan

21   refused to sign them.

22   Q    Is there a team member signature on 11?

23   A    There is not.

24   Q    Does it say, "refuse to sign"?

25   A    It does not.

1    Q      Isn't it a fact Ryan was never given this document?

2    A      I cannot speak to that.

3    Q      But on Exhibit 10, Ryan did sign that, right?

4    A      It looks as though he did.

5    Q      Have you ever, in your time as a regional manager at Thunderdome given

6    any employee five written warnings at one time?

7    A      I don't recall.

8    Q      Isn't it a fact that Ryan Bennett is the only person to whom you have

9    done that?

10   A      I don't recall.

11   Q      Isn't it a fact that Ryan Bennett is the only employee working for you who

12   filed a worker's comp complaint?

13   A      I'm sorry, can you repeat that?

14   Q      Ryan Bennett is the only person working under you who filed a worker's

15   comp claim?

16   A      Absolutely not.  I have multiple employees over seven years that have

17   filed worker's comp claims.

18   Q      Okay.  And how many have you had that have filed FMLA claims?

19   A      I don't know off the top of my head.

20   Q      Any?

21   A      Yes.

22          MS. LEYSHOCK:  Mark, when you say, "filed an FMLA claim", do

23   you mean take an FMLA leave?

24          MR. WATERFILL:  I think the record is clear.

25          MS. LEYSHOCK:  I don't think it is.

1          MR. WATERFILL:  Okay.  I appreciate that.

2     BY MR. WATERFILL:

3     Q     Is it your testimony that Ryan Bennett received a second orientation

4     when he was transferred?

5     A     Ryan was transferred two times.  Which one are you speaking -- referring

6     to?

7     Q     The most recent one.

8     A     No, I don't believe I ever said that.

9     Q     Do you believe that happened?  Did Ryan receive another orientation

10    when he was transferred to The Eagle?

11    A     I don't recall that.

12    Q     Okay.  Did you order anyone to do that?

13    A     I do not recall that.

14    Q     Looking at Exhibit 15, is there another similar form that is for

15    termination of someone who is not within their 90-day period separation?

16    A     I don't recall what we had back then.

17    Q     Well, how about today?  Do you have a termination form?

18    A     Everything is electronic now.

19    Q     Is there an electronic termination form?

20    A     There is an electronic process for termination, yes.

21    Q     And is there one for people who are past their 90-day orientation period?

22    A     I don't recall.

23    Q     Okay.  What was the date of your termination of Ryan Bennett?

24    A     Looks like 10-26-19.

25    Q     At the time you fired Ryan Bennett, you knew that he had been injured

1  on the job?

2  A      Yes.

3  Q      You knew that he had suffered a hernia injury?

4  A      Yes.

5  Q      You knew that he would need to have surgery?

6  A      I did not know that.

7  Q      Did Ryan have surgery soon after being fired?

8  A      I don't know that.  I didn't speak to Ryan after his termination until he

9  called me on November 3rd of 2020.

10 Q      What did he say at that phone call?

11 A      He called me and said something along the lines of, "you need to pay my

12 medical bills, you haven't paid my medical bills", and my response was, "I don't

13 know what you're talking about", and he just continued to ramble on about

14 how I was responsible for his medical bills, and I told him that I personally was

15 not responsible for his medical bills and I'm not sure why he was calling me

16 about this.

17 Q      Ramble on, huh?  Is that -- is that what you said?

18 A      Yes, I believe that's what I said.

19 Q      So you really didn't care about what he was saying?

20         MS. LEYSHOCK:  Objection.  You can answer, Ricky.

21         THE WITNESS:  I comply with everything that I'm supposed to

22 when an employee files a worker's compensation.  I don't have any issues with

23 Ryan Bennett. I was very thrown off at the fact that I hadn't spoken to an

24 employee -- if any employee called me within -- outside of a year of speaking to

25 them or having any interaction with them and started yelling at me and telling

1  me I was responsible for their medical bills, I would have been just as thrown

2  off.

3  BY MR. WATERFILL:

4  Q       Was Ryan yelling at you?

5  A       Ryan was yelling at me, yes.

6  Q       And what did you say?

7  A       My response was "I'm not responsible for your medical bills and I don't

8  know where this is coming from".

9  Q       Did you direct him to Kier?

10  A       I did.

11  Q       Okay.  Let's go back to the termination meeting.  Have you -- what did

12  you say to Ryan during the termination meeting?

