# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| RYAN BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO. 1:21-cv-03027-RLY-MJD |
| THUNDERDOME RESTAURANTS, LLC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

DEPOSITION OF COLLIN MARTIN

DATE: AUGUST 22, 2022

PAGES 1 - 37

---

Recording Agent:  Christy Brooks
Phoenix Transcription Services, LLC
christy@phoenixtranscription.org
317-937-2396

APPEARANCES


ON BEHALF OF THE PLAINTIFF RYAN BENNETT:

MARK WATERFILL
ATTORNEY AT LAW
2230 STAFFORD ROAD, SUITE 115
PLAINFILD, INDIANA
317-501-6060
Mark@waterfilllaw.com



ON BEHALF OF THE DEFENDANT THUNDERDOME RESTAURANTS, LLC:

SARAH CLAY LEYSHOCK
TAFT LAW FIRM
425 WALNUT STREET SUITE 1800
CINCINNATI, OH 45202
513-357-8731
Sleyshock@taftlaw.com

# Contents

AUGUST 22, 2022 ...................................................................................... 4

DIRECT EXAMINATION OF COLLIN MARTIN ........................................ 4

  BY MR. WATERFILL, COUNSEL FOR PLAINTIFF:............................... 4

    (Exhibits 1 - 20 received) ............................................................. 11

    (Exhibit 26 received) ..................................................................... 13

CERTIFICATE OF OATH ........................................................................ 36

CERTIFICATE OF REPORTER............................................................... 37

1          <u>AUGUST 22, 2022</u>

2          (Called to order at 10:02 a.m.)

3          RECORDING AGENT:  Okay.  All right.  It is August 22nd at 10:04

4    a.m.  We are here in the case of Ryan Bennett vs. Thunderdome Restaurants,

5    LLC.  Out of the United States District Court, Southern District of Indiana,

6    Indianapolis Division.  Cause Number 1:21-CV-03027-RLY-MJD.  We have

7    Sarah Leyshock here on behalf of the Defendant.  Mark Waterfill here on behalf

8    of the Plaintiff.  And the deponent today is Collin Martin.

9          And sir if you could raise your right hand.

10          COLLIN MARTIN,

11          Called as a witness, having been first duly sworn to tell the truth,

12          the whole truth and nothing but the truth, was examined and testified as

13          follows:

14          <u>DIRECT EXAMINATION OF COLLIN MARTIN</u>

15          RECORDING AGENT:  Okay.  All right.  We can begin.

16          <u>DIRECT EXAMINATION COLLIN MARTIN</u>

17    BY MR. WATERFILL, COUNSEL FOR PLAINTIFF:

18    Q    Mr. Martin.

19    A    Yes.

20    Q    Good morning.

21    A    Morning.

22    Q    This is Mark Waterfill, the attorney for Ryan Bennett.  Can you hear me?

23    A    I can.

24    Q    Okay.  I'll be taking your deposition today.  I need you to be verbal in

25    your responses.  Does that sound fair?

1    A    Yes.

2    Q    If you need to take a break, let me know.  Is that okay?

3    A    Absolutely.

4    Q    We need to try not to speak over one another because this is a Zoom

5    deposition.  And sometimes it can be difficult to understand when the person

6    has finished the question.  Does that sound fair?

7    A    Yes.

8    Q    Have you ever been deposed before?

9    A    I have in the past once, yes.

10   Q    What was that circumstance?

11   A    It was a friend's case.  It is nothing related to this.

12   Q    Who was the friend?

13   A    It was a friend in high school with a driving issue.

14   Q    Where do you live?

15   A    I live in Indianapolis.

16   Q    What is your residential address?

17   A    It's 1934 East 69th Street.

18   Q    And the ZIP?

19   A    46220.

20   Q    Where do you work?

21   A    I work at Bakersfield Tacos and Tequila of Thunderdome Restaurant

22   Group.

23   Q    How long have you worked there?

24   A    I've worked there about six and a half years now.

25   Q    What is your current job?

1    A    I'm general manager of Bakersfield.

2    Q    How long have you held that position?

3    A    I've been in this position for the past year.

4    Q    What did -- what was your job before the past year?

5    A    Prior to that I was the kitchen manager at The Eagle.

6    Q    For what period of time?

7    A    Would have been the year prior to, I believe until -- from July 2019 on.

8    Q    And prior to that?

9    A    The general manager at Krueger's.

10    Q    And during what time?

11    A    It would have been March or January before 2019.   But I would have

12    started working on it in 2018.

13    Q    And before that?

14    A    Assistant general manager at The Eagle.

15    Q    During what period of time?

16    A    I believe another year before that, so probably early 2018, 2017.

17    Q    And before that?

18    A    Bakersfield as the assistant general manager.  And that would have been

19    for the two and a half years, for the first part of my time with Thunderdome.

20    Q    To whom do you report?

21    A    I report to Ricky Tindell and Brian Riggenbach.

22    Q    Can you spell Brian's name?

23    A    B-R-I-A-N R-I-G-G-E-N-B-A-U-G-H [sic].

24    Q    Have you talked to anyone about this deposition?

25    A    I have not.

1    Q      Have you talked to anyone about Ryan Bennett's case?

2    A      I have not.

3    Q      You know Ryan Bennett?

4    A      Yes.

5    Q      Do you recall Ryan being injured on the job?

6    A      I don't recall Ryan being injured on the job.  I do recall Ryan bringing a

7    note from the doctor saying that he had some restrictions for standing.

