**EXHIBIT 18**

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RYAN BENNETT,                    )<br>                                  )<br>           Plaintiff,            )<br>                                  )<br>      vs.                        )<br>                                  )<br>THUNDERDOME RESTAURANTS,          )<br>LLC.                              )<br>                                  )<br>           Defendant.            )<br>                                  ) | CASE NO. 1:21-cv-03027-RLY-MJD |

DEPOSITION OF DAVID DOWNS

DATE: AUGUST 22, 2022

PAGES 1 - 25

Recording Agent:  Christy Brooks
Phoenix Transcription Services, LLC
christy@phoenixtranscription.org
317-937-2396

APPEARANCES

ON BEHALF OF THE PLAINTIFF RYAN BENNETT:

MARK WATERFILL
ATTORNEY AT LAW
2230 STAFFORD ROAD, SUITE 115
PLAINFILD, INDIANA
317-501-6060
Mark@waterfilllaw.com


ON BEHALF OF THE DEFENDANT THUNDERDOME RESTAURANTS, LLC:

SARAH CLAY LEYSHOCK
TAFT LAW FIRM
425 WALNUT STREET SUITE 1800
CINCINNATI, OH 45202
513-357-8731
Sleyshock@taftlaw.com

# Contents

August 22, 2022 ............................................................................................................ 4

DIRECT EXAMINATION DAVID DOWNS ...................................................... 4

   BY MR. WATERFILL, COUNSEL FOR DEFENDA: ....................................... 4

      (Exhibits 1 - 20 received) ............................................................................. 4

      (Exhibit 26 received) .................................................................................... 4

      (Exhibit 4 received) ...................................................................................... 9

      (Exhibit 9 received) .................................................................................... 11

      (Exhibit 10 received) .................................................................................. 12

      (Exhibit 11 received) .................................................................................. 12

      (Exhibit 13 received) .................................................................................. 13

      (Exhibit 14 received) .................................................................................. 14

      (Exhibit 26 received) .................................................................................. 14

      (Exhibit 15 received) .................................................................................. 18

CROSS-EXAMINATION ................................................................................... 22

   BY MS. LEYSHOCK: ...................................................................................... 22

CERTIFICATE OF OATH ................................................................................. 24

CERTIFICATE OF REPORTER ........................................................................ 25

1  AUGUST 22, 2022
2       (Called to Order at 1:57 p.m.)
3       RECORDING AGENT:  It's August 22nd, 2022.  It's 1:57 p.m.  We
4  are here in Ryan Bennett vs. Thunderdome Restaurant, LLC, in the United
5  States District Court, Southern District of Indiana, Indianapolis Division.
6  Cause Number 1:21-CV-03027-RLY-MJD.
7       We have Mark Waterfill here on behalf of Plaintiff and Sarah
8  Leyshock here on behalf of Defendant.  Our deponent today is David Downs.
9       And if you could please raise your right hand.
10                          DAVID DOWNS,
11      Called as a witness, having been first duly sworn to tell the truth,
12      the whole truth and nothing but the truth, was examined and testified as
13                             follows:
14      RECORDING AGENT:  Okay.  We can get started.
15              DIRECT EXAMINATION DAVID DOWNS
16 BY MR. WATERFILL, COUNSEL FOR DEFENDA:
17 Q    Okay.  Hello, Mr. Downs.
18 A    Hello.
19      MR. WATERFILL:  Christy, you can go ahead and send him the
20 deposition exhibits 1 through 20, as well as number 26.
21      (Exhibits 1 - 20 received)
22      (Exhibit 26 received)
23 BY MR. WATERFILL:
24 Q    My name is Mark Waterfill.  I represent Ryan Bennett.  Thank you for
25 being here this afternoon.  Where do you work?

1  A  I currently work for El Tigre Golf Seats in Elkhart, Indiana.

2  Q  And what do they do?

3  A  Produce golf cart seats.

4  Q  How long have you worked there?

5  A  I've been there about two years. A couple of days over two years.

6  Q  Have you ever had your deposition taken?

7  A  I have not.

8  Q  Okay. I'll ask you a series of questions. And I need you to be verbal in

9  your response. Does that sound fair?

10 A  Yes.

11 Q  And uh-huh's and shakes of the head and that sort of thing cannot be

12 recorded by the court recorder. So we need you to answer yes or no, or give an

13 explanation as seems fit. Is that okay?

