UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RYAN BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:21-cv-03027-RLY-MJD |
| | ) | |
| THUNDERDOME RESTAURANTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant Thunderdome Restaurants, LLC ("Thunderdome") submits the following memorandum in support of its motion for summary judgment as to all claims that plaintiff Ryan Bennett has asserted in this lawsuit.

## I. INTRODUCTION

Mr. Bennett worked for Thunderdome as an Assistant Kitchen Manager in three of its locations for a total of approximately fifteen months. During Mr. Bennett's short tenure with Thunderdome, he demonstrated that he was a habitual underperformer. Mr. Bennett would often disappear from his shifts for 30 to 45 minutes at a time on unauthorized breaks during peak hours leaving his staff scrambling to fill in the gaps. On multiple occasions, Thunderdome management caught Mr. Bennett smoking during times that violated the smoking policy. In each instance, Thunderdome management followed its progressive discipline process and issued him oral counselings in an attempt to improve his behavior. Mr. Bennett, however, continually responded with indignation and failed to make corrective actions. In a further attempt to help Mr. Bennett succeed, Thunderdome transferred him between three of its Indianapolis, Indiana locations. But Mr. Bennett continued to underperform despite the change in structure.

After Thunderdome management had orally counseled Mr. Bennett on his poor performance on multiple occasions and transferred him to the third location, he sustained a workplace injury to his groin. As soon as Thunderdome received notice of the injury, it sent Mr. Bennett to receive medical attention and filed a worker's compensation claim. From the date of his injury through the end of his employment, Mr. Bennett's medical providers released him to work with restrictions and Thunderdome accommodated him with light duty work. Unfortunately, however, Mr. Bennett's poor performance continued and he committed six infractions within two weeks. At that point, Thunderdome management met with Mr. Bennett to review the infractions, but he failed to take any responsibility for his actions. As a result, Thunderdome made the decision to terminate Mr. Bennett's employment because of his history of poor performance and his complete failure to take accountability for his actions and make the appropriate adjustments.

Yet, despite these undisputed facts, Mr. Bennett brings two claims stemming from the termination of his employment, arguing that Thunderdome retaliated against him for needing leave under the Family and Medical Leave Act ("FMLA") and for suffering a workplace injury and filing a worker's compensation claim. In light of the circumstances surrounding his termination, however, Mr. Bennett cannot even begin to meet the high standard to prove his claims and show that the evidence would permit a reasonable factfinder to conclude that his termination was based on retaliation. Rather, the evidence will show that Mr. Bennett admitted he never requested time off for his workplace injury, that he could continue working even after his injury with work restrictions, that he made a full recovery from his injury, and that his termination was related solely to his poor performance that began way before his workplace injury. For those reasons, Mr. Bennett's retaliation claims fail as a matter of law.

2

Finally, Mr. Bennett also brings a claim of FMLA interference alleging that Thunderdome denied him leave to which he was entitled due to his workplace injury. However, Mr. Bennett can point to no evidence other than his own unsubstantiated testimony that he had a serious health condition under the FMLA. Notably, Mr. Bennett made a full recovery from his groin injury in approximately 2.5 months. In addition, Mr. Bennett admitted that he never requested time off for his injury and his medical records do not support that he needed leave from work. As a result, Thunderdome is entitled to summary judgment on Mr. Bennett's FMLA interference claim.

II.     **STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

   A.     **Thunderdome's Relevant Policies.**

As part of its business operations, Thunderdome maintains an Employee Handbook that sets forth its policies and procedures on a wide variety of topics, including its FMLA policy and Worker's Compensation policy. [Ex. 1, Employee Handbook at Thunderdome000172-75 (FMLA) and Thunderdome000126 (Worker's Compensation); *see also* Ex. 2, Bennett Dep. 133:7-12.] Although Mr. Bennett does not remember going through orientation or receiving a copy of the Employee Handbook, Thunderdome's management testified that all employees are provided a copy and walked through the Employee Handbook during orientation. [Ex. 3, Muchnicki Dep. 19:13-21:3; Ex. 4, Tindell Dep. 17:2-10, 18:8-10, 18:20-19:5 (testifying that he recalls sitting and going over the Employee Handbook with Mr. Bennett when he was hired).] In any case, Mr. Bennett testified that he knew that Thunderdome had an Employee Handbook in place during his employment. [Ex. 2, Bennett Dep. 133:7-12 (testifying that he knew Thunderdome had an Employee Handbook in place during his employment).] Employee orientations are conducted by the general manager of the restaurant and, during orientation, the manager reviews the contents of

the Employee Handbook, including its FMLA Policy, with the employees. [Ex. 3, Muchnicki Dep. 19:13-20:14, 25:7-18; Ex. 4, Tindell Dep. 17:2-10, 18:8-10]

Included within the Employee Handbook is Thunderdome's FMLA policy that sets forth the eligibility requirements and employee notification and reporting requirements. [Ex. 1 at Thunderdome000172-75.] Pursuant to Thunderdome's FMLA policy and practice, employees seeking FMLA leave must submit an initial request form to their direct manager, and then requests are handled by its Human Resources Department through its FMLA coordinator Kier Muchnicki, Vice President of Human Resources. [Ex. 2, Bennett Dep. 131:3-16 (testifying that the process to request FMLA leave was to submit a request form); Ex. 3, Muchnicki Dep. 18:25-19:5, 90:19-91:7 (testifying about how employees may request time off for medical or non-medical reasons).] Thunderdome makes every effort to ensure that employees eligible and qualified for FMLA leave obtain such leave, and does not interfere with or impede an employee's ability to do so. [Ex. 5, Muchnicki Decl. at ¶ 3; *see also* Ex. 3, Muchnicki Dep. 91:8-22.] In addition to the FMLA policy in the Employee Handbook and employee orientation where the FMLA policy is discussed, Thunderdome maintains posters in each of its restaurants, notifying employees of the FMLA provisions and identifying the Human Resources Department as the point of contact for any personnel questions. [Ex. 3, Muchnicki Dep. 21:14-23, 22:3-9, 82:2-12; Ex. 4, Tindell Dep. 34:25-35:4 (testifying that the restaurants have the FMLA notice posters hanging up).]

Also included within the Employee Handbook is Thunderdome's Worker's Compensation policy that directs employees who "are injured on the job, no matter how slightly, [to] report the incident immediately to [their] supervisor." [Ex. 1 at Thunderdome000165.] Thunderdome uses the Cincinnati Insurance Companies ("CIC") as its worker's compensation insurance carrier. [Ex. 3, Muchnicki Dep. 86:14-22, 87:15-88:1.] Generally, once Thunderdome files a worker's

compensation claim, CIC processes the claim and handles approval of any additional medical care and the payments of the medical claims. [Ex. 3, Muchnicki Dep. 86:14-22, 87:15-88:1 (testifying that Thunderdome uses the CIC to handle the worker's compensation claims and that Thunderdome is involved only when the CIC needs additional information).] After CIC takes over the claim, Thunderdome is involved only if the CIC needs additional information from the company. [*Id.* at 86:14-22, 87:15-88:1.]

Thunderdome's managers are experienced with FMLA, as they handle several each year without incident. [*Id.* at 29:15-21 (testifying that she and Mr. Tindell had worked together on FMLA leaves for other employees during the past six and a half years because Mr. Tindell has had 5 to 12 employees go out on FMLA in the course of a year in his region), 28:5-13 (testifying that she has provided Mr. Tindell with training on how to handle leaves of absence and Thunderdome's FMLA policies probably 20 or more times over their course of working together).] Providing time off as needed by the employee, for any reason, but especially for one's health, is part of the Thunderdome's values-based culture and total benefit package for employees. [*Id.* at 91:8-22.] To get time off, employees only have to ask not to be included on the schedule for a particular day. [*Id.* at 90:19-91:7; *see also* Ex. 4, Tindell Dep. 80:25-81:10.] Thunderdome does not retaliate against employees that take (or attempt to take) FMLA leave or those who file worker's compensation claims; to the contrary, Thunderdome's workforce includes many employees who have filed worker's compensation claims and/or applied for and utilized FMLA leave during their employment. [Ex. 5, Muchnicki Decl. at ¶ 7.]