13  A       So I sat him down and I actually was not -- I did not go into the meeting

14  with the intention of terminating Ryan.  I sat him down and I spoke to him

15  about his performance.  There were multiple instances about like, for example,

16  the smoking of cigarettes.  I said, "Ryan, did you go out and smoke at 7:19 like

17  Collin stated?"  His reply was, "yes".  I asked, "were you told that you could go

18  out and smoke?"  The reply was, "no".  "Ryan, are you aware based off our

19  previous conversations that you are not allowed to go out and smoke during

20  non-smoking times?"  "Yes."  "Ryan, why did you go out and smoke?"  "I needed

21  a cigarette."  This is an example of the circularness of the conversations with

22  Ryan and he didn't have the ability to comprehend that -- he didn't seem to

23  have the ability to comprehend the fact that his performance was negatively

24  impacting the restaurants and that these were things that had been discussed

25  with him a multitude of times.

1    Q    What did he say?

2    A    He refused to take accountability for any of his actions.

3    Q    Well, let's just -- what did he say?

4    A    I just told you what he said when I brought up the cigarette smoking.

5    Q    Okay.  Can you remember anything else that he said?

6    A    Yes.  I also mentioned to him that he was still walking off the line to go to

7    his car to get his medication after we had previously discussed the fact that he

8    was going to bring his medication into the restaurants and again, I said, "why

9    are you going out to your car for extensive amounts of time to get your

10   medication if we have agreed in the past that you were going to bring your

11   medication in?"  And it was, "because I need my medication".  So once again,

12   there seemed to be just a very large disconnect in ability to coach him on what

13   was acceptable behavior and what was unacceptable behavior.

14   Q    Are you familiar with diabetes?

15   A    I am familiar with diabetes.  I mean, no, I'm not familiar with diabetes.  I

16   don't have diabetes.  I don't know, no.

17   Q    If someone needs their medication and don't get it, they could faint,

18   right?

19   A    We had had previous, multiple previous conversations concerning him

20   bringing his medication into work and we had agreed that this is not something

21   he needed any level of exception for.

22   Q    You and Ryan had agreed that he didn't --

23   A    That he was going to bring his medication into work as opposed to

24   leaving it in his car, yes, one hundred percent we had had that conversation.

25   Q    Okay.  We've looked at a bunch of write-ups.  None of these have to do

1  with him going to his car to get his medication, right?

2  A    Correct.

3  Q    Okay.  So, you never wrote him up for that?

4  A    I would never write somebody up for -- no, I did never -- I never wrote

5  him up for that, but again, I have many conversations with many employees

6  and I'm not going to write every single conversation down I have with every

7  single employee.

8  Q    But you stated to him that was one of the many reasons for his

9  termination?

10  A    The inability of Ryan to do the tasks required and Ryan's performance

11  was my only -- and his inability to comprehend the conversations was the only

12  reason that I terminated Ryan Bennett.

13  Q    But you brought up him going to his car to get his medicine?

14  A    Because that was a previous conversation --

15  Q    Sir, you've got to let me finish.  You got to let me finish.  The record is

16  going to be a mess.  Just let me finish my question.

17  A    Okay.  I apologize.

18  Q    And I'm not asking why you brought this up.  I'm just confirming.  You

19  brought up Ryan going to his car to get his medicine during your termination

20  meeting?

21  A    Yes.

22  Q    Okay.  Let's look at -- well, I guess that's good.  Let's look at 26, I think.

23  Yeah.

24  A    Twenty-six?

25        (Exhibit 26 received)

1    Q    Yeah.

2    A    Okay.

3    Q    Okay.  Look at pages -- there's an email from Collin Martin to David

4    Downs, is that the email you've been referring to a few times?

5    A    Could you tell me the page number?  I'm not seeing it.

6    Q    I think it's two.  It's dated October 24, 2019.

7    A    You said page two?

8    Q    Yeah, yeah.

9    A    I'm scrolling.

10    Q    It's Thunderdome 22.

11         MS. LEYSHOCK:  It's a separate document, Ricky.

12         THE WITNESS:  Oh, okay.  Got it.

13         MS. LEYSHOCK:  You'll have to pull it from your email, and it was

14    sent with the subject line, Exhibit 26.

15         THE WITNESS:  Exhibit 26, got it.

16    BY MR. WATERFILL:

17    Q    Now there's also an email from Christy, the court reporter, at 10:10 a.m.

18    that has all of these.

19    A    Okay.

20    Q    Okay.  So, you'll agree with me then several times you've mentioned an

21    email?