8    Q      Did Ryan ever tell you that he had been injured on the job?

9    A      He never told me that he had been injured on the job.  I just knew that

10   he had been injured in some way.

11   Q      Did you ask?

12   A      If he had been injured on the job?

13   Q      Yeah.

14   A      No, I didn't ask that because it was brought to me in the context that he

15   was prior -- previously injured and just brought a doctor's note.

16   Q      Who told you he -- Ryan was previously injured?

17   A      Ryan.

18   Q      What do you mean previously injured?

19   A      He just brought a note that said he had some restrictions after some

20   pain.  And then later on, within that day, he had complained that he had some

21   pain while working on XPA (phonetic).

22   Q      Did you ever observe Ryan lifting kegs of beer?

23   A      No.  The kegs were always brought in by the distributors and the

24   distributors' delivery driver.  So that wouldn't have been something within his

25   realm of job duties.

1   Q     If Ryan were to swear that he lifted kegs of beers and was injured, do you

2   have personal fact -- do you have personal knowledge of any facts to rebut

3   that?

4   A     I mean I wasn't there to witness any sort of keg movement.  I couldn't

5   provide any facts on that. But that's not something that's within the realm of

6   job duties for us as managers.

7   Q     Really.  Is there a document that says that?

8   A     Not to my knowledge.  But this is something that was always performed

9   by the delivery drivers from the distributors.

10  Q     Did the kegs ever have to be shifted around in order to make sure that

11  they're in the right location?

12  A     They do on occasion, but they would have been done by a bar back or

13  the bar manager.

14  Q     Did you ever have any disciplinary actions while at Krueger's?

15  A     Yes.  I -- I had some issues with -- I did have some disciplinary issues

16  with payroll.  There was some misinformation.  And I was given the opportunity

17  to take a different position at The Eagle.

18  Q     Was that a demotion?

19  A     It wasn't a demotion.  It's part of our Thunderdome process of helping

20  people learn and train.  It was an opportunity for me to grow and learn from

21  my mistakes.

22  Q     So you were the general manager at Krueger's.

23  A     Uh-huh.

24  Q     You had an issue -- can you say yes?

25  A     I was the general manager at Krueger's, yes.

1  Q      You were disciplined regarding payroll?

2  A      That's correct.

3  Q      And you became the assistant general manager at The Eagle?

4  A      I would have been functioning as the kitchen manager, but my job title in

5  the hierarchy at that store would have been assistant general manager.

6  Q      Okay.  Did you have your pay cut?

7  A      No, I did not.

8  Q      What was the payroll issue?

9  A      There is some confusion about how tips were distributed between certain

10  employees.  It was a misunderstanding, and it was cleared up within our

11  department internally.

12  Q      Okay.  As the kitchen manager at The Eagle, did you have payroll

13  responsibilities?

14  A      I did not.

15  Q      Where did you work before Thunderdome?

16  A      Before Thunderdome I was at a small local place called Diablo Pizza.  I

17  helped open them up.

18  Q      How old are you?

19  A      I'm 34; I'll be 35 in November.

20  Q      Did you graduated from high school?

21  A      I did graduate from high school.

22  Q      Where?

23  A      It was Waipahu High School in Honolulu, Hawaii.

24  Q      And did you graduate from college?

25  A      I attended college, but I did not graduate.

1    Q    Where did you attend?

2    A    Wright State University in Dayton, Ohio.

3    Q    For how long?

4    A    I was there for three and a half years studying motion picture

5    production.

6    Q    Where did you go after college?

7    A    After college I went to go work for an entertainment company based out

8    of Los Angeles with some talent actors and models.

9    Q    Then after that?

10    A    I then got into -- back into the restaurant industry with Darden

11    Restaurant Group at Olive Garden in Norfolk, Virginia.

12    Q    Have you ever been fired at a job?

13    A    I have not.

14    Q    Let's look at Exhibit 26.

15    A    Okay, just a second here.

16    Q    I'm sorry.  Let's start at Exhibit 4.  Do you have Exhibits 1 through 20,

17    Mr. Martin?

18            RECORDING AGENT:  I'm sending them right now.

19            THE WITNESS:  I do, yes.

20            RECORDING AGENT:  Oh, you already have some pulled up.

21    Okay.

22            THE WITNESS:  Uh-huh.

23            MS. LEYSHOCK:  Christy, can you send them to me, please?

24            RECORDING AGENT:  Yes.

25            MS. LEYSHOCK:  Thanks.

1        THE WITNESS:  Which one are we looking for? 20?

2        (Exhibits 1 - 20 received)

3    BY MR. WATERFILL:

4    Q       No, no we're looking at Exhibit 4, which his page 80 in PDF pages.

5    A       I have documents that are titled tab number 19, 20, 21 and 22.  Are

6    these the correct documents?