14 A  Yes.

15 Q  Okay. How old are you?

16 A  I'm sorry?

17 Q  How old are you?

18 A  How old am I? Forty-three.

19 Q  And what is your residential address ?

20 A  1968 Midnight Pass, Brownsburg, Indiana 46112.

21 Q  What is your job at El Tigre?

22 A  Vice President of Marketing and National Sales Manager.

23 Q  Are you commuting?

24 A  Yes, as needed.

25 Q  Where did you work before El Tigre?

1  A    I worked at The Eagle.

2  Q    What was your job?

3  A    General Manager.

4  Q    Do you want me to go further back than that? Are you talking about

5  immediately prior to El Tigre?

6  Q    Yeah. That's fine. What did you do to prepare for this deposition?

7  A    Nothing.

8  Q    Did you speak to anyone?

9  A    I was informed that the deposition would be coming up by Kier and

10 Sarah.

11 Q    Okay. And what else did they say to you?

12 A    They told me to expect to be questioned. To answer the questions to my

13 best ability as to what I can recall.

14 Q    All right. Did you do anything else to prepare?

15 A    I did not.

16 Q    Did you look at any documents?

17 A    I did not.

18 Q    Why did you leave The Eagle?

19 A    I had an opportunity to go work for El Tigre. It was shortly after

20 reopening after the pandemic. I did not feel like I wanted to be in the

21 restaurant business anymore, and this opportunity presented itself. And that's

22 what led me there.

23 Q    When did you leave?

24 A    I left August -- it's just been just about two years ago. August 10th of

25 2020.

1  Q    When did you start working for Thunderdome?
2  A    It was -- I was there just over two years.  So July of '18.
3  Q    Was your job as General Manager of The Eagle the same job you held for
4  two years?
5  A    Yes.
6  Q    To whom did you report?
7  A    Ricky Tindell.
8  Q    Who reported to you?
9  A    The managers in the building.  Kitchen manager, service manager, bar
10 manager.  Basically general manager, I'm over everybody that's there.
11 Q    Do you know Ryan Bennett?
12 A    I do.
13 Q    When did you first meet him?
14 A    It's hard to answer that honestly.  I don't know.  I don't recall.  When he
15 was working at Bakersfield, I believe.
16 Q    Did you ever have the opportunity to supervise Ryan?
17 A    I did.  Once he was transferred to The Eagle.
18 Q    Did you ever write him up?
19 A    I did not.
20 Q    Do you have Exhibits 1 through 20?
21 A    Do I?
22 Q    Yeah.
23 A    I don't know.  Where would I have them?
24 Q    On your email.
25        MS. LEYSHOCK:  David, you may have received an email from our

1   court reporter, Christy Brooks.  That would have come in just a second ago.
2   Right before we got started.
3           THE WITNESS:  All right.  Yeah, let me check.
4           MS. LEYSHOCK:  Yeah, you can take a second to look.
5           THE WITNESS:  Yeah.  They're here on my phone.  I'll figure out
6   how to open them.  Is there a way to open them not within Google Drive?
7           MR. WATERFILL:  Why don't we do this?  Christy, can you share
8   your screen?
9           RECORDING AGENT:  Yes.  What exhibit do you want to start on?
10          MR. WATERFILL:  The one that's 1 through 20.
11          RECORDING AGENT:  Okay.
12          MR. WATERFILL:  And I want to -- I want to go to page 80.
13          RECORDING AGENT:  Okay.  Give me just a second.
14  BY MR. WATERFILL:
15  Q    While she's doing that, let me ask you.
16  A    Sure.
17  Q    Did -- were there two assistant general managers for The Eagle?
18  A    At the same time?
19  Q    Yeah.
20  A    Not that I can recall.  I believe there was only one.
21  Q    Okay.  Was Collin Martin an assistant general manager at The Eagle?
22  A    He was -- I want to say he was the kitchen manager for part of the time.
23  He may have been promoted to assistant general manager.  From what I can
24  recall, and again, I've been gone from there for just over two years.  I want to
25  say that Collin was a kitchen manager at the time.