## B.    Mr. Bennett's Employment with Thunderdome.

### i.   *Mr. Bennett's Early Performance Issues.*

Mr. Bennett began working as an Assistant Kitchen Manager for Thunderdome at its Bakersfield Indianapolis restaurant on July 27, 2018. [Ex. 5, Muchnicki Decl. at ¶ 4; *see also* Ex. 2, Bennett Dep. at 33:7-13, 44:8-10.] During his employment at Bakersfield, Mr. Bennett was orally counseled on multiple occasions for his poor work ethic. [Ex. 6, Martin

Dep. 24:4-12 (testifying that he orally counseled Mr. Bennett multiple times before the October 9, 2019 write up); Ex. 4, Tindell Dep. 21:15-24, 36:14-24; Ex. 7, Tindell Decl. at ¶¶ 5-8; *see also* Ex. 2, Bennett Dep. 60:3-10 (admitting that Thunderdome management had orally counseled him on violating its smoking policy), 61:10-14.] In one instance, on May 16, 2019, Siobhan Stephenson, Assistant General Manager at Bakersfield, reported to Ricky Tindell, Regional Managing Partner of Bakersfield and The Eagle Indianapolis, that two back-of-house employees walked out of their shifts that evening because of Mr. Bennett. [Ex. 8, Text Message; Ex. 4, Tindell Dep. 24:8-26:10; *see also* Ex. 7, Tindell Decl. at ¶ 6.] In addition, Mr. Bennett was frequently missing from his shift for 30-45 minutes at a time when he was not on an approved break. [Ex. 4, Tindell Dep. 21:15-24, 36:14-24.]

Mr. Bennett was also caught smoking during times that violated Thunderdome's smoking policy. [Ex. 2, Bennett Dep. 60:3-10, 61:10-14; Ex. 4, Tindell Dep. 21:15-24, 36:14-24.] All of Thunderdome's locations have a strict no smoking policy ("smoking policy") during the busy hours posted in the restaurants [Ex. 2, Bennett Dep. at 58:13-59:6 (testifying that he knew of the smoking policy); Ex. 6, Martin Dep. 17:13-22.]. Despite this policy, on several occasions, Mr. Bennett was caught smoking during prohibited times and was missing from the shift when his team needed him. [Ex. 4, Tindell Dep. 21:15-24, 36:14-24; Ex. 7, Tindell Decl. at ¶¶ 5, 7; *see also* Ex. 2,

Bennett Dep. 60:3-10, 61:10-14.] When Mr. Bennett was observed smoking during times that violated the smoking policy, Thunderdome managers would orally counsel him about the violation and re-enforce the smoking policy. [Ex. 2, Bennett Dep. at 60:3-10, 61:10-16 (testifying that Thunderdome management would not be lying if they testified that they counseled him on taking smoke breaks when he was not permitted); Ex. 4, Tindell Dep. 52:1-10 (testifying that he had orally counseled Mr. Bennett on not taking smoking breaks during non-break time); *see also* Ex. 4, Tindell Dep. at 21:15-24, 36:14-24; Ex, 7, Tindell Decl. at ¶¶ 5, 7.]

Throughout his employment with Thunderdome, prior to August 23, 20219, Mr. Tindell and Mr. Martin orally coached Mr. Bennett on how to speak to other employees, not walking off the line during peak times, and not going to smoke cigarettes during peak times. [Ex. 4, Tindell Dep. 21:15-24, 36:14-24; Ex. 6, Martin Dep. 23:25-24:12; *see also* Ex. 7, Tindell Decl. at ¶¶ 5, 7.] Mr. Bennett, however, was not receptive to the constructive feedback and did not make adjustments to his performance. [Ex. 4, Tindell Dep. 21:15-24, 36:14-24; Ex. 7, Tindell Decl. at ¶¶ 5-8.]

By July 15, 2019, Thunderdome had reassigned him to its Krueger's Tavern ("Krueger's") Indianapolis restaurant due to ongoing performance issues. [Ex. 7, Tindell Decl. at ¶¶ 5-7; Ex. 5, Muchnicki Decl. at ¶ 4.] Thunderdome hoped that Mr. Bennett would be able to perform better at Krueger's because it was a slower restaurant than Bakersfield. [Ex. 7, Tindell Decl. at ¶¶ 5-7.] At the time, Thunderdome believed that Krueger's would be a better fit for Mr. Bennett because the location was considered less complex due to its smaller menu and slower business. [*Id.*] However, Mr. Bennett did not improve his performance while at Krueger's. [*Id.* at ¶ 7.] Rather, Mr. Bennett continued to go missing during his shifts and was caught multiple times smoking during

unauthorized times in violation of the smoking policy. [*Id.*] In each instance, Thunderdome management would orally counsel Mr. Bennett regarding these performance infractions. [*Id.*]

On or about August 12, 2019, Thunderdome again reassigned Mr. Bennett to its Indianapolis restaurant The Eagle because it had a larger staff that Mr. Tindell hoped could provide more structure and support for Mr. Bennett. [Ex. 5, Muchnicki Decl. at ¶ 4; Ex. 7, Tindell Decl. at ¶¶ 7-8.] At The Eagle, Mr. Bennett reported directly to Collin Martin, Assistant General Manager and Kitchen Manager, and David Downs, then General Manager, and ultimately reported to Mr. Tindell. [Ex. 2, Bennett Dep. 73:18-74:15.] As the Assistant Kitchen Manager at The Eagle, Mr. Bennett was responsible for placing orders for food in the kitchen on a daily basis, completing a prep list as requested, and managing the expo station. [*Id.* at 75:7-77:7, 79:25-81:10.]

ii.   *Mr. Bennett's Continued Performance Issues and Termination.*

Despite Thunderdome's previous attempts to turn around Mr. Bennett's performance through multiple oral counselings and transfers to two different restaurants to see if he would have the opportunity to change his behavior, Mr. Bennett's poor performance continued at The Eagle. [Ex. 7, Tindell Decl. at ¶¶ 10-14.] In one incident, Mr. Bennett left in the middle of his shift while he was working the expo line. [*Id.* at ¶ 10.] When an employee is assigned to work as the expo, the employee calls out the orders on the guest tickets to let the cooks know what to make, then reads the order ticket and ensures that all the food for a particular order is on the plate or collected on the tray before the server delivers the food to the customer's table. [Ex. 2, Bennett Dep. 62:19-63:8, 80:23-81:10.] One day, Mr. Bennett left during the middle of his shift causing extreme confusion with the staff regarding which items in the expo went to which tables. [Ex. 7, Tindell Decl. at ¶ 10.] This significantly affected the business operation for that shift. [*Id.*] When coached he was highly combative, and did not respond with improvement. [*Id.*]

8

Instead, on October 9, 2019, Mr. Bennett came in late for his 4:00 p.m. work shift and Mr. Martin issued him a written warning for being late. [Ex. 9, October 9, 2019 Written Warning; Ex. 6, Martin Dep. 24:16-25:10; Ex. 2, Bennett Dep. 182:8-184:13; *see also* Ex. 7, Tindell Decl. at ¶ 11.] Since Mr. Bennett had already received multiple oral counselings regarding his poor performance and work ethic, Thunderdome management felt that a written warning was necessary at this point. [Ex. 7, Tindell Decl. at ¶ 11; *see also* Martin Dep. 24:4-12.] On October 10, 2019, Mr. Martin issued Mr. Bennett a written warning because he improperly completed the food order on September 9, 2019. [Ex. 10, October 10, 2019 Written Warning; Ex. 2, Bennett Dep. 188:4-18, 191:19-193:3; Ex. 6, Martin Dep. 25:11-26:5; *see also* Ex. 7, Tindell Decl. at ¶ 11.] To place the food orders, Mr. Bennett was required to take inventory of the current food in the walk-in refrigerator and freezer and compare it with a "par sheet" that identified what quantity levels were needed that day in order to determine what still needed to be ordered. [Ex. 2, Bennett Dep. 75:7-77:7.] Then Mr. Bennett was responsible for placing the order to bring the amount up to the required par level. [*Id.*] When a food order was place incorrectly, it causes a direct loss to Thunderdome for not having the appropriate amount of food for the restaurant service. [Ex. 7, Tindell Decl. at ¶ 11.]