22    A    Yes.

23    Q    Okay.  Is page two of Exhibit 26 the email that you wanted to talk about?

24    A    Correct.

25    Q    Okay.  All right.  In that email, that is from Collin Martin to David Downs

1   dated October 24, 2019, right?

2   A      Yes.

3   Q      How did you get this email?

4   A      It looks like it was forwarded to me from Collin.

5   Q      On November 26th, 2021, right?

6   A      Yes.  That's what it looks like.

7   Q      That's like a month after you fired Ryan, right?

8   A      Yes.

9              MS. LEYSHOCK: (Inaudible).

10             THE WITNESS:  No, no, no.  This is for discovery.  I think this was

11  just for discovery.

12  BY MR. WATERFILL:

13  Q      Okay.  We're getting there.  We're getting there.  Did you see the October

14  24, 2019, email on that date?

15  A      Yes.

16  Q      How did you see it?

17  A      I was sitting at The Eagle with David and Collin.

18  Q      Okay.  Because I don't see anything in this email string that reflects that

19  you were copied on it; do you?

20  A      I do not.

21  Q      Okay.  It looks like it was forwarded to you a month later, right?

22  A      No, this is -- this is a document from 2019 and the forwarded was from

23  Collin for the discovery for this case.

24  Q      I got you.  Okay.  You're right. You're right.  Okay.  All right.  So, in any

25  event, your testimony is that you saw it on October 24 when it was created?

1  A    I saw it either on or around, yes.  I was sitting in front of a computer with

2  David and Collin, and I did see this email.

3  Q    Okay.  And in the middle of paragraph one, it says, "Ryan complained of

4  being in pain", do you see that?

5  A    I do.

6  Q    So you knew before you fired Ryan that he was at work in pain?

7  A    On that specific instance, yes.

8  Q    Okay.  And it says he asked the MOD.  I assume that's the manager on

9  duty?

10 A    That is.

11 Q    To leave?  Who was the manager on duty?

12 A    Well, it says Dayton was there.  Dayton would have been -- the manager

13 on duty is any manager that's on duty.  So, it looks like Dayton was on expo.  If

14 -- I don't -- I can't speak to who else was there.

15 Q    Did you ask Collin how severe the pain was to Ryan?

16 A    I did not.

17 Q    And this is recording events on October 23, 2019, right?

18 A    It looks like that's what that states, yes.

19 Q    Which is the same day that events happened for which Ryan was written

20 up, correct?

21 A    I would have to look back at the documents.

22 Q    Okay.  Did the manager on duty give Ryan permission to leave?

23 A    It looks like he was instructed that if he was to leave, he needed to go to

24 Concentra.

25 Q    Okay.  And is there a policy that if you're in excruciating pain and you

1   ask to leave the job, you have to go to Concentra?

2   A      If you are -- if you have a worker's compensation claim and you are

3   experiencing additional pain from that claim, we will drive you to Concentra,

4   get you a ride to go to Concentra, or allow you to leave and go to Concentra so

5   that you can get seen for your medical concerns.

6   Q      Where is that policy written?

7   A      So that would be something that all managers would pick up the phone

8   and call Kier to get that guidance, but it's also something that we are -- that is

9   known as part of your continual training which is exactly what he should have

10  done and that's why that was written in here.

11  Q      When did you say that to Ryan Bennett?

12  A      When did I say what?

13  Q      If you're in pain, you have to go to Concentra?

14  A      It says right here.

15  Q      Oh, I know it's written in an email after the fact, but when did you ever

16  say that to Ryan Bennett before?

17  A      That would have been part of the follow-up conversation after he came

18  back from Concentra.

19  Q      Did you say that to Ryan, "if you leave the shift because you're in pain,

20  you have to go to Concentra"?

21  A      I was not here for this shift.

22  Q      Identify any employee that you've ever made that instruction to?

23              MS. LEYSHOCK:  Objection.  Go ahead, Ricky.

24              THE WITNESS:  Identify any employee?

25  BY MR. WATERFILL:

1    Q      Exactly.

2    A      I would say any employee that has ever had a follow-up concern after

3    going to Concentra, I would have said that to if they would have come to me.

4    Q      You never said it to Ryan Bennett; did you?

5    A      I don't know that I did or didn't.

6    Q      This is just a made-up rule that Collin Martin wrote in an email?

7    A      This is absolutely not made up.  This is absolutely one hundred percent

8    part of our policy that if an employee has a worker's compensation claim, they

9    go to Concentra.  We drive them to Concentra, or we get them an Uber, or if

10   they can drive themselves, they go.  Once they go to Concentra and they bring

11   back their restrictions, we always make work available whenever possible, and

12   if the employee is stating that they are unable to be within those restrictions

13   then a follow-up at Concentra is part of that follow-up.