7    Q       No.

8        MR. WATERFILL: Christy can you send him Exhibit 4?

9        RECORDING AGENT:  Yes.  I'm getting ready to send them all now.

10       MR. WATERFILL:  Okay.

11       (Exhibit 4 received)

12   BY MR. WATERFILL:

13   Q       While she's doing that, Mr. Martin, isn't it true that after your demotion,

14   you were not the assistant manager at The Eagle, you were kitchen manager?

15       MS. LEYSHOCK:  Objection.

16       THE WITNESS:  I was not demoted.  But I was in the same position

17   as the kitchen manager.  The AGM and the kitchen manager are lateral levels

18   within our company.  So I functioned as both.

19   BY MR. WATERFILL:

20   Q       Didn't you go down a level in the Thunderdome hierarchy?

21   A       I chose to take that position.  It was an opportunity for me to learn and

22   grow from.

23   Q       Is that the only reason your pay went down was to --

24   A       My pay did not go down.  It was never cut.

25   Q       Sir, you're going to have to let me finish with my question.  Okay?  Isn't

1    the only reason that your pay did not go down was because The Eagle has

2    higher volume?

3    A      That's not correct.  My pay never changed.  I actually bonused off The

4    Eagle the entire time that I worked at Krueger's.  So my pay never changed

5    from one position to another.

6    Q      Looking at Exhibit 4, do you see that?

7           (Exhibit4 received)

8    A      Let me see here.  I still haven't received that.

9           MS. LEYSHOCK:  Mark, I've not received that yet.

10          RECORDING AGENT:  Yes, I just need some clarification, Mark.

11   So you said, Exhibit 4, you wanted me to send 9 through 15 and 26 out; is that

12   correct?

13          MR. WATERFILL:  Yeah, but I've added Exhibit 4.  Sarah, and

14   Christy, you guys should have Exhibits 1 through 20 in one PDF that was

15   prepared by Ms. Schmidt.

16          RECORDING AGENT:  Yes.  You want me to send that one?

17          MR. WATERFILL:  Yeah, so --

18          RECORDING AGENT:  Okay.

19          MR. WATERFILL:  -- just send that.

20          Do you have Exhibit 4?

21          RECORDING AGENT:  It's sending now.  It was a large file, so it's

22   sending as a link.

23          MR. WATERFILL:  Okay.

24          Okay, I've received it.

25          THE WITNESS:  We're looking for number 4?  What information do

1    I need to find that on this file?

2            (Exhibits 1- 20 received)

3            (Exhibit 26 received)

4    BY MR. WATERFILL:

5    Q      Of the --

6    A      The --

7    Q      Of the 305 pages of this PDF, it's on page 80.

8    A      Okay.

9            MS. LEYSHOCK:  Do you see that, Collin?

10           THE WITNESS:  I do.   It's just taking me a second to --

11           MS. LEYSHOCK:  Okay.

12           THE WITNESS:  -- go through all of it.

13           MS. LEYSHOCK:  Yep.

14   BY MR. WATERFILL:

15   Q      Okay.

16   A      It's page 80.  Number 4, is this a safety investigation for employee

17   incident?

18   Q      First page, yes.

19   A      Okay.

20   Q      Have you seen that document before?

21   A      I have seen that document before.

22   Q      Did you see it at or near August 23, 2019?

23   A      Yes.

24   Q      Who filled out this document?

25   A      Dayton Neely.

1    Q      Who is Dayton Neely?

2    A      Dayton Neely was one of the assistant general managers at The Eagle at

3    the time.

4    Q      Okay.  Did you talk to Dayton about this document?

5    A      I would have talked to him about it the following day.  After this

6    interaction.

7    Q      At paragraph 10 it says Ryan approached Ricky and informed him that

8    he had suffered a hernia. Do you see that?

9    A      I do see that.

10   Q      Who's Ricky?

11   A      Ricky would be our supervisor.

12   Q      Ricky Tindell?

13   A      That's correct.

14   Q      Okay.  So when you read that, did you ask Ryan about it?

15   A      Ryan had brought me documentation at that point stating that he had

16   restrictions.  So I  was already aware that he was injured, but not in the nature

17   of how so.

18   Q      Okay.  When you read that he had suffered a hernia, did you ask him

19   about that?

20   A      When asked about it, it wasn't told to me that it was work related.  It was

21   an existing injury at that point.

22   Q      Okay.  Let's try to think about my question.  When you read that Ryan

23   had suffered a hernia, did you ask him about that?

24   A      I would have asked Ryan about that, because he would have given me

25   documentation at that point.

1  Q    Okay.  Did you ask him if he was in pain?

2  A    I did.

3  Q    What did he say?

4  A    He told me that he was in pain.  And then based off of his information

5  that was provided, he would be required to sit down when in pain.  And we

6  accommodated those requests.

7  Q    Did you ask him how he was doing?

8  A    I probably asked Ryan how he was doing daily.

9  Q    Are you saying that both you and Dayton Neely were at the time

10  assistant general managers?

11  A    We had multiple roles in our restaurant and sometimes we have multiple

12  positions that are filled by multiple people.  But, yes, we were both considered

13  assistant general managers at that time.