1  Q    Okay. Well, looking at this page on Christy's screen.
2  A    Yep.
3  Q    That is Exhibit 4 to these depositions.
4       (Exhibit 4 received)
5  A    Okay.
6  Q    It describes an incident that happened on August 23, 2019. Where Ryan
7  was hurt. Do you remember that?
8           MS. LEYSHOCK: Objection. You can answer, David.
9           THE WITNESS: I need to be able to scroll down. Hold on. It's
10 going now. It's -- yeah, so I -- I don't remember the incident specifically, no. I
11 was aware of it. But I don't remember the specific incident, no.
12 BY MR. WATERFILL:
13 Q    Did you see Ryan Bennett picking up kegs of beer?
14 A    No.
15 Q    Did you see anyone else doing that?
16 A    On that specific date, or ever?
17 Q    On that date.
18 A    Oh, no, I've -- no, I don't recall that day at all.
19 Q    How about at any time?
20 A    At any time?
21 Q    Yeah.
22 A    Oh, yeah, sure.
23 Q    Okay. Did you ever see Ryan doing that?
24 A    Not that I can recall.
25 Q    If Ryan pitched in to help, to move kegs of beer, would that be okay?

1  A    Yes.

2  Q    Okay.  Did you ever talk to Ryan about his injury?

3  A    Gosh, yeah, I would have had to have.  I mean I'm sure I was informed
4  about it.  I can't tell you any specific conversations that I know.

5  Q    Did he talk to you about suffering a hernia?

6  A    I do remember that.  How I was informed, whether it was from him or
7  whether it was from Ricky, again time -- too much time has passed for me to
8  tell you that with certainty.

9  Q    What did Ricky tell you about it?

10 A    That it occurred.  I mean I -- honestly, I'm going to be speaking with
11 generalities on a lot of this, because the specifics are -- again, they're just so
12 far removed.  I wish I had more specifics for you.  I just don't.

13 Q    Did anyone tell you that Ryan filed a workers compensation claim?

14 A    See this is where I'm going to have to differentiate, workers compensation
15 -- yeah, yes.  I believe so.

16 Q    Okay.  Did anyone tell you that Ryan was on light duty?

17 A    I do remember making -- or an accommodation, I won't say making,
18 because I specifically didn't do it myself, an accommodation being made.  I
19 remember one of Ryan's primary duties was to run the window in the kitchen,
20 as the assistant kitchen manager.  I do recall him being allowed to sit on a
21 stool in the window.  That's unusual.  I had never seen that in two years.
22 Nobody else was ever able to sit on a stool.

23         As far as an accommodation, I do recall that.  I'm not going to be
24 able to give you dates.  Again, I vaguely remember changing the schedule to
25 accommodate a few things for him.

1   Q       That's okay.  Just we'll focus -- just focus on my question and we'll get
2   through this pretty quickly.
3   A       I gotcha.
4           MR. WATERFILL:  Christy, can you go to page 242.
5   BY MR. WATERFILL:
6   Q       Okay, page 242 is Exhibit 9.  Have you seen that before?
7           (Exhibit 9 received)
8   A       Have I seen that specific write-up?
9   Q       Yeah.
10  A       I don't recall.
11  Q       Okay.  Let's show him Exhibit 10.  Have you seen that?
12  A       It hasn't appeared yet.
13          RECORDING AGENT:  Mark, what page is Exhibit 10?
14          MR. WATERFILL:  The next page, 243.
15          RECORDING AGENT:  Okay.
16          MS. LEYSHOCK:  Christy, can you shrink this down, so we can see
17  the whole document at once?  That might be helpful for David.
18          RECORDING AGENT:  Okay.
19          MS. LEYSHOCK:  Thank you.
20          MR. WATERFILL:  I think it's going to be so tiny; you won't be able
21  to read it.
22          MS. LEYSHOCK:  Possible, yeah.
23          MR. WATERFILL:  Just scroll down and show him 243.  That's fine.
24          MS. LEYSHOCK:  Okay.  I am going to object to the speed to which
25  we are going to through these.  I do think that David has the right to at least

1  see the whole document with a little more -- there we go.
2  BY MR. WATERFILL:
3  Q    Have you seen that before?
4       (Exhibit 10 received)
5  A    Not that I recall.
6  Q    Okay.  The next page, please.  Have you seen that before?
7  A    I don't know.  That one seems familiar.  I seem to remember the incident,
8  but I can't tell you with certainty that I saw the document.
9  Q    Okay.  And where we're at is Exhibit 11, right?
10      (Exhibit 11 received)
11 A    Yes.  If the blue tag that says 11 is Exhibit 11, yes.
12 Q    Yeah, okay.  Now you didn't sign any of these, did you?
13 A    I did not.
14 Q    That's Dayton Nealy's (phonetic) signature down at the bottom of the
15 letter.
16 A    It says his name, yes.
17 Q    Okay.  Do you know Dayton Nealy?
18 A    I do.
19 Q    And did you fire Dayton Nealy?
20 A    I did not personally fire him, no, Thunderdome fired him, yes.
21 Q    Was he fired before you left?
22 A    Yes.
23 Q    Okay.  Please look at 12.  Tell me if you've seen that before.
24      (Exhibit 12 received)
25 A    Sorry.  I'm going to -- my face is going to get real close here.  It's hard for