On October 23, 2019, Mr. Bennett committed four separate performance infractions. [Ex. 11, October 24, 2019 Written Warning 1; Ex. 12, October 24, 2019 Written Warning 2; Ex. 13, October 24, 2019 Written Warning 3; Ex. 14, October 24, 2019 Written Warning 4.] First, Mr. Bennett was caught smoking during peak business hours in violation of Thunderdome's smoking policy. [Ex. 11; Ex. 2, Bennett Dep. 209:10-25, 211:13-212:5 (testifying that he was smoking at 7:19 p.m. that day); *see also* Ex. 7, Tindell Decl. ¶ 12.] When Mr. Bennett returned from smoking, he sat on a stool and watched while Mr. Neely ran the expo line instead of managing

the expo line himself as he was supposed to do. [Ex. 15, October 24, 2019 Email Communication from Collin Martin at Thunderdome000022.] Since Mr. Bennett had been previously orally counseled for violation of the smoking policy many times [Ex. 2, Bennett Dep. at 61:10-16; Ex. 4, Tindell Dep. 52:1-10; Ex. 7, Tindell Decl. at ¶¶ 5, 10-12], Thunderdome issued him a final written warning for the violation with Mr. Martin and Mr. Neely signing the document. [Ex. 11; Ex. 7, Tindell Decl. at ¶¶ 14-15.]

Second, despite his previous written second warning on October 10, 2019 [Ex. 9], Mr. Bennett failed again to properly place the food order for his shift. [Ex. 12; Ex. 7, Tindell Decl. at ¶ 12]. Mr. Bennett failed to properly count the product already in the kitchen and adjust it to the proper pars. [Ex. 12; Ex. 15.] This resulted in Mr. Bennett both over-ordering and under-ordering certain products, and his failure resulted in an extra $926.14 cost for unnecessary product and caused Thunderdome to have to send an employee to Restaurant Depot to get the products that were not ordered. [Ex. 12; Ex. 15.] Since Mr. Bennett had previously been written up for this same violation, Thunderdome issued him a second written final warning for October 23, 2019. [Ex. 12; Ex. 15; *see also* Ex. 7, Tindell Decl. at ¶ 12.]

Third, Mr. Bennett also failed to properly complete the prep list for his shift and, therefore, did not order the correct produce to complete the list. [Ex. 13; Ex. 15.] As a result of the direct cost to Thunderdome for his mistake and his prior warning on October 10, 2019, Thunderdome issued Mr. Bennett a third written final warning for October 23, 2019. [Ex. 13; Ex. 15; *see also* Ex. 7, Tindell Decl. at ¶ 12.]

Finally, Mr. Bennett left his shift early without notifying a supervisor and receiving approval. [Ex. 14; Ex. 15.] Mr. Martin and Mr. Tindell had previously instructed Mr. Bennett not to leave his shift without managerial approval and that if he needed to leave his shift because of

10

his workplace injury then he had to go to Concentra to seek medical assistance. [Ex. 6, Martin Dep. 18:7-15 (testifying that Mr. Bennett was required to go to Concentra any time that he was leaving because of his injury); Ex. 4, Tindell Dep. 70:22-71:10 (testifying that it was Thunderdome's practice to require employees who had to leave work because of a workplace injury to go to Concentra for treatment); Ex. 15.] Since Mr. Bennett did not go seek medical care for his injury and he left his shift early without approval, Thunderdome issued him a fourth written final warning. [Ex. 14; Ex. 15.]

When Mr. Martin reported Mr. Bennett's infractions on October 23, 2019 to Mr. Tindell, Mr. Tindell requested to meet with Mr. Bennett. [Ex. 7, Tindell Decl. at ¶ 12.] Accordingly, on October 24, 2019, Mr. Martin sent Mr. Bennett home when he reported to work until Mr. Tindell could meet with him to discuss his four October 23, 2019 infractions. [*Id.* at ¶ 13.] On October 26, 2019, Mr. Tindell and Mr. Downs met with Mr. Bennett regarding his performance on October 23, 2019. [*Id.* at ¶ 14.] During the meeting, Mr. Tindell asked Mr. Bennett about each incident that lead to his four final warnings. [Ex. 4, Tindell Dep. 65:11-66:13; *see also* Ex. 7, Tindell Decl. at ¶ 14.] Mr. Bennett, however, would not take accountability for his actions. [Ex. 4, Tindell Dep. 65:11-66:13; *see also* Ex. 7, Tindell Decl. at ¶ 14.] As a result of his repeated poor performance and failure to take responsibility and make the appropriate changes and having exhausted the option of reassignment to each of the various Thunderdome restaurants environments, Mr. Tindell made the decision to terminate Mr. Bennett's employment effective immediately. [Ex. 4, Tindell Dep. 65:11-66:13 (testifying that he had not made the decision to terminate Mr. Bennett prior to Mr. Bennett's behavior during the disciplinary meeting on October 26, 2019), 67:8-12 (testifying that Mr. Bennett's performance and inability to make the necessary changes was the only reason that he terminated him), 78:9-21 (testifying to same); *see also* Ex. 7, Tindell Decl. at ¶¶ 14-16;

Ex. 6, Martin Dep. 31:20-32:10 (testifying that the decision to terminate Mr. Bennett was not made until the disciplinary meeting when Mr. Bennett did not take accountability for his performance issues).]

       iii.  *Mr. Bennett's Workplace Injury.*

On August 23, 2019, Mr. Bennett reported to Dayton Neely, then Assistant General Manager at The Eagle, that he had suffered an injury while he was lifting something at work. [Ex. 16, August 23, 2019 Employee Injury Report at Thunderdome000008-9; Ex. 2, Bennett Dep. 88:15-24, 90:2-11, 91:20-25, 93:17-23.] Mr. Neely filled out a workplace injury report and told Mr. Bennett that he needed to leave and seek medical treatment from Concentra Occupational Health ("Concentra"). [Ex. 16 at Thunderdome000008-9; Ex. 2, Bennett Dep. 92:9-19; *see also* Ex. 7, Tindell Decl. at ¶ 9.] Concentra was Thunderdome's worker's compensation medical provider. [Ex. 3, Muchnicki Dep. 44:17-45:11.] Mr. Bennett was then seen by Dr. Jared Shields at Concentra who diagnosed him with a right inguinal hernia and severe right groin pain. [Ex. 17, Concentra Medical Records at Thunderdome000396-418, 398 (assessment and treatment plan); Ex. 2, Bennett Dep. 93:5-16.]

Dr. Shields put in a referral to general surgery and released Mr. Bennett to work an entire shift with workplace restrictions, including may lift up to 10 pounds frequently, may bend occasionally, may stand frequently, may walk frequently, may engage in activities requiring trunk rotation frequently, and may perform sweeping/mopping occasionally. [Ex. 17 at Thunderdome000398.] The medical records provided the following definitions: "Occasionally = up to 3 hrs/day, Frequently = up to 6 hrs/day, Constantly = up to 8 hours or greater per day." [*Id.* at Thunderdome000398.] In addition, Dr. Shields noted that Mr. Bennett should not perform tasks that exacerbate pain, and that he must be allowed to sit for parts of his shift to help alleviate pain.

[*Id.* at Thunderdome000398.] Dr. Shields did not indicate that Mr. Bennett needed time off work for his injury. [*See Id.* at Thunderdome000396-418.] Mr. Bennett returned to work the next day and began working with his work restrictions. [Ex. 2, Bennett Dep. 103:18-20; Ex. 18, Downs Dep. 10:16-25 (testifying that Bennett was accommodated with light duty of being able to sit on a stool and run the expo window); Ex. 6, Martin Dep. 15:1-6; *see also* Ex. 7, Tindell Decl. at ¶ 9.]

On August 26, 2019, Mr. Bennett had a follow-up appointment at Concentra with Dr. David Wells regarding his hernia. [Ex. 17 at Thunderdome000386-395.] Dr. Wells again released Mr. Bennett to work an entire shift with the same work restrictions as he had on August 23, 2019. [*Id.* at Thunderdome000388; Ex. 2, Bennett Dep. 104:8-105:7.] Dr. Wells scheduled a follow-up for one week unless Mr. Bennett was able to see the surgeon first. [Ex. 17 at Thunderdome000388.] Dr. Wells did not indicate that Mr. Bennett needed time off work for his injury. [*Id.* at Thunderdome000388.] Mr. Bennett then returned to work and provided Mr. Neely with the medical records showing his work restrictions. [Ex. 2, Bennett Dep. 107:5-19.] Mr. Bennett continued to follow his current work restrictions while at work. [*Id.* 107:20-24; Ex. 7, Tindell Decl. at ¶ 9.]

On August 27, 2019, Thunderdome filed a worker's compensation claim with CIC for Mr. Bennett's August 23, 2019 workplace injury. [Ex. 16 at Thunderdome000010-15; Ex. 3, Muchnicki Dep. 90:9-18; *see also* Ex. 5, Muchnicki Decl. at ¶ 5.] From there, Thunderdome followed its general process for Mr. Bennett's worker's compensation claim and CIC processed and handled the approval of any additional medical care and the payments of the medical claims. [Ex. 5, Muchnicki Decl. at ¶¶ 5-7; Ex. 3, Muchnicki Dep. 86:14-22, 87:15-88:1.] Thunderdome did not deny Mr. Bennett's worker's compensation claim or delay the process. [Ex. 5, Muchnicki

Decl. at ¶¶ 5, 7; *see also* Ex. 3, Muchnicki Dep. 90:9-18 (testifying that Thunderdome did not deny Mr. Bennett's worker's compensation claim or delay the process).]

On August 28, 2019, Mr. Bennett had a follow-up appointment at Concentra with Dr. Wells. [Ex. 17 at Thunderdome000376-385, 377.] During that appointment, Mr. Bennett reported that he had intolerable pain with his current work restrictions. [*Id.* at Thunderdome000377.] Dr. Wells discharged Mr. Bennett with the following work restrictions: work only 6 hours a day, may lift up to 5 pounds occasionally, should be sitting 75% of the time, no bending or twisting at waist, do not perform tasks that exacerbate pain, and must be allowed to sit for parts of his shift to help alleviate pain. [*Id.* at Thunderdome000378.] Again, Dr. Wells did not indicate that Mr. Bennett needed time off for his injury. [*Id.* at Thunderdome000378.] In addition, Dr. Wells scheduled a follow-up for September 3, 2019 unless Mr. Bennett could see the surgeon first. [*Id.* at Thunderdome000378.]

When Mr. Bennett returned to work on August 29, 2019, Thunderdome adjusted his schedule to work only six hours a day consistent with his work schedule. [Ex. 2, Bennett Dep. 129:18-130:2; Ex. 19, Bennett's Time Records; *see also* Ex. 7, Tindell Decl. at ¶ 9.] From August 29, 2019 through his medical release on September 10, 2019, Mr. Bennett recorded only one shift lasting more than six hours. [Ex. 19 (showing that on August 30, 2019, Mr. Bennett was paid for 6.64 hours).]

On September 3, 2019, Mr. Bennett had a follow-up appointment at Concentra with Dr. Willie Stewart. [Ex. 17 at Thunderdome000366-375.] Mr. Bennett reported that he was working light duty, but was still in severe pain. [*Id.* at Thunderdome000371.] Following his appointment, Mr. Stewart requested that an ultrasound inguinal be scheduled, and placed Mr. Bennett with the following restrictions: may work only 6 hours a day, may lift up to 5 pounds occasionally, should

be sitting 50% of the time, no bending or twisting at the waist, and must be allowed to sit for parts of his shift to help alleviate pain. [*Id.* at Thunderdome000368.] Dr. Stewart did not indicate that Mr. Bennett needed time off for his injury. [*See generally id.* at Thunderdome000366-375.] Again, Mr. Bennett returned to work and followed his restrictions, including working a maximum of 6 hours each shift. [Ex. 19; Ex. 7, Tindell Decl. at ¶ 9.]

On September 10, 2019, Mr. Bennett returned to Concentra to see Dr. Mark Kehres for a recheck. [Ex. 17 at Thunderdome000355-365.] Mr. Bennett reported that he was working with restrictions and Dr. Kehres notes that Mr. Bennett "is close to being able to do the physical requirements of his job, but not quite all the way yet." [*Id.* at Thunderdome000357.] Following this appointment, Dr. Kehres released Mr. Bennett to work an entire shift and removed the 6-hour restriction [*Id.* at Thunderdome000356 ("Work Duration: Patient may work their entire shift.").] In addition, Dr. Kehres provided that Mr. Bennett should work with the following restrictions: 5 pounds maximum lift, push, and pull, no bending at waist for more than ten times an hour, and vary position from sitting to standing/walking as needed. [*Id.* at Thunderdome000356.] Dr. Kehres did not indicate that Mr. Bennett needed time off work for his injury. [*Id.* at Thunderdome000356.] Mr. Bennett then returned to work for his entire shift and followed the new work restrictions. [*See generally* Ex. 7, Tindell Decl. at ¶ 9.]

On September 30, 2019, Mr. Bennett saw Dr. Larry Stevens for his general surgery consultation. [Ex. 20, IU Health Medical Records at Thunderdome000330-331.] After an assessment, Dr. Stevens ordered an ultrasound to assess for a possible hernia. [*Id.* at Thunderdome000330-331.] On October 8, 2019, Mr. Bennett had an ultrasound of his left and right groin. [Ex. 21, Methodist Medical Records at Thunderdome000244-250.] On October 14, 2019, Mr. Bennett saw Dr. Stevens for a follow-up to his ultrasound, and Dr. Stevens diagnosed

him with a hernia in his left groin. [Ex. 20 at Thunderdome000332-333.] Dr. Stevens recommended that Mr. Bennett have surgery to repair the hernia. [*Id.* at Thunderdome000332-333.] On November 4, 2019, Mr. Bennett underwent surgery to repair the hernia. [Ex. 21 at Thunderdome000205; Ex. 2, Bennett Dep. 199:4-13, 261:10-17.] Following this surgery, Mr. Bennett received no additional medical care for his hernia. [*See generally* Ex. 17; Ex. 20 at Thunderdome000258-263 (showing that Mr. Bennett did not see Dr. Charles Rogers between August 4, 2019 and November 5, 2021); Ex. 21.]

From August 23, 2019 through the end of his employment on October 26, 2019, Thunderdome accommodated Mr. Bennett's work restrictions by placing him on light duty work. [Ex. 7, Tindell Decl. at ¶ 9.] Other than taking approved time off to receive follow-up medical care for his workplace injury, Mr. Bennett never asked Thunderdome for time off of work because of his injury. [Ex. 2, Bennett Dep. 128:12-131:2, 279:22-24, 131:3-16; Ex. 4, Tindell Dep. 43:4-7, 80:25-81:10; Ex, 7, Tindell Decl. at ¶ 9.] In fact, Mr. Bennett did not want to take time off of work. [Ex. 2, Bennett Dep. 102:5-9 (testifying that he could not afford to take time off work).]

### C.     Mr. Bennett's Lawsuit.

On November 1, 2021, Mr. Bennett filed his lawsuit in Marion County Commercial Court in the State of Indiana. [Dkt. 1-2.] On December 13, 2021, Thunderdome removed the lawsuit to federal court. [Dkt. 1.] In his complaint, Mr. Bennett alleges that Thunderdome denied him FMLA benefits to which he was entitled and terminated him in retaliation for requesting FMLA leave. [Dkt. 1-2 at ¶ 10.] Mr. Bennett also alleges that Thunderdome terminated him in retaliation for filing a worker's compensation claim. [*Id.* at ¶ 11.]

III.    **LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

IV.    **ARGUMENT**

   A.    **Mr. Bennett's FMLA Claims Fail as a Matter of Law.**

Mr. Bennett alleges that Thunderdome interfered with his substantive rights under the FMLA by allegedly failing to offer and provide him with medical leave for his workplace injury. [Dkt. 1-2 at ¶ 10.] Mr. Bennett further contends that Thunderdome violated the FMLA by terminating him for allegedly requesting FMLA leave. [*Id.*]

The FMLA allows an eligible employee with a serious health condition that renders the employee unable to perform his position to take twelve workweeks of leave during each twelve-month period. *Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 992 (7th Cir. 2010) (quotations and citations omitted). An employer subject to the FMLA may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. 29 U.S.C. § 2615(a)(1). An employer also may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA. § 2615(a)(2). As explained below, Mr. Bennett's

17

FMLA interference and retaliation claims both fail as a matter of law and should be summarily dismissed.

> i. *Mr. Bennett cannot establish the essential elements of his FMLA interference claim.*

To prevail in an FMLA interference claim, Mr. Bennett must establish: "(1) []he was eligible for the FMLA's protections; (2) [his] employer was covered by the FMLA; (3) []he was entitled to take leave under the FMLA; (4) []he provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [his] FMLA benefits to which []he was entitled." *Goelzer*, 604 F.3d at 992. In cases where the employee alleges that the employer interfered with his substantive rights under the FMLA, the employee must prove that he forfeited a right or benefit to which he was entitled as a result of the employer's interference with his rights under the FMLA. *See, e.g.*, *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008) ("When an employee alleges a deprivation of the substantive guarantees of the FMLA, the employee must establish, by a preponderance of the evidence, an entitlement to the disputed leave.") (internal citations omitted). Plaintiff retains the ultimate burden of proof as to his entitlement to leave and as to each prong of his *prima facie* case. *Simpson v. Off. of the Chief Judge of the Cir. Ct. of Will Cnty., et al.*, 559 F.3d 706, 712 (7th Cir. 2009). Mr. Bennett cannot establish that Thunderdome denied him FMLA leave as he cannot satisfy the third, fourth, and fifth prongs of his *prima facie* burden.

> a. Mr. Bennett was not entitled to take leave under the FMLA because he cannot establish that he had a "serious health condition" during the relevant time.

First, Mr. Bennett cannot establish that he was entitled to FMLA leave because he did not suffer from a "serious health condition" that prevented him from fulfilling the functions of his job from August 23, 2019 through the end of his employment on October 26, 2019. 29 U.S.C. § 2612(a)(1)(D). The FMLA specifically defines an employee with a "serious health condition" as

someone who has an illness, injury, impairment or other condition that involves inpatient care or continuing treatment by a healthcare provider. 29 U.S.C. § 2611(11). In order to establish that his workplace injury involved "inpatient care" from August 23, 2019 through October 26, 2019, Mr. Bennett must prove that he had an "overnight stay in a hospital, hospice, or residential medical care facility… or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114. Mr. Bennett did not receive inpatient care in a hospital or other residential medical care facility during the relevant time from August 23, 2019 through October 26, 2019. [*See* Ex. 17, 20-21.] Consequently, Mr. Bennett must establish that he was receiving "continuing treatment by a health care provider." 29 U.S.C. § 2611(B).

### 1. Mr. Bennett cannot establish a period of incapacity lasting more than three consecutive days.

The applicable Department of Labor regulation defines "continuing treatment by a health care provider," in parts relevant to Mr. Bennett's groin injury, as:

> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.115(a).

To proceed during the incapacity definition, Mr. Bennett must submit evidence of a period of incapacity lasting more than three consecutive days to establish that he was receiving continuing treatment. *See Mason v. St. Vincent Hosp. and Health Care Ctr.*, No. 1:03-CV-LJM-VSS, 2004 WL 3242339, at *6 (S.D. Ind. Nov. 8, 2004) (noting that a plaintiff must establish a period of

incapacity under the FMLA statute and regulations defining a serious health condition). Mr. Bennett, however, has presented no evidence, including any medical records to establish that he had a period of incapacity between August 23, 2019 and October 26, 2019. Therefore, he has not established that he suffered from a serious health condition as defined by the regulations.

Instead, Mr. Bennett's claim of incapacity relies exclusively on his own deposition testimony that he was in pain and could not work. [*See generally* Ex. 2, Bennett Dep. 128:12-129:8.] A plaintiff's own statement, however, is insufficient to establish incapacity under the FMLA. *See Mason*, 2004 WL 3242339, at \*6; *Dowell v. Ind. Heart Physicians, Inc.*, No. 1:03-CV-01410-DFH-TAB, 2004 WL 3059788, at \*6 (S.D. Ind. Dec. 22, 2004); *see also Haefling v. United Percel Serv., Inc.*, 169 F.3d 494, 500 (7th Cir. 1999) ("Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging [his] condition to be so."). Instead, "[Mr. Bennett] must offer evidence from a treating health care provider that [his condition] qualified as a serious health condition." *Dowell*, 2004 WL 3059788, at \*6 (citing *Haefling*, 169 F.3d at 500 (plaintiff's "own self-serving assertions regarding the severity of his medical condition and the treatment it required are insufficient to raise an issue of fact on this point") (affirming summary judgment for employer)). Furthermore, his testimony is directly contradicted by his medical records which indicated he was not incapacitated, as well as his own admission in the medical records that he wanted to continue working. [Ex. 2, Bennett Dep. 102:5-9.]

Mr. Bennett's medical records do not support his assertion that he was incapacitated and unable to work. [*See* Ex. 17, 20-21.] Rather, from August 23, 2019 through October 26, 2019, Mr. Bennett sought medical treatment on nine occasions and was released to work with restrictions on each of those occasions. [*See supra* Section II.B.iii.; *see generally* Ex. 17, 20-21.] Defendant

followed those restrictions and Plaintiff continued to work. [*See supra* Section II.B.iii]. The only time that Plaintiff requested off work for was for his follow-up medical care, and Defendant accommodated those requests. [Ex. 7, Tindell Decl. at ¶ 9; Ex. 2, Bennett Dep. 128:12-131:2, 279:22-24, 131:3-16 (testifying that it was up to the medical providers to decide if he was able to perform his job with or without restrictions); Ex. 4, Tindell Dep. 43:4-7, 80:25-81:10.] Accordingly, since the undisputed evidence shows that Mr. Bennett's medical records from August 23, 2019 through October 26, 2019 never restricted him from working with restrictions, he has failed to establish that he had a "serious health condition" that entitled him to FMLA leave. *See Mason*, 2004 WL 3242339, at *6 (finding that the only evidence from her treating physician does not support her assertion that she was incapacitated and unable to work. Dr. Strate, in a note regarding Mason's September 9, 2002, appointment, wrote: 'Terry L. Mason was in our office today and is under treatment. She may return to work on 9/10/02.'"); *see also Matthys v. Wabash Nat.*, 799 F. Supp. 2d 891, 900 (N.D. Ind. 2011) (finding that plaintiff could not establish that she suffered from a serious health condition because, in relevant part, the "evidence demonstrate[d] that [plaintiff] was given work restrictions by three different medical providers but was, otherwise physically able to complete her work").

As a result, Thunderdome is entitled to summary judgment on Mr. Bennett's FMLA interference claim. *See Mason*, 2004 WL 3242339, at *6 (granting summary judgment for employer on an FMLA interference claim where plaintiff produced no evidence that any health care professional opined that plaintiff was unable to work due to her illness); *see also Levine v. Children's Museum of Indianapolis,* 2002 WL 180054, at *6 (S.D. Ind. July 1, 2002) (granting summary judgment for employer on FMLA case where employee offered only his own and his wife's statements that he was incapacitated, and offered no evidence from a health care provider

showing need to take time off from work), *aff'd mem.*, 61 F. App'x 298 (7th Cir. 2003); *Matthys*,

799 F. Supp. 2d at 900 (granting summary judgment for employer on FMLA interference claim

because plaintiff could not factually establish that she suffered from a serious health condition).

### 2. Mr. Bennett cannot establish that he had a chronic condition.

Mr. Bennett may also attempt to claim that he is entitled to FMLA leave because his groin

injury was a "chronic serious health condition." The FMLA regulations define a chronic serious

health condition as:

> Chronic conditions. Any period of incapacity or treatment for such incapacity due
> to a chronic serious health condition. A chronic serious health condition is one
> which:
> (1) Requires periodic visits (defined as at least twice a year) for treatment by a
> health care provider, or by a nurse under direct supervision of a health care
> provider;
> (2) Continues over an extended period of time (including recurring episodes of a
> single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma,
> diabetes, epilepsy, etc.).

29 C.F.R. § 825.115 (c).

Mr. Bennett's groin condition cannot meet the definition of a chronic condition because he

did not experience any period of incapacity, as explained above.  Additionally, Mr. Bennett's groin

condition cannot meet the definition of a chronic condition because it was a temporary condition

from which he fully recovered in a short period of time. The regulations do not define "an extended

period of time" and courts in the Seventh Circuit have not strictly defined any minimum duration

that meets the requirement. However, other courts that have addressed the question have noted that

"the language of the FMLA itself, its legislative history, and the regulations promulgated pursuant

to that statute all suggest that to constitute a 'chronic' illness, the condition must exist for well

more than a few weeks." *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 852 (W.D. Tenn. 2010)

(internal citations and quotations omitted) (two months from initial treatment to final doctor's appointment is insufficient).

Here, Mr. Bennett's groin injury lasted approximately two and a half months from August 23, 2019 through his surgery on November 4, 2019. [Ex. 21 at Thunderdome000205; Ex. 2, Bennett Dep. 199:4-13, 261:10-17.] In addition, there is no evidence that he continued receiving any medical treatment for his injury after November 4, 2019. [*See generally* Ex. 17; Ex. 20 at Thunderdome000258-263 (showing that Mr. Bennett did not see Dr. Charles Rogers between August 4, 2019 and November 5, 2021); Ex. 21.] Accordingly, Mr. Bennett's temporary groin injury, "from which [he] was completely recovered, simply fails to constitute a chronic condition", and thus, he cannot establish that he had a chronic condition under the FMLA. *Taylor*, 706 F. Supp. 2d at 852 (finding that plaintiff failed to establish a chronic serious health condition under the FMLA, explaining: "There is no evidence that suggests her back pain will likely cause her pain or disability, or require continuing treatment, in the future. (internal citations and quotations omitted)); *see, e.g.,* 29 C.F.R. § 825.115(c) (giving, as examples of chronic serious health conditions, asthma, diabetes, epilepsy, etc.).

        b.   Mr. Bennett did not provide sufficient notice of his intent to take FMLA leave.

Regarding the second prong of the *prima facie* test, Mr. Bennett also cannot establish that he provided sufficient notice of his need or intent to take FMLA leave. Although "[a]n employee need not expressly mention the FMLA in [his] leave request or otherwise invoke any of its provisions," the employee must provide the employer with sufficient information to determine whether FMLA leave may apply. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015) (internal quotations and citations omitted). At a minimum, the notice must succeed in alerting the employer to the seriousness of the health condition. *Stevenson v. Hyre Elec. Co.*,

505 F.3d 720, 725 (7th Cir. 2007). Notably, however, Mr. Bennett testified that he never requested time off because of his injury. [Ex. 2, Bennett Dep. 128:12-131:2 (testifying that, on August 28, 2019, he made a "general statement" to Mr. Tindell and Mr. Downs that he didn't know if he was able to do the job because he was in pain), 279:22-24 (testifying that he never requested FMLA leave from Thunderdome), 131:3-16 (testifying that it was up to the medical providers to decide if he was able to perform his job with or without restrictions).] Rather, the undisputed facts show that Mr. Bennett was aware that he had to fill out a request form if he needed time off and provide it to his manager. [Ex. 2, Bennett Dep. 131:3-16.] Despite this, Mr. Bennett never submitted a request for time off due to his injury. [Ex. 2, Bennett Dep. 128:12-131:2, 279:22-24, *see also* 131:3-16; Ex. 4, Tindell Dep. 43:4-7, 80:25-81:10; Ex, #, Tindell Decl. at ¶ 9.] In addition, Mr. Bennett's medical records from August 23, 2019 through October 26, 2019 show that he was able to work with restrictions and do not indicate that he ever needed time off work other than to seek medical attention. [*See supra* Section II.B.iii.; *see generally* Ex. 17, 20-21.] Indeed, Mr. Bennett testified that he did not request time off because he was medically injured because he left "that up to the doctors" to determine if time off was appropriate. [Ex. 2, Bennett Dep. 131:3-16.]

Accordingly, Mr. Bennett's interference claim fails as a matter of law because he did not provide Thunderdome with sufficient information to determine whether FMLA leave may apply. *See Matthys*, 799 F. Supp. 2d at 906 (finding that a release to work with restrictions from her medical providers was insufficient to establish notice of a request for FMLA leave due to the employee's serious health condition that makes her unable to perform her job).

c.  <u>Thunderdome did not deny Mr. Bennett FMLA benefits to which he was entitled</u>.

Mr. Bennett also cannot establish the last prong of his *prima facie* claim, which requires him to show that Thunderdome denied FMLA benefits to which he was entitled. First, Mr. Bennett

did not suffer from a "serious health condition" between August 23, 2019 and October 26, 2019 that would have entitled him to benefits under the FMLA. [*See supra* Section IV.A.i.a.] Second, because he never sufficiently informed Thunderdome of his need to take FMLA leave [*see supra* Section IV.A.i.b.], Thunderdome never actually denied him FMLA leave. Indeed, Mr. Bennett admitted during his deposition that he had never requested time off for his August 23, 2019 injury outside of his medical appointments. [Ex. 2, Bennett Dep. 128:12-131:2, 279:22-24, 131:3-16; *see also* Ex. 4, Tindell Dep. 43:4-7, 80:25-81:10; Ex, #, Tindell Decl. at ¶ 9.]

Accordingly, because Mr. Bennett cannot establish the essential elements of his FMLA interference claim, his claim cannot survive summary judgment.

### ii.     *Mr. Bennett cannot establish his FMLA retaliation claim.*

Mr. Bennett also alleges that Thunderdome retaliated against him for taking (or attempting to take) FMLA leave by terminating his employment. This claim also fails as a matter of law.

A plaintiff claiming FMLA retaliation may make his case under the same direct or indirect methods of proof that is utilized in Title VII cases. *Smith v. Hope Sch.,* 560 F.3d 694, 702 (7th Cir. 2009). To survive summary judgment under the direct method, Mr. Bennett must present evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) (citation omitted). Mr. Bennett's claim, however, is doomed from the start because, as explained in detail above, he cannot demonstrate that he suffered from a "serious health condition" between August 23, 2019 and October 26, 2019. [*See supra* Section IV.A.i.a.] Therefore, Mr. Bennett cannot establish that he engaged in protected activity. *Mason*, 2004 WL 3242339, at *7 ("Without evidence of incapacity, [plaintiff's] substantive FMLA claim fails as a matter of law because she cannot make a prima facie showing that he suffered from a "serious

health condition," and summary judgment must be granted in favor of [employer]. Because [plaintiff] was not entitled to FMLA leave, her FMLA retaliation claim adds nothing to her case, so summary judgment must also be granted on the retaliation theory."); *Matthys*, 799 F. Supp. 2d at 907 ("Because [plaintiff] can not demonstrate that she was entitled to FMLA leave, she can not be said to have engaged in protected activity; and, therefore, [plaintiff] can not demonstrate a sustainable claim of FMLA retaliation."). Because Mr. Bennett cannot establish that he engaged in protected activity, he cannot establish that there was a causal connection between any FMLA-qualifying protected activity and his termination.

However, even if Mr. Bennett could establish the first two elements of the *prima facie* test, which he cannot, he still cannot demonstrate a causal connection between his request for FMLA leave and his termination. To the contrary, the undisputable evidence shows that Mr. Bennett had performance issues throughout his employment and well before his August 23, 2019 injury (resulting in successive reassignment to all three of Thunderdome's local restaurants) and had already received extensive verbal counseling for those performance issues prior to his injury. [*See supra* Section II.B.i.] Mr. Bennett's performance, however, did not improve and he continued to have escalating performance issues resulting in the progressive disciplinary step of written warnings issued in October 2019 when he engaged in six material performance violations within a two week period. [*See supra* Section II.B.ii.] Specifically, on October 9, 2019, Mr. Bennett came in late for his shift and received a written warning. [Ex. 9; Ex. 6, Martin Dep. 24:16-25:10; Ex. 2, Bennett Dep. 182:8-184:13; *see also* Ex. 7, Tindell Decl. at ¶ 11.] On October 10, 2019, Mr. Martin issued Mr. Bennett a second written warning because he improperly completed the food order. [Ex. 10; Ex. 2, Bennett Dep. 188:4-18, 191:19-193:3; Ex. 6, Martin Dep. 25:11-26:5; *see also* Ex. 7, Tindell Decl. at ¶ 11.] Finally, on October 23, 2019, Mr. Bennett engaged in unacceptable

behavior of committing four separate violations despite previously being orally counseled on his performance. [Ex. 11, Ex. 12, Ex. 13, Ex. 14; *see also supra* Section II.B.ii.] Additionally, Mr. Tindell testified that he made the decision to terminate Mr. Bennett's employment based solely on his history of performance issues and failure to take accountability and make the appropriate changes. [Ex. 4, Tindell Dep. 65:11-66:13 (testifying that he had not made the decision to terminate Mr. Bennett prior to Mr. Bennett's behavior during the disciplinary meeting on October 26, 2019), 67:8-12 (testifying that Mr. Bennett's performance and inability to make the necessary changes was the only reason that he terminated him), 78:9-21 (testifying to same); *see also* Ex. 7, Tindell Decl. at ¶¶ 14-16; Ex. 6, Martin Dep. 31:20-32:10.] As he lacks the necessary evidence to proceed under the direct method of proof, Mr. Bennett must attempt to utilize the indirect method, which he likewise cannot fulfill. *See Langenbach*, 761 F.3d at 800 (holding that plaintiff did not establish an FMLA retaliation claim under the direct method of proof where she had a history of performance issues prior to her FMLA leave and her performance issues were consistent both before and after her leave.).

Mr. Bennett also cannot establish his retaliation claim under the indirect method of proof. The standard for a FMLA retaliation claim is exactly the same as the standard for a Title VII retaliation claim—specifically, Mr. Bennett must show that: (1) he engaged in a statutorily protected activity; (2) he met Thunderdome's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Simpson*, 559 F.3d at 718. In the event Mr. Bennett establishes a *prima facie* claim of retaliation, he must then show that Thunderdome's reason for terminating his employment was pretextual. *Id.* Mr. Bennett's retaliation claim fails under the indirect method for many of the same reasons his other claims fail.

First, as explained in detail above, Mr. Bennett did not engage in statutorily protected activity under the FMLA. [*See supra* Section IV.A.i.a.] Second, the undisputed evidence shows that he was not meeting Thunderdome's legitimate performance expectations. As explained in detail above, Mr. Bennett's performance issues began early in his employment and prior to his August 23, 2019 injury. [*See supra* Section II.B.i.; *see also* Ex. 7, Tindell Decl. at Tindell Decl. at ¶¶ 5-8.] Mr. Tindell and Mr. Martin orally counseled Mr. Bennett on how to speak to other employees, not walking off the expo line during peak times, and not smoking during peak times in violation of Thunderdome's smoking policy. [Ex. 4, Tindell Dep. 21:15-24, 36:14-24; Ex. 6, Martin Dep. 23:25-24:12; *see also* Ex. 7, Tindell Decl. at ¶¶ 5, 7.] Mr. Bennett, however, was not receptive to the constructive feedback and did not change his performance. [Ex. 4, Tindell Dep. 21:15-24, 36:14-24; Ex. 7, Tindell Decl. at ¶¶ 5-8.] Rather, in October 2019, Mr. Bennett engaged in six infractions that resulted in written warnings and, ultimately, his termination. [*See supra* Section II.B.ii.; *see also* Ex. 9, Ex. 10, Ex. 11, Ex. 12, Ex. 13, Ex. 14.] Accordingly, Mr. Bennett's FMLA retaliation claim fails as a matter of law because he cannot establish that he was meeting Thunderdome's legitimate performance expectations at the time of his termination. *See Langenbach*, 761 F.3d at 801 (granting summary judgment for employer where there was "voluminous evidence" that plaintiff was not meeting employer's expectations"—the notes from the 2010 PIP, her evaluations, and the deposition testimony of her co-workers").

Third, Mr. Bennett cannot establish that similarly situated employees who have not engaged in protected activity have been treated more favorably than him. [Ex. 2, Bennett Dep. 280:25-281:4 (testifying that he is not aware of any other Thunderdome employee taking FMLA leave during his tenure with Thunderdome).] Rather, Thunderdome routinely issues counseling

and disciplinary written warnings to its employees regarding performance issues regardless of any legally protected classes. [Ex. 7, Tindell Decl. at ¶ 3; *see also* Ex. 5, Muchnicki Decl. at ¶ 7.]

Even if Mr. Bennett could establish a *prima facie* case under the indirect method, which he cannot, Mr. Bennett has failed to provide any evidence that Thunderdome's reason for his termination—his repeated performance issues—was pretextual. *See Simpson*, 559 F.3d at 718. To establish pretext, Mr. Bennett must establish that Thunderdome's reason for terminating him was false. *See, e.g., id.* at 715-17. In an attempt to establish pretext, Mr. Bennett will likely cite to his own deposition testimony denying that he had received oral counselings regarding his performance, and alleging that his performance was satisfactory. Mr. Bennett's own self-serving testimony, however, is insufficient to satisfy his evidentiary burden for three reasons.

First, Mr. Bennett contradicts himself in his own deposition testimony. During his deposition, Mr. Bennett testified that he did not recall ever receiving oral counselings regarding his performance. [*See generally* Ex. 2, Bennett Dep. 61:3-9; 71:8-72:2.] But, he then admitted that Thunderdome management orally counseled him on violating the smoking policy. [Ex. 2, Bennett Dep. 60:3-10 (admitting that Thunderdome management did tell him that he was caught smoking during peak hours in violation of the smoking policy), 61:10-14 (testifying that if Thunderdome management testified that they orally counseled him on taking smoke breaks in violation of the smoking policy they would not be lying).]

Second, the Seventh Circuit has reiterated repeatedly that the way in which a plaintiff perceives himself is irrelevant; rather, it is the employer's perception that matters. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337-38 (7th Cir. 1991) (affirming summary judgment for employer on an age discrimination claim where plaintiff failed to establish pretext with plaintiff's own self-serving testimony, explaining: "The employee "must do more than challenge

29

the judgment of his superiors through his own self-interested assertions ... The employee's perception of himself ... is not relevant. It is the perception of the decision maker which is relevant." (internal quotation and citations removed); *see also Schultz v. General Elec. Cap. Corp.*, 37 F.3d 329, 334 (7th Cir. 1994) ("[A]n employee's 'own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.'") (citations omitted).

Third, courts in the Seventh Circuit have made clear that a plaintiff's self-serving assertions of the facts, without more, are insufficient as the sole basis of a retaliation claim. *See Watkins v. Henderson*, No. IP99-1945-C-B/S, 2001 WL 219807, at *20 (S.D. Ind. Mar. 5, 2001) (granting summary judgment for employer on an FMLA retaliation claim and Title VII claim, explaining that "[plaintiff's] self-serving assertions of fact are insufficient as the sole basis for his claim of retaliation under the FMLA in the same way they were insufficient as the sole basis for his discrimination, retaliation and harassment claims under Title VII"); *see also Qualls-Holston v. Ind. Univ.*, No. 1:19-cv-04068-TWP-MG, 2021 WL 4035050, at *11 (S.D. Ind. Sept. 3, 2021) (granting summary judgment for employer on a Title VII retaliation claim, explaining: "A review of [plaintiff's] summary judgment response and affidavit reveals that her retaliation claim is built upon a foundation of conclusory assertions, unsupported statements, speculation, and conjecture. … Although [plaintiff] disagrees with the [employer's] assessment of her work performance and denies that she was "error-prone," the admissible, designated evidence shows that [plaintiff] received negative employment performance feedback over a period of several years and that she was terminated because of a long history of work performance issues. She characterizes the [employer's] assessments of her work performance as "lies" and "false criticisms" without citation to supporting, admissible evidence.") (citing *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d

389, 398 (7th Cir. 1998) (plaintiff "attempts to raise issues of material fact based on his own perceptions of his performance. However, it is the perception of the decisionmaker, not the employee, that is relevant.")).

Contrary to Mr. Bennett's uncorroborated, self-serving assertions regarding his performance issues, the undisputed evidence shows that Mr. Bennett's performance issues began early in his employment and prior to his August 23, 2019 injury and that Thunderdome management had orally counseled him on those issues multiple times. [*See supra* Section II.B.i; *see also* Ex. 2, Bennett Dep. 60:3-10, 61:10-14.] Mr. Bennett, however, was not receptive to the constructive feedback and did not change his performance. [*See supra* Section II.B.i., II.B.ii.] Rather, in October 2019, Mr. Bennett made six performance infractions within two weeks that resulted in written warnings. [*See supra* Section II.B.ii.; IV.A.ii.] On October 26, 2019, Mr. Tindell met with Mr. Bennett and asked him to respond to his performance deficiencies on October 23, 2019. [*See supra* Section II.B.ii.; *see also* Ex. 7, Tindell Decl. at ¶¶ 14-16.] During the meeting, Mr. Bennett refused to take accountability for his performance, so Mr. Tindell made the decision to terminate his employment because of his history of performance issues and refusal to take accountability. [Ex. 4, Tindell Dep. 65:11-66:13, 67:8-12; *see also* Ex. 7, Tindell Decl. at ¶¶ 14-16; Ex. 6, Martin Dep. 31:20-32:10.]

Accordingly, because Mr. Bennett has failed to produce any evidence that Thunderdome did not terminate him for his repeated performance issues, Mr. Bennett's FMLA retaliation claim must fail as a matter of law and Thunderdome is entitled to summary judgment on that claim. *See Watkins*, 2001 WL 219807, at *20.

**B.      Mr. Bennett Was Not Terminated in Retaliation for Filing a Worker's Compensation Claim.**

Mr. Bennett claims that Thunderdome "fired [him] for seeking Workers' Compensation, which is a wrongful discharge in Indiana." [Dkt. 1-2 at ¶ 11.] In Indiana, a plaintiff may bring a claim (referred to as a "*Frampton* claim") against his employer if he is terminated in retaliation for exercising his statutorily conferred right to seek worker's compensation benefits. *Frampton v. Central Ind. Gas Co.*, 297 N.E.2d 425, 428 (Ind. 1973). "To survive a motion for summary judgment in a *Frampton* case, an employee must show more than a filing of a worker's compensation claim and the discharge itself." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002) (citation omitted). "The employee must present evidence that directly or indirectly implies the necessary inference of causation between the filing of a worker's compensation claim and the termination, such as proximity in time or evidence that the employer's asserted lawful reason for discharge is a pretext." *Id.*

Here, Mr. Bennett cannot make the required showing of a causal connection to defeat Thunderdome's motion for summary judgment on his *Frampton* claim.

> i.      *There is no proximity in time between Mr. Bennett's filing of a worker's compensation claim and his termination.*

Relevant authority dictates that the mere timing of an employee's termination in relation to the filing of his worker's compensation claim, standing alone, does not suffice to create a causal connection between the two events and is not enough to preclude summary disposition in the employer's favor on a retaliatory discharge claim. *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 787 (7th Cir. 2005); *see also Smeigh v. Johns Manville, Inc.*, 1:09–cv–0414–TWP–DML, 2010 WL 3781492, at *6 (S.D. Ind. Sept. 22, 2010). Rather, critical intervening events between the two acts must be considered. *Smeigh*, 2010 WL 3781492, at *6.

In the instant matter, the two month temporal proximity between Mr. Bennett's August 23, 2019 workplace injury and his termination on October 26, 2019, by itself, is insufficient to establish the requisite causal connection for purposes of summary judgment. *See id.*, at *6 (granting summary judgment for employer on *Frampton* claim, determining that a four day period between plaintiff's injury was insufficient in and of itself to establish the requisite causal connection where intervening events lead to his termination); *see also Crye v. Caterpillar, Inc.*, 2008 U.S. Dist. LEXIS 98073, at *22 (N.D. Ind. Dec. 3, 2008) (granting summary judgment in employer's favor when the worker's compensation claim and the plaintiff's termination occurred within the same month). In addition, critical events exist between Mr. Bennett's August 23, 2019 workplace injury and his termination on October 26, 2019, namely, the six performance infractions in two weeks that required progressive discipline and resulted in written warnings. [*See supra* Section II.B.ii.] These six incidents were in addition to the numerous instances of verbal counselings for performance issues and three work location transfers that took place prior to Mr. Bennett's August 23, 2019 injury. [*See supra* Section II.B.i.] Finally, on October 26, 2019, when Mr. Tindell met with Mr. Bennett to discuss his performance issues, Mr. Bennett took no responsibility for his actions and it became clear that Mr. Bennett's performance was not going to improve. [Ex. 4, Tindell Dep. 65:11-66:13, 67:8-12; *see also* Ex. 7, Tindell Decl. at ¶¶ 14-16; Ex. 6, Martin Dep. 31:20-32:10.] As a result, Mr. Tindell terminated Mr. Bennett's employment solely due to his performance issues and his failure to take accountability and commit to making the necessary changes. [Ex. 4, Tindell Dep. 65:11-66:13, 67:8-12; *see also* Ex. 7, Tindell Decl. at ¶¶ 14-16; Ex. 6, Martin Dep. 31:20-32:10.] As such, Mr. Bennett cannot prevail on his claim of retaliatory discharge by simply pointing to the temporal proximity of his discharge to the filing of a worker's compensation claim. *See Smeigh*, 2010 WL 3781492, at *6; *see also Matthys*, 799 F.

33

Supp. 2d at 900 (finding that the intervening event of plaintiff's poor attendance undercut plaintiff's worker's compensation retaliation claim).

ii.    *Thunderdome's reason for termination was not a pretext.*

As explained above, there is no evidence that Thunderdome's reason for terminating Mr. Bennett's employment was a pretext. [*See supra* Section IV.A.ii.] In addition, it is undisputed that Mr. Neely filled out a workplace injury report for Mr. Bennett on the day of his injury. [Ex. 16 at Thunderdome000008-9.] It is also undisputed that Thunderdome filed a worker's compensation claim with CIC on August 27, 2019 and that CIC handled the claim from there. [Ex. 16 at Thunderdome000010-15; Ex. 3, Muchnicki Dep. 90:9-18; *see also* Ex. 5, Muchnicki Decl. at ¶ 5.] Finally, it is undisputed that Thunderdome accommodated Mr. Bennett's workplace restrictions following his injury by providing him with light duty work. [Ex. 2, Bennett Dep. 107:20-24; Ex. 7, Tindell Decl. at ¶ 9; Ex. 18, Downs Dep. 10:16-25; Ex. 6, Martin Dep. 15:1-6.] These facts "tend[] to support the more reasonable inference that [Thunderdome] views Workers Compensation claims as a cost of doing business and not as an occasion for termination." *See Mullins v. Lobdell Emery, Inc.*, NA 01-3-C B/S, 2002 WL 459040, at *5 (S.D. Ind. Mar. 21, 2002); *see also, e.g.*, *Grubb v. Cook Med. Tech. LLC*, No. 1:17-cv-01086-JMS-MJD, 2018 WL 2416407, at *8 (S.D. Ind. May 29, 2018) (holding that plaintiff "put forward no evidence connecting her discharge to the filing of her worker's compensation claim" where her employer instructed her to file her worker's compensation claim and restricted her work activities in accordance with her medical needs).

Accordingly, Thunderdome's decision to terminate Mr. Bennett had nothing to do with his filing of a worker's compensation claim, but rather was based upon legitimate and nondiscriminatory reasons. As a result, Mr. Bennett's *Frampton* claim fails as a matter of law.

V.   **CONCLUSION**

For the foregoing reasons, Mr. Bennett's claims fail as a matter of law, and the Court should enter summary judgment in favor of Thunderdome on all of his claims.

Respectfully submitted,

*Erica M. Knear*
Erica M. Knear, Atty. No. 35028-53
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
(317) 713-3500 – telephone
(317) 713-3699 – fax
eknear@taftlaw.com

Sarah Clay Leyshock, OH Atty. No. 0081695
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
(513) 381-2838 – telephone
(513) 381-0205 – fax
sleyshock@taftlaw.com
*Admitted Pro Hac Vice*

*Counsel for Defendant*