14   Q      And this policy is not written anywhere; is it?

15   A      Kier Muchnicki's number is on the ph-- is on the wall.  Every manager

16   has her phone number, and everybody knows that if they do not -- if they have

17   a question concerning this policy that they are to pick up the phone and call

18   Kier.

19   Q      Okay.  Let's try answering my question.  This alleged policy is not written

20   anywhere; is it?

21   A      I don't -- I'm not aware.

22   Q      Thank you.

23   A      If it's written anywhere.

24   Q      Okay.

25   A      Actually, we do have flow charts.  I take that back.  We actually have flow

1    charts in the restaurants that are hanging in all of the offices that state if this

2    occurs, then this occurs.

3    Q      None of those have been produced; have they?

4    A      I'm not privy to all of the information that has been produced, but we do

5    have flow charts.

6    Q      You didn't produce those to your counsel; did you?

7    A      I did not, no.

8    Q      Collin Martin writes, "Ryan has specific instructions from myself, David,

9    and Ricky that he is not allowed to leave a shift without approval from myself

10   or David".  What date did you give Ryan those instructions?

11   A      I don't recall.

12   Q      Then the next paragraph is, "before Ryan left his shift, he completed the

13   Piazza order and the prep list", right?

14   A      That's what it says.

15   Q      Okay.  So, Ryan could be there in excruciating pain and --

16   A      Where does it say excruciating?

17   Q      Well, let me ask the question.  He could be in excruciating pain.  You

18   don't know, because you didn't ask, right?  But he got written up because he

19   made some mistakes on the Piazza order, right?

20   A      Okay.

21   Q      So Ryan Bennett was hurt at work, right?  Correct?

22   A      Correct.  And did not choose to leave work and go to Concentra.

23   Q      And Ryan Bennett could have been in excruciating pain and instead of

24   helping him, you fired him, right?

25   A      Ryan was offered to leave work to go to Concentra to receive medical

1    attention.  Ryan chose not to leave work.  Ryan did not go to Concentra, nor

2    did he notify myself or David that he was leaving early.

3    Q      How do you know he didn't go to Concentra?

4    A      I believe we would have received documentation of that.  Kier would have

5    received that documentation.

6    Q      How do you know he didn't?  How do you know as of October 24, 2019,

7    that Ryan did not go to Concentra on October 23, 2019?

8    A      I didn't write the email.

9    Q      And you didn't write up anyone who was healthy for failing to properly

10   complete a Piazza order; did you?

11   A      I --

12            MS. LEYSHOCK:  Objection.

13   BY MR. WATERFILL:

14   Q      And you didn't fire anyone who was healthy after giving them five --

15            MS. LEYSHOCK:  Objection.

16   BY MR. WATERFILL:

17   Q      -- warnings in one day; did you?

18   A      I don't -- I don't have my entire termination history of every employee

19   over seven years and their health status in front of me, so I can't answer those

20   questions.

21            MR. WATERFILL:  Okay.  Let's take a break and come back in at

22   12:45, okay?  And just for everybody's planning, it's not going to be too much

23   longer, so 12:45; does that sound good for everyone?

24            MS. LEYSHOCK:  Yes.

25            RECORDING AGENT:  Yes.  Okay.  It's 12:15 and we're off the

1  record.

2          MR. WATERFILL:  Thank you.

3                          (Off the record at 12:15 p.m.)

4                          (On the record at 12:45 p.m.)

5  A    I don't recall that.

6  Q    Didn't Ryan say to you --

7          RECORDING AGENT:  Excuse me, I'm sorry to interrupt.  I just

8  want to make sure we have a good record.  Can you repeat your first two

9  questions?

10 BY MR. WATERFILL:

11 Q    Okay.  Isn't it a fact that Ryan Bennett's medicine was stolen when he

12 kept it at the restaurant?

13 A    I don't recall that.

14 Q    Isn't it a fact that he told your assistant Sarah that as well?

15 A    I don't recall that either.

16 Q    If Ryan Bennett's medicine had been stolen at the restaurant, wouldn't

17 that be a good reason for him to keep it locked in his car?

18 A    I don't recall his medicine being stolen at the restaurant.

19 Q    Okay.  But if it were --

20 A    (Inaudible) concerning such.

21 Q    I'm sorry?

22 A    I don't recall him having a conversation with me concerning that.

23 Q    If it were, wouldn't that be a good reason for him to keep it locked in his

24 car?

25 A    I would think that he would -- could keep it on his person.

1   Q      What kind of medicine was it?

2   A      I don't know.  I never asked Ryan what medication he was referring to.

3   Q      We looked at the email that is Exhibit 26 where Collin Martin talks about

4   the events of October 23, 2019; do you remember that?

5   A      Do I remember talking about the email?  Yes.

6   Q      Okay.  Isn't it a fact that as of October 23, 2019, Ryan had already been

7   to Concentra eight times?

8   A      I don't know that information off the top of my head.

9   Q      Hadn't all of those visits been due to pain he was suffering?

10  A      I don't know that information off the top of my head.

11  Q      Didn't Ryan tell you that Concentra said there's nothing more we can do

12  for you until the worker's compensation insurance company provides us with

13  authorization?

14  A      I don't recall that conversation.

15  Q      If that were true, if Ryan had already been to Concentra eight times,

16  knew that he wasn't going to be able to get treatment, would you agree that it

17  would have been useless for him to go to Concentra on October 23, 2019?

18  A      If Ryan had come to me with that information, I would have called Kier

19  immediately and informed her of the situation.

20  Q      Isn't it a fact that Ryan did tell you that information?

21  A      I do not recall him ever bringing that attention -- to my attention.

22  Q      Isn't it a fact you didn't care?  You wanted to fire him?

23  A      That is absolutely not true.

24  Q      Isn't it a fact that Concentra said that Ryan needed an ultrasound, but

25  they did not have that equipment?

1    A    After an employee goes to Concentra initially, I'm really not privy to any

2    information that is a back and forth between them and Kier.  The only

3    information that I would be provided after an employee has visited Concentra

4    after a follow-up information would be work restrictions which I would abide by

5    completely.

6    Q    Isn't it a fact that Concentra said Ryan needed an ultrasound, but they

7    did not have that equipment?

8    A    I am not aware of that.

9    Q    Isn't it a fact that later it was discovered that Ryan had two separate

10    hernias?

11    A    I'm not aware of that information.

12    Q    Did Ryan have surgery in November of 2019 as a result of the workplace

13    injuries?

14    A    I'm not aware of that, no.

15    Q    With respect to the break, do you recall there being complaints about

16    Ryan taking a break at 7:19 p.m. on October 23, 2019?

17    A    Yes.

18    Q    And isn't it a fact that he had been working without a break since noon?

19    A    I don't know that information.

20    Q    Isn't it a fact that Dayton Neely approached Ryan and said at 7:15 p.m.

21    that day, "go ahead, you can take a break, I'll relieve you"?

22    A    I was not there.

23    Q    Isn't it a fact you didn't ask Dayton Neely; did you?

24    A    I don't recall.

25    Q    You didn't ask Dayton Neely if he had told Ryan that he could have a

1    break?

2    A    I don't recall.

3    Q    If in fact Dayton Neely did tell Ryan that after seven hours and fifteen

4    minutes without a break, that he could go on break; wouldn't that be okay?

5    A    I don't know that that conversation occurred.

6    Q    You really didn't give Ryan a chance to explain that; did you?

7    A    I gave Ryan ample opportunity to discuss all of these things in our -- in

8    the conversation that led to his termination.

9    Q    Well, it was the conversation that was his termination, right?  It's not like

10   there were two conversations, there was only one?

11   A    I did not go into this conversation with the intention of terminating Ryan.

12   Q    Okay.  Did you express that to anybody?

13   A    I expressed it to Ryan.

14   Q    But you did fire him during that conversation, correct?

15   A    Correct.

16   Q    All right.  And you fired him with a handful of final written warnings all

17   written on the same day?

18   A    I terminated Ryan based off of his performance over the tenure of his

19   employment with us at Thunderdome after transferring him to two different

20   restaurants to give him ample opportunity to provide -- to prove the fact that

21   he could be a substantial employee and manager for us.

22   Q    But you didn't ask Dayton Neely if he gave Ryan permission to take a

23   break; did you?

24   A    I don't recall.

25   Q    What kind of comp food benefits do you enjoy at the restaurant?

1    A    Me personally?

2    Q    Yes.

3    A    I get a one hundred percent comp on food.

4    Q    Did you ever get drunk at the restaurant?

5    A    I have had drinks at the restaurants, yes.

6    Q    Have you ever been drunk at the restaurant?

7    A    I don't believe so.

8    Q    Have you ever yelled at Ryan in front of other managers and employees

9    while you were drunk at the restaurant?

10   A    I do not recall any such circumstance.

11   Q    Was Collin Martin ever demoted from any restaurant?

12   A    Collin Martin had a transfer of position.

13   Q    From where to where?

14   A    I don't recall off the top of my head, but I know Collin has worked in all

15   three restaurants.

16   Q    (Inaudible).

17   A    Krueger's Tavern, and The Eagle.

18   Q    He was demoted; wasn't he?

19   A    Collin was not demoted.  Collin was transferred.

20   Q    I'm sorry?

21   A    Collin was transferred.

22   Q    Who was Erica Summers?

23   A    Erica Summers is a line level -- is a former line level employee that

24   worked at Bakersfield.

25   Q    And did you used to smoke pot with her in the parking lot near the

1  restaurants?

2  A    Did I smoke pot with her?  Absolutely not.  I know Ryan did on his off

3  days.

4  Q    And you never did?

5  A    Absolutely not.  I have never smoked pot and came into work a day in my

6  life.

7  Q    Isn't it a fact that you said to Erica Summers that you had to "fire his fat

8  ass" with respect to Ryan Bennett?

9  A    Absolutely not.  I don't discuss my manager interactions with line level

10  employees.

11  Q    So if she were to testify that you did say that she would be lying?

12  A    Yes.

13  Q    When is the last time you talked to her?

14  A    Shortly before she left the restaurant, before she -- she put in her notice,

15  I want to say -- I don't know, maybe two months ago.

16  Q    Did she put in her notice to you?

17  A    No.  She put in her notice to her direct supervisor, Randy Holt.

18  Q    What is she doing now?

19  A    I don't know.  I do know.  I take that back.  She -- I saw her at

20  Bazbeaux's, but I heard that she's no longer there.

21            MR. WATERFILL:  Okay.  I pass the witness.  Anything, Sarah?

22            MS. LEYSHOCK:  Sorry.  I was on mute.

23            CROSS-EXAMINATION WITNESS RICKY TINDELL

24  BY MS. LEYSHOCK, COUNSEL FOR DEFENDANT:

25  Q    Ricky, are there any questions that you wanted to follow-up on in

1   particular with respect to the FMLA process as it relates to -- to Ryan Bennett?

2   A    I mean, I just want to be very clear that if Ryan Bennett had asked for

3   any time off, we absolutely would have accommodated that.  Our goal is to

4   abide by those guidelines, and Ryan at no point asked for additional time off.

5   Q    Did you ever see any medical records or did anyone bring to your

6   attention that they had been presented with medical records indicating that

7   Mr. Bennett needed time off?

8              MR. WATERFILL:  Object to the form.  You can answer.

9              THE WITNESS:  No.  I saw, I just saw, you know, his Concentra

10  that required accommodations, and we abided by those accommodations.

11             MS. LEYSHOCK:  I don't have any -- I don't have any more

12  questions.

13             MR. WATERFILL:  Okay.  We're done.  Thank you very much.  Your

14  counsel will take care of signature along with the court reporter.

15             RECORDING AGENT:  Okay.  All right.  It is 12:56 and that

16  concludes the deposition today.  Thank you.

17         (Deposition concludes at 12:56 p.m.)

18

19

20

21

22

23

24

25

## CERTIFICATE OF OATH

STATE OF INDIANA

COUNTY OF MARION

      I, **Christy Brooks**, Notary Public in and for the State of Indiana, do hereby certify that the witness named herein, **Ricky Tindell**, appeared before me via zoom on August 12, 2022, and was duly sworn.

      WITNESS my hand and official seal this 15th day of September, 2022.

*/s/ Christy Brooks*
Christy Brooks

NOTARY PUBLIC - STATE OF INDIANA

MY COMMISSION NO.: 0703343

EXPIRES:  JULY 28, 2025

<u>CERTIFICATE OF REPORTER</u>

STATE OF INDIANA

COUNTY OF MARION

     I, Christy Brooks, digital recorder, do hereby certify that I was authorized to and did electronically report the examination of the witness named herein, **Ricky Tindell**; that a review of the transcript was requested; and that the foregoing transcript is a true record my electronic recording.

     I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel for any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of this action.

     DATED THIS 15thday of September 2022.


     */s/ Christy Brooks*
     Christy Brooks