14  Q    Now let's look at Exhibit 26.

15      That's not going to be on that document.

16  A    Okay.   Let me get out of this then.

17          MR. WATERFILL:  Christy, has that been sent?

18          RECORDING AGENT:  I sent Exhibits 1 through 20.

19          MR. WATERFILL:  Right.

20          RECORDING AGENT:  Do you want me to send 26?

21          MR. WATERFILL:  I need you to send Exhibit 26.

22          RECORDING AGENT:  Okay.

23      You should be getting it any second.

24          MR. WATERFILL:  Okay.

25      (Exhibit 26 received)

1                  THE WITNESS:  I don't see a 26.

2                  Yes, I'm aware of what this -- this is an email that I wrote to David

3     and Ricky.

4     BY MR. WATERFILL:

5     Q        Okay.  You read this on October 24, 2019?

6     A        That's correct.

7     Q        And in the middle of the first paragraph you write, "Ryan complained of

8     being in pain."   Do you see that?

9     A        Second paragraph?

10    Q        No.  First paragraph.

11    A        Oh, yes, I do see that.

12    Q        Okay.  Did Ryan complain of being in pain to you?

13    A        Yes.  Ryan complained of being in pain and was instructed to go to

14    Concentra, as per our procedures for any sort of --

15    Q        Mr. Martin, we'll get there, okay.

16    A        Uh-huh.

17    Q        All I asked, was did Ryan complain of being in pain to you?

18    A        Ryan complained of being in pain to me, yes.

19    Q        Okay.  How many times did he complain of being in pain?

20    A        I mean the one time would have been enough to tell me that he needed to

21    go to Concentra.

22    Q        I understand.  But how many times did he complain?

23    A        I don't have a recall on how many times that was.

24    Q        Okay.  Where were you when he complained of being in pain?

25    A        I would have been most likely in the kitchen, but I don't know exactly

1    where that would have been.

2    Q        When Ryan said this, what were the words that he used?

3    A        I don't recall.

4    Q        Okay.  It says, "And asked the MOD to leave."  Who's the MOD?

5    A        The manager on duty.

6    Q        And who was that?

7    A        It would have been me or one of the other AGM's that day.

8    Q        Could it have been Dayton Neely?

9    A        It's possible.  I don't have an exact answer for that.  I don't recall.

10   Q        Okay.  Isn't it true that Ryan had been working at the Expo since noon

11   until about 7:15 p.m.?

12   A        That's not unusual, but I can't verify that.

13   Q        Okay.  Isn't it true that Ryan was finally relieved and allowed to take a

14   break at 7:19 p.m.?

15   A        That's not correct.  We would not allow breaks to happen between the

16   hours of 5:00 and 10:00.

17   Q        Well, if Ryan would have testified that Dayton Neely told him to take a

18   break at 7:15 p.m., do you have personal knowledge of facts to rebut that?

19   A        I would be unaware of that, but it seems unlikely, as that's not our policy

20   for breaks or smoking.

21   Q        Okay.  You're not aware, are you?

22   A        I'm not aware of that conversation.

23   Q        Okay.  Did you ask Dayton Neely, hey, did you tell Ryan he could take a

24   break?

25   A        I don't recall that.

1    Q    Okay.  So Ryan told you I'm in pain and I asked the manager on duty,

2    Dayton Neely if I could leave.  Correct?

3    A    That's not my understanding.

4    Q    Okay.  Now you write here about that if you're in pain, you must go to

5    Concentra.

6    A    That's correct.

7    Q    Isn't it a fact that Ryan had already been to Concentra eight times?

8    A    Ryan had been to Concentra multiple times.  But in order for us to

9    continue with his injury, the restrictions that he had, he was required to go to

10    Concentra any time that he complained of pain or was leaving via the

11    establishment because of his injury.

12    Q    And where is that written?

13    A    That was during a conversation that was had between Ricky, David,

14    myself and Ryan about the expectations of his job performance and the

15    accommodations we had made based on his doctor's note.

16    Q    What was the date of that conversation?

17    A    It would have been probably around the 21st or 22nd.

18    Q    But you're not sure?

19    A    I'm not sure, no.

20    Q    And that conversation is not recorded?

21    A    Not to my knowledge.

22    Q    Nor did you send an email or text to Ryan, stating that instruction in

23    writing, did you?

24    A    I feel like we would have, but I don't have a positive answer on that, no.

25    Q    So if Ryan would have testified he had already been to Concentra eight

1    times --

2    A     Uh-huh.

3    Q     -- and they couldn't help him, do you have personal knowledge of facts

4    which would rebut that?

5    A     That's not been something I would have handled.  That would have been

6    something that Ricky Tindell and Kier would have handled.  That would have

7    been something that would have been above my pay grade at that point.

8    Q     So the answer is no, you don't know whether he had been there eight

9    times already?

10   A     That's -- that's not something that I would have been privy to.  I just

11   knew that he had restrictions that were given to me, and I had to accommodate

12   his restrictions.

13   Q     How do you know Ryan did not go to Concentra?

14   A     Because we would have received a report from Concentra, stating that he

15   had visited and what the results were from his visit, along with any new

16   restrictions that would have come with it.

17   Q     Well, the date that you're discussing is the evening of October 23, 2019,

18   right?

19   A     Uh-huh.

20   Q     Yes?

21   A     In this email?

22   Q     Yes.

23   A     Yes, that's correct.

24   Q     Okay.  The court reporter is not able to record mm-hm or uh-huh.  I

25   need you to be verbal with your responses.  Okay?

1    A    Yes, sir.

2    Q    Okay.  So you're writing this email a little bit less than 24 hours later,

3    right?

4    A    That's correct.

5    Q    So as of the time that you wrote this, how do you know that Ryan did not

6    go to Concentra?

7    A    We would have already received a report that he had visited, and he

8    would have had to have turned that paperwork into us.

9    Q    Did you ask Ryan if he had gone to Concentra?

10    A    Yes.

11    Q    What did he say?

12    A    No.

13    Q    Did he also say, "They can't help me there."?

14    A    That was not a conversation that he and I ever had.

15    Q    So you're saying, no, he did not tell you that?

16    A    He did not tell me that Concentra was unable to help him.

17    Q    Okay.  And have you ever had a hernia?

18    A    I have not.

19    Q    Have you ever had an accident that caused you severe pain?

20    A    Yes.

21    Q    What kind of accident?

22    A    I had dislocated my knee.

23    Q    So when you dislocated your knee, did you maybe say some things that

24    you shouldn't have said?

25    A    No.  Not that I'm aware of.

1  Q      Okay.  Was Ryan bent over in pain when he told you that he was in

2  pain?

3  A      No.  He was standing.

4  Q      Okay.  Did you come to understand that Ryan actually had a double

5  hernia?

6  A      That would not be information that I would be privy to.

7  Q      And that not long after you fired him, he was -- had to undergo surgery?

8  A      That would not be something to my knowledge.

9  Q      Okay.  Let's go back to the other document that has 305 pages.

10  A      Okay.

11  Q      And let's go to page 242.

12  A      Sorry, 242?

13  Q      Yeah.

14  A      What blue box am I looking for?

15  Q      Exhibit 9.

16  A      Exhibit 9, okay.  Ryan was late for his 4:00 p.m. shift.

17  Q      Okay.  Now I think we've established that Ryan was injured on August

18  23, 2019.  Do you recall that?

19  A      No, I would not have -- that would not have -- let me rephrase that.  I

20  was not aware that he was injured at that point.  I wasn't given work

21  restrictions until later on.

22  Q      Okay.  But we've looked at Exhibit 4.

23  A      Sure.

24  Q      And that show the date of the incident August 23, 2019.  Correct?

25         MS. LEYSHOCK:  Objection.

1    THE WITNESS:  I don't' believe we looked at Exhibit 4 yet.

2   BY MR. WATERFILL:

3   Q    All right.  Let's go up to the very first exhibit that we looked at, page 80.

4   Do you see Exhibit 4 there?

5   A    Exhibit 3.  No.  I'm sorry, are we talking about a health invoice?

6   Q    No.  We're talking about the same exhibit we started with.

7    MS. LEYSHOCK:  It's page 80 of the 305-page PDF.

8    MR. WATERFILL:  Safety investigation employee incident report.

9    THE WITNESS:  Yes, that would have been an incident report; that

10   wouldn't have been a date of injury from a doctor.

11   BY MR. WATERFILL:

12   Q    Mr. Martin, look at item 7 on page 80.

13   A    Uh-huh.

14   Q    Doesn't it say date of incident, August 23, 2019?

15   A    I did not fill that form out, so I can't verify that.

16   Q    I just --

17    MS. LEYSHOCK:  Mark I'm going to object.  He can't testify

18   because he already -- about whether the injury occurred, because he already

19   said he wasn't there.

20    MR. WATERFILL:  You can object all you want, but I can ask the

21   questions.

22   BY MR. WATERFILL:

23   Q    Please look at item 7 on Exhibit 4.

24   A    Yeah, I didn't fill that form out, so I wouldn't be able to give you an

25   answer for that.

1    Q    You can answer whether it says 8/23/19.  Is that what -- is that what it

2    says?

3    A    It says date of incident 8/23/19, but I didn't fill this form out, so I don't

4    know that information.

5    Q    Well, you can read, can't you?

6    A    I'm able to read.

7              MS. LEYSHOCK:  Mark.  Mark.  Objection.

8              MR. WATERFILL:  Okay.

9              MS. LEYSHOCK:  And also, I think he's answered your question.

10   BY MR. WATERFILL:

11   Q    And you did look at this document before.  Correct?

12   A    I have seen this document.

13   Q    All right.  Now let's go back down to Exhibit 9, at page 242.

14   A    Are these files that I could receive individually, because this is taking me

15   quite some time to scroll through them.

16   Q    No.  No.  Thunderdome's -- or Sarah's paralegal put them in one big PDF.

17   A    Okay.  I can make it work.

18   Q    All right.  So we're going to Exhibit 9, page 242.

19   A    So that was Exhibit 9.  That would have been the documentation for

20   being late.  Is that correct?

21   Q    You have the document in front of you.

22   A    I'm still trying to find it, but --

23   Q    Let's just find page 242 of the PDF.

24   A    Yes, I have the document.

25   Q    Okay.  My question is, did you write up Ryan Bennett before August 23,

1    2019?

2    A      I had done in moment coaching with Ryan multiple times.  Part of our

3    progressive --

4    Q      That's not my question.  Did you write him up?

5    A      If I had written Ryan up prior to that, I don't have any documentation for

6    that currently.

7    Q      Thank you.  Isn't it a fact that all of your write-ups of Ryan Bennett were

8    after August 23, 2019?

9    A      Based on our progressive Thunderdome disciplinary policy, he would

10   have been coached multiple times before receiving these write-ups.   A lot of

11   our focus is on the in-the-moment coaching to grow employees.  So these write-

12   ups would have been after multiple offenses.

13   Q      Okay.  Let's answer my question.  Isn't it a fact that all of your write-ups

14   of Ryan Bennett was after August 23, 2019?

15   A      I don't know.

16   Q      Would you agree that October 9th, 2019, is after August 23, 2019?

17   A      Yes.

18   Q      Looking at Exhibit 9, did you fill out the body of this document?  Is that

19   your printed handwriting?

20   A      Yes.  I filled out this information and it would have been presented to

21   him by a different manager because I would not have been there on that date.

22   That's why it's not signed by me.  That is my handwriting.

23   Q      But did you fill out TBD?

24   A      Yes, to be determined.

25   Q      Okay.

1    A    No. I did not. That's not my handwriting.

2    Q    Okay. Who -- did you fill out, "Be on time. Leave earlier to get to work

3    on time?"

4    A    Yes, I did.

5    Q    Who is Sarah Straub (phonetic)?

6    A    Sarah Straub is our admin manager.

7    Q    And is that her signature next to her printed date?

8    A    That's correct.

9    Q    How late was Ryan?

10   A    I don't recall this time. Late enough to warrant a write-up.

11   Q    Let's look at the next page. Did you fill out the date in the top right

12   corner of Exhibit 10?

13   A    10/10/2019?

14   Q    Yeah.

15   A    Yes, I did.

16   Q    And in the place, fully explain infraction, did you put in the "On

17   9/9/2019," and the rest of those three sentences?

18   A    Yes.

19   Q    Okay. Did you fill that out on October 10, 2019?

20   A    Yes.

21   Q    Okay. And that's got Ryan's signature, correct?

22   A    Yes, it does.

23   Q    As well as your signature?

24   A    That's correct.

25   Q    Had you ever written anyone up for failing to fill out the Piazza guide

1    properly?

2    A    I coached multiple employees on that, and this is the first time that I

3    needed to write someone up for it.

4    Q    Is that the only time you've written someone up for this?

5    A    Possibly, but I don't recall at the moment.

6    Q    Okay.  Look at the next slide.  That is Exhibit 11, page 244.

7    A    Yep.  Okay.

8    Q    Okay.  Did you fill out the date 10/24/19 in the top right corner?

9    A    Yes, I did.

10   Q    As well as the date of the infraction, 10/23/2019?

11   A    Yes.

12   Q    Okay.  As well as the part that says, "fully explain infraction."?

13   A    That's correct.

14   Q    Did you sign this?

15   A    I did sign this.

16   Q    And did Dayton Neely sign it?

17   A    He did sign this.

18   Q    Did you ask Dayton whether he had given Ryan permission to take a

19   break?

20   A    According to this document, and the fact that he signed it, Dayton would

21   not have given him permission.

22   Q    Well, let's answer my question.  Did you ask Dayton that question?

23   A    Dayton signed this document, so he would have agreed with the

24   circumstances for the write-up, which means that he would not have given him

25   permission.

1   Q      All right.  Well, let's answer my question.  Did you ask Dayton?

2   A      I believe so.

3   Q      Okay.  And you believe Dayton agreed with Exhibit 11?

4   A      Yes, he acknowledged it as a witness, so he would have agreed to the

5   infraction that we were writing Ryan Bennett up for.

6   Q      Now this is not signed by Ryan Bennett.

7   A      Ryan Bennett refused to sign the document.

8   Q      Are you saying you gave this document to Ryan?

9   A      Ryan would have been presented with this document at the same time

10  Dayton would have signed it.

11  Q      When a team member refuses to sign, don't you place in the signature

12  block, "refused to sign."

13  A      Not necessarily.  We give the team member an opportunity to sign the

14  document.

15  Q      Isn't it a fact that Ryan was never shown this document?

16  A      That's not true.

17  Q      If Ryan would have testified that he was never shown this document,

18  would he be lying?

19  A      He would be incorrect, yes.

20  Q      Okay.  But you made no reference on the document that he refused to

21  sign, correct?

22  A      It doesn't currently state that, but it was presented to him.

23  Q      Let's look at Exhibit 12, which is the next page, 245.

24  A      Uh-huh.

25  Q      And you filled out the date in the top right corner?

1    A    I did.

2    Q    And the date of the infraction?

3    A    That is correct.

4    Q    Okay.  And the description of the infraction?

5    A    That he failed to properly order produce on his shift.  He had been

6    counseled prior to, on the 10th and --

7    Q    Did you --

8    A    -- properly using the Piazza order guide.

9    Q    Did --

10    A    I did write this.

11    Q    Okay.  And you signed it at the bottom?

12    A    That's correct.

13    Q    As did Dayton Neely?

14    A    Uh-huh.

15    Q    Yes?

16    A    That's correct.

17    Q    Ryan did not sign this either, did he?

18    A    Ryan refused to sign this document as well.   As stated in my email prior,

19    before, this is when Ryan became insubordinate and started questioning my

20    work performance.  And at that point, we decided that this meeting was over,

21    and we would take it to our supervisors to continue the conversation.

22    Q    You did not place on the document, refused to sign, under team

23    member's signature, did you?

24    A    I did not write that on there, because there was still an opportunity for

25    Ryan to acknowledge the document and sign it.

1    Q    Well, let's look at 13.  The next page.

2    A    Absolutely.

3    Q    You prepared this one, also, right?

4    A    That's correct.

5    Q    Your signature is there, as well as Dayton Neely's.

6    A    That's correct.

7    Q    But not Ryan's?

8    A    Once again, Ryan refused to sign the document.  At which time, we

9    decided to move this to our supervisors, to continue the conversation.

10   Q    And then the same is true with 14, right?  You prepared 14.

11   A    Yes.

12   Q    Ryan's signature is not on 14.

13   A    That's correct.

14   Q    And if Ryan were to testify you never showed him 14, would he be lying?

15   A    He would be incorrect, yes.

16   Q    Now how many write-ups did you present to Ryan on October 24th?

17   A    I presented him with three write-ups because there had been multiple

18   infractions over the past couple of days, and it was the first opportunity that I

19   had seen Ryan, based on his schedule.

20   Q    Had you ever given anyone three write-ups at once?

21   A    I've given multiple write-ups at one time, yes.

22   Q    Three at one time?

23   A    They were for different infractions, so yes.

24   Q    To the same person?

25   A    Absolutely.  If it's multiple issues, they require multiple different write-

1    ups for those issues.

2    Q       These infractions allegedly happened on the same shift where Ryan said

3    he was in pain?

4    A       No. These infractions would have happened throughout that week.  They

5    just were all presented to him on that date.

6    Q       Well, the documents show the date of the infraction was October 23,

7    2019.

8    A       Sure.  And I believe the date that was provided in Exhibit 4 was the 19th.

9    Q       No.  The -- your memo, Exhibit 26 reflects that Ryan said that he was in

10   pain on October 23, 2019.  Right?

11   A       The life safety document?  Yes.  That was a document I didn't fill out. So

12   I wouldn't be aware of that.

13   Q       No.  Your memo, Exhibit 26, you can go to that.  Ryan complained of

14   being in pain on October 23, 2019.  Correct?

15   A       Yes.

16              MS. LEYSHOCK:  Counsel, he's referring to your email that you

17   sent to David Downs --

18              THE WITNESS:  Oh.

19              MS. LEYSHOCK:  -- on October 24.

20              THE WITNESS:  Yes, that would have been around the same time

21   then.

22   BY MR. WATERFILL:

23   Q       Okay.  Now did you talk to Ricky Tindell about the fact that Ryan was on

24   workers comp.

25   A       No.   That would not be information that I would be privy to.

1  Q    Did you talk to Kier about the fact that Ryan was on workers comp?

2  A    I spoke with Kier about the work restrictions that were provided to me

3  from Ryan Bennett, but I was not aware of any workers comp at the time. That

4  would not be something that I would have been involved with.

5  Q    And when did you speak to Kier?

6  A    I don't have a specific date. But it would have been roughly around the

7  same time that this was happening. I did speak to her after the documentation

8  was issued to give her a head's up that I had written him up three times in one

9  day, because it was a little unusual. But it was within the realm of

10  acceptability for his actions.

11  Q    Did you tell Kier that Brian was in pain?

12  A    I would have, yes. And per our discussion with Ricky and Kier earlier,

13  Ryan's expectation was to go to Concentra if he was in pain.

14  Q    How many times did you speak to Kier regarding Ryan Bennett?

15  A    I don't recall, but multiple times.

16  Q    And it was multiple times before Ryan Bennett was terminated?

17  A    That's possible. I speak to Kier about numerous team members on a

18  weekly basis, about multiple issues. So I don't recall specifically what those

19  reasons would have been.

20  Q    Okay. Let's look at Exhibit 15. Which is page 248.

21      Have you seen that before?

22  A    Yes, one moment. Fifteen. Tier warning form. Sorry, number 15, yes,

23  that is the other side of one of the write-up documents. Or I'm sorry, no, that

24  is a separation document prepared by Ricky Tindell on the date of termination.

25  Q    Have you seen it before?

1    A    I have.

2    Q    When?

3    A    I would have seen it just after a disciplinary meeting with Ryan Bennett

4    that turned into a termination.

5    Q    Was this given to Ryan Bennett?

6    A    This -- this was not prepared at the time Ryan Bennett was there

7    because our meeting initially was to discuss the three write-ups that were

8    presented to him the day before.  Ryan chose to not take any accountability for

9    his actions.  Which resulted in the termination and this document was

10   prepared, per our policy, for terminating team members.

11   Q    Okay.  Let's focus on my question.  Was this given to Ryan Bennett?

12   A    Ryan Bennett would not have been here at the time of this document.

13   Q    So is your answer yes, or no?

14   A    My answer is Ryan Bennett did not see this document, as it was

15   prepared after he had left the facilities.

16   Q    Okay.  But you saw it?

17   A    I did see this, yes.

18   Q    Did you point out to Ricky Tindell that Ryan was not within his first 90

19   days of employment?

20   A    We have multiple forms.  This form looks exactly the same regardless of

21   what the title of it is.  It's the same separation document.

22   Q    Okay.  Let's focus on my question.  Did you say to Ricky Tindell, Ryan

23   was not within his first 90 days of employment?

24   A    Ryan was within his first 90 days of employment at The Eagle location.

25   He had been employed with the company longer than that, but we reset our

1    dates to the start date at a new location.

2    Q     Okay.  I'll try it one more time.  Did you say to Ricky Tindell, Ryan is not

3    within his first 90 days of employment.

4    A     Ryan was within his first 90 days of employment.

5    Q     Okay.  Well, I'll try it one more time.  Did you say to Ricky Tindell, Ryan

6    was not within his first 90 days of employment.

7    A     I would not have needed to tell Ricky that because Ryan was within his

8    first 90 days of employment.

9    Q     So is your answer, no?

10   A     My answer to that question is Ryan was within his first 90 days of

11   employment at The Eagle location.  So I would not have needed to tell Ricky

12   that this document would have not been needed.

13   Q     Have you ever used this document to terminate anyone?

14   A     This document is used to terminate 90 percent of our team members.

15   Q     So you've used it before to terminate people?

16   A     That's correct.

17   Q     Have you ever used it to terminate someone who's been working at

18   Thunderdome for over a year?

19   A     Yes, based on their store transfers.  Their start date and seniority resets.

20   So it would have been appropriate in the moment.

21   Q     Then let's take a break and come back at ten after.

22   A     Okay.

23          RECORDING AGENT:  Okay.  It is 10:56 and we're off the record.

24          (Recess taken from 10:56 a.m. to 11:10 a.m.)

25   BY MR. WATERFILL:

| | | |
|---|---|---|
| 1 | Q | Mr. Martin. |
| 2 | A | Yes. |
| 3 | Q | Did you fire Dayton Neely? |
| 4 | A | I did not. |
| 5 | Q | Was Dayton Neely fired? |
| 6 | A | Dayton Neely was removed from his position. |
| 7 | Q | When? |
| 8 | A | I don't recall. |
| 9 | Q | Why? |
| 10 | A | Performance. |
| 11 | Q | Did you give him negative reviews? |
| 12 | A | I had written Dayton up in the past for performance, yes. |
| 13 | Q | What position did he last hold? |
| 14 | A | Assistant general manager. |
| 15 | Q | What did you think of Dayton's job performance? |
| 16 | A | Dayton performed the bare minimum of his duties and then was let go |
| 17 | | for performance-related issues. |
| 18 | Q | Was he fired by Ricky Tindell? |
| 19 | A | He would have been let go by our owner, Alex Blust and Ricky Tindell. |
| 20 | Q | I'm sorry, tell me the owner's name again. |
| 21 | A | Alex Blust. |
| 22 | Q | Please spell the last name. |
| 23 | A | B-L-U-S-T. |
| 24 | Q | Do you know where Dayton works today? |
| 25 | A | I do not. |

1    Q      When is the last time you've spoken to him?

2    A      That would have been his last shift at Thunderdome.  I've not spoken to

3    Dayton since.

4    Q      And when was his last shift at Thunderdome?

5    A      I don't recall, but I remember it being sometime in December.  But I don't

6    know exactly.

7    Q      Of 2021?

8    A      No.  It would have been 2019.

9    Q      When you said he's assistant general manager, which restaurant?

10   A      This would have been at The Eagle.

11            MR. WATERFILL:  Okay.  I pass the witness.

12            Do you have anything, Sarah?

13            MS. LEYSHOCK:  I don't have any questions.  Thank you.

14            MR. WATERFILL:  Okay. Thank you, very much.

15            RECORDING AGENT:  Okay.  And would you like signature?  Do

16   you want to read and sign?  Oh, you're on mute.

17            MS. LEYSHOCK:  Yes.

18            RECORDING AGENT:  Okay. Okay.  Let's see.  It is -- let me just

19   close the deposition it's 11:12 and that will conclude today's deposition.

20            Thank you.

21            (Deposition concluded at 11:12: a.m.)

22

23

24

CERTIFICATE OF OATH

STATE OF INDIANA

COUNTY OF MARION

     I, **Christy Brooks**, Notary Public in and for the State of Indiana, do hereby certify that the witness named herein, **Collin Martin**, appeared before me via zoom on August 22, 2022, and was duly sworn.

     WITNESS my hand and official seal this 21st day of September, 2022.

     */s/ Christy Brooks*
     Christy Brooks
     NOTARY PUBLIC - STATE OF INDIANA
     MY COMMISSION NO.: 0703343
     EXPIRES:  JULY 28, 2025

## CERTIFICATE OF REPORTER

STATE OF INDIANA

COUNTY OF MARION

I, Christy Brooks, digital recorder, do hereby certify that I was authorized to and did electronically report the examination of the witness named herein, **Collin Martin**; that a review of the transcript was requested; and that the foregoing transcript is a true record my electronic recording.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel for any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the outcome of this action.

DATED THIS  21st day of September 2022.


*/s/ Christy Brooks*
Christy Brooks