1  me to see it.  Again, I remember the incident, but I can't tell you with
2  certainty that I saw the document.
3  Q    Okay.  And then 13, which is page 246.  Have you seen that before?
4       (Exhibit 13 received)
5  A    Again, not 100 percent certainty on the document.  I feel like this is all
6  somewhat related to the same shift, maybe.  I haven't been looking at the dates
7  on it.
8  Q    How about 14?  Have you seen 14 before?
9       MS. LEYSHOCK:  Mark, just for a point of clarification, I think this
10 14 is not Bennett deposition 14.  I sent that to you separately.
11      MR. WATERFILL:  Yes.  Is the one you sent me separately different
12 than this one?
13      MS. LEYSHOCK:  I believe it is, Mark.
14      MR. WATERFILL:  Okay.
15      RECORDING AGENT:  I can pull that up.  Give me just a second.
16      MS. LEYSHOCK:  Thanks, Christy.
17      RECORDING AGENT:  Yes.
18 BY MR. WATERFILL:
19 Q    While they're doing that, David, have you ever written anyone up more
20 than three times in one day?
21 A    Have I, personally?
22 Q    Yeah.
23 A    No.
24 Q    Okay.  Did anyone -- did Ricky Tindell or Collin Martin talk to you about
25 these write-ups?

1  A    Well, yeah, Collin talked to me about them.
2  Q    What did he tell you?
3  A    That there was a -- again, it was a pretty poor shift.  There was some
4  duties that were not completed.  And as the kitchen manager, he wanted to
5  hold the assistant kitchen manager accountable.  And that was his way of
6  doing so.
7  Q    Okay.  Looking at 14, have you seen that before?
8       (Exhibit 14 received)
9  A    Can you scroll down, please?  No.  I remember the incident, but I've
10 never -- I don't recall seeing the document, no.
11 Q    Okay.  Let's go to 26, please.  Okay.  You just said that Collin talked to
12 you about these write-ups.  Did he talk to you about Ryan Bennett being in
13 pain?
14      (Exhibit 26 received)
15 A    Not that I can recall.
16 Q    Okay.  Please scroll down on 26, Christy, to page 2.  This is an email
17 from Collin Martin to you.
18 A    Okay.
19 Q    October 24.  Are you able to read the first paragraph?
20 A    Yeah, I'm reading it right now.
21 Q    Okay.   And go ahead and read all you'd  like, but I'd like to direct your
22 attention to the middle sentence of that paragraph, where Collin says, "Ryan
23 complained of being in pain."  Do you see that?
24 A    Okay.  I see it.
25 Q    Did Ryan ever complain to you of being in pain?

1  A   Oh, I had discussions with Ryan, where he talked about being in pain,
2  sure.
3  Q   What did he say to you?
4  A   I remember he had MRSA at one point, which hasn't been mentioned yet.
5  And I remember a hernia being mentioned at some point.  Again, recalling back
6  that far to specific conversations about it, I can give you the overall gist, which
7  is just the subject matter.  I don't really recall much else, as far as details of
8  the conversation.
9  Q   Well -- and let me understand the hierarchy here.  So Ryan Bennett was
10 the assistant kitchen manager, right?
11 A   Yes.  Uh-huh.
12 Q   And then Collin Martin was the kitchen manager.
13 A   Yes.
14 Q   And then you were the assistant manager.
15 A   No, I was the general manager.
16 Q   The general manager, okay.  And then to whom did you report?
17 A   I reported to Ricky.
18 Q   And what was his title?
19 A   Regional market partner, maybe.  It was regional.
20 Q   Okay.
21 A   I think that's right.
22 Q   Did you talk to Ricky about Ryan being in pain?
23 A   Yeah, I'm sure there were conversations about it. That's where the
24 accommodations came from.
25 Q   Okay.  And in this document that we're looking at, the sentence